

IN THE UNITED STATES DISTRICT COURT
FOR THE SOUTHERN DISTRICT OF TEXAS
BROWNSVILLE DIVISION

U.S. DISTRICT COURT
SOUTHERN DISTRICT of Texas
RECEIVED

2004 JUL - 1  AM 9: 01

MICHAEL N. MILBY. CLERK

| | | | |
|---|---|---|---|
| ZAPOTECA ENERGY, INC., | § | | **United States District Court**<br>**Southern District of Texas**<br>**FILED** |
| Applicant | § | | |
| | § | | JUL 0 6 2004 |
| VS. | § | CAUSE NO.: B-04-048 | |
| | § | (Diversity) | **Michael N. Milby**<br>**Clerk of Court** |
| CHARLES DOUGLAS PHILLIPS, | § | | |
| Respondent | § | | |

## ZAPOTECA ENERGY INC'S ORIGINAL COMPLAINT

TO THE HONORABLE JUDGES OF SAID COURT:

COMES NOW Plaintiff, Zapoteca Energy Inc (hereinafter "Zapoteca"), and files this its Original Complaint complaining of Defendant, Charles Douglas Phillips (hereinafter "Phillips"), and for cause would respectfully show unto this honorable Court as follows:

### PARTIES

1.    Zapoteca is a Liberian Corporation organized and existing pursuant to the Liberian Corporation Act, with a registered place of business of 80 Broad Street, Monrovia. Liberia.

2.    Phillips is an individual who resides in Houston, Texas. Phillips has been served with process, has appeared herein, and has filed a counterclaim against Zapoteca. Phillips may be served with Zapoteca's Original Complaint by serving his lead counsel of record, Mr. Charles F. Herd, Jr., The Lanier Law Firm, Post Office Box 691448, Houston, Texas 77269-1448.

### VENUE

3.    Venue has been established in this District.

1

## JURISDICTION

4.    Jurisdiction vests in this Court, as there is complete diversity among the parties.

## FACTS

5.    The Rig ZAPOTECA was built in 1981 for Protexa.

6.    The Rig ZAPOTECA was built as a Friede & Goldman L-780 Independent Jackup drilling rig.

7.    In October 1987 the Rig ZAPOTECA was drilling the YUM-2 well for Pemex in the Bay of Campeche when the well blew out and caught fire.

8.    The fire raged for more than one month, causing extensive damage to the Rig ZAPOTECA, including damage to Rig's hull and legs, the rig package and substructure, crews quarters, control room, helideck, and the jacking motors and controls.

9.    After this blow out and fire, Protexa replaced and/or repaired the Rig ZAPOTECA's jacking motors and controls and moved the Rig away from the YUM-2 well drill site.

10.    After this blow out and fire, The Rig ZAPOTECA was incapable of being utilized for her intended use.

11.    Protexa declared the Rig ZAPOTECA a constructive total loss, tendered the Rig to the insurance underwriters and later worked out an arranged total loss with underwriters.

12.    Protexa left the Rig ZAPOTECA in the Gulf of Campeche until 1989.

13.    Protexa completely removed the Rig ZAPOTECA from navigation and commerce and had no plans to reintroduce the Rig back into navigation and commerce.

14. In 1989, because the Rig ZAPOTECA was a hazard to navigation, Protexa moved the Rig to its yard in Tuxpan, Mexico, where the Rig remained continually and indefinitely removed from navigation and commerce.

15. In the Spring of 2000, Zapoteca purchased the Rig ZAPOTECA with the intent to fully refurbish, refit, modify and convert the Rig to the status of a hull with legs and enter the market either for the outright sale of the Rig, or to convert the Rig to an accommodation platform, or to reconstruct the Rig for offshore drilling (hereinafter "the project").

16. Zapoteca renamed the Rig ENERGY ZAPOTECA.

17. Zapoteca reflagged the Rig ENERGY ZAPOTECA to Panama.

18. Zapoteca hired Southern International, Inc. (hereinafter "Southern") to manage the project in Tuxpan, Mexico.

19. Southern appointed Canega to act as the agent for the Rig ENERGY ZAPOTECA.

20. Phillips worked on the project for and was paid by Southern.

21. In late 2000, it became apparent to Zapoteca that Southern would be unable to complete the project on time and within budget.

22. Accordingly, Zapoteca entered into negotiations with Phillips to assume the management of the project in Tuxpan, Mexico.

23. In December 2000, Zapoteca hired Phillips to manage the project.

24. Zapoteca agreed to pay Phillips $400.00 per day, plus housing rental that amounted to 15,000.00 Mexican pesos per month, which payment was to be made every 15 days in arrears.

25.    During the course of three years Phillips was in charge and in control of all aspects of the project.

26.    To manage the project legally in Mexico, Zapoteca provided Phillips certain powers under a Power of Attorney Protocol No. 33/2001, and later further provided Phillips additional powers under a Power of Attorney dated 17 April 2002.

27.    Phillips' managerial responsibilities included, among other responsibilities, appointing agents, renting office space, negotiating and entering into contracts for supplies and materials, documenting and accounting for all project expenses, supervising all work on the project, running Zapoteca's Tuxpan, Mexico business office, and handling all legal disputes that might arise out of the project.

28.    After Phillips was hired to manage the project, Phillips became embroiled in a legal dispute with Canega, involving, among other matters, an alleged misuse of Zapoteca funds.

29.    Accordingly, in May of 2001, Phillips appointed Meritus de Mexico S.A. de C.V (hereinafter "Meritus"), through its local representative office in Tuxpan, Mexico to act as agent for the Rig ENERGY ZAPOTECA.

30.    To pay for the expenses of the project, Phillips would prepare and submit to Zapoteca pro forma disbursement requests for funding.

31.    Zapoteca would forward to Meritus funding for these expenses in accordance with the pro forma disbursement requests prepared by Phillips.

32.    Meritus would in turn review Phillips's documentation and accounting for all project expenses for which Phillips had submitted a pro forma disbursement request.

33.    Meritus would then pay the project expenses, or pay most of the most of the project expenses and provide Phillips funds to pay for the remainder of the project expenses.

34.    Upon instructions from Phillips, Meritus relinquished to Phillips the responsibility and control of documenting, accounting and paying all project expenses in accordance with the pro forma disbursement requests prepared by Phillips.

35.    After Phillips assumed this responsibility from Meritus, Zapoteca would forward to Meritus the funding for the project expenses in accordance with the pro forma disbursement requests prepared by Phillips.

36.    Meritus would in turn provide Phillips funds to pay for all of the project expenses in accordance with the pro forma disbursement requests prepared by Phillips.

37.    In early 2003, the Rig ENERGY ZAPOTECA had been refurbished, refitted, modified and/or converted to the status of a hull with legs.

38.    At this time, Nabors Drilling International Limited (hereinafter "Nabors") expressed an interest in purchasing the Rig ENERGY ZAPOTECA in her present condition.

39.    On 8 March 2003, Zapoteca entered into an agreement to sell the Rig ENERGY ZAPOTECA to Nabors.

40.    On 9 May 2003, Zapoteca and Nabors amended this agreement

41.    Under the terms of this agreement and the amendment thereto, delivery of the Rig ENERGY ZAPOTECA by Zapoteca to Nabors was to take place once the Rig entered international waters after being towed from Tuxpan, Mexico.

42.    Under the terms of this agreement, Nabors was to provide a "rider crew" to be used in towing the Rig ENERGY ZAPOTECA.

43.    In April 2003, Nabors hired Phillips and other Zapoteca employees who had worked on the Rig ENERGY ZAPOTECA as the "rider crew" to be used in towing the Rig ENERGY ZAPOTECA.

44.    As a part of the "rider crew" agreement between Nabors and Phillips and the other Zapoteca employees, Phillips agreed that Zapoteca would also responsible for payment of services rendered by the "riding crew" hired by Nabors.

45.    Phillips took this action without the knowledge (until recently) or consent of Zapoteca and in direct contravention to Zapoteca's instruction to Phillips that Zapoteca was in no way to be involved as a part of the "rider crew" agreement.

46.    Nabors stopped paying Phillips and the other members of the "rider crew" after one week.

47.    Phillips, and the other members of the "rider crew" at the direction of Phillips, filed a lawsuit in the Labor Court in Tuxpan, Mexico against the Rig ENERGY ZAPOTECA and Nabors for non-payment of services rendered as the "rider crew" hired by Nabors.

48.    Phillips, and the other members of the "rider crew" at the direction of Phillips, effected the arrest of the Rig ENERGY ZAPOTECA.

49.    The Labor Court in Tuxpan, Mexico entered a judgment against Nabors.

50.    Nabors failed to pay this judgment.

6

51. Because Nabors failed to pay the judgment, Zapoteca was forced settle this lawsuit with Phillips and the other members of the "rider crew" in order to lift the arrest of the Rig ENERGY ZAPOTECA and, thus, be able to deliver the Rig to Nabors.

52. Settlement of this judgment against Nabors cost Zapoteca $100,000.00, $35,000.00 of which was paid to Phillips, together with unnecessary attorneys' fees and costs.

53. Previously, Phillips had refused to pay Protexa dockage incurred for docking of the Rig ENERGY ZAPOTECA at Protexa's dock.

54. As Zapoteca was preparing to deliver the Rig ENERGY ZAPOTECA to Nabors, Protexa presented a bill for dockage to Zapoteca.

55. Phillips advised Zapoteca that there was no obligation to pay Protexa for the dockage.

56. Based upon Phillips' advice there was no obligation to pay Protexa for the dockage, Zapoteca and Protexa became entangled in legal proceedings.

57. At a hearing related to these legal proceedings, Phillips provided false testimony before the Court in Tuxpan, Mexico.

58. At no time did Zapoteca instruct Phillips to provide this false testimony.

59. Protexa brought criminal charges against Phillips for providing this false testimony.

60. After a thorough review of the legal dispute with Protexa, Zapoteca determined that, contrary to Phillips' advise, dockage incurred for docking of the Rig ENERGY ZAPOTECA at Protexa's dock was due and owing Protexa.

61.    Accordingly, Zapoteca entered into a settlement agreement with Protexa regarding the disputed dockage.

62.    This settlement by Zapoteca with Protexa cost Zapoteca $115,000.00 plus unnecessary attorneys' fees and costs in the amount of $50,000.00.

63.    A part of Zapoteca's settlement agreement with Protexa regarding the disputed dockage obligated Protexa to drop the criminal charges it had levied against Phillips.

64.    Protexa honored this obligation and dropped the criminal charges it had levied against Phillips.

65.    However, Phillips advised Zapoteca that the criminal prosecutor had refused to close the file on these criminal charges and that Phillips was still subject to arrest in Mexico.

66.    Accordingly, to avoid arrest arising from unclosed file on these criminal charges, Phillips moved to Port Isabelle, Texas where he remained employed by Zapoteca and continued to manage the project in Tuxpan, Mexico as before.

67.    Upon Phillips' move to Port Isabelle, Texas, Zapoteca agreed to pay Phillips $12,000.00 per month, $75.00 per diem, $2,250.00 per month housing allowance and $500.00 per month auto allowance, which payment was to be made every two weeks in arrears.

68.    Thereafter, previous Zapoteca employees improperly terminated by Phillips without proper compensation filed lawsuits in the Labor Court in Tuxpan, Mexico against Zapoteca and the Rig ENERGY ZAPOTECA.

69.    These Labor Court lawsuits are know as:

    a.    the "Electricians lawsuit";

b.    the "Security Guards lawsuit"; and

c.    the "McDermott, Vega, Monroy lawsuit."

70.    These lawsuits resulted in three different arrests of the Rig ENERGY ZAPOTECA.

71.    Zapoteca began the defense these previous employees' lawsuits on the advice of Phillips that these employees' lawsuits were without merit.

72.    Phillips directed the defense of these Labor Court lawsuits.

73.    Zapoteca was forced to post three separate bonds, in the amounts of $60,000.00, $95,000.00 and $325,000.00 respectively, in these lawsuits in order to lift the three arrests of the Rig ENERGY ZAPOTECA.

74.    The total cost of these bonds to Zapoteca was in excess of $50,000.00.

75.    Additional lawsuits were filed in the Civil Court in Tuxpan, Mexico against Zapoteca because of Phillips' failure to pay for materials and services supplied to Zapoteca and the Rig ENERGY ZAPOTECA by various vendors and service providers.

76.    These Civil Court lawsuits are known as:

a.    the "Landlord lawsuit";

b.    the "ASAC lawsuit"; and the

c.    "International Paint lawsuit."

77.    The "Landlord lawsuit" and the "ASAC lawsuit" resulted in two different embargoes being placed on the Rig ENERGY ZAPOTECA with the Captain of the Port of Tuxpan, Mexico.

78.    Zapoteca began the defense of these lawsuits on the advice of Phillips that the various vendors and suppliers lawsuits were without merit.

79.    Phillips directed the defense of these Civil Court lawsuits.

80.    Under the direction of Phillips, Zapoteca lost the "Landlord lawsuit."

81.    Phillips failed to advise Zapoteca it had lost the "Landlord lawsuit" lawsuit.

82.    In the Fall of 2003, Zapoteca realized that it was absolutely necessary to move the Rig ENERGY ZAPOTECA out of Tuxpan, Mexico in order to be able to complete the project.

83.    Zapoteca advised Phillips of the absolutely necessary to move the Rig ENERGY ZAPOTECA out of Tuxpan, Mexico in order to be able to complete the project.

84.    Accordingly, Zapoteca began a concentrated effort to move the Rig ENERGY ZAPOTECA from Tuxpan, Mexico to Texas.

85.    Phillips directed the concentrated effort to move the Rig ENERGY ZAPOTECA from Tuxpan, Mexico to Texas.

86.    Part of the concentrated effort to move the Rig ENERGY ZAPOTECA from Tuxpan, Mexico to Texas included the continued defense of all outstanding Labor Court and Civil Court lawsuits against Zapoteca and the Rig ENERGY ZAPOTECA; i.e.:

    a.    the "Electricians lawsuit";

    d.    the "Security Guard lawsuit";

    e.    the "McDermott, Vega, Monroy lawsuit";

    f.    the "ASAC lawsuit"; and

    g.    the "International Paint lawsuit."

87.    Phillips directed the continued defense of these Labor Court and Civil Court lawsuits.

88     As part of the continued defense of these lawsuits, Phillips demanded Zapoteca legally "denounce" Messrs. McDermott, Vega and Monroy, the plaintiffs in the "McDermott, Vega, Monroy lawsuit," and the principles of ASAC and International Paint.

89.    According to Phillips, the purpose of "denouncing" Messrs. McDermott, Vega and Monroy and the principles of ASAC and International Paint was to effect criminal charges being levied against these individuals and principals resulting in their continued incarceration in jail pending trial on the criminal charges, similar to what happened to Phillips in the legal proceeding between Zapoteca and Protexa.

90.    Zapoteca began preparations to "denounce" Messrs. McDermott, Vega and Monroy and the principals of ASAC and International Paint.

91.    Another part of the effort to move the Rig ENERGY ZAPOTECA from Tuxpan, Mexico to Texas included the preparation of the Rig ENERGY ZAPOTECA for the move from Tuxpan, Mexico to Texas.

92.    Preparations to move the Rig ENERGY ZAPOTECA from Tuxpan, Mexico to Texas included the procurement of appropriate towage and insurance, readying the Rig to be towed, arranging surveys, and bringing the condition of Rig into compliance with the surveyors' requirements.

93.    Zapoteca began the process of arranging vessels to tow the Rig ENERGY ZAPOTEA from Tuxpan, Mexico to Texas and the process of acquiring appropriate insurance as well as finding appropriate stacking places in Texas for the Rig.

94. As part of the process of acquiring appropriate insurance, the insurance underwriters required surveyors' approval of the condition of the Rig ENERGY ZAPOTECA to be towed from Tuxpan, Mexico to Texas.

95. In accordance with the insurance underwriters' requirement of surveyors' approval of the condition of the Rig ENERGY ZAPOTECA to be towed from Tuxpan, Mexico to Texas, the insurance underwriters requested Zapoteca to send surveyors appointed by the insurance underwriters to Tuxpan, Mexico.

96. Phillips was responsible for readying the Rig to be towed, arranging surveys with the surveyors appointed by the insurance underwriters that Zapoteca sent to Tuxpan, Mexico, and bringing the condition of Rig into compliance with the surveyors' requirements.

97. Zapoteca instructed Phillips to begin readying the Rig ENERGY ZAPOTECA for an "unmanned " tow from Tuxpan, Mexico to Texas.

98. Contrary to Zapoteca's instructions to Phillips to begin preparations for an "unmanned" tow of the Rig ENERGY ZAPOTECA from Tuxpan, Mexico to Texas, Phillips instructed the surveyors appointed by the insurance underwriters that Zapoteca desired a "manned" tow of the Rig.

99. At the same time, Phillips instructed Zapoteca the surveyors appointed by the insurance underwriters demanded a "manned" tow for the Rig ENERGY ZAPOTECA.

100. Accordingly, both Zapoteca and the surveyors that were appointed by the insurance underwriters concentrated their efforts on readying the Rig ENERGY ZAPOTECA for a "manned" tow of from Tuxpan, Mexico to Texas.

12

101.    Because Phillips wanted to use Zapoteca employees to man the tow of the Rig ENERGY ZAPOTECA from Tuxpan, Mexico to Texas made it became necessary to obtain visas for the Zapoteca employees who would man the Rig when towed.

102.    Phillips directed the efforts to obtain these visas.

103.    In early January 2004, it became apparent to Zapoteca that the efforts directed by Phillips in defending the Labor Court and Civil Court lawsuits against Zapoteca and the ENERGY ZAPOTECA and the concentrated efforts directed by Phillips in moving the Rig ENERGY ZAPOTECA from Tuxpan, Mexico to Texas were failing.

104.    Accordingly, Zapoteca retained the services of Per Johansen (hereinafter "Johansen") and Erik Ostbye (hereinafter "Ostbye) to take assist in moving the Rig ENERGY ZAPOTECA from Tuxpan, Mexico to Texas.

105.    A part of Johansen's and Ostbye's assistance in moving the Rig ENERGY ZAPOTECA from Tuxpan, Mexico to Texas included a thorough review of the status of all Labor Court and Civil Court lawsuits against Zapoteca and the ENERGY ZAPOTECA.

106.    Johansen's and Ostbye's first action was to conduct meetings in Houston, Texas to determine the status of all affairs related to the Rig ENERGY ZAPOTECA.

107.    Phillips attended these meetings.

108.    During these meetings, Johansen and Ostbye developed a suspicion that Phillips was not being forthcoming regarding the matters related to the Rig ENERGY ZAPOTECA.

109.    Among other things, and by way of example only, Johansen's and Ostbye's suspicion that Phillips was not being forthcoming regarding the matters related to the Rig

ENERGY ZAPOTECA was developed when Phillips held out documents he declared would ruin Zapoteca chances of winning the "McDermott, Vega, Monroy lawsuit" if Zapoteca produced these documents to Messrs. McDermott, Vega and Monroy while, at the same time, refusing Johansen's and Ostbye's request to review the documents.

110.    After these meetings, Johansen and Ostbye traveled to Mexico to move the Rig ENERGY ZAPOTECA from Tuxpan, Mexico to Texas.

111.    Johansen and Ostbye began a thorough investigation of all Labor Court and Civil Court lawsuits filed against Zapoteca and the Rig ENERGY ZAPOTECA; i.e.:

      a.    the "Landlord lawsuit";

      b.    the "ASAC lawsuit";

      c.    the "International Paint lawsuit";

      d.    the "Electricians lawsuit";

      e.    the "Security Guard Lawsuit"; and

      f.    the "McDermott, Vega, Monroy lawsuit."

112.    Johansen and Ostbye discovered that Phillips had failed to advise Zapoteca it had lost the "Landlord lawsuit" and that the judgment was unpaid.

113.    Accordingly, Zapoteca paid the judgment in the "Landlord lawsuit."

114.    The judgment and costs of the defense of this lawsuit was greater than the amount that Phillips had refused to pay the Landlord.

115.    After a thorough investigation of the "ASAC lawsuit" and the "International Paint lawsuit," Johansen and Ostbye determined that, contrary to the advice of Phillips, the lawsuits were mostly meritorious, and Zapoteca owed money to ASAC and International Paint.

116.   Accordingly, Zapoteca settled the "ASAC lawsuit" and the "International Paint lawsuit."

117.   The settlement and costs of the defense of these lawsuits was greater than the amount that Phillips had refused to pay ASAC and International Paint.

118.   After a thorough investigation of the "Electricians lawsuit," the "Security Guards" lawsuit" and the "McDermott, Vega, Monroy lawsuit," Johansen and Ostbye determined that, while some of the merits of these lawsuits were questionable, the potential damages arising from these lawsuits, in particular the "McDermott, Vega, Monroy lawsuit," coupled with the probability of not being able to move the Rig ENERGY ZAPOTECA out of Mexico if Zapoteca continued to defend these lawsuits, made it necessary for Zapoteca to look into the possibility of settling these lawsuits on a commercial basis.

119.   Johansen and Ostbye looked into the possibility of settling these lawsuits on a commercial basis.

120.   Johansen and Ostbye were able to come to mutually agreeable terms with Messrs. McDermott, Vega and Monroy.

121.   Accordingly, Zapoteca settled the "McDermott, Vega, Monroy lawsuit."

122.   The settlement amount and costs of the defense of the "McDermott, Vega, Monroy lawsuit" was greater than the amount that Phillips had refused to pay Messrs. McDermott, Vega and Monroy.

123.   The   "Electricians lawsuit" and the "Security Guards" lawsuit" remain open and on appeal.

124. The cost of the defense of the "Electricians lawsuit" and the "Security Guards" lawsuit" incurred to date by Zapoteca is far greater than the amount that Phillips had refused to pay the Electrician and Security Guard.

125. Johansen's and Ostbye's thorough investigation of all of the Labor Court and Civil Court lawsuits against Zapoteca and the Rig ENERGY ZAPOTECA indicated the majority of these legal problems were created out of some form of personal animosity Phillips held against the Zapoteca employees and vendors and suppliers who had filed the lawsuits.

126. Johansen and Ostbye's thorough investigation of all of the Labor Court and Civil Court lawsuits against Zapoteca and the Rig ENERGY ZAPOTECA indicated Phillips had provided Zapoteca false advice as to the merits of these lawsuits to further Phillips personal animosity against the ex Zapoteca employees and vendors and suppliers who had filed the lawsuits.

127. As Johansen and Ostbye were dealing with the aforementioned lawsuits, Johansen and Ostbye also began preparations to move the Rig ENERGY ZAPOTECA from Tuxpan, Mexico to Texas.

128. Part of these preparations to move the Rig ENERGY ZAPOTECA from Tuxpan, Mexico to Texas included meeting with surveyors appointed by the insurance underwriters.

129. In meeting with surveyors appointed by the insurance underwriters, Johansen and Ostbye learned that the surveyors had recommended to Phillips an "unmanned" tow for the Rig ENERGY ZAPOTECA FROM Tuxpan, Mexico to Texas.

130.    In meeting with surveyors appointed by the insurance underwriters, Johansen and Ostbye also learned that Phillips had advised the surveyors Zapoteca demanded a "manned" tow.

131.    In essence, Johansen and Ostbye learned that Phillips had disregarded Zapoteca's instructions to Phillips to begin preparations for an "unmanned" tow of the Rig ENERGY ZAPOTECA from Tuxpan, Mexico to Texas.

132.    Accordingly, it became necessary for Zapoteca and the surveyors appointed by the insurance underwriters to begin preparations of the Rig ENERGY ZAPOTECA for an "unmanned" tow from Tuxpan, Mexico to Texas, which included discarding much of the work previous performed in preparing the Rig for a "manned" tow from Tuxpan, Mexico to Texas.

133.    The necessity of reworking the preparations of the Rig ENERGY ZAPOTECA for an "unmanned" tow from Tuxpan, Mexico to Texas created by Phillips' disregard of Zapoteca's instructions cost Zapoteca both time and additional surveyors' fees and expenses.

134.    Once Johansen and Ostbye arrived in Mexico, Phillips became wholly uncooperative in assisting Zapoteca, Johansen and Ostbye in the preparations to move the Rig ENERGY ZAPOTECA from Tuxpan, Mexico to Texas.

135.    In fact, Phillips refused to follow direct orders from Zapoteca.

136.    At this same time, Phillips began demanding payment of a bonus in the amount of $165,000.00 that was not yet due and owing Phillips.

137.    Phillips continued his lack of cooperation and failure to follow direct orders from Zapoteca and continued his demands for payment of a bonus in the amount of $165,000.00 that was not yet due and owing Phillips over the next several months.

138.    Phillips' previously mentioned and the following acts of lack of cooperation and Phillips' previously mentioned and the following failures to follow direct orders from Zapoteca was an attempt by Phillips to delay or prevent Zapoteca from moving the Rig ENERGY ZAPOTECA from Tuxpan, Mexico to Texas and to extort payment from Zapoteca of a bonus that had not yet become due and owing.

139.    Despite repeated requests, Phillips refused to provide Zapoteca payroll and other documents necessary to the defense of the various lawsuits against Zapoteca and the Rig ENERGY ZAPOTECA, and to the daily operations of preparing the Rig for the move from Tuxpan, Mexico to Texas.

140.    Phillips failed and refused to timely provide Zapoteca a stability plan necessary for moving the Rig ENERGY ZAPOTECA as requested by the surveyors appointed by insurance underwriters.

141.    Once Phillips finally provided a stability plan, the stability plan was wholly incorrect.

142.    Zapoteca was forced to hire and pay an independent consultant to draft a correct stability plan.

143.    Because Phillips was unable to be present on the Rig ENERGY ZAPOTECA in Tuxpan, Mexico due to the criminal charges Phillips claimed were still pending against him, and because a physical presence was required in Tuxpan, Mexico to move the Rig,

in October 2003, Phillips hired Steve Gray as an alternate/substitute Captain to the Rig to assist Phillips and Zapoteca in Tuxpan, Mexico.

144.    On instructions from Phillips, Steve Gray, refused to meet with Johansen and Ostbye in Tuxpan, Mexico.

145.    On instructions from Phillips, employees of Zapoteca refused the surveyors appointed by the insurance underwriters access to the Rig ENERGY ZAPOTECA.

146.    The refusal to allow the surveyors appointed by the insurance underwriters access to the Rig ENERGY ZAPOTECA caused the insurance underwriters to temporarily cancel the insurance which delayed the move of the Rig from Tuxpan, Mexico to Texas.

147.    When Zapoteca advised Phillips his refusal to allow the surveyors appointed by the insurance underwriters access to the Rig ENERGY ZAPOTECA had caused the insurance to be cancelled which delayed the move of the Rig from Tuxpan, Mexico to Texas, Phillips stated he did not care.

148.    On instructions from Phillips, employees of Zapoteca refused Johansen and Ostbye access to the Rig ENERGY ZAPOTECA and refused Johansen and Ostbye access to Zapoteca's Tuxpan, Mexico office.

149.    Zapoteca, Johansen and Ostbye were forced to obtain the assistance of local authorities to gain access to the Rig ENERGY ZAPOTECA and to Zapoteca's Tuxpan, Mexico office.

150.    Upon gaining access to the Rig ENERGY ZAPOTECA, Johansen and Ostbye discovered no maintenance had been performed on the Rig ENERGY ZAPOTECA in quite some time.

151.    Although no maintenance had been performed on the Rig ENERGY ZAPOTECA for quite some time, Phillips had continually submitted pro forma disbursement requests that included funding for maintenance, which funding was provided to Phillips by Zapoteca.

152.    Johansen and Ostbye also discovered employees of Zapoteca had removed integral equipment and all Rig ENERGY ZAPOTECA manuals and records from the Rig on instructions from Phillips.

153.    Upon gaining access to Zapoteca's Tuxpan, Mexico office, Johansen and Ostbye discovered employees of Zapoteca removed all Zapoteca business documents from the office on instructions from Phillips.

154.    To perform necessary testing of the Rig ENERGY ZAPOTECA before the surveyors appointed by the insurance underwriters would approve the Rig for tow from Tuxpan, Mexico to Texas, it was necessary to move the Rig from its location at Celesa Dock to the Government Dock, all within the Port of Tuxpan, Mexico.

155.    Johansen and Ostbye obtained the permission of the Captain of the Port of Tuxpan and the Judge of Labor Court in Tuxpan to move the Rig ENERGY ZAPOTECA from its location at Celesa Dock to the Government Dock.

156.    Through communications with the Captain of the Port of Tuxpan, Mexico, Johansen and Ostbye discovered that Phillips, on 18 February 2004, had forwarded correspondence to the Captain of the Port of Tuxpan requesting the Captain of the Port to refuse to allow Zapoteca the right to move the Rig ENERGY ZAPOTECA and that the Captain of the Port had advised Phillips that he had no authority to prevent Zapoteca from moving the Rig.

157.    Accordingly, Zapoteca instructed Phillips to move the Rig ENERGY ZAPOTECA from its location at Protexa Dock (also known as Celesa Dock) to the Government Dock.

158.    Phillips refused to move the Rig from its location at Celesa Dock to the Government Dock and instructed Zapoteca employees not to move the Rig.

159.    Phillips refused to act in accordance with Zapoteca's orders, and conducted all aforementioned obstructionist activities under authority, which Phillips openly declared to Mexican authorities and Zapoteca employees, was granted to him by Zapoteca as Master of the Rig ENERGY ZAPOTECA and under the Power of Attorney dated 17 April 2002 and the Power of Attorney Protocol No. 33/2001.

160.    By so doing, Phillips had misused the authority granted to him by Zapoteca as Master of the Rig ENERGY ZAPOTECA and under the Power of Attorney dated 17 April 2002 and under the Power of Attorney Protocol No. 33/2001 to directly thwart the desires of Zapoteca regarding the Rig ENERGY ZAPOTECA.

161.    Because of the obstructionist actions and inaction of Phillips under authority granted to him by Zapoteca as Master of the Rig ENERGY ZAPOTECA and under the Power of Attorney dated 17 April 2002 and the Power of Attorney Protocol No. 33/2001, it became necessary for Zapoteca to revoke Phillips' powers as Master of the Rig ENERGY ZAPOTECA and the powers granted to Phillips under these Powers of Attorney.

162.    On 10 March 2004, Zapoteca revoked Phillips' powers as Master of the Rig ENERGY ZAPOTECA and the powers granted to Phillips under the Power of Attorney dated 17 April 2002 and under the Power of Attorney Protocol No. 33/2001.

163.    On 11 March 2004, Zapoteca requested Phillips to make arrangements to have all Zapoteca documents in his possession and control in both Texas and Mexico delivered to Zapoteca.

164.    Phillips again refused and failed to provide Zapoteca these documents.

165.    In fact, Ostbye learned that Phillips had requested the assistance of some of Zapoteca's employees to harbor Zapoteca's documents for the purpose of extorting money from Zapoteca.

166.    The Zapoteca employees refused to assist Phillips in this scheme of extortion.

167.    In March of 2004, Phillips conducted meetings with several employees of Zapoteca in Port Isabelle, Texas.

168.    At these meetings Phillips conspired with these employees to file a lawsuit against Zapoteca and the Rig ENERGY ZAPOTECA in the Labor Court in Tuxpan, Mexico and to effect the arrest of the Rig ENERGY ZAPOTECA.

169.    To further this conspiracy, on 9 March 2004, Phillips wrote a letter improperly terminating all Zapoteca employees without compensation.

170.    By so terminating the Zapoteca employees, the employees became entitled to file a lawsuit in the Labor Court in Tuxpan, Mexico against Zapoteca and the Rig ENERGY ZAPOTECA and to effect the arrest of the Rig.

171.    Phillips' termination of the Zapoteca employees was done without the knowledge or consent of Zapoteca.

172.    Thereafter, Phillips and these improperly terminated Zapoteca employees filed a lawsuit against Zapoteca and the Rig ENERGY ZAPOTECA in the Labor Court in

Tuxpan, Mexico for wages, and severance and vacation pay in an amount in excess of $2,000,000.00.

173.    Under applicable Mexican law, Phillips and the improperly terminated Zapoteca employees would be entitled to a recovery in an amount less than $200,000.00.

174.    Upon a review of this lawsuit, Zapoteca learned that Phillips had retained 20 employees on Zapoteca's payroll since May 2003 despite that fact Phillips had advised Zapoteca he had retained only 8 employees.

175.    Phillips' and the improperly terminated Zapoteca employees' lawsuit was dismissed by the Labor Court in Tuxpan, Mexico for jurisdictional reasons and referred to the Federal Labor Court in Posa Rica, Mexico.

176.    12 of the original 20 improperly terminated Zapoteca employees filed two separate lawsuits the Federal Labor Court in Posa Rica, Mexico.

177.    These two lawsuits resulted in two separate arrests of the Rig ENERGY ZAPOTECA.

178.    Zapoteca was forced to post two bonds in the total amount of $220,000.00 in order to effect the release of the Rig ENERGY ZAPOTECA from arrest.

179.    The total cost for these bonds to Zapoteca was in excess of $10,000.00.

180.    Zapoteca reached a settlement with several of the improperly terminated Zapoteca employees in accordance with the amount these employees were entitled under Mexican law.

181.    The lawsuits of the improperly terminated Zapoteca employees with whom Zapoteca could not settle have been consolidated and remain active.

182.    By the foregoing actions and inaction of Phillips, Phillips effectively terminated his employment with Zapoteca.

183.    In furtherance of Zapoteca attempts to recover Zapoteca documents from Phillips, on 12 March 2004, Zapoteca filed its Application for Temporary Restraining Order and Preliminary Injunction (hereinafter "TRO") against Phillips seeking the return of all Zapoteca documents in Phillips' possession and control.

184.    This Court granted Zapoteca's TRO and directed Phillips to turn over to Zapoteca all Zapoteca documents in his possession and control in both Texas and Mexico.

185.    Phillips failed and refused to obey this Order.

186.    Instead, Phillips turned a portion of Zapoteca's documents in his possession and control in Texas to his attorneys, Royston, Rayzor, Vickery & Williams, L.L.P. (hereinafter "Royston").

187.    On 18 March 2004, this Court conducted a hearing on Zapoteca's TRO.

188.    During this hearing Phillips stated (1) he had turned over all Zapoteca documents in his possession and control in Texas to Royston, and (2) he did not know where Zapoteca's documents in Mexico were or who had possession and control of the same.

189.    On 18 March 2004, an Agreed Order was entered wherein this Court ordered Phillips to turn over all Zapoteca documents in his possession and control in Texas to Zapoteca's agent DIX Shipping (hereinafter "DIX"), and further ordered Phillips to instruct all past Zapoteca employees, agents and other persons, whom Phillips had reason to believe might be in possession of or know where Zapoteca documents were, to turn over all Zapoteca documents to Zapoteca's agent, Meritus.

190.    On 19 March 2004, all Zapoteca documents previously given to Royston, plus additional Zapoteca documents that had been in Phillips' possession and control in Texas, were turned over to DIX.

191.    On 21 March 2003, Phillips advised Arturo Bazaldua, a lawyer previously retained by Phillips to assist Zapoteca in legal matters in Mexico, that previous Zapoteca employees improperly terminated by Phillips, would, contrary to the Order of this Court, deliver Zapoteca documents in Mexico to the offices of Arturo Bazaldua in Tampico, Mexico.

192.    On 23 March 2004, Zapoteca was advised that Zapoteca documents in Mexico had been delivered to the offices of Arturo Bazaldua.

193.    Clearly, contrary to Phillips statements in Court, Phillips knew what person or persons were in possession and control of Zapoteca's documents in Mexico.

194.    Zapoteca was forced to transport these documents from Arturo Bazaldua's office in Tampico, Mexico to Meritus' office in Tuxpan, Mexico.

195.    Zapoteca later transported all Zapoteca documents to Houston, Texas and began a to review of the same.

196.    Upon preliminary review of Zapoteca documents for the years 2003 and 2004, Zapoteca discovered Phillips has wholly failed to properly document and account for and pay all expenses for which Zapoteca funded for the project in accordance with pro forma disbursement requests prepared by Phillips.

197.    Upon preliminary review of Zapoteca documents for the years 2003 and 2004, Zapoteca discovered that Phillips retained 12 more employees in Mexico from May 2003 to 9 March 2004 than Phillips advised Zapoteca were employed.

198.    On 5 April 2004, the Rig ENERGY ZAPOTECA was towed to Sabine Pass, Texas where she remains today.

## ZAPOTECA'S DAMAGES

199.    Because of Phillips above-mentioned refusal to provide Zapoteca documents, at present, Zapoteca has had time only to conduct a preliminary review of Zapoteca documents related to the years 2003 and 2004. Zapoteca has not had time to review any Zapoteca documents for the years 2000 through 2002. Accordingly, the damage estimates recited below are incomplete. Zapoteca reserves the right to amend its damage estimates, and damage types pending a thorough review of all Zapoteca documents.

200.    Based upon Zapoteca's review of Zapoteca documents as noted above, Zapoteca estimates damages as follows;

      a.    Approximately $192,000.00 -total amount of expenses for which Phillips failed to document and account for the years 2003 and 2004, which money is presumed to have passed to Phillips.

      b.    $100,000.00 - settlement of the "rider crew" lawsuit initiated and spearheaded by Phillips.

      c.    Approximately $100,000.00 - excess costs in attorney's fees in the lawsuits that Phillips had advised Zapoteca were without merit.

      d.    Approximately $130,000.00 – excess settlement costs and judgments in the lawsuits that Phillips had advised Zapoteca were without merit

      e.    Approximately $50,000.00 – unnecessary costs of placing bonds in the lawsuits that Phillips had advised Zapoteca were without.

f.    Approximately $1,500.00 - expenses in gaining access to the Rig ENERGY ZAPOTEC and to Zapoteca's Tuxpan, Mexico office.

g.    Undetermined but substantial amount for maintenance on the Rig ENERGY ZAPOTECA that had not been performed.

h.    $500.00 - expenses in retrieving Zapoteca documents delivered to Arturo Bazaldua's offices in Tampico, Mexico.

i.    Approximately $15,000.00 – unnecessary expenses in obtaining visas for the "manned" tow.

j.    Approximately $25,000.00 - unnecessary surveyors' fees related to preparation for "manned" tow.

k.    Approximately $1,500.00 - fees for the creation of a proper stability plan.

l.    Approximately $330,000.00 - wages paid to unnecessary employees from May 2003 until 9 March 2004.

m.    Undetermined but substantial amount Zapoteca is legally obligated to pay unnecessary employees for vacation and severance pay from May 2003 until 9 March 2004.

n.    Undetermined but substantial amount Phillips spent on goods, services, and personal expenses, etc. that are wholly unrelated to the project.

o.    Approximately $215,000.00 – unnecessary fees and expenses of Johansen and Ostbye.

### BREACH OF FIDUCIARY DUTY CAUSE OF ACTION

#### Phillips' Breach of Fiduciary Duty

201.    Zapoteca incorporates as if fully set forth herein paragraphs 1 through 198 above.

202.    The elements of a cause of action for breach of fiduciary duty are the following:

    a.    The plaintiff and defendant have a fiduciary relationship;

    b.    The defendant breached his fiduciary duty to the plaintiff; and

    c.    The defendant's breach resulted in (1) an injury to the plaintiff, or (2) a benefit to the defendant.

*Burrow v. Arce*, 997 S.W. 2d 229, 238-39 (Tex. 1999); *Kinzbach Tool Co. v. Corbett-Wallace Corp.*, 160 S.W. 2d 509, 513-14 (Tex. 1942

203.    During their employment, employees owe a fiduciary duty to their employers and are obligated to act in their employer's interest. *Kinzbach Tool Co. v. Corbett-Wallace Corp.*, 160 S.W. 2d 509, 513-14 (Tex. 1942).

204.    As fully set forth above, Phillips owed Zapoteca a fiduciary duty, Phillips breached his fiduciary duty to Zapoteca and Phillips' breach resulted in both an injury to Zapoteca and a benefit to Phillips.

### Zapoteca's Economic Injury

205.    As set forth above, Zapoteca suffered injury in the approximate amount of $1,160,500.00 as a direct and proximate result of Phillips' breach of fiduciary duty to Zapoteca, for which Zapoteca brings this cause of action.

### Exemplary Damages

206.    In an action for breach of fiduciary duty, a plaintiff may recover exemplary damages. *Maeberry v. Gayle*, 955 S.W. 2d 875, 882 (Tex. App. – Corpus Christi 1997, no pet.); *International Bankers Life Ins. Co. v. Holloway*, 368 S.W. 2d 567, 584 (Tex. 1963).

207. The actions and inaction of Phillips as fully set forth above were committed with malice, and were felonious in that Phillips misapplied fiduciary property, fraudulently destroyed, removed or concealed writings, and committed theft of Zapoteca funds.

208. Accordingly, Phillips is liable to Zapoteca for exemplary damages in an amount to be determined at the time of trial, for which Zapoteca brings this cause of action.

### BREACH OF CONTRACT CAUSE OF ACTION

#### Phillips' Breach of Contract

209. Zapoteca incorporates as if fully set forth herein paragraphs 1 through 198 above.

210. The elements of a cause of action for breach of contract are the following:

  a.    The plaintiff and defendant had a valid, enforceable contract;

  b.    The plaintiff performed, tendered performance, or was excused from performing its contractual obligations;

  c.    The defendant breached the contract; and

  d.    The defendant's breach caused the plaintiff injury.

*Hussong v. Schwan's Sales Enter., Inc.*, 896 S.W. 2d 320, 326 (Tex. App. – Houston [1st Dist.] 1995, no writ).

211. As fully set forth above, Phillips and Zapoteca had a valid, enforceable contract; Zapoteca performed, tendered performance, or was excused from performing its contractual obligations; Phillips breached the contract; and Phillips' breach caused Zapoteca injury.

### Zapoteca's Economic Damages

212.    As set forth above, Zapoteca suffered injury in the approximate amount of $1,160,500.00 as a direct and proximate result of Phillips' breach of contract to Zapoteca, for which Zapoteca brings this cause of action.

### Attorney's Fees

213.    As a direct and proximate result of Phillips' breach of contract, Zapoteca has been required to retain the services of the undersigned counsel.

214.    Pursuant to the provisions of Chapter 38 of the Texas Civil Practice & Remedies Code, § 38.001(8), Zapoteca is entitled to a recovery of reasonable attorney's fees in addition to the amount of Zapoteca's valid claim and costs, for which Zapoteca brings this cause of action.

## CONVERSION CAUSE OF ACTION

### Phillips' Conversion of Zapoteca Property

215.    Zapoteca incorporates as if fully set forth herein paragraphs 1 through 198 above.

216.    The elements of a cause of action for conversion are:

    a.    The plaintiff owned, possessed or had the right of immediate possession of property;

    b.    The property was personal property;

    c.    The defendant wrongfully exercise dominion or control over the property; and

    d.    The plaintiff suffered injury.

*Bures v. First Nat'l Bank*, 806 S.W. 2d 935, 938 (Tex. App. – Corpus Christi 1991, no writ); *United Mobile Networks, L.P. v. Deaton*, 939 S.W. 2d 146, 147-48 (Tex. 1997).

217.    Money can be converted. *Dixon v. State*, 808 S.W. 2d 721, 723-24 (Tex. App. – Austin, 1991, writ dism'd); *Security State Bank v. Valley Wide Elec. Sup. Co.*, 752 S.W. 2d 661, 665 (Tex. App. – Corpus Christi 1988, writ denied).

218.    As fully set forth above, Zapoteca owned, possessed and had the right of immediate possession of funds Zapoteca provided to Phillips for expenses related to the project, these funds were the personal property of Zapoteca, Phillips failed to account for the use of these funds thus exercising dominion and control of the same, causing Zapoteca injury.

### Zapoteca's Economic Injury

219.    As set forth above, Zapoteca suffered injury in the approximate amount of $1,160,500.00 as a direct and proximate result of Phillips' conversion of Zapoteca property, for which Zapoteca brings this cause of action.

### Exemplary Damages

220.    In an action for conversion, a plaintiff may recover exemplary damages. *Green Int'l, Inc. v. Solis*, 951 S.W. 2d 384, 391 (Tex. 1997).

221.    The actions and inaction of Phillips as fully set forth above were committed with malice, and were felonious in that Phillips misapplied fiduciary property and committed theft of Zapoteca funds.

222.    Accordingly, Phillips is liable to Zapoteca for exemplary damages in an amount to be determined at the time of trial, for which Zapoteca brings this cause of action.

### PRAYER

WHEREFORE PREMISES CONSIDERED, Zapoteca Energy Inc respectfully prays Phillips be cited to appear and answer the allegations set forth above, and that after

a trail on the merits, this honorable Court enter judgment against Charles Douglas

Phillips and in favor of Zapoteca Energy Inc, award Zapoteca Energy Inc both economic

and exemplary damages, together with attorneys fees, costs of court and pre and post

judgment interest, and for such other and further relief to which Zapoteca Energy Inc

may be justly entitled.

Respectfully submitted,

Edwin K. Nelson, IV
Texas Bar No.: 14890600
3814 Sun Valley Drive
Houston, Texas 77025
Telephone: 713-668-5100
Facsimile: 713-668-5110

ATTORNEY FOR PLAINTIFF
ZAPOTECA ENERGY INC

## Certificate of Service

I hereby certify that a true and correct copy of the foregoing document was forwarded to the following counsel of record in accordance with the Federal Rules of Civil Procedure on the 1st day of July 2004:



Edwin K. Nelson, IV

cc:    Mr. Charles F. Herd, Jr.
       The Lanier Law Firm
       Post Office Box 691448
       Houston, Texas 77269-1448

       Frank Wood
       Dennis Sanchez
       Sanchez, Whittington, Janis & Zabarte, L.L.P.
       100 North Expressway 83
       Brownsville, Texas 78521

33