48

IN THE UNITED STATES DISTRICT COURT
FOR THE SOUTHERN DISTRICT OF TEXAS
BROWNSVILLE DIVISION

United States District Court
Southern District of Texas
FILED

AUG 1 1 2004

Michael N. Milby
Clerk of Court

| | | |
|---|---|---|
| ZAPOTECA ENERGY, INC. | § | |
| | § | |
| VS. | § | CIVIL NO. B-04-048 |
| | § | In Admiralty/Rule 9(h) |
| CHARLES DOUGLAS PHILLIPS, et al. | § | |

**CAPTAIN PHILLIPS' RESPONSE TO ZAPOTECA'S MOTION FOR RULING,
ET AL., AND HIS SUPPLEMENTAL
BRIEF REGARDING VESSEL STATUS, ATTACHMENT, TEMPORARY
RESTRAINING ORDER,
AND PRELIMINARY INJUNCTION**

TO THE HONORABLE JUDGES OF SAID COURT:

COMES NOW, Charles D. Phillips, Defendant and Counter-Plaintiff herein, and files this his Response to Zapoteca's Motion for Ruling, et al., and His Supplemental Brief Regarding Vessel Status, Attachment, Temporary Restraining Order, and Preliminary Injunction, respectfully submitting as follows:

I.

ZAPOTECA CANNOT NOW ASSERT THIS RIG IS NOT A
"VESSEL IN NAVIGATION"

(a)    Zapoteca judicially admitted the Rig is a vessel and Captain Phillips is a seaman.

In its initial pleading, Zapoteca asserted that the case properly falls within the Court's Admiralty jurisdiction. On page 2 on its Application for a Temporary Restraining Order, Zapoteca states as follows:

"Jurisdiction: Jurisdiction is proper in this Honorable Court, and this is an admiralty cause of action within the meaning of Rule 9(h) of the Federal Rules of Civil Procedure, as this matter centers around services of the Master of a jack-up oil Rig designed and built for offshore drilling. . .

. . . Rig ENERGY ZAPOTECA is presently located in Tuxpan, Mexico. Zapoteca is presently engaged [in] its daily business and in operations for the sailing of the Rig ENERGY ZAPOTECA from Tuxpan, Mexico to Port Isabelle, Texas. (emphasis added.)

The above statements, made by Zapoteca in its initial pleading (and before Captain Phillips' counterclaim was filed) make clear that the case properly is in Admiralty and that the Rig (which Zapoteca admits it is "sailing") is a "vessel in navigation."[1] Zapoteca should not be heard now to assert otherwise. *See Martinez v. Bally's Louisiana, Inc.,* 244 F.3d 474, 476 (5th Cir.2001) (A judicial admission is a formal concession in the pleadings or stipulations by a party or counsel that is binding on the party making them.) Jurisdictional and status issues, as asserted by the plaintiff in its initial pleading, may not thereafter be refuted by that same party in defense of a counterclaim. *Brandon v. Interfirst Corp.,* 858 F.2d 266, 268 (5th Cir.1988) (stating "a party who has assumed one position in his pleading may be estopped from assuming an inconsistent position"). *Jett v. Zink,* 474 F.2d 149, 154-55, *reh'g denied,* 474 F.2d 1347, 1348 (5th Cir.), (party who argued that action was *quasi in rem* was precluded from arguing at a later stage in the litigation that the action was *in personam* ). *In re Double D Dredging Co.,* 467 F.2d 468, 469 (5th Cir.1972) (party who argued that a ship had been in navigable waters was later estopped from arguing that the ship had not been in navigable waters).

---

[1]    Zapoteca does not even waste breath asserting that a Rig is not a "vessel," since Zapoteca knows that the statutory definition of vessel is quite broad and is more than sufficient to encompass the Rig ENERGY ZAPOTECA. The statutory definition of "vessel", as found at 1 U.S.C. § 3, includes "every description of water-craft or other artificial contrivance used, or capable of being used, as a means of transportation on water." This definition is very broad by design and is intended to include all manner of water-borne or "artificial contrivances" which could be used as a means of transportation on water. That clearly includes the jack-up rig/barge involved here, and such is so obvious that even Zapoteca must concede that it is not worth arguing.

Moreover, in a more recent allegation (page 21 of Zapoteca's Original Complaint, filed July 1, 2004) Zapoteca continues to describe Phillips as "master of the rig" ENERGY ZAPOTECA. On four occasions in paragraphs 160, 161, and 162 of its Complaint, Zapoteca specifically describes Captain Phillips as "master of the rig." These allegations are made well after the counter-claim was filed and the issue of the Rig's status as a "vessel in navigation" was asserted by Zapoteca as a defense. Consequently, Zapoteca, by continuing to describe Phillips as the master of the rig, essentially admits both that the Rig is a vessel and that Captain Phillips, as master, is a member of the ship's crew or other employment/vessel compliment.

Zapoteca's admission that Captain Phillips is "the master of the jack-up Rig", amounts to an admission that, for purposes of Admiralty jurisdiction, Captain Phillips is a "seaman," which is to say "a member of the crew of a vessel." (For jurisdictional purposes, there is no distinction between being a vessel master and a crew member, since both of them have legitimate claims within the Admiralty and Maritime Law and well within the Admiralty and Rule 9(h) jurisdictions of this Honorable Court.) It is beyond dispute that, before a person can be a "master," "seaman" or "crewmember," there must be a vessel "in Navigation" involved. Indeed, the very definition of a seaman is "a person more or less permanently  attached to a <u>vessel in navigation</u> and providing services supportive of her mission." *See Offshore Co. v. Robison,* 266 F.2d 769, 779 (5th Cir. 1959). This in essence is the standard for seaman's status in the Fifth Circuit, and has been so for over 40 years, *id.*  A jack-up rig, as Zapoteca's counsel knows, is a "vessel," even in its jacked-up position, *id.*  Moreover, a jack-up rig has been held specifically <u>not</u> to have been "withdrawn from navigation or commerce," even while

jacked-up and incapable of being moved. *Demette v. Falcon Drilling Co.*, 280 F.3d 492, 498 (5th Cir. 2002). All this is well-established, and Zapoteca's counsel, an admitted maritime lawyer, should be well-familiar with it.

Consequently, describing the Vessel as a "jack-up rig" and Captain Phillips as "master" denotes to every knowledgeable maritime practitioner that a vessel in navigation is involved. It goes without saying that one cannot be a master for a vessel that is not in navigation; the dictionary definition of "master" is "a person licensed to command a merchant ship." If the Rig were not in navigation and there was no anticipation that she be in navigation, there would be no need to have a master aboard or assigned to her; indeed, the Court could take judicial notice of the fact that Zapoteca as the Rig's title owners and P.D. Gram & Co. as the vessel's managers would not have been paying Captain Phillips $12,000 plus per month (plus expenses, etc.) if he were <u>not</u> acting as the vessel's master.

(b)    <u>Zapoteca represented to Captain Phillips that: 1) he is a seaman; 2) his claims follows the Rig; and 3) his claims constitute "maritime liens."</u>

As indicated earlier, Zapoteca's maritime counsel Ed Nelson (who initiated and continues to prosecute this case on behalf of Zapoteca) wrote Captain Phillips on numerous occasions representing to him that his wage claim and other claims against the vessel were protected. On February 9, 2004, Mr. Nelson wrote Captain Phillips, stating in part:

> I have . . . advised you that you are a seaman and your wage claim will follow the Rig. I would assume that you have also confirmed this with your own attorney. (e-mail dated February 10, 2004, attached as Exhibit "A", p. 1).

Earlier in this same day (or perhaps the prior day), in response to Captain Phillips indicating that he is "an exiled captain" and his concern that there may be a law that will somehow hurt him, and his request for some assurances from Zapoteca that his claims will be protected, Mr. Nelson responds as follows:

> As stated before, I do not believe you have any worries regarding your agreement with Owners. I believe Owners will live by their agreement. Furthermore, if something happens, you have been advised by others with knowledge of maritime law that you are fully protected as a seaman under U.S. law, sale or no sale. I concur with this advice. (Exhibit "A", p. 3).

Zapoteca should be bound by its' counsel's representations and admissions, which establish that Captain Phillips' was the master of the Rig and a seaman under maritime law. Captain Phillips' wage claim therefore will follow the Rig, as admitted by Zapoteca. This is the essence of a seaman's claim against a vessel and upon which he has a "sacrosanct" maritime lien. It is by virtue of his status as the holder of a priority maritime lien that his claim follows the vessel, even after she is sold and title transfers into the hands of a new and otherwise-innocent owner.[2]

Consequently, Zapoteca's counsel's admission of and representation to Captain Phillips that his wage and related claims constituted seaman's claims, which could be asserted against the vessel, even after she was sold, constitute admissions and establish as a matter of fact and of law that the Rig constitutes a vessel in navigation for the relevant

---

[2]   This is why maritime liens such as Captain Phillips' wage claim sometimes are called "hidden liens," because they need not be filed with any registry and they follow the vessel wherever she may go geographically and through a transfer of countless number of changes in title, ownership or management. In other words, the lien is not exhausted and follows the ship wherever she may be and in whoever's hands she may be held. The validity of maritime liens depends neither on possession nor on notice through filing, hence its "secret" or "hidden" status. It also is "indelible" since it can be perfected only by an admiralty court through the court's *in rem* jurisdiction, and can be perfected in any court of competent jurisdiction which exercises control over the vessel. The lien is extinguished only by payment of the underlying claim. *See* Generally The Law of Admiralty, Gilmore & Black, by Grant Gilmore and Charles Black, Foundation Press, 1975, Chapter IX, Maritime Liens and Ship Mortgages; Introduction to the Law of Maritime Liens, 47 Tulane Law Review No. 3 (April 1973), pages 559 -568; The Law of Seaman (4th Ed. 1985) by Martin J. Norris, Chapter 20, Maritime Liens, page 577-603.

time period. Captain Phillips' status under the maritime law as a seaman, whose wage claims (at a minimum) constitute maritime liens, permit attachment of the vessel as security.

<div align="center">II.</div>

## EVEN UNDER ZAPOTECA'S LATEST ARGUMENTS, ITS RIG IS A VESSEL AS OF AUGUST, 2003.

Even after the parties had been working to arrange towage for the Rig, Zapoteca asserts that the "relevant time period" for the Court to determine whether the Rig is a "vessel in navigation" is the summer of 2000, because that is when Zapoteca asserts that it hired Captain Phillips to be the Rig's master. Regardless of whether that allegation is true (and upon information and belief it is not), the summer of 2000 is not the relevant time period. Captain Phillips was re-hired to be the vessel's master in August of 2003. During the Spring of 2003, Captain Phillips had been hired by Nabors Drilling (who was then negotiating to purchase the Rig from Zapoteca), which employment lasted during the period April-August, 2003. During that approximately five-month time period, Captain Phillips was not a maritime employee of Zapoteca. Instead, during that time, he was a maritime employee (still bearing the title "Master") of Nabors. However, when Nabors' employment of Captain Phillips drew to a close, in August of 2003, he again was hired by or on behalf of Zapoteca to return as the master of the Rig, in the maritime employment of Zapoteca (or more precisely the Vessel's manager, P.D. Gram & Co.). Accordingly, the relevant time period for the inquiry whether the Rig is or was a "vessel in navigation" is certainly no earlier than August of 2003, and likely (as described below) later than that time period.

What is important on the vessel "in navigation" issue during that time period is what had happened and was happening to the Rig just before and after August of 2003. First, Zapoteca had entered into a vessel sale agreement (called a Memorandum of Agreement, or "MOA", a copy of which is enclosed as Exhibit "B"), whereby Nabors agreed to pay over $8 million to purchase the Vessel. Significantly, the Rig is described numerous times in the sales agreement as a "vessel." Nowhere does it state that the vessel is not in navigation. Instead, there are numerous references to the navigational characteristics of the Rig, and in fact documents reflect that she had a current Navigational Certificate (*See* Exhibit "C", copy attached).

In Nabors' Intervening Complaint and related documents, it refers to the Rig as a "jack-up barge." Nabors has no interest at present in the issue whether the Rig is a vessel "in navigation," yet it innocently (and correctly) calls the Rig a "barge." As Zapoteca and Nabors were contracting for the "sailing" of the "barge" as a critical term in the MOA, it is apparent that the vessel in fact was "in navigation" or was anticipated to be in navigation shortly, else there would have been no contract between them for her sale and purchase. The contract for sale included delivery on the ocean and in international waters (and which therefore required her movement and navigation in commerce) and such delivery and navigation were critical terms of that agreement. Thus, even if all other evidence is disregarded, that fact alone establishes that the Rig was a vessel in navigation not later than August of 2003.

Moreover, there are numerous documents in correspondence and otherwise between Zapoteca, Nabors and related parties describing the circumstances under which the Rig would be sailing, from her berth in Tuxpan, Mexico, to one or more ports in

Texas.  A number of reports were issued by various parties' consultants discussing the towage of the vessel; ultimately it was determined that she would be a "wet tow," which means that she was towed, behind a tug-boat, just as any other ocean-going barge would be towed.  She was in fact towed from Tuxpan, Mexico, to Sabine Pass, Texas.  All that was under discussion before and after August of 2003.

The MOA also references the specific kinds of maritime insurance, which only a vessel in navigation would need.  Those marine coverages include hull coverage, protection and indemnity (like liability) coverage (which is unique to a vessel and is unlike comprehensive general liability policies, which apply to non-vessels) and other specific coverages, including specifically ocean-going towing of the Rig and "tower's liability" coverage, which specifically covers the vessel <u>while under tow</u> of another vessel.  There is considerable correspondence and documentary detail evidencing what the parties were doing which demonstrate the extent to which those parties were engaged in getting the Rig ready for her towage from Mexico to Texas.  Even without looking at deposition or affidavit testimony, it is clear from Zapoteca's own records that it intended, and in fact its representatives were trying very hard, to get the Rig "to go to sea" and to get to a port in Texas as soon as such arrangements could be completed.  It also is clear that Zapoteca had taken considerable steps to get her in shape physically for such an ocean voyage culminating in the one she ultimately took in April 2004, (which was not to Brownsville, as represented by Zapoteca, but rather to Sabine Pass, the eastern-most port in Texas).

The controlling case is *Gonzales v. U.S. Shipping Board Emergency Fleet Corp.*, 3.F 2d 168 (E.D. N.Y. 1924) where the federal court held that a ship is not in navigation:

(1) "if there is no present hope or intention of having her go to sea"; (2) and "if it would take a long time to put her in shape for an ocean voyage." Both Zapoteca and Nabors had the firm "hope" and "intent" of having her go to sea, and both of them were proceeding diligently to get her in shape for the ocean voyage at the earliest possible time.

Under this standard, the Rig ENERGY ZAPOTECA certainly was a vessel in navigation in August of 2003. The records are replete with extensive correspondence and documents indicating that Zapoteca was negotiating for ocean towage of the Rig in the months leading up to and after August of 2003. By then, Zapoteca had spent approximately $4,000,000.00 to improve the Rig and make her ready for ocean voyage. Little if any additional money was expected to be paid by Zapoteca to get her ready for her ocean tow at that time. Under that standard (and that is the most relevant standard undersigned counsel has found on the immediate "vessel in navigation" issue), the Rig certainly was a vessel in navigation as of August of 2003.

III.

## THE RIG SURELY IS A VESSEL IN NAVIGATION DURING THE TIMES OF PHILLIPS' COUNTER-CLAIMS

Even if the Rig was not a vessel in navigation in the year 2000 (which is the time period Zapoteca asserts his relevant) or August of 2003 (when Phillips was re-hired by the Vessel Interests[3] as Master), it undoubtedly would have been a vessel in navigation during one or more of the various time periods upon which Phillips' counter-claims arise. Those counter-claims and the relevant time periods are as follows:

---

[3] As is often the case, the Vessel entities are composed of three parties: (1) the Vessel itself; (2) the title owner (Zapoteca), and (3) the Vessel's managers (Gram). Collectively they are the "Vessel Interests". Here, since Zapoteca has no employees at all, all work done on or related to the Vessel, all operations and navigation, etc., are done by the manager (Gram) or the Vessel's crew--in this case, Captain Phillips and the crewmembers, who were Gram employees.

1.     Back wages due - (which includes owed but unpaid wages of $12,000 per month, plus living expenses, plus one month paid vacation, plus two weeks paid vacation over the Christmas Holidays, and repatriation/moving expenses, i.e., moving from Mexico to Texas ). As Phillips was fired on March 10, 2004, his back pay and benefits should have been paid at least through the date of termination. Thus, the relevant time period for that claim and the commencement of damages resulting from it would be March 10, 2004;

2.     The $165,000 bonus - as originally discussed to be paid in late 2003, but Captain Phillips suggested it be deferred (to assist Zapoteca, who allegedly was having cash flow problems) until the vessel departed Mexico, which actually occurred in early April, 2004. Thus, the relevant time period for that claim would be early April, 2004;

3.     Wrongful termination - Captain Phillips was fired on March 10, 2004, so that would be the relevant time period;

4.     Zapoteca's failure to resolve criminal charges against Captain Phillips - Zapoteca agreed contractually to ensure that those charges were resolved in June, 2003, but in fact they were not resolved at that time and Captain Phillips and his wife had to flee Mexico at the end of May, 2003, due to the fear than an arrest warrant was forthcoming. Phillip's damages are his lost wage-earning capacity over the next 4 or 5 years, so the relevant time period would commence April, 2003, and continue for 4 or 5 years thereafter. Alternately, Zapoteca represented and continued to represent that it would have those claims resolved, but again failed to do so, as late as March, 2004. Thus, the relevant time period would be in April of 2003 or March of 2004;

5.　　Enforcement of the Mexican "embargo" order - which was issued by the relevant Mexican Court on April 7, 2004, and from which the Rig would have been attached under Mexican law and procedure, except that it had just departed Mexican waters beforehand. The relevant time period on that claim is April, 2004;

6.　　Indemnity/defense/hold harmless in favor of Captain Phillips regarding the second Mexican labor case. While Zapoteca posted a $225,000 bond to protect itself and enforcement against its personal representative, Captain Phillips, that issue still has not been resolved and Captain Phillips is entitled on an ongoing basis to defense, indemnity and a hold harmless obligation in his favor from Zapoteca. The relevant time period would begin with the posting of that bond on approximately April 5, 2004, and continue indefinitely thereafter (including and after today) until that matter is resolved.

As seen from the above, there are various relevant time periods, which begin as early as April of 2003, and center around March and April of 2004 (and are still continuing thereafter). As Zapoteca must admit, the Rig certainly was a vessel and in fact in active navigation (since she was being towed from Mexico to Sabine Pass, Texas) in April of 2004. Accordingly, there can be no doubt that the Rig was a vessel in navigation in one or more of the relevant time periods asserted by Captain Phillips in his counterclaim, which thereby disposes of the matter.

IV.

## CAPTAIN PHILLIPS' "EMBARGO" ORDER FROM MEXICO ALLOWS MARITIME ATTACHMENT/SEIZURE.

Under the Embargo Order, the Mexican Court having jurisdiction over the matter ordered that Zapoteca's assets within the Court's jurisdiction (which at that time was limited to the Rig) be seized or judicially attached, as security for the Order. That is the

Mexican equivalent of the same sort of pre-judgment maritime attachment which is sought in this case; in fact, it forms the basis in part for Captain Phillips asking this Court to likewise issue an order of maritime attachment or seizure for the Rig, to grant security for the amount set out in the Embargo Order, $1,115,568.00, which is what the Mexican Court preliminarily determined to be the amount to which Captain Phillips may be entitled to recover under the Mexican labor law claim. (Enclosed as Exhibit "D", is a translated copy of the Embargo Order issued by the appropriate maritime court on April 7, 2004.)

However, Zapoteca was successful in removing the Rig from the Mexican Court's jurisdiction, as the Rig departed Tuxpan, Mexico on April 5, 2004, which was only one or two days before the Court's Embargo Order would have been enforced against the Rig. As Zapoteca's efforts to have the Rig towed from Mexico effectively frustrated the enforcement of that Embargo Order, Captain Phillips asks that this Court enforce that Order by issuing the Order of Attachment and attaching the Rig under the Court's Admiralty and Maritime jurisdiction. To do otherwise would reward Zapoteca for fleeing the Mexican Court's jurisdiction, with its only known asset; to allow Zapoteca to keep from having the Rig seized here simply rewards Zapoteca for improperly avoiding attachment for a second time.

V.

## RULES B & C PERMIT *IN REM* SEIZURE OF VESSELS TO PROTECT MARITIME LIENS.

(a)   Rule B

As the Court is aware, Rule B of the Supplemental Rules for Certain Admiralty & Maritime Claims permits an attachment and garnishment of a defendant's tangible or

intangible property (which in this case would include the Rig) if the defendant cannot be found within the District.  Rule B(d)(i) specifically permits attachment or garnishment of a vessel or tangible property aboard the vessel.  Rule B(e) specifically permits a plaintiff to invoke state-law remedies for seizure of property to secure a satisfaction of a judgment, which in this case would include the Embargo Order issued by the Mexican court.

Rule B is appropriate if the defendant is not found within the District.  The Court will recall that Zapoteca has no assets within the District, with the exception of the Court's jurisdiction over the Rig, now located in Sabine Pass, Texas.  Moreover,  at the time of filing of its original pleading (Application for Temporary Restraining Order and Preliminary Injunction), which occurred on or shortly after March 11, 2004, Zapoteca had no offices, officers, or employees within the District (the closest thing to an office or officer acting on behalf of Zapoteca and located in the Southern District of Texas was Captain Phillips, but he was fired by Zapoteca earlier, so he was not an officer of Zapoteca at the time Zapoteca commenced suit.)  Consequently, as of the filing of its initial pleading, Zapoteca did not have any offices, employees, or officers located within the District.  Consequently, it cannot be found within the District and an attachment under Rule B is appropriate.

(b)    Rule C

In addition, the Court will recall that Rule C of the Supplemental Rules of Certain Admiralty & Maritime Claims permits *in rem* actions to proceed against vessels, including actions "to enforce a maritime lien,"whenever a federal statute provides for a maritime action *in rem* on a similar proceeding.  As discussed above, Captain Phillips has

one or more maritime liens against the Rig, including those he has as a seaman for non-payment of his wages, fringe benefits and bonus, so the requirements of Rule C(1)(a) are met.   In addition, his other claims, including: 1) wrongful termination/retaliatory discharge; 2) failure to honor the Mexican Court's Embargo Order; 3) failure to hold him harmless, defend and indemnify him in the second Mexican lawsuit brought against; Zapoteca in its corporate capacity and Captain Phillips personally; and (4) Zapoteca's failure to protect him from the criminal charges and his resulting inability to return to Mexico to pursue employment for another employer, all arise by virtue of his status, at least in part, as the master of the Rig.   Consequently, those also are maritime or quasi-maritime claims, each of which falls within the Court's Admiralty jurisdiction and which generally provides for a pre-judgment lien or action *in rem* against the vessel.   Such claims arise within or are analogous to the various enumerated causes of action which a seaman has under 46 U.S.C. §688 (sometimes referred to as "the Jones Act,") and certainly arise by virtue of "proceedings analogous thereto" in compliance with Rule C(1)(b).

Consequently, Captain Phillips' claims arise under the Court's *in rem* jurisdiction and specifically under Rule C, which allows the Court to judicially arrest the rig as security for Captain Phillips' claims against Zapoteca and the Rig *in rem*.

VI.

### EVEN IF MARITIME LIENS DO NOT EXIST HERE, TEXAS LAW PERMITS ATTACHMENT.

As discussed in earlier pleadings, Texas law permits attachment of the Rig as Zapoteca's asset within the Court's jurisdiction under §61.002 of the Texas Civil Practice and Remedies Code, which specifically permits pre-judgment attachment of a

defendant's property if:  (1) the defendant is not a resident of the state; (2) the defendant

is about to move from the state permanently and has refused to pay or secure the debts;

(3) the defendant is about to remove his property from the state; or (4) the defendant is

about to convert all or part of his property into money for the purpose of placing it

beyond the reach of its creditors.  *See* Tex. Civ. Prac. & Rem. Code, §61.002.  As

discussed in prior briefs, any one of those conditions justify attachment; here, all four

apply.  As discussed above, Zapoteca is not a resident of Texas; it admits in its pleadings

that it is a foreign corporation, under the laws of Liberia. Second, Defendant has no

permanent offices, employees, or officers in Texas.  Third, Zapoteca also has refused to

pay or secure Captain Phillips' claims.  Fourth, Zapoteca, upon information and belief  is

about to remove its property, the Rig, from Texas and already has moved it as far away

from Southwest Texas as physically possible and still remain in the state; and upon

information and belief Zapoteca is trying to sell the Rig, which will allow it to convert all

or part of its property into money, which it then will place beyond the reach of its

creditor, Captain Phillips.

Accordingly, the Texas statute, §61.002, has been met and the state-law

permitting attachment should be invoked here, in the event the Court determines that the

Court's Admiralty and Maritime jurisdiction does not permit such.

VII.

EVEN IF NO MARITIME ATTACHMENT EXISTS, A TEMPORARY
RESTRAINING ORDER OR
PRELIMINARY INJUNCTION IN FAVOR OF PHILLIPS PRESERVES
THE STATUS QUO.

In its Motion for Ruling, etc., Zapoteca next complains that Phillips has not met

the procedural prerequisites for a Temporary Restraining Order ("TRO") or a preliminary

injunction. That argument really begs the threshold question, because the Court will recall that the issue of a TRO or preliminary injunction becomes relevant only in the event the Court determines that the Rig was not a vessel in navigation during any of the times relevant to Phillips' claims against Zapoteca.[4] On page 8 of its Motion, Zapoteca concedes that the purpose of the TRO is to "preserve the status quo." Phillips submits that is precisely what the Court was attempting to do, and in fact accomplished, in its earlier orders; in essence, the Court ordered that Zapoteca not move, sell or encumber the Rig until the Court has ruled on the vessel status issues, while at the same time granting Zapoteca leave to ask the Court to revise the orders, if and when Zapoteca found a ready, willing and able purchaser for the Rig. As Zapoteca has not advised that it has such a purchaser, there is no prejudice to Zapoteca to keep the "status quo" in effect until the vessel issues are ruled on by this Court.

Zapoteca next complains that the technical requirements for an application of a TRO have not been met. Given the lengthy hearings and briefing on this matter, that complaint is form over substance. Nevertheless, enclosed as Exhibit "F" is an affidavit by Captain Phillips, based upon his personal knowledge, which meets the elements required for injunctive relief (including: the substantial likelihood of success on the merits; the need for a TRO in order to prevent irreparable injury; that the threatened harm to Captain Phillips outweighs any harm a TRO would inflict on Zapoteca (which is addressed by the Judge's prior Orders); and that the TRO would serve the public interest; that Captain Phillips would post an appropriate bond, if so ordered by the Court; and

---

[4]  As the Court will recall, Phillips was fired on March 10, 2004; See Letter from Zapoteca's attorney, Ed Nelson (and on his letterhead) copy enclosed as Exhibit "E". Accordingly, one of the "relevant time periods" will be March 10, 2004; it is beyond dispute that the Rig was a vessel "in navigation" on that date; in fact, she sailed for and arrived in Sabine Pass, Texas, within a month thereafter. Under the *Gonzales* case discussed above, there can be no doubt whatsoever but that she was a vessel in navigation at that point.

whether the TRO would be granted *ex parte* or following a hearing, etc. Those showings therefore defeat whatever procedural or similar claims Zapoteca asserts.

Regarding the likelihood of success on the merits, the Court already has recognized that Captain Phillips was fired by virtue of Mr. Nelson's letter of March 10, 2004. The parties already are aware of the "embargo" court order issued by the appropriate Mexican Court, which unsuccessfully attempted to attach the vessel in Mexico before she departed for Texas. Thus, the likelihood of successful enforcement of the Mexican Labor Courts' prior embargo order is substantial. Next, and just as asserted by Nabors in its Intervening Complaint, the TRO in favor of Captain Phillips is necessary. Captain Phillips will be unable to enforce or attach any assets of Zapoteca located in Texas, since the only known asset of Zapoteca is the Rig itself, and it is clear that Zapoteca desires to sell the Rig and remove her from Texas waters as soon as possible. If the vessel leaves Texas waters without posting adequate security for Phillips' claims, it is likely that it will be impossible for him to enforce or secure any judgment against Zapoteca. Next, the threat and harm to Captain Phillips, that he will have an unenforceable order of judgment, outweighs the temporary harm to Zapoteca in keeping the Rig unencumbered and in Texas pending resolution of the vessel status issue. Finally, a TRO in favor of Captain Phillips serves the public's interest since he is a Texas citizen and has been working in Texas for overseas corporations.[5] Finally, if the Court orders, Captain Phillips will post an appropriate bond. However, no such bond is needed here, since the Rig now is stacked in Sabine Pass, Texas, and nothing hampers Zapoteca from showing the Rig or marketing her for sale. The question of whether the TRO should be

---

[5] Zapoteca is a Liberian corporation and P.D. Gram & Co. upon information and belief is a Norwegian corporation, neither of whom now maintain offices or employees in Texas.

granted *ex-parte* or after hearing is moot, given the number of hearings that have occurred and briefs on file. The Court can rule based on the evidence before it; however, Phillips would be pleased to attend a further hearing on this and related matters, should the Court wish. Nevertheless, as the Court has not ruled on the vessel's "in navigation" or admiralty jurisdiction/*in rem* issues yet, the actual issue of a TRO and preliminary injunction are premature.

Phillips likewise can meet the requirements of a valid preliminary injunction, which are similar to the TRO elements described above. Specifically, it is likely that Captain Phillips will prevail on at least one of his various claims against Zapoteca. To summarize briefly, he has a claim for past-due wages and related benefits, which were earned but still have not been paid to him prior to the date Zapoteca's counsel fired him. This is a "cinch" seaman's wage claim, and it is probable if not certain that he will recover on it. Likewise, he has written confirmation from Zapoteca that it will pay him his bonus, and there is a substantial certainty that the Court ultimately will award that. It is also likely, if not absolutely assured, that the Court will order Zapoteca to hold Captain Phillips harmless and defend and indemnify him concerning the second Mexican labor case. Further, it is likely that the Court will conclude that Phillips was wrongfully terminated and that he has substantial economic and other damages as a result. It is likely that he will be awarded damages, under Mexican or American law, for wrongful termination and the calculation of monies he is due under the labor laws of Mexico (whether under the Embargo Order or otherwise). Thus, the elements of eligibility for a Preliminary Injunction are met.

Second, the potential for irreparable injury to Phillips is great, if the Court does not grant an injunction or other equitable relief and does not attach, seize or otherwise keep the vessel from departing Texas waters, especially since Zapoteca has no other assets in Texas and no offices or employees here. The effect on the public interest is the same as discussed above, as is the balancing of relative equities as discussed above. Likewise, there is no hardship to Zapoteca if the injunction is issued, since it still can market the vessel and, if a sale is consummated, petition the Court to revisit the TRO, injunction or similar remedies.

## VIII.

## WHO HAS UNCLEAN HANDS?

Zapoteca asserts that Captain Phillips has unclean hands (Zapoteca Motion, p. 16). The "evidence" cited is Zapoteca's original Complaint and the "declaration" of Mr. Ostbye, which sadly is based on information he knows only "to the best of his knowledge." Mr. Ostbye's declaration is deficient, since it is not based on personal knowledge (although it is understandable that the declaration is so limited since he has very little personal knowledge about the matters in dispute in the case). Thus, Zapoteca's complaints about Phillips are based merely on the allegations in its Complaint. However, Zapoteca itself knows that at least some of the allegations it has made against Phillips are patently untrue. For example, in paragraphs 57, 58 and 59 of its Complaint, Zapoteca asserts that Phillips provided false testimony, that Zapoteca did not instruct Phillips to provide false testimony, and that Protexa brought criminal charges against Phillips because he had provided false testimony. Enclosed as Exhibit "G" is a letter from Zapoteca's counsel, Ed Nelson, dated November 18, 2003, in which he states on page 3:

> "Based on our review of the documents and testimony upon which this criminal charge is based, we are of the opinion Phillips committed no crime. . . . We consider the actions of ASAC against Phillips malicious prosecution. We also consider these actions to be tortious interference with the business of Zapoteca. . . ASAC is also fully aware that, until Mr. Baladua has these criminal against Phillips dismissed, Phillips will remain in the United States."

Those statements, by the very attorney who drafted Zapoteca's Complaint, make clear that the allegations asserted against Phillips in Zapoteca's Complaint are refuted by its own attorney.[6] Likewise, in Zapoteca's allegation number 115 (and elsewhere) in its Complaint, Zapoteca asserts that various lawsuits, "were mostly meritorious and Zapoteca owed money" to those claimants despite the recommendations from Phillips to the contrary. However, Mr. Nelson has written that the various claims asserted against Zapoteca or the Rig in Mexico generally are <u>without</u> merit and that Zapoteca did not actually owe the alleged debt. (There are several documents which state this, two of which are Mr. Nelson's letter to ASAC's counsel of November 18, 2003, copy attached as Exhibit "G", and Mr. Nelson's letter of November 20, 2003, to Mr. Kongsli, a copy of which is attached as Exhibit "J").[7] There are other allegations asserted in Zapoteca's Complaint that Captain Phillips expects the documents will show are not merely untrue, but directly refuted by Zapoteca's own documents (assuming that they have not been destroyed).

Moreover, Mr. Nelson represented to the Court on numerous occasions that Zapoteca did not yet have in Texas the documents it had requested be sent from Mexico. Those statements were made to the Court repeatedly during the May 7, 2004 hearing.

---

[6] It again makes clear that Mr. Nelson is a fact witness and has a conflict of interest, since Zapoteca now alleges claims against Captain Phillips which are directly refuted by Zapoteca's (and Captain Phillips') attorney, Mr. Nelson.

[7] These documents also make clear that Mr. Nelson has acted as Captain Phillips' attorney and therefore is conflicted out of suing him over any of these same issues.

However, Federal Express records show that in fact Zapoteca's documents were shipped to Mr. Nelson's office in Houston and received there on April 28, 2004, <u>over a week</u> <u>before</u> the May 7, 2004 hearing (See Exhibit "H" enclosed).  Since these documents were sent to Mr. Nelson's leased law office, he knew or should have known that they had been received.  However, he stated during the hearing on May 7:

> We have now received nine. . . we have been given 22 or so boxes of documents down in Mexico.  They were not turned over to us.

As the Federal Express records show, Zapoteca shipped only 14 boxes on April 27, 2004, and sent them to Mr. Nelson's office in Houston, Texas, even though the Court order of March 18, 2004, clearly states that the documents were to be shipped to DIX Shipping in Brownsville, Texas.  Nevertheless, there still are 6 boxes of documents from Mexico that Zapoteca has not accounted for.

As late as June 18, 2004, Zapoteca's counsel was still misrepresenting to the Court when all the documents arrived from Tuxpan, Mexico. (See Zapoteca's Response to Phillips' Correspondence to the Court and Zapoteca's Motion for Sanctions, p. 2, no. 10 and attachment "D" thereto, a copy attached as Exhibit "I").

Thus, Zapoteca's counsel (who also fired Captain Phillips on March 10, 2004, and now drafted the Complaint against him) has misstated facts to the Court upon which Zapoteca's allegations against Captain Phillips are based.  Zapoteca's own documents establish that those allegations are unmerited and ultimately will not prevail.  Given these facts, it is clear now that it is Zapoteca and its counsel who have unclean hands here, not Captain Phillips.

IX.

## ZAPOTECA'S RECENT AFFIDAVITS ARE FULL OF ERROR AND THEREFORE WITHOUT CREDIBILITY.

In its recent brief, Zapoteca provided a number of affidavits from various corporate officers, representatives or contractors of Zapoteca. Those affidavits are so replete with errors and false statements that they are beyond credibility. As an example (which is not exclusive) of the false statements and errors in those affidavits, see the affidavit of Captain Phillips, attached as Exhibit "F," beginning at paragraph 23.

WHEREFORE, premises considered, Captain Phillips asks the Court to rule that the Rig is or was a vessel in navigation at one or more of the times relevant to the claims made herein (which include each and any of the times upon which each of his allegations and causes of action against Zapoteca are made), that this Court has Admiralty Jurisdiction over Zapoteca and its vessel, the ENERGY ZAPOTECA, including the Court's Rule B and Rule C *in rem* claims and seizure or attachment proceedings, and that, in the alternative, Captain Phillips is entitled to temporary restraining orders or preliminary injunctions against the Rig and her owners and managers, whereby owners or managers of the Rig are enjoined from moving her from her current location in Sabine Pass, Texas, selling or encumbering her, removing any property, equipment or machinery from her, or allowing her to fall into disrepair or otherwise deteriorate in condition and value during the pendency of this action, and for all other further relief, in admiralty, in equity, or under the General Maritime Laws of the United States, Texas law, Mexican law or Norwegian law, to which he is justly entitled.

Respectfully submitted,

**THE LANIER LAW FIRM, P.C.**


BY: _Charles F. Herd_

CHARLES F. HERD, JR.
TSB# 09504480
LAWRENCE P. WILSON
TSB # 21704100
KEVIN P. PARKER
SBN #15494020
P. O. Box 691408
Houston, TX 77269-1408
(713) 659-5200
Fax: (713) 659-2204
ATTORNEYS FOR PLAINTIFFS

LOCAL COUNSEL:

Mr. C. Frank Wood
SANCHEZ, WHITTINGTON, JANIS
& ZABARTE, L.L.P.
100 North Expressway 83
Brownsville, Texas 78521-2284


## CERTIFICATE OF SERVICE

I hereby certify that a true and correct copy of the foregoing instrument has been forwarded to all counsel in accordance with the Federal Rules of Civil Procedure on this the _11th_ day of August, 2004.

Mr. Edwin K. Nelson, IV
Attorney at Law
3814 Sun Valley Drive
Houston, Texas 77025
**ATTORNEYS FOR PLAINTIFF
ZAPOTECA ENERGY, INC.**

Mr. Lee Haag
Ms. Tonja De Sloover
FULBRIGHT & JAWORSKI, L.L.P.
1301 McKinney, Suite 5100
Houston, Texas 77010-3095

Jaime Arturo Saenz
RODRIGUEZ, COLVIN, CHANEY & SAENZ, L.L.P.
1201 East Van Buren
P. O. Box 2155
Brownsville, Texas 78522
**ATTORNEYS FOR INTERVENOR**
**NABORS DRILLING INTERNATIONAL**

_____
C. Frank Wood

# EXHIBIT "A"

# YAHOO! Mail

Print - Close Window

**From:** "Edwin Nelson" <seaproctor@hotmail.com>
**To:** energyzapoteca@yahoo.com
**CC:** seaproctor@hotmail.com
**Subject:** Re
**Date:** Tue, 10 Feb 2004 10:17:07 -0600

Charles,

1. Please read later correspondence to owners advising of the same,
which
has been passed onto Per Johansen.

2. No written reports have been filed. All communication was by phone.
Christian and I called you daily with reports of what was done and what
was
discussed with owners.

3. As you are well aware and as reported to you, Arturo did not attend
this
meeting. The lady judge said there were no lawsuits other than the
landlord
matter and the International Paint matter.

Your and Arturo's advise has been that certified apostilled copies of
McDrermott's Houston lawsuit will cause the same lawsuit in Mexico to
be
dismissed.

Per Arturo,the certified apostilled copies of McDrermott's Houston
lawsuit
are not outdated.

4. Charles, things take time. Arturo and I have done everything
poissible
given the time we have had. Neither Arturo nor I can denounce. This is
being
set up to be done when someone appropriate returns to Mexico.

5. Please provide your recommendations on what needs to be done to stop
Monroy and McDermott from bothering the crew, given the situation as it
exists. I am at a loss here.

6. Noted regarding Rosario.

7. Jonathan and I have both advised you that you are a seaman and your
wage
claim will follow the Rig. I would assume that you have also confirmed
this
with your own attorney.

Edwin K. Nelson, IV

>From: Chris Phillips <energyzapoteca@yahoo.com>
>To: Edwin Nelson <seaproctor@hotmail.com>

>Subject: Re:
>Date: Tue, 10 Feb 2004 06:49:56 -0800 (PST)
>
>
>
>Edwin Nelson <stephnntr@hotmail.com> wrote:
>Charles,
>
>Not a problem.
>
>If you remember, I have instructed owners that no deal should be
reached
>with ASAC unless the same includes the dismissal of all claims and
causes
>of
>action against all, including you. This includes any and all criminal
>charges. I will further instruct Owners on this immediately.
>
>HERE WE GO AGAIN. NOBODY HAS A MEMORY''''' PROTEXA/CELASA FORGAVE ME.
WHAT
>HAPPENED????
>
>WHAT THE OWNERS WILL DO IS WHAT I SAID- ASAC WILL GO BEFORE A NOTARY
AND
>SWEAR THAT NO CHARGES OF ANY KIND HAVE BEEN FILED OR WILL BE FILED
AGAINST
>CHARLES PHILLIPS.. PERIOD'!!!
>
>FOR THE RECORD: NOTHING LESS WILL BE ACCEPTED. I WANT THAT IN WRITING
>TODAY... NOT TOMORROW OR ANY BULL-SHIT.. DISMISSAL MY ASS'''''
>
>ED THIS IS NOT THE USA...
>
>
>Let's keep watching the Labor Court. In this regard, please instruct
Arturo
>to attend the Labor Court this Thursday as this is the day the labor
Court
>will advise whether or not the bond is acceptable. Please copy me on
the
>instruction.
>
>
>WHY NOT COPY ME ON YOUR REPORTS TO THE OWNERS ON THE VISIT TO
>TUXPAN!!!!!!!!!!!!!!
>
>
>As to the Meritus attorney, we will share our intelligence with him. I
>suspect Owners are having to pay for this attorney also. I do not
believe
>it
>necessary for Meritus' attorney to attend Court this Thursday. I
believe
>Arturo will handle the matter appropriately.
>
>If and when Bill's civil case surfaces, provided the same relates to
any
>breach of contract by owners regarding the sale proceeds of the Rig,
we are
>properly equipped to handle the matter. Your and Arturo's guidance is

that
>the Civil Court will immediately dismiss such a claim once we produce the
>certified and apostilled copies of Bill's claim in Houston. I trust your
>guidance on this.
>
>LETS CLEAR THIS UP NOW!! YOU HAD THE MEETING WITH THE JUDGE, NOT ME. DID
>ARTURO MEET WITH THE JUDGE REGARDING THIS
>MATTER???????????????????????????????????????????????????
>
>THE APOSTILLE ARE OUT DATED. I SUGGESTED THAT THEY BE UPDATED. NO RESPONSE.
>
>What are your thoughts regarding Rosario? I suggest Arturo handle all
>claims
>given the behavior of Rosario.
>
>DO WE WANT TO PISS HIM OFF NOW???????? HOW DO I KNOW.....
>
>LETS PISS HIM OFF AFTER THE RIG LEAVES...
>
>As stated before, I do not believe you have any worries regarding your
>agreement with owners. I believe Owners will live by their agreement.
>Furthermore, if something happens, you have been advised by others with
>knowledge of maritime law that your are fully protected as a seaman under
>U.S law, sale or no sale. I concur with this advise.
>
>
>WHAT OTHERS ARE YOU REFERRING TO???? I AM AN EXILED CAPTAIN. SURELY THERE
>IS A LAW THAT SOME HOW WILL SCREW ME.. I AM NOT GOING THAT ROUTE.. I WANT
>SOME GUARANTEES NOW!!!!!!! WHY SHOULD I HAVE TO FIGHT FOR WHAT HAS BEEN
>AGREED UPON??? WHY WOULD THE OWNERS PUT ME IN THIS SITUATION???
>
>BELIEVING AND FACT ARE TWO TOTALLY MATTERS......
>
>
>We will need to keep the crew in order, what ever it takes. You have done a
>great job so far. Keep up the good work.

>WHAT ARE YOU TALKING ABOUT. I DO NOT SEE ANYONE DOING SHIT TO BILL AND
>RAFAEL TO STOP THEM FROM HARASSING THEM....
>
>QUIT PUMPING ME UP///
>
>On this note, I let it be known among the crew that we are declaring war on
>anyone who gets in our way, that Owners have the financial ability to carry
>out the war and that anyone we declare war on will be squashed like a
>grape.
>I believe the crew fully understands Owners' and my will and ability to so act.

```
>act..
>
>ARE YOU FUCKING JOKING!!!!!!!!!!!!!!!!!
>
>POSTING A 3 MIL/PESO BOND IS NOT DECLARING WAR!!!!!! EXACTLY WHAT ELSE
HAVE
>YOU DONE EXCEPT TO TELL THE PEOPLE THAT YOU HAVE DECLARED WAR!!!!!!! I
DO
>NOT SEE ANY PLAN TO DENOUNCE ANYONE.. THAT IS ERIK'S PLAN!!!!
>
>I would not let Monroy's e-mail stress you too much on this as the
same is
>only an attempt to upset you.
>
>ED, YOU DON'T KNOW ME!!!!!!!!!!!!!!!!!!!!!!!!
>
>I know nothing regarding the export document. This is in Owners'
hands.
>
>NO, THIS IS IN PINEDO AND PROTEXA/CELASA HANDS
>
>Have a good dinner. Keep me posted.
>
>
>HAD A GREAT DINNER WITH JONATHAN. HOWEVER, HE TORE A BIG HOLE IN HIS
PANTS
>GETTING UP FROM THE CHAIR...
>
>
>Ed                                          CHARLES
>
>
>
>
>
>
> >From: Chris Phillips
> >To: Edwin Nelson
> >Subject: Re: Date: Mon, 9 Feb 2004 16:55:23 -0800 (PST)
> >
> >Ed,
> >
> >Sorry for the delay.
> >
> >I was meeting with Jonathan this morning and we are going out for
> >dinner tonight.
> >
> >From what I have been told, the group were at the labor court most
of the
> >day.
> >For sure, they are trying something..Our people was watching the
labor
> >court..
> >
> >Is the Meritus attorney in Tuxpan?? If so, he should have been
there..
> >I do not know how to contact him..
> >
> >You saw the hate mail from Rafael and my reply..
> >
```

> >Arturo called me today after receiving an e-mail from Rafael.. They
.are
> >working overtime on the crew. However, I have said this many times
>without
> >any response from the owners.. Time will tell.
> >
> >I have not seen the export document!!! I cannot say today that the
bond
> >will be
> >approved by the labor court..
> >
> >For sure, Bill's civil case will come to life very soon...
> >
> >I spoke with Sammy Downs this morning.. He still says that an
agreement
>is
> >in
> >place for the Energy Zapoteca.
> >
> >I have been waiting for some type of guarantee from the owners
regarding
>my
> >money
> >and what about the problems in Mexico. Did ASAC file charges on
me???
> >Nobody wants to discuss this subject!!! No one wants to make sure
that
>ASAC
> >will sign a statement in front of a notary swearing that no charges
have
> >been filed nor will any charges be filed against Charles
Phillips....
> >
> >
> >
> >
> >
> >Edwin Nelson wrote:
> >
> >Charles,
> >
> >Please respond to my questions of yesterday and please update me on
what
>we
> >determined regarding MVM movements today.
> >
> >Thank you.
> >
> >Ed
> >
> >_____
> >Optimize your Internet experience to the max with the new MSN
Premium
> >Internet Software.
>http://click.atdmt.com/AVE/go/onm00200359ave/direct/01/
> >
> >
> >
> >Charles Phillips
> >Master

# EXHIBIT "B"

Case 1:04-cv-00048     Document 48     Filed in TXSD on 08/11/20___     Page

# MEMORANDUM OF AGREEMENT

Norwegian Shipbrokers' Association's Memorandum of Agreement for sale and purchase of Ships. Adopted by The Baltic and International Maritime Council (BIMCO) in 1956.
Code-name
SALEFORM 1987
Revised 1966, 1983 and 1986

# DUPLICATE

Dated: 7 *March* February, 2000

PERFORACIONES MARITIMAS MEXICANAS S.A. DE C.V., OR NOMINEE
hereinafter called the Sellers, have today sold, and                                    1


ENERGY DRILLING, INC. MONROVIA, LIBERIA, OR NOMINEE
hereinafter called the Buyers, have today bought                                        2

THE JACK UP RIG ZAPOTECA"
Classification:N/A                                                                      3

Built:GOTHENBURG by: GOTAVERKEN ARENDAL AB                                              4

Flag: PANAMA                          Place of Registration:PANAMA, REP. OF PANAMA      5

Call sign: N/A                        Register tonnage:                                 6

Register number:                                                                        7

on the following conditions: AS INSPECTED BY BUYERS REPRESENTATIVE                      8
    DECEMBER 1999 AND PER CLAUSE 20

## 1. Price                                                                             9

Price: USD 1,437,500    (ONE MILLION FOURHUNDRED THIRTYSEVEN                            10
                         THOUSAND FIVEHUNDRED)

## 2. Deposit    (SEE CLAUSE 16)                                                        11

~~As a security for the correct fulfillment of this contract, the Buyers shall pay a deposit of 10%~~     12

~~ten per cent — of the Purchase Money within~~                    banking days from the date of this     13

~~agreement. This amount shall be deposited with~~                                      14


~~and held by them in a joint account for the Sellers and the Buyers. Interest, if any, to be credited the~~     15

~~Buyers. Any fee charged for holding said deposit shall be borne equally by the Sellers and the Buyers.~~     16


## 3. Payment  (SEE CLAUSE 16)                                                          17

~~The said Purchase Money shall be paid free of bank charges to~~                        18


~~on delivery of the vessel, but not later than three banking days after the vessel is ready for delivery~~     19

~~and written or telexed notice thereof has been given to the Buyers by the Sellers.~~     20


## 4. Inspections                                                                       21

~~The Buyers shall have the right to inspect the vessel's classification records and declare whether~~     22

~~same are accepted or not within~~                                                      23

The Sellers shall provide for inspection of the vessel at/in                            24


The Buyers shall undertake the inspection without undue delay to the vessel. Should the Buyers     25
cause such delay, they shall compensate the Sellers for the losses thereby incurred.     26

The Buyers shall inspect the vessel afloat without opening up and without cost to the Sellers. During the inspection, the vessel's log books for engine and deck shall be made available for the Buyers' examination. If the vessel is accepted after such afloat inspection, the purchase shall become definite — except for other possible subjects in this contract — provided the Sellers receive written or telexed notice from the Buyers within 48 hours after completion of such afloat inspection. Should notice of ~~acceptance of the vessel's classification records and of the vessel not be received by the Sellers as~~     27 28 29 30 31 32

~~said, the deposit shall immediately be released, whereafter this contract shall be considered null~~
~~and void.~~                                                                                           34

# DUPLICATE

## 5. Place and time of delivery                                                                        35

The vessel shall be delivered and taken over at/in                                                     36

### FOB TUXPAN, MEXICO

Expected time of delivery:   20 FEBRUARY – 20 MARCH 2000                                               37

~~7~~ MAY ~~ch~~

Date of cancelling (see clause 14): ~~31 MARCH~~ 2000                                                   38

~~The Sellers shall keep the Buyers well posted about the vessel's itinerary and estimated time and~~   39
~~place of drydocking.~~                                                                                40

Should the vessel become a total or constructive total loss before delivery the deposit shall immedi-  41
ately be released to the Buyers and the contract thereafter considered null and void.                  42

## 6. Drydocking                                                                                         43

~~In connection with the delivery the Sellers shall place the vessel in drydock at the port of delivery~~  44
for inspection by the Classification Society of the bottom and other underwater parts below the Sum-   45
ner Load Line. If the rudder, propeller, bottom or other underwater parts below the Summer Load        46
Line be found broken, damaged or defective, so as to affect the vessel's clean certificate of class, such  47
defects shall be made good at the Sellers' expense to"                                                 48

satisfaction without qualification on such underwater parts."                                          49

Whilst the vessel is in drydock, and if required by the Buyers or the representative of the Classifi-   50
cation Society, the Sellers shall arrange to have the tail-end shaft drawn. Should same be condemned    51
or found defective so as to affect the vessel's clean certificate of class, it shall be renewed or made  52
good at the Sellers' expense to the Classification Society's satisfaction without qualification.        53

The expenses of drawing and replacing the tail-end shaft shall be borne by the Buyers unless the       54
Classification Society requires the tail-end shaft to be drawn (whether damaged or not), renewed or     55
made good in which event the Sellers shall pay these expenses.                                          56

The expenses in connection with putting the vessel in and taking her out of drydock, including dry-    57
dock dues and the Classification Surveyor's fees shall be paid by the Sellers if the rudder, propeller,  58
bottom, other underwater parts below the Summer Load Line or the tail-end shaft be found broken,        59
damaged or defective as aforesaid or if the Classification Society requires the tail-end shaft to be    60
drawn (whether damaged or not). In all other cases the Buyers shall pay the aforesaid expenses, dues    61
and fees.                                                                                               62

During the above mentioned inspections by the Classification Society the Buyers' representative        63
shall have the right to be present in the drydock but without interfering with the Classification Surve-  64
yor's decisions.                                                                                        65

The Sellers shall bring the vessel to the drydock and from the drydock to the place of delivery at      66
~~their own expense.~~                                                                                  67

## 7. Spares/bunkers etc.                                                                                68

The Sellers shall deliver the vessel to the Buyers with everything belonging to her on board and on     69
shore. ~~All spare parts and spare equipment including spare tail-end shaft(s) and/or spare propeller(s),~~  70
if any, belonging to the vessel at the time of inspection, used or unused, whether on board or not shall  71
become the Buyers' property, but spares on order to be excluded. Forwarding charges, if any, shall be   72
for the Buyers' account. The Sellers are not required to replace spare parts including spare tail-end   73
shaft(s) and spare propeller(s) which are taken out of spare and used as replacement prior to delivery,  74
but the ~~replaced items shall~~ be the property of the Buyers. The radio installation and navigational  75

the Sellers' flag or name, provided they replace same with similar unmarked items. Library, forms, 78
etc., exclusively for use in the Sellers' vessels, shall be excluded without compensation. Captain's, 79
Officers' and Crew's personal belongings including slop chest to be excluded from the sale, as well as 80
the following additional items: 81

DUPLICATE

The Buyers shall take over remaining bunkers, unused lubricating oils and unused stores and pro- 82
visions and pay the current market price at the port and date of delivery of the vessel. 83

Payment under this clause shall be made at the same time and place and in the same currency as 84
the Purchase Money. 85

## 8. Documentation   (SEE APPENDIX A) 86

In exchange for payment of the Purchase Money the Sellers shall furnish the Buyers with legal Bill 87
of Sale of the said vessel free from all encumbrances and maritime liens or any other debts whatsoe- 88
ver, duly notarially attested and legalised by the                              consul toget- 89
her with a certificate stating that the vessel is free from registered encumbrances. On delivery of the 90
vessel the Sellers shall provide for the deletion of the vessel from the Registry of Vessels and deliver a 91
certificate of deletion to the Buyers. The deposit shall be placed at the disposal of the Sellers as well as 92
the balance of the Purchase Money, which shall be paid as agreed together with payment for items 93
mentioned in clause 7 above. 94

The Sellers shall, at the time of delivery, hand to the Buyers all classification certificates as well as 95
all plans etc. which are onboard the vessel. Other technical documentation which may be in the Sel- 96
lers' possession shall promptly upon the Buyers' instructions be forwarded to the Buyers. The 97
Sellers may keep the log-books, but the Buyers to have the right to take copies of same. 98

## 9. Encumbrances 99

The Sellers warrant that the vessel, at the time of delivery, is free from all encumbrances and ma- 100
ritime liens or any other debts whatsoever. Should any claims which have been incurred prior to the 101
time of delivery be made against the vessel, the Sellers hereby undertake to indemnify the Buyers 102
against all consequences of such claims. 103

## 10. Taxes etc. 104

Any taxes, fees and expenses connected with the purchase and registration under the Buyers' flag 105
shall be for the Buyers' account, whereas similar charges connected with the closing of the Sellers' re- 106
gister shall be for the Sellers' account. 107

## 11. Condition on delivery   (SEE CLAUSE 17) 108

The vessel with everything belonging to her shall be at the Sellers' risk and expense until she is de- 109
livered to the Buyers, but subject to the conditions of this contract, she shall be delivered and taken 110
over as she is at the time of inspection, fair wear and tear excepted. 111

However, the vessel shall be delivered with present class free of recommendations. The Sellers 112
shall notify the Classification Society of any matters coming to their knowledge prior to delivery 113
which upon being reported to the Classification Society would lead to the withdrawal of the vessel's 114
class or to the imposition of a recommendation relating to her class. 115

## 12. Name/markings 116

Upon delivery the Buyers undertake to change the name of the vessel and alter funnel markings. 117

## 13. Buyers' default 118

Should the deposit not be paid as aforesaid, the Sellers have the right to cancel this contract, and 119
they shall be entitled to claim compensation for their losses and for all expenses incurred together 120

ZAPOTECA

RIDER TO MEMORNDUM OF AGREEMENT DATED __ FEBRUARY 2000

16. Payment

As security for the correct fulfillment of this Memorandum of Agreement, the Buyers shall pay a deposit of usd 125,000 (usd one hundred twenty five thousand), of the purchase money mentioned in clause number one within 5 (five) banking days of execution of this Memorandum of Agreement.

The remaining amount, usd 1,312,500 (usd one million three hundred twelve thousand five hundred) shall be paid by Buyer to Seller by wire transfer, as noted below, upon presentation of documents required in Appendix A hereto.

Payment is to be made to:

Chase Bank
New York, NY

ABA # 021 000 021

Account # 400 2 22809, beneficiary Serfin International Bank & Trust

Reference Perforaciones Maritimas Mexicanas, S.A. de C.V., contract 38866

17. Delivery

The vessel with everything belonging to her shall be at Sellers risk and expense until she is delivered to Buyers at the place and at the time stipulated in clause —, but subject to the conditions of this Agreement. The vessel will be taken over as is, in the same condition as at the time of signing this Agreement, except for work which may have been carried out by Buyers prior delivery.

It is understood that nothing contained in the paragraph above shall apply or be in effect unless Buyers furnish Sellers, when this Agreement is executed, an insurance policy described in clause — which shall remain in effect from the date of the execution of this Agreement until the time of delivery to Buyers. ~~Cu~~

18. Insurance

BEFORE COMMENCEMENT OF ANY WORK    Cu

Buyers shall furnish Sellers, ~~at the time of execution of this Agreement~~, an insurance policy which shall remain in full force and effect from the ~~time of execution of this~~

COMMENCEMENT OF BUYERS
Cu

Should the Purchase Money not be paid as aforesaid, the Sellers have the right to cancel this con-
tract, in which case the amo   deposited together with interest earned, if a..., shall be forfeited to
the Sellers. If the deposit does not cover the Sellers' losses, they shall be entitled to claim further com-
pensation for their losses and for all expenses together with interest at the rate of 12% per annum.

**14. Sellers' default**

   If the Sellers fail to execute a legal transfer or to deliver the vessel with everything belonging to her
in the manner and within the time specified in line 38, the Buyers shall have the right to cancel this contract
in which case the deposit in full shall be returned to the Buyers together with interest at the rate of 12 % per
annum. The Sellers shall make due compensation for the losses caused to the Buyers by failure to execute a
legal transfer or to deliver the vessel in the manner and within the time specified in line 38, if such are due to
the proven negligence of the Sellers.

**15. Arbitration**

   If any dispute should arise in connection with the interpretation and fulfilment of this contract,
same shall be decided by arbitration in the city of[3] DALLAS , TEXAS
and shall be referred to a single Arbitrator to be appointed by the parties hereto. If the parties cannot
agree upon the appointment of the single Arbitrator, the dispute shall be settled by three Arbitrators,
each party appointing one Arbitrator, the third being appointed by [4].

   If either of the appointed Arbitrators refuses or is incapable of acting, the party who appointed
him, shall appoint a new Arbitrator in his place.

   If one of the parties fails to appoint an Arbitrator — either originally or by way of substitution —
for two weeks after the other party having appointed his Arbitrator has sent the party making default
notice by mail, cable or telex to make the appointment, the party appointing the third Arbitrator
shall, after application from the party having appointed his Arbitrator, also appoint an Arbitrator on
behalf of the party making default.

   The award rendered by the Arbitration Court shall be final and binding upon the parties and may
if necessary be enforced by the Court or any other competent authority in the same manner as a
judgement in the Court of Justice.

   This contract shall be subject to the law of the country agreed as place of arbitration.


CLAUSES 16 THROUGH 25, ATTACHED, TO BW PART OF THIS
MEMORANDUM OF AGREEMENT

Copyright Norwegian Shipbrokers' Association, Oslo.
Printed and sold by Halvorsen & Larsen A.s. Oslo.

1) The name of the Classification Society to be inserted.
2) Notes, if any, in the Surveyor's report which are accepted by the Classification Society without qualification are not to be taken into account
3) The place of arbitration to be inserted. If this line is not filled in, it is understood that arbitration will take place in London in ac-cordance with English law.
4) If this line is not filled in it is understood that the third arbitrator shall be appointed by the London Maritime Arbitrators' Associ-ation in London

Agreement until delivery to Buyers as provided herein., at the sole cost and expense of the Buyers.

The insurance coverage shall include:

    a.   Broad form Hull and Machinery insurance, including collision, in the case of total loss or total constructive loss of the vessel. Seller shall be nominated as loss payee for up to 100% of the purchase price of USD 1,437,500.

    b.   Protection and Indemnity insurance including but not limited to Towers liability as applies to Sellers vessels or units involved in the mobilization of the vessel, as well as Buyers vessels or units, in the equivalent of form SP-23

    c.   London Standard Drill Barge Insurance overage applicable to the Sellers vessels or units involved in the mobilization of the vessel.

    d.   Any deductible or coinsurance penalties shall be the sole responsibility of Buyers.

## 19. Buyers Labor Relations

Buyers declare, as employers of personnel engaged in work on the vessel, that they are the sole sponsors of such work and responsible for the obligations arising therefrom regarding work rules and social security matters.

Buyers undertake to respond to all claims his workers may make against Buyers for any reason, and is liable for any amounts which must be spent in this connection.

It is clearly agreed that Sellers at no time shall be considered as mediators between Buyers and Buyers labor, nor shall they be considered as substitute supervisors on Buyers behalf of any workers carrying out work for Buyers. Sellers will have no obligations with respect to personnel contracts for Buyers work and are exempt from paying any labor benefits to Sellers technicians and/or workers engaged by Buyers. Sellers will not be involved in such claims and will be reimbursed by Buyers for any proven expenses which may arise in this connection.

## 20. Inspection

Sale is outright and not subject to inspection

## 21. Buyers Work

Buyers have right to carry out work on board the vessel at their risk and expense following execution of this Agreement and lodging of the deposit.

Buyers have right to retain vessel at its present location for up to (one hundred eighty) 180 days following delivery at their risk and expense.

## 22. Export

Sellers to arrange for export documentation; cost of some documentation for Buyers Account *up to a maximum of USD 15,000 (fifteen thousand) uc to be documented by sellers*

## 23. Taxes

Sellers shall be responsible for all taxes levied by Sellers government in connection with this sale.

## 24. Future Employment

Buyers undertake that following transfer of title, the vessel will not be employed in Mexican waters for drilling. Buyers retain the right to employ the rig in Mexican waters, however, as an accommodation, production, or maintenance unit.

## 25. Confidentiality

The terms and conditions of this Agreement to remain private and confidential

| SELLERS | BUYERS |
|---|---|
| PERFORACIONES MARITIMAS MEXICANAS S.A DE C.V. | ENERGY DRILLING, INC. |

By: GABRIEL DESCHAMPS /ATTORNEY-IN-FOOT
*Arturo medellin /Attorney-in-fact*
*Ernesto Navarro /Attorney-in-fact*

By: _____ Attorney in Fact



~~acceptance of the vessel's classification records and of the vessel not be received by the Sellers as~~

# EXHIBIT "C"

FROM : PATT11.ps          FAX NO. : 2815891424          Aug. 05 2004 04:11PM P2
Case 1:04-cv-00048    Document 48    Filed in TXSD on 08/11/2004    Page 40 of 93

-02  05:02pm    De-PATTON MORENO Y ASVAT          +00507          T-981  P.02/03  F-097

ORIGINAL

**REPUBLICA DE PANAMA**
REPUBLIC OF PANAMA
**AUTORIDAD MARITIMA DE PANAMA**
PANAMA MARITIME AUTHORITY
**DIRECCION GENERAL DE MARINA MERCANTE**
DIRECTORATE GENERAL OF MERCHANT MARINE

PRORROGA No.  **08-02**
EXTENSION No :

**XXXXXXX LA SUSCRITA DIRECTORA GENERAL DE LA DIRECCION GENERAL DE MARINA MERCANTE**

**CONSIDERANDO:**
CONSIDERING.

Que el señor    **PATTON, MORENO & ASVAT** _____ en su capacidad
de   **REPRESENTANTE LEGAL** _____ ha solicitado se prorrogue la patente  **PROVISIONAL**
de Navegación No.   **28909-PEXT-1** _____ expedida el   **9 DE MAYO DEL 2000**
a la nave   **ENERGY ZAPOTECA**

Que se ha comprobado que esta nave ha pagado impuesto y tasa única anual hasta el   **31 DE DICIEMBRE DEL 2002**

Que la Dirección General de Marina Mercante ha concedido la prórroga de la patente antes expresada.

**RESUELVE:**
RESOLVES:

Prorróguese por el término de  **CUATRO (4) MESES** _____ contados desde el  **4 DE OCTUBRE DEL 2001** hasta el  **CUATRO (4) DE FEBRERO DEL 2002** __ es validez de
la Patente  **PROVISIONAL** _____ de Navegación No.  **28909-PEXT-1** __ expedida el
**9 DE MAYO DEL 2000** _____ a favor de la nave  **ENERGY ZAPOTECA**
_____ del porte de   **2,661.00** __ toneladas netas y
**3,675.00** _____ toneladas brutas, de propiedad de  **ZAPOTECA ENERGY INC.**

Expedida y firmada en  **PANAMA** _____ el (los)  **CUATRO (4)**
Mes  **ENERO** __ **DOS MIL DOS (2002)** __ Día
Año

NUMERAL A. C. 42
Derechos cobrados B/.  **200.00**

Comprobante No. y fecha  **63847**
**3-1-02**

nv.    (SELLO)
(SEAL)



**LICDA. MARIXENIA DE BARRIOS**
Nombre y firma del Funcionario

DISTRIBUCION  ORIGINAL Y DUPLICADO - INTERESADO
TRIPLICADO - DIRECCION GRAL. DE MARINA MERCANTE
CON EL INFORME MENSUAL
CUADRUPLICADO - ARCHIVO, CONSULADO

P-99- No. **3321**

AMP-2000

ORIGINAL

**REPUBLICA DE PANAMA**
REPUBLIC OF PANAMA
**AUTORIDAD MARITIMA DE PANAMA**
PANAMA MARITIME AUTHORITY
**DIRECCION GENERAL DE MARINA MERCANTE**
DIRECTORATE GENERAL OF MERCHANT MARINE

**PRORROGA No.** 165-03
(EXTENSION No.)
EXTENSION NO. LA SUSCRITA, DIRECTORA GENERAL DE LA DIRECCION GENERAL DE MARINA MERCANTE
The Undersigned

**CONSIDERANDO:**
CONSIDERING:

**Que el señor** PATTON, MORENO & ASVAT **en su capacidad**
That Mr. in the capacity
**de** REPRESENTANTE LEGAL **ha solicitado se prorrogue la patente** PROVISIONAL
of has applied for extension of certificate of registration
**de Navegación No.** 28909-PEXT-1 **expedida el** 9 DE MAYO DEL 2000
for navigation No. issued on the
**a la nave** ENERGY ZAPOTECA
to the vessel

**Que se ha comprobado que esta nave ha pagado impuesto y tasa única anual hasta el**
That it has been attested that the said vessel has cancelled consular and annual taxes until the
31 DE DICIEMBRE DEL 2003

**Que la Dirección General de Marina Mercante ha concedido la prórroga de la patente antes expresada.**
That the Directorate General Of Merchant Marine has granted the extension of said certificate of registration.

**RESUELVE:**
RESOLVES:

**Prorrógase por el término de** CUATRO (4) MESES **contados desde el** 4 DE ABRIL DEL 2003
To extend for a period of counted from
**hasta el** 4 DE AGOSTO DEL 2003 **la validez de**
until the the validity of
**la Patente** PROVISIONAL **de Navegación No.** 28909-PEXT-1 **expedida el**
Certificate of Registration for Navigation No. issued on the
9 DE MAYO DEL 2000 **a favor de la nave** ENERGY ZAPOTECA
for the vessel
**del porte de** 2,661.00 **toneladas netas y**
of net tons and
3,675.00 **toneladas brutas, de propiedad de** ZAPOTECA ENERGY INC.
gross tons owned by

=============================================================

**Expedida y firmada en** PANAMA **al (los)** VEINTICINCO (25)
Issued and signed in on the **Día** (day)
MARZO 2003
**Mes** (month) **Año** (year)

/indec

**NUMERAL A. C. 42**
Derechos cobrados B/. 200.00
Fiscal rights US $
**Comprobante No. y fecha** LIQ. 112276
Receipt No. and date 24-3-03

**LICDA. MARIXENIA DE BARRIOS**
**Nombre y firma del Funcionario**
Name and signature of Officer

**(SELLO)**
(SEAL)

DISTRIBUCION: ORIGINAL Y DUPLICADO - INTERESADO
TRIPLICADO - DIRECCION GRAL. DE MARINA MERCANTE
CON EL INFORME MENSUAL
CUADRUPLICADO - ARCHIVO, CONSULADO

**P-01- No.** 5360 **AMP-2001**

# EXHIBIT "D"

Sergio A. Huerta Guerrera

## Title page of Fax

Attention:

Name: Mr. Charles Douglas Phillips
Firm:  None
Telephone: 0012815891424   Fax: 0012815891424
City: Houston        State:  Texas, USA

---

From


Name: Attorney Sergio A. Huerta Guerrero
Comments:
            ATTACHED EMBARGO RESOLUTION

Number of pages: 6

In case the documents are illegible please call:  833  2142338


Directions: Area 104 North Office 2 in the central zone of Tampico, Tamaulipas
Telephone & Fax:  2-14-23-38

Branch office: Special council number one
Office number: 260/2004
File No: 194/1/2004

Tampico, Tamaulipas     Monday 12 of April 2004

President of the committee of
Conciliation and Arbitration of
Tuxpan, Veracruz.

      On April 07 of the present year a letter has already been presented
to the committee that the defendant (Zapoteca Energy Inc. and Gram & Co.)
is responsible for the actions that occurred at Energy/Naborns 660 which is locate at
Rio Pantepec near the company Celasa on the Tuxpan platform bridge in Veracruz.
This copy is up to date with the resolution of April 07, 2004.

Special Counsel number one of
Conciliation and Arbitration of
The State of Tampico, Tamaulipas

Steve Royce Gray and others
                    Vs.
Zapoteca Energy Inc. and others
File No.  194/1/04


In Tampico, Tamaulipas April 07, 2004

The state has considered the issues to achieve a result from the
 evidence that was presented by the plaintiffs. A next step needs to
be taken to achieve a result.

_____RESULT_____

On April the 1st 2004 the authorities received a written motion that was set on
March 30th of the present year, from CC. Steve Royce Gray and Charles
Douglas Phillips. (lawsuit)
Now the defendant has the intention to remove either (the employees or the platform) to
a port in the United States to remove its self from their responsibilities.

Special Counsel number one of the
Local Conciliation and Arbitration from the
State of Tampico, Tamaulipas

On April 2, 2004 an attorney from the state of Tampico, Tamaulipas
C. Lic. Julieta Castillo Gonzalez  she assigned a date and time(April 05, 2004) to hear
the testimony of CC. Luis Jerez, Marco Molar, and Abrham Trejo.


Whereas_____

1. The authority is competent to recognize and resolve and take preventive measures
On articles 523 fraction XI, 698, 857, fraction II and any thing else related to and
applicable to the Federal Work Laws.

2. The arguments made by the plaintiff and along with the study of the evidence offered
by the plaintiff will be analyzed by the authority based on the testimony given by Luis,
Marco, and Abrham.

They agree to answer questions number 6 and 7
6. For the witness to say if he knows the economical situation of the
company(Zapoteca Energy Inc.)
7. For the witness to say if he knows if the company has any debts.

The first witness answered number
 (6) They have a lot of lawsuits from which we have heard; the employees say that the
company is has many conflicts.
 (7) With the workers that have been terminated in the company, as with the different
suppliers to the company

The second witness answered the questions as such
(6) It is a hard situation now that the company has many debts with employees and
as well they have many lawsuits.
(7)With the employees that are suing –

the last witness answered like this
(6) It is a bad situation now that they have a lot of lawsuits, and are in debt with
employees and suppliers
(7) Yes, Yes, they have debts with the same workers

The testimony of the three people that were mentioned before that they came to the
conclusion that the lawsuit will remain unsolved and leave the employees with no pay in
accordance with the lawsuit presented by Segio H. Guerrero They have assigned April
02, 2004 to confirm the existence of another lawsuit that will be beneficial to the interest
of the workers.

El C. President Agreement: Let it be known that the precautionary embargo for the defendants Zapoteca Energy Inc. and Y P.D. Gram and Co. AS. and whom is responsible for the source of work located at the platform Energy Zapoteca/Nabors 630 located in the river Pantepec, near the company Celasa on the platform bridge in Tuxpan, Veracruz.
For the amount of $1,115,568.00 which is being sought by the plaintiffs, or will settle for the equivalent amount in Mexican pesos. The previous was chosen on April 6, 2004. Taken into consideration the address of where the incident took place, it is found outside of the jurisdiction of the authority. A letter is to be sent to a Special Committee Number 6 of the Conciliation and Arbitration with residency of Tuxpan, Veracruz to ask for the help of Commission of the Precautionary Embargo. To notify them of the terms of the Federal Laws of Labor.

Notification:    The address of the person helping the special committee is located at Calle Cristobal Colon No. 104Nte. Office 102 in zone central Tampico, Tamaulipas
The terms of the lawsuit is appointed to resolve this action.


The committee is in accordance with Federal law of labor 635

# EXHIBIT "E"

EDWIN K. NELSON, IV

ATTORNEY AT LAW

3814 Sun Valley Drive · Houston, Texas 7702.

Telephone: 713-668-5100 · Facsimile: 713-668-5110

Email: seaproctor@hotmail.com

10 March 2004

Charles Douglas Phillips
**Via Facsimile: 956-761-6784**
**Via E-mail: energyzapoteca@yahoo.com**

> RE:    Revocation of Powers of Charles Douglas Phillips as Representative of
> Zapoteca Energy, Inc. and Master of Rig ENERGY ZAPOTECA

Dear Charles,

It is with deep regret that I must write this letter, which I write as the attorney for and under instructions from Zapoteca Energy, Inc.

Please be advised that Zapoteca Energy, Inc. hereby immediately revokes all powers granted to you as Owner's Representative and Master of the Rig ZAPOTECA ENERGY. The powers being revoked include, but are not limited to, those powers granted to you by Zapoteca Energy, Inc. under the Power of Attorney dated 17 April 2002 and under the Power of Attorney Protocol No. 33/2001.

Please be further advised that Zapoteca Energy, Inc. is simultaneously taking appropriate action in Tuxpan, Mexico revoking all powers granted to you as Owner's Representative and Master of the Rig ZAPOTECA ENERGY. The powers being revoked in Mexico include, but are not limited to, those powers granted to you by Zapoteca Energy, Inc. under the Power of Attorney dated 17 April 2002 and under the Power of Attorney Protocol No. 33/2001.

If you have any questions regarding this matter, please feel free to contact me. I will discuss this matter with you to the extent I am able.

Sincerely,

Edwin K. Nelson, IV

# EXHIBIT "F"

IN THE UNITED STATES DISTRICT COURT
FOR THE SOUTHERN DISTRICT OF TEXAS
BROWNSVILLE DIVISION

| | | |
|---|---|---|
| ZAPOTECA ENERGY, INC. | § | |
| | § | |
| VS. | § | CIVIL NO. B-04-048 |
| | § | In Admiralty/Rule 9(h) |
| CHARLES DOUGLAS PHILLIPS, et al. | § | |

## AFFIDAVIT OF CHARLES D. PHILLIPS

| | |
|---|---|
| STATE OF TEXAS | § |
| | § |
| COUNTY OF HARRIS | § |

Before me, the undersigned officer, on this day personally appeared Charles D. Phillips who, after first being duly sworn, deposes and says on oath as follows:

1.    My name is Charles D. Phillips. I am over the age of 21 years. I have never been convicted of a felony or a crime of moral turpitude, and I am not otherwise disqualified from making this affidavit. Except where otherwise stated, I have personal knowledge of every fact to which I testify in this affidavit, and every fact to which I testify in this affidavit is true and correct to my personal knowledge.

2.    I am 61 years old and a U.S. Citizen. My home address is 14227 Misty Meadow Lane, Houston, Texas 77079.

3.    I am a licensed Master. I received my first Master's license from the United States Coast Guard on December 14, 1984. That license covers "any gross tons and oceans." My Master's license number is 560648 and issued by the U.S. Coast Guard in New Orleans, Louisiana. In addition, I also hold a United States Coast Guard license as an Able-bodied Seaman/Lifeboatman. I also hold certificates from Noble Denton & Associates as a Marine

Move Supervisor for Mobile Offshore Drilling Units and am a Certified Rig Mover from Global Marine.

4.      In 1980, I was the Master of the DAN PRINCE, a jack-up drilling rig registered and flagged in Liberia. While under tow from Dutch Harbour, Alaska, to Abijahn, West Africa, the vessel sank due to severe weather with no loss of life. At the end of the investigation and hearings, I received a commendation from the U.S. Coast Guard Admiral and the hearing board for my actions and performance as Master for my efforts to save the Vessel and in maintaining the safety of the crew.

5.      I have never had any negative action or proceedings taken against of my Coast Guard licenses. None of these licenses has ever been suspended or revoked.

6.      In regard to the Rig, ENERGY ZAPOTECA, sometimes called the NABORS 660 (hereinafter "the Vessel"), I originally was an employee of Southern International, Inc. ("Southern") and was hired by Southern in May of 2000 to become project manager having to do with refurbishing the Vessel. At that time I also became the Master of the Vessel. My employer initially was Southern, but I was assigned to the Vessel and working under the supervision of the Vessel's managers, P.D. Gram & Co. ("Gram"). My understanding is that the Vessel's title owner is Zapoteca Energy, Inc. ("Zapoteca"), which to my knowledge was created strictly to acquire title in the Vessel. However all Rig operations, supervision, management, repair, etc., were seen to by the Vessel's managers, Gram, since Zapoteca has no actual employees or officers. If it does, I never met them. I was appointed Master of the ENERGY ZAPOTECA in the Summer of 2000 by Mr. Christian Kongsli. In December 2000, I was under the supervision of Gram. My instructions came from the Vessel's

managers, Gram. I was told that Mr. Kongsli, to whom I reported, was authorized by Gram as my supervisor. That was also true in late 2003 and even through mid-March of 2004.

In the Spring of 2003, I went to work for Nabors Drilling as Master of the ENERGY ZAPOTECA/NABORS 660. I continued to work for Gram and Zapoteca as the owners' representative and legal representative. That was after Nabors had entered into a Memorandum of Agreement to purchase the Vessel. However, in August of 2003, I left Nabors' employ and returned to the employment of Gram as the Master of the ENERGY ZAPOTECA. Throughout 2003 I was the Master of the Vessel and was either an employee of Nabors or Gram, depending on the time frame. (During the Nabors time period, Nabors paid me a portion of my Master's wages, but not the balance. That issue later was settled.) Throughout my period as a Gram employee, I submitted my payroll and other items to Gram and received my paycheck and reimbursement of various expenses from Gram as Master. I also continued to report to Gram, through my supervisor and contact, Mr. Kongsli. Again, to my knowledge, Zapoteca had no actual employees. Rather, the Vessel again was managed by Zapoteca's managers, Gram, just as had occurred earlier.

7.    During the period of March 3-11, 2004, Mr. Kongsli, my supervisor at Gram, came to Port Isabelle, Texas, to meet with me and discuss progress of the Vessel's improvements, my bonus, meetings with the crew members, and final preparations of the Vessel for her intended ocean tow from Tuxpan, Mexico, to what I was told would be Port Isabelle, Texas. Mr. Kongsli did not indicate to me that he was unhappy with my performance, nor did he request that I provide any documents, files, or other papers to him. However, in a sudden shock to me, on March 10, 2004, I received a fax letter from Zapoteca's attorney, Ed Nelson, with whom I had dealt on numerous occasions over the

preceding five months or so and with whom I had exchanged correspondence well over a hundred times. While Mr. Nelson was Zapoteca's counsel, he gave me advice as the Vessel's Master and as the local representative of Zapoteca, upon which I routinely relied. He frequently told me that he had received instructions from Gram or Zapoteca and was passing those instructions to me. He also gave me a good deal of legal advice on how to handle the various claims against or concerning Zapoteca in Mexico. Several of the claims were against Zapoteca and against me personally. On several occasions he assured me that my own claims as a merchant mariner, seaman and the Vessel's Master, were protected under controlling law, so I did not need to worry when Zapoteca did not pay me promptly, postponed payment of my bonus, etc. On March 10, 2004, the same day I had been meeting with Mr. Kongsli, I got a letter from Mr. Nelson indicating that my employment was terminated. I was shocked that I was being terminated for refusing to move the Vessel without permission of the Port Captain and the Labor President.

8.      I later learned that Zapoteca, in a meeting in Oslo, Norway, on February 18, 2004, revoked my Power of Attorney without any justification. I did not learn of this February 18, 2004 meeting or revocation until I was served on March 15, 2004, with the Application for TRO filed by Zapoteca on March 12, 2004.

9.      Although I had been told that the Vessel would be towed to Port Isabelle, Texas, I later learned that in fact Zapoteca had no intent to do so, and in fact had been planning with Nabors, who was intending to buy the Rig, that the Rig was to be taken to Freeport, Texas, or points further east. I believe that I was being misinformed intentionally of the intended destination of the Vessel, in Gram's or Zapoteca's desire to keep me from becoming more alarmed about not being paid and trying to take steps to protect my claims,

including seeking an embargo from the appropriate Mexican court. After I was fired on March 10, 2004, I did seek an embargo order from the appropriate Mexican labor court. That Embargo Order was issued on April 7, 2004. However, Zapoteca and Gram were successful in having the Vessel leave Tuxpan before the court officials could attach the Vessel, thus thwarting the intent of the Mexican judicial officials in trying to hold the Vessel within the Mexican court's jurisdiction. If she had not departed as quickly as she did, the Vessel would have been attached under Mexican law, which I understand is similar to an arrest in Admiralty under United States law.

10.    One of the civil disputes Zapoteca had in Mexico was based on alleged charges owed to Protexa/Celesa. As the local representative of Zapoteca and the Vessel, I was questioned by a Mexican court representative. I had a Mexican attorney representing me, who was hired by Zapoteca and paid by Zapoteca. He advised me on how to answer various questions. Protexa/Celesa later asserted that one of my answers was incorrect and on that basis were able to get criminal charges issued against me in Mexico. Zapoteca agreed shortly after the civil claims were asserted by Protexa, and again after the criminal charges were asserted, that it would protect me from both the civil and criminal charges and take all steps necessary to be sure those claims and charges against me personally were completely dropped, both by Protexa/Celesa and by the appropriate judicial authorities. In late May 2003, my wife and I had to flee Mexico due to fear that an arrest warrant was forthcoming. Zapoteca confirmed that to me and indicated that they would be sure in resolving the civil claim with Protexa that all the criminal charges against me would be dropped and withdrawn. In June 2003, an agreement was drawn up between Zapoteca and Protexa whereby Protexa was obligated "to obtain the total and final discharge of the charges against me." In late

June, 2003, the agreement was changed without informing me. Christian Kongsli and Henirk Aadnesen with Nodisk Legal Services changed the agreement from "total and final discharge" to "everything within Protexa's power to obtain the total discharge of the criminal charges against me. I learned on August 2, 2003, in a meeting with Mr. P. D. Gram and Mr. Christian Kongsli in Houston, Texas, that the agreement with Protexa had been changed and that the criminal charges were not dropped.   Shortly after that meeting, I learned that an arrest warrant had been issued in early July, 2003, by the criminal court in Tuxpan, Mexico. Since then, I have not been able to return to Mexico and, based on the advices from Zapoteca's Mexican counsel to me, I will not be able to return to Mexico, even to visit, for a period of at least 4-5 years, and possibly later. I have been advised by Zapoteca's counsel that it will take at least that long before the criminal charges against me cannot be pursued.

11.     Around the period of time that I dealt with the Vessel, she had various insurance coverages in effect, which would be typical of commercial vessels in navigation. For example, she had collision hull coverage (the vessel equivalent of property damage), collision liability (if she ran into or was run into by another vessel), protection and indemnity coverage (which is somewhat similar to comprehensive general liability coverage as might apply on a homeowners' policy), employee and wage protection coverage, and even navigation and tower's liability coverage. These coverages were renewed or put into effect in conjunction with the anticipated and ultimately successful towage of the Vessel from Mexico to Texas. Those coverages were in effect in the Summer of 2000, and were renewed or extended, including specifically tower's liability coverages, in 2003 and 2004, after Zapoteca and Nabors had contracted for the sale and delivery of the Vessel to Nabors in international or Texas waters.

12.    As reflected in the counter-claim filed in this case, I have various claims against Zapoteca, the Vessel and Gram, (collectively "Vessel Interests") which include:

(a)    The Vessel Interest's failure to pay me my back wages and employment benefits prior to and through the date of my termination of employment, March 10, 2004;

(b)    The Vessel Interest's wrongful termination of my employment and retaliatory discharge of me, based on my failure to have the Vessel moved within the port of Tuxpan, Mexico, which had I done so would have been in violation of local orders and would have made me subject to immediate arrest and imprisonment;

(c)    The Vessel Interest's contractual obligation to pay me my $165,000 bonus, which was agreed to be paid in the Spring of 2003 and later in the Summer of 2003, but which I indicated that I would defer until the Spring of 2004;

(d)    The Vessel Interest's debt to me of my portion of the Embargo Order issued by the Mexican court on April 7, 2004, of which my portion is approximately $800,000 to $900,000;

(e)    My entitlement to hold harmless, defense and indemnity obligations having to do with Mexican labor cases in which I personally am named and may have some liability by virtue of being Zapoteca's local representative in Mexico; and

(f)    Zapoteca's liability to me for failing to get the criminal charges totally dismissed and withdrawn, thereby damaging my reputation and prohibiting my return to Mexico, where I otherwise could gain employment for a period of some 5-6 years or more.

13.    I have a substantial likelihood of success on the merits of my claims against Zapoteca and the Vessel because, in part, I was the Vessel's Captain and had not been paid

my wages and benefits, either prior to or after Zapoteca's attorney, Mr. Ed Nelson, fired me on March 10, 2004.  Zapoteca owes me back wages, fringe benefits, reimbursement of housing, car allowance, phone allowance, repatriation (including moving expenses to the United States) and the bonus I had agreed to for exceptional work I had done on the refurbishment of the Vessel, and work done to ready the Vessel to be brought to the United States (and specifically  Texas) in the Fall of 2003 and the Spring of 2004.  I have a substantial likelihood of recovery on the other claims (b, d, e & f above) as well.

14.     Accordingly, I have asserted my counterclaim in this court against Zapoteca and seek damages in excess of $2,000,000.00, plus interest, costs and attorney's fees. I should be permitted to attach property of Zapoteca to secure these amounts and claims.

15.     Zapoteca, the defendant as to my claims, is a Liberian corporation with no place of business in the State of Texas.  Further, upon information and belief, Zapoteca has no assets anywhere in the state of Texas, with the sole exception being the Vessel, located at the Sabine Shipyard, Sabine Pass, Jefferson County, Texas.  Accordingly, upon successful prosecution of this suit, I will have a post-judgment lien against the Vessel.  I already have one or more pre-judgment liens, based on my seaman's wage claim, abrupt discharge on March 10, 2004, and the Mexican "Embargo Order."

16.     Upon information and belief, the Vessel is a risk for departure.  If the Vessel departs, I will be left without means to recover my damages from Zapoteca.  I fear that Zapoteca will remove the Vessel from the jurisdiction of this Court.

17.     Zapoteca is justly indebted to me.  A writ of attachment in my favor is not sought for the purpose of injuring or harassing, and I will probably lose the debt unless an attachment is issued.

18.    I will suffer immediate and irreparable injury if the Court does not grant a Rule B or C attachment or if a temporary restraining order or preliminary injunction is not issued because I will be left without means to recover my damages from Zapoteca. The harm to me outweighs the harm to Zapoteca if the temporary restraining order and preliminary injunction are not granted, as this is the sole asset of Zapoteca's in which I can satisfy a potential judgment lien and Zapoteca is not currently conducting business with the Vessel, as she presently is docked or "stacked" at the Sabine Shipyard, Sabine Pass, Jefferson County, Texas.

19.    Granting a temporary restraining order and preliminary injunction is in the public interest in that it secures a judgment lien in my favor, since I live and work in Texas, am a Texas resident and U.S. citizen and Zapoteca is an overseas company. Further, it will prohibit Zapoteca, a foreign corporation, from avoiding its liabilities and debts to me by further encumbering its only asset in Texas upon which I can satisfy a judgment.

20.    If the pre-judgment relief I seek is not granted, I have no other adequate remedy at law. Should my request for TRO, preliminary injunction and Rule B & C attachment or arrest be denied, I will be without remedy to prevent Zapoteca from disposing of or further encumbering the Vessel. I will be left without means to recover my damages for Zapoteca's wrongful termination/retaliatory discharge, failure to pay to me my earned seaman's wages, and failure to protect me from civil and criminal proceedings in Mexico or from personal liabilities for Zapoteca's and the Rig's debts and liabilities, etc.)

21.    If so ordered, I will obtain a bond or other such surety or bond payable to Zapoteca Energy, Inc., in the above-referenced action in the amount and under the terms fixed by the Court's order and on the further condition that I will prosecute  this suit to effect

and pay the extent of the penal amount of the bond or surety all damages and costs that may be adjudged against me for wrongfully suing out such writ of attachment.

22.    If so ordered, I also will obtain a bond or other such surety on the amount payable to Zapoteca Energy, Inc., in the above-referenced action in the amount and under the terms fixed by the Court's order for the payment of such costs and damages as may be incurred or suffered by any party who is found to have been wrongfully enjoined or restrained by a temporary restraining order, preliminary injunction, and permanent injunction.

23.    Regarding the Christian Kongsli affidavit of March 11, 2004, attached as Exhibit "A" to the TRO filed on March 12, 2004; I state as follows:

(a)    Christian Kongsli would have had full knowledge that the Vessel was not coming to Port Isabel, Texas, when he signed his affidavit on March 11, 2004;

(b)    On March 3, 2004, I provided the ballast program and tanks, and towing procedures to Mr. Kongsli. The next day (March 4, 2004) he forwarded them to Erik Ostybe, Per Johansen, and Meritus in Tuxpan, Mexico and Gram in Norway;

(c)    On Page 2, paragraph 4, Chrisian Kongsli should have been aware when he signed his affidavit that the attachments (embargoes) from the Labor Court had not been lifted and that the Vessel could not legally be moved from her location in Mexico. Zapoteca, Zapoteca's counsel in Mexico and its counsel in Houston were also aware that the Labor Court attachments on the Vessel prohibited any movement of the Vessel from her then- present location.

(d)    In late June, 2003, I was not terminated or reprimanded for not moving the Vessel to APITUX dock, as instructed by Gram; I also was not terminated or

reprimanded for not allowing onboard Christian Kongsli, Henrik Aadnesen (with Nordisk Legal), our agent with Meritus, or the Port Inspector.  At that time, the Vessel had two attachments (embargoes) in effect by the Labor Court and could not be moved from her then-present location.  The Labor Court President assigned the crew as watchman for the Labor Court onboard the Vessel.  Christian Kongsli instructed the agent for Meritus to cancel the inspection by the port inspector after learning that the Vessel could not be moved until all attachments had been lifted.  On July 10, 2003, I received an e-mail from Gram, (Mr. Kim Steimler), stating:  "Charlie, let there be no doubt in your mind that we recognize that you have protected our interest and done it well."

24.    Regarding the Erik Ostybe affidavit filed on May 28, 2004 in the Supplemental Response to Defendant's Motion for Arrest and Seizure of Vessel, I state as follows:

(a)    Erik Ostybe should have been fully aware based on the Memorandum of Agreement between Zapoteca and Nabors, entered in March 2003, that the Vessel was approved for a tow from Tuxpan, Mexico to Freeport, Texas in April/May 2003.  He also should have been fully aware that the tow from Tuxpan, Mexico to Freeport, Texas was approved by their insurance company and survey company for a "manned tow."  He also should have been fully aware that the entire purchase price of the Vessel was transferred to Zapoteca's bank account in Norway and England.

(b)    Erik Ostybe also should have been aware that the Vessel was made ready for a manned tow for Nabors in April, May or June of 2003 and August of 2003.

(c)    Even after Nabors cancelled the MOA in early September 2003, Zapoteca continued to make plans to take the Vessel to Freeport, Texas for Nabors.

25.     Regarding Cliff Arkley's affidavit, attached to Zapoteca's Supplemental Response filed on May 28, 2004; I state as follows:

(a)     There are various letters, faxes and e-mails from the Vessel's hull insurers' surveyors, London Offshore Consultants (including Cliff Arkley and his supervisor, Kevin Highfield) discussing conditions to be met before the proposed manned tow, beginning in December of 2003.   Starting then and running through February and even March of 2004, London Offshore Consultants (including Mr. Arkley) were proceeding with steps for the manned tow.   Christian Kongsli, acting on behalf of Gram as Vessel managers and Zapoteca Energy, Inc. as the Vessel's owners, and on behalf of the Vessel ENERGY ZAPOTECA (herein sometimes collectively "Vessel Interests") in early February 2004 indicated that Gram or Zapoteca would provide the life rafts which would be required for the "riding crew."   Similar correspondence confirmed that the Vessel would be towed, (i.e., a "wet tow" movement).   Mr. Kongsli on behalf of Gram or Zapoteca was making arrangements for Visas for the Mexican citizens who would be on the riding crew.   However, to the best of my knowledge as of the date of my termination of employment on March 10, 2004, neither Zapoteca nor Gram had made arrangements to get the life rafts aboard the Vessel, which was a pre-condition to the Vessel being able to be towed with a riding crew aboard.   Consequently, she could only be towed in an unmanned status until that life saving gear was placed aboard.   It was never placed aboard, so the Vessel ultimately was towed, unmanned.

(b)     In addition, Zapoteca was well aware that Nabors had rented an accommodation quarters, which had been placed aboard the rig, in anticipation of the manned tow from Tuxpan, Mexico to Texas in April or May of 2003.   This in fact was the

same accommodation quarters that Zapoteca rented from Nabors under an agreement entered into in December of 2003. Neither Nabors nor Zapoteca would consider that accommodation quarters to be "unfit for habitation," as suggested by Mr. Arkley.

(c)     In addition, the Vessel Interests, including their insurer, were communicating among themselves that they were very concerned that London Offshore Consultants were "very much to blame" in the "delay in moving this rig." These statements and related documents make clear that delays associated with having the Vessel ready for a manned tow were not caused by me, but were caused by Gram or Zapoteca in not getting life rafts aboard promptly or by Vessel Interests' surveyors in delaying and making unnecessarily complex the arrangements for the towage of the rig.

FURTHER AFFIANT SAYETH NOT:

Charles D. Phillips

SWORN TO AND SUBSCRIBED BEFORE ME on this _10th_ day of August, 2004.

Notary Public in and for the State of Texas

Shari Carnahan
Printed Name of Notary

SHARI L. CARNAHAN
NOTARY PUBLIC
State of Texas
Comm. Exp. 02-14-2005

My Commission Expires: _2-14-05_

# EXHIBIT "G"

**EDWIN K. NELSON, IV, P.C.**
ATTORNEY AT LAW
3814 Sun Valley Drive - Houston, Texas 77025
Telephone: 713-668-5100 - Fascimile: 713-668-5110
Email: seaproctor@hotmail.com

18 November 2003

Importacion Industrial ASAC, S.A. De C.V.
Attn.: Mr. Jose A. Salazar
Avenue Ejercito Mexicano Number 54 Altos
Col. Lauro Aguirre C.P. 89140
Tampico, Tamps
MEXICO
**Via Facsimile: 011-52-833-217-0518**

<div style="margin-left:2em">

RE:    Energy Zapoteca, Inc.

Rig ENERGY ZAPOTECA

Importacion Industrial ASAC, S.A. De C.V.

Importacion Industrial ASAC, S.A. De C.V. Letter Dated 10 September 2001 to Energy Zapoteca with Attached Invoice

</div>

Dear Mr. Salazar:

Please be advised that we have been retained to represent Energy Zapoteca, Inc. (hereinafter "Zapoteca") and the Rig ZAPOTECA ENERGY (hereinafter "EZ") in the referenced matters. As such, we request that all correspondence regarding the referenced matters be directed through our offices. You may carbon copy Charles Phillips (hereinafter "Phillips"), Zapoteca and P.D. Gram & Co. AS (hereinafter "Gram") on all correspondence if you so desire.

We address below several issues regarding ASAC that we deem important.

ISSUE ONE

Based upon our review of numerous documents related to the referenced matter, we have the following understanding of certain facts:

1.    Per your 10 September 2001 letter to Phillips, as President of Zapoteca, with attached invoice, ASAC claims an additional amount of $16,436.64 is due and owing ASAC by Zapoteca.

2.  Zapoteca, Phillips and Gram have asked ASAC to provide the appropriate documentation in support this above-mentioned invoice, and agreed to pay all invoices so supported. <u>This documentation includes all invoices for product, freight, ABS certificates, duties, ad valorem border taxes, IVA, etc., and cancelled checks supporting payment of the same by ASAC.</u>

3.  To date, ASAC has refused and failed to provide Zapoteca, Phillips and Gram the appropriate documentation in support this above-referenced invoice.

4.  On or about 30 May 2002, ASAC filed suit against Meritus De Mexico for payment on the referenced invoice, claiming an outstanding amount of $26,591.07 as due and outstanding.

5.  This lawsuit was dismissed.

6.  The EZ is located in Tuxpan.

7.  ASAC has filed a lawsuit against Phillips individually claiming Phillips is liable for payment of the referenced invoice.

8.  This lawsuit was filed in Tampico.

9.  Arturo Bazaldua had a meeting scheduled with you to discuss this matter.

10. You failed to attend this meeting.

From the above, it is clear that Zapoteca, Phillips, and Gram have taken every step possible, and wise, to make payment of the referenced invoice. It is equally clear ASAC has taken not one step, aside from submitting the referenced invoice, to ensure payment of the same.

We can think of no appropriate reason ASAC would refuse and fail to provide Zapoteca, Phillips and Gram with the appropriate documentation in support of the above-reference invoice. Our only conclusion is ASAC does not have the appropriate documentation. Accordingly, ASAC's refusal and failure to provide Zapoteca, Phillips and Gram with the appropriate documentation leads us to believe the referenced invoice is fraudulent or fraudulently overstated.

ASAC's refusal and failure to provide Zapoteca, Phillips and Gram with the appropriate documentation also leads us to believe that all previous ASAC invoices to Zapoteca are equally fraudulent or fraudulently overstated. Accordingly, we respectfully request ASAC immediately provide to us all appropriate documentation supporting all ASAC invoices previously paid by Zapoteca, Canega and/or Gram. As noted above, this documentation includes <u>all invoices for product, freight, ABS certificates, duties, ad valorem border taxes, IVA, etc., and cancelled checks supporting payment of the same by ASAC.</u>

Upon our review of all appropriate documentation supporting the referenced invoice and all ASAC invoices previously paid by Zapoteca, Canega and/or Gram, we will ensure payment of any amount that may be due ASAC. ASAC's failure to provide appropriate documentation supporting the referenced invoice and all ASAC invoices previously paid by Zapoteca and Gram will reinforce our belief the referenced invoice is fraudulent or fraudulently overstated and all previous ASAC invoices to Zapoteca are equally fraudulent or fraudulently overstated, and result in the non-payment of any amounts alleged by ASAC to be owed by Zapoteca.

ISSUE TWO

ASAC's lawsuit against Phillips is purely harassment. ASAC is fully aware of the fact Phillips is not liable for payment of the above referenced ASAC invoice as the same, like all other ASAC invoices, is addressed to Zapoteca. The fact that ASAC chose to file this lawsuit in Tampico, rather than Tuxpan, the location of Zapoteca's offices, is clear evidence of harassment, and, for the reasons stated below, further evidence supporting our belief the referenced invoice and all previously paid ASAC invoices are fraudulent or fraudulently overstated.

Unfortunately, we are inclined to believe ASAC's filing of this lawsuit in Tampico is far more that purely harassment. ASAC is fully aware a criminal charge has been levied against Phillips. Based upon our review of the documents and testimony upon which this criminal charge is based, we are of the opinion Phillips committed no crime. ASAC is also fully aware Arturo Bazaldua in Tuxpan represents Phillips, and that Mr. Bazaldua visits the Court in Tuxpan daily for the purpose of obtaining information on action against Zapoteca or EZ. ASAC is also fully aware that, until Mr. Bazaldua has these criminal charges against Phillips dismissed, Phillips will remain in the United States.

We believe ASAC filed this lawsuit against Phillips in order to obtain a judgment by default knowing Phillips could not appear in Mexico without being subject to arrest. We also believe ASAC filed this lawsuit against Phillips in Tampico hoping Mr. Bazaldua would not be visiting the Court in Tampico, thus allowing ASAC to obtain a judgement by default against Phillips.

We consider the actions of ASAC against Phillips malicious prosecution. We also consider these actions to be tortuous interference with the business of Zapoteca.

We respectfully request that ASAC cease and desist from filing any causes of action against Phillips and immediately move to dismiss any such actions now pending. Please be advised that, if ASAC fails to honor our request, Phillips will file appropriate counterclaims against ASAC and Zapoteca intervene in such actions and file appropriate claims against ASAC.

ISSUE THREE

We are well aware that Bill McDermott (hereinafter "McDermott") has been in constant contact with ASAC. In this respect, we feel ASAC should be made aware of the following facts:

1.   McDermott filed a lawsuit in Texas in the United States seeking payment for an alleged ownership share of the profits of the sale of the EZ to Nabors Drilling International Limited (hereinafter "Nabors").

2.   McDermott, through an ex parte proceeding, convinced a judge to issue an order directing a portion of the proceeds of this sale into escrow with the Court. It is our opinion McDermott used a fraudulent to convince the Court to issue said order.

3.   McDermott has no ownership interest in the EZ and is not entitled to a share of the profits from the sale of the EZ to Nabors or any other entity.

4.   We believe that McDermott's filing of this lawsuit may have played some part in the failure of the sale of the EZ to Nabors.

5.   Zapoteca has filed a cross claim against McDermott in the lawsuit in the United States for tortuous interference with the business relations of Zapoteca.

6.   If McDermott claims to have an interest in the ownership of the EZ, we believe his best interest is served by the removal of the EZ from Mexico

Given McDermott's well documented and continuing efforts to interfere with the business of Zapoteca, we consider any ASAC contact McDermott that in any way relates to Zapoteca, EZ, Phillips or Gram a furtherance of McDermott's tortuous interference with the business relations of Zapoteca. Additionally, we consider any such contact by ASAC with McDermott a civil conspiracy against Zapoteca by and between ASAC and McDermott.

With these facts and our beliefs stated, please be advised that we are aware ASAC has a business presence in Texas in the United States. As such, ASAC is subject to the jurisdiction of the Courts in Texas. Please be advised that we will not hesitate to file a lawsuit against ASAC or join ASAC in McDermott's lawsuit in Texas if ASAC continues further contact with McDermott that in any way relates to Zapoteca, EZ, Phillips or Gram.

ISSUE FOUR

ASAC is well aware of the fact Zapoteca intends to move the EZ from Tuxpan in mid December 2003. As noted above, Zapoteca, Phillips, and Gram have taken every step possible, and wise, to make payment of the referenced invoice, and ASAC continues to fail and refuse to provide appropriate documentation supporting the referenced invoice.

Any attempt by ASAC to prevent to movement of the EZ will be considered tortuous interference with the business relations of Zapoteca, and any seizure of the EZ by ASAC will be considered a wrongful seizure. We will not hesitate to bring these actions against ASAC if necessary.

We look forward to the immediate receipt of all appropriate documentation supporting the referenced invoice. We also look forward to the immediate receipt of all appropriate documentation supporting ASAC's invoices previously paid by Zapoteca, Canega and/or Gram. As noted above, this documentation includes <u>all invoices for product, freight, ABS certificates, duties, ad valorem border taxes, IVA, etc., and cancelled checks supporting payment of the same by ASAC</u>.

In the meanwhile, if you have any questions regarding this matter, please feel free to contact us.

Sincerely,

Edwin K. Nelson, IV

cc:    Zapoteca Energy, Inc.
        Attn.: Mr. Christian Kongsli
        P.O. Box 1720 Vika
        NO-0121 Oslo Norway

        P.D. Gram & Co AS
        Attn.: Mr. Kim Steimler
        P.O. Box 1383 Vika
        NO-0114 Oslo, Norway

        Zapoteca Energy, Inc.
        Mr. Charles Phillips

# EXHIBIT "H"



FedEx Express
Customer Support Trace
3875 Airways Boulevard
Module H, 4th Floor
Memphis, TN 38116

U.S. Mail: PO Box 727
Memphis, TN 38194-4643

Telephone: 901-369-3600

6/29/2004

Dear Customer:

Here is the proof of delivery for the shipment with tracking number 40053761735. Our records reflect the following information.

## Delivery Information:

Signed For By: M.LACHAUSSE



Delivery Location: 2929 BRIARPARK STE 520
Delivery Date: April 28, 2004
Delivery Time: 1024

## Shipping Information:

Tracking No: 40053761735            Ship Date: April 27, 2004

Recipient:                          Shipper:
                                    BLYSTAD SHIPPING
ENERGY ZAPOTECA                     MERITUS DE MEXICO SA DE CV
2929 BRIARPARK DRIVE SUITE 520      HEROICA VERACRUZ 35
HOUSTON, TX 77042                   TUXPAN, 92800
US                                  MX

Shipment Reference Information:

Thank you for choosing FedEx Express. We look forward to working with you in the future.

FedEx Worldwide Customer Service
1-800-Go-FedEx®
Reference No.: R2004062900135461981

6/29/2004

FROM : PHILLIPS          FAX NO. : 2815891733D          Jun. 28 2004 12:08PM P4
Case 1:04-cv-00048    Document 8    Filed on 08/11/2004    Page 72 of 93

FedEx Express | Tracking | Results Detail                                Page 1 of 1

Track Shipments
## Detailed Results

(?) Quick Help

Select another track: [40053761735 ▼]  Next

| | |
|---|---|
| Tracking number | 40053761735 |
| Signed for by | M.LACHAUSSE |
| Ship date | Apr 27, 2004 |
| Delivery date/time | Apr 28, 2004 10:24 am |

| | |
|---|---|
| Delivered to | Recept/Fmt desk |
| Delivery location | HOUSTON TX |
| Service type | International Priority Service |
| Master tracking number | 40053761735 |
| Total pieces | 1 of 14 |

| Date/time | | Status | Location | Comments |
|---|---|---|---|---|
| Apr 28, 2004 | 10:24 am | Delivered | HOUSTON TX | |
| | 8:33 am | On FedEx vehicle for delivery | HOUSTON TX | |
| | 6:55 am | Left FedEx Ramp | HOUSTON TX | |
| | 6:33 am | Arrived at FedEx Destination Location | HOUSTON TX | |
| | 4:15 am | Left FedEx Sort Facility | MEMPHIS TN | |
| | 3:59 am | Arrived at FedEx Ramp | HOUSTON TX | |
| Apr 27, 2004 | 10:59 pm | Arrived at Sort Facility | MEMPHIS TN | |
| | 8:55 pm | Left FedEx Ramp | APODACA MX | |
| | 6:23 pm | Left FedEx Origin Location | APODACA MX | |
| | 5:00 pm | Picked up by FedEx | APODACA MX | |

| Signature proof | Track more shipments | << Multi-piece summary |

Email your detailed tracking results (optional)

Enter your email, submit up to three email addresses (separated by commas), add your message (optional), and click Send email.

From [            ]
To [            ]

Add a message to this email.
[            ]

Send email

Global Home | Service Info | About FedEx | Investor Relations | Careers | fedex.com Terms of Use | Privacy Policy
This site is protected by copyright and trademark laws under US and International law. All rights reserved. © 1995-2004 FedEx

FedEx | Track

Track Shipments
## Multiple-Piece Summary

(?) Quick Help

Successful tracks

1-14 (14 total)

**Master tracking number 40053761735**

| Track more shipments |
| --- |

| Tracking number | Status | Date/Time | Location |
| --- | --- | --- | --- |
| 40053761735 | Delivered | Apr 28, 2004 10:24 am | HOUSTON TX |
| 844112684625 | Delivered | Apr 28, 2004 10:24 am | HOUSTON TX |
| 844112684636 | Delivered | Apr 28, 2004 10:24 am | HOUSTON TX |
| 844112684847 | Delivered | Apr 28, 2004 10:24 am | HOUSTON TX |
| 844112684658 | Delivered | Apr 28, 2004 10:24 am | HOUSTON TX |
| 844112684669 | Delivered | Apr 28, 2004 10:24 am | HOUSTON TX |
| 844112684670 | Delivered | Apr 28, 2004 10:24 am | HOUSTON TX |
| 844112684680 | Delivered | Apr 28, 2004 10:24 am | HOUSTON TX |
| 844112684566 | Delivered | Apr 28, 2004 10:24 am | HOUSTON TX |
| 844112684577 | Delivered | Apr 28, 2004 10:24 am | HOUSTON TX |
| 844112684588 | Delivered | Apr 28, 2004 10:24 am | HOUSTON TX |
| 844112684599 | Delivered | Apr 28, 2004 10:24 am | HOUSTON TX |
| 844112684603 | Delivered | Apr 28, 2004 10:24 am | HOUSTON TX |
| 844112684614 | Delivered | Apr 28, 2004 10:24 am | HOUSTON TX |

# EXHIBIT "I"

IN THE UNITED STATES DISTRICT COURT
FOR THE SOUTHERN DISTRICT OF TEXAS
BROWNSVILLE DIVISION

| | | |
|---|---|---|
| ZAPOTECA ENERGY, INC., | § | |
|     Plaintiff | § | |
| | § | |
| VS. | § | Civil Number B-04-048 |
| | § | |
| CHARLES DOUGLAS PHILLIPS, | § | |
|     Defendant | § | |

**ZAPOTECA ENERGY INC'S RESPONSE TO CHARLES DOUGLAS PHILLIPS'
CORRECPONDENCE TO THE COURT
AND
ZAPOTECA ENERGY INC'S MOTION FOR SANCTIONS**

TO THE HONORABLE JUDGES OF SAID COURT:

COMES NOW Zapoteca Energy Inc (hereinafter "Zapoteca") and files this its

Response to Charles Douglas Phillips' Correspondence to the Court and its Motion for

Sanctions and respectfully shows unto the Court as follows:

**PRELUDE**

1.    Zapoteca is deeply concerned that Charles Douglas Phillips (hereinafter

"Phillips") chooses to direct correspondence to the Court seeking clarification of a Order

rather than follow appropriate procedures set forth under the Federal Rules of Civil

Procedure and the Local Rules of this Court.

2.    Further Zapoteca is deeply concerned Phillips chooses such course of action at a

date wherein Zapoteca is unable to timely file a response to such inappropriate

communication with the Court without being required to travel to Brownsville, Texas.

3.    Clearly, as more fully set forth below, Phillips attempts to persuade this Court to

enter a ruling based upon false and unsubstantiated statements, while at the same time

avoid the possible consequences of properly filing a motion, albeit a frivolous motion.

1

## RESPONSE TO CHARLES DOUGLAS PHILLIPS CORRESPONDENCE TO THE COURT

4.      Contrary to any allegations made by Phillips, as more fully set forth below, Zapoteca has clearly followed the 7 May 2003 Order of this Court regarding movement of documents to the offices of Edwin K. Nelson, IV.

5.      On 1 April 2004, the Edwin K. Nelson, IV rented office space from Mesa Drilling, Inc. (hereinafter "Mesa"). (See attached Exhibit "A").

6.      Edwin K. Nelson, IV rented this office space for the following reasons:

     a.      To accommodate the storage of a very large volume of documents; and

     b.      To facilitate to review of these documents by all concerned. (See attached Exhibit "B")

7.      By virtue of the aforementioned Lease Agreement, this rented office space is the office of Edwin K. Nelson, IV.

8.      On 7 May 2004, this Court directed that documents related to this cause, then present in Tuxpan, Mexico and at DIX Shipping in Brownsville, Texas could be moved to the offices of the Edwin K. Nelson, IV. (See attached Exhibit "C").

9.      Thereafter, all documents from Tuxpan, Mexico and Brownsville, Texas were moved to the offices of Edwin K. Nelson, IV rented from Mesa.

10.     On 20 May 2004, in accordance with this Court's 18 March 2004 Order, the undersigned notified Phillips' that all documents from Tuxpan, Mexico had been received and were located at the office of Edwin K. Nelson, IV rented from Mesa.[1] (See attached Exhibit "D").

---

[1] This letter was improperly dated 19 May 2004.

11.    Pursuant to this Court's 18 March 2004 Order, Phillips then had 10 days to inspect and mark for copying all such documents from Mexico.

12.    On 21 May 2004 Phillips objected to the location of the documents at the offices of Edwin K. Nelson, IV rented from Mesa, falsely asserting, "Mesa Drilling, Inc. is owned by Blystad Shipping Co., which, in turn, is also an owner of...Zapoteca Energy, Inc." Phillips further complained that this office space was not a "neutral" environment and in direct violation of this Court's Order. (See attached Exhibit "E").

13.    On 21 May 2004, the undersigned advised Phillips' the office space rented was "neutral" and not in violation of this Court's Order. The undersigned also advised Phillips that any action taken by Phillips regarding the location of the documents would be take under appropriate consequences. (See attached Exhibit "F").

14.    The undersigned also advised Phillips' counsel that Zapoteca Energy Inc and Blystad Shipping, Co. has no ownership in Mesa. (See attached Exhibit "B").

15.    It was not until 9 June 2004 that Phillips requested review of the documents at the offices of Edwin K. Nelson, IV rented from Mesa, such review to take place beginning 15 June 2004. (See Exhibit "G" attached hereto).

16.    On 11 June 204, the undersigned advised Phillips that, even with the broadest reading of this Court's 18 May 2004 Order, Phillips' time to review the documents had expired and that any review of the documents should be accomplished through proper discovery. The undersigned also advised Phillips' that any attempt to seek redress from the Court would be considered "groundless, frivolous, and brought solely for purpose of harassment." (See attached Exhibit "H").

3

17.    On 16 June 2004, Phillips improperly directed correspondence to this Court seeking a clarification of this Court's 7 May 2004 Order. (See attached Exhibit "I").

18.    This correspondence contains false statements regarding the affiliation of Mesa and Zapoteca.

19.    As shown by the Declaration under Penalty of Perjury of Don L. Bockhorn, Mesa has absolutely no affiliation with Zapoteca. (See attached Exhibit "J").

20.    Given Mesa has no affiliation with Zapoteca, and given Edwin K. Nelson, IV rents office space from Mesa, any allegation said office space is not "neutral," and any allegation the location of documents in this office space is in violation of this Court's 7 May 2004 Order, is patently false.

21.    Given more than 10 days expired before Phillips requested review of the documents from Tuxpan, Mexico, and given more than 10 days expired since Phillips was notified of the location of these documents at the offices of Edwin K. Nelson, IV, Phillips has foregone his opportunity to review these documents other than through appropriate discovery.

## PRAYER

WHEREFORE PREMISES CONSIDERED, Zapoteca Energy Inc requests this Court stand by its 7 May 2004 Order, find that all documents have been properly delivered to the offices of Edwin K. Nelson, IV, that Charles Douglas Phillips has foregone his opportunity to review these documents, and for such other and further relief to which Zapoteca Energy Inc may be justly entitled.

4

## MOTION FOR SANCTIONS

1.     Zapoteca incorporates as if fully set forth herein its Response to Charles Douglas Phillips' Correspondence to the Court.

2.     Phillips has utilized an improper method seeking this Court's clarification of its 7 May 2004 Order. State Bar Rule 3.05 (a).

3.     Phillips' seeks clarification of this Court's 7 May 2004 Order on false and wholly unsubstantiated assertions.

4.     This Court has advised the undersigned that his presence at this Status Conference could be by telephone. (See attached Exhibit "C").

5.     Because of Phillips' utilization of an improper method seeking this Court's clarification of its 7 May 2004 Order, and given the time at which Phillips' utilized this improper method seeking this Court's clarification of its 7 May 2004 Order, Zapoteca has been forced to:

      a.     respond to a groundless, frivolous and harassing misuse of judicial process; and

      b.     attend this Status Conference in person.

6.     In so doing, Zapoteca has incurred unnecessary but reasonable attorney's fees, costs and expenses for travel and lodging in the approximate amount $3,500.00.

## PRAYER

WHEREFORE PREMISES CONSIDERED, Zapoteca Energy Inc respectfully prays this Court find Charles Douglas Phillips' improper method seeking this Court's clarification of its 7 May 2004 Order to be groundless and frivolous and a harassing misuse of judicial process, enter an order directing Charles Douglas Phillips immediately

pay all attorney's fees, costs and expenses for travel and lodging in the approximate amount $3,500.00, and for such other and further relief to which Zapoteca Energy Inc may be justly entitled.

Respectfully submitted,

Edwin K. Nelson, IV
Texas Bar No.: 14890600
3814 Sun Valley Drive
Houston, Texas 77025
Telephone: 713-668-5100
Facsimile: 713-668-5110

ATTORNEY FOR PLAINTIFF
ZAPOTECA ENERGY INC

6

## Certificate of Service

I hereby certify that a true and correct copy of the foregoing document was forwarded to the following counsel of record in accordance with the Federal Rules of Civil Procedure on the 18th day of June 2004:

_____
Edwin K. Nelson, IV

cc:   C. Frank Wood
      Dennis Sanchez
      Sanchez, Whittington, Janis & Zabarte, L.L.P.
      100 North Expressway 83
      Brownsville, Texas 78521

7

# EXHIBIT "D"

**EDWIN K. NELSON, IV**
ATTORNEY AT LAW
3814 Sun Valley Drive - Houston, Texas 77025
Telephone: 713-668-5100 - Facsimile: 713-668-5110
Email: seaproctor@hotmail.com

19 May 2004

Mr. C. Frank Wood
Sanchez, Whittington, Janis & Zabarte, L.L.P.
100 North Expressway 83
Brownsville, Texas 78521-2284
**Via Facsimile: 956-546-3765**

> RE:   Cause No.: G-04 048: *Zapoteca Energy Inc vs. Charles Douglas Phillips*;
> in the United States District Court for the Southern District of Texas,
> Brownsville Division

Dear Mr. Wood:

Please be advised that we have received approximately 12 boxes of documents from Meritus Tuxpan. I have rented space at Mesa Drilling, Inc. to accommodate Charles Phillips', yours and our review of the documents contained in these boxes.

I have retained a Certified Public Accountant to begin organization and review of the documents contained in these boxes. We made substantial progress today arranging documents in some reasonable order, but much work remains to be done.

Mesa Drilling, Inc.'s address is 2929 Briarpark Drive, Suite 520, Houston, Texas, 77042. If you or Mr. Phillips desire to review the documents contained in these boxes in accordance with the Court's Order, please contact me, and I will arrange to have the space unlocked and available for Charles Phillips and/or you to perform your review.

In this regard, please be advised of the following:

1.   We have also received several boxes of documents from DIX Shipping, Inc. As Charles Phillips has reviewed the documents contained in these boxes, these boxes of documents will remain sealed and are not available for further review.

2.   I will not allow brief cases or other similar items to be carried into the office space. Although I trust you to leave all documents as you find them, I do not trust Charles Phillips to do the same.

3.   Please identify all documents you want copied, and the copier you want to perform the copy work. Please also make appropriate arrangements for payment for the copy work. Once you have completed your review of the documents, we will make arrangements to have the identified documents picked up, copied, and returned to the offices.

If you have any questions regarding this matter, please feel free to contact us.

Sincerely,

Edwin K. Nelson, IV

# EXHIBIT "J"

## Frank Wood

**From:**    "Edwin Nelson" <seaproctor@hotmail.com>
**To:**      <kongsli@online.no>
**Cc:**      <kim.steimler@pdgram.com>
**Sent:**    Monday, November 17, 2003 3:00 PM
**Attach:**  KONGSLI.001.doc

Dear Christian,

Per your request, please see attached, which is drafted in "Word" format.

As noted above, I have included Mr. Kim Steimler of P.D. Gram on the distribution list.

Hoping all is well.

Edwin K. Nelson, IV

---

MSN Shopping upgraded for the holidays!  Snappier product search...
http://shopping.msn.com

<div align="center">

**EDWIN K. NELSON, IV, P.C.**
ATTORNEY AT LAW
3814 Sun Valley Drive - Houston, Texas 77025
Telephone: 713-668-5100 - Fascimile: 713-668-5110
Email: seaproctor@hotmail.com

</div>

Investments Oil & Energy
Attn.: Mr. Christian Kongsli
Stortingsgt. 30
0161 Oslo
Postboks 1720 Vika
0121 Oslo
**Via E-mail:** kongsli@online.no

     RE: Rig ENERGY ZAPOTECA

Dear Mr. Kongsli:

<div align="center">

**INTRODUCTION**

</div>

It was a pleasure meeting you, your wife and Charles Phillips in Houston last week. I look forward to seeing you and your wife in the future.

During our meetings and subsequent telephone conversations, and through several telephone conversations with Charles Phillips, I have developed a rough concept of the numerous issues related to the Rig ENERGY ZAPOTECA (hereinafter "EZ") that have developed over the past couple of years. However, to better understand these issues, I will need to do a comprehensive study of all documents related to the same.

Charles Phillips has requested my attendance in South Padre Island beginning Thursday this week for the purpose of reviewing all documentation related to the EZ and to meet Arturo Bazaldua. After this meeting, I believe I will have a better understanding of the issues and be in a better position to offer my guidance.

To facilitate my review of these documents, I have asked both you and Charles Phillips to draft an outline of the facts and events related to the EZ that have developed over the past couple of years. I look forward to receipt of your and Mr. Phillip's draft outline. I have also asked Mr. Phillips to draw an organization chart of the different entities involved in these issues and events. I belief this organizational chart will greatly assist in my review of the documents.

Below, I will address the issues I have learned to exist. These issues are addressed in their respective order of importance as I view them.

## ISSUES

ISSUE NUMBER ONE:

First and foremost, it is of vital importance that the Rig ENERGY ZAPOTECA be moved from its berth in Tuxpan, Mexico to an appropriate berth in another country. This importance exists for two reasons. First, the legal system in Mexico is corrupt and the highest bidder or entities with close ties to the country can buy judicial orders. I believe you have experienced this already.  Second, through my research of the world rig market, I believe the world market is under the impression EZ will never exit Mexico. This impression by the world rig market certainly makes the sale, lease or other venture of the EZ less likely than would be if the Rig ENERGY ZAPOTECA were moved out of Mexico.

Regarding the movement of the EZ out of Mexico, I believe you will experience the following further problems:

1.                          Bill McDermott (hereinafter "McDermott")

McDermott will do everything in his power to create the following additional problems:

a.       Interfere with crew seeking seizure of EZ for wages.
b.                                Advise Nabors Drilling International Limited (herein "Nabors") of ongoings in Tuxpan.
c.                                Advise Importacion Industrial ASAC, S.A. De C.V. (hereinafter "ASAC") of ongoings in Tuxpan and push for seizure of EZ.
d.                                Advise Celesa of ongoings in Tuxpan and push for seizure of EZ.

PROPOSED INTERIM SOLUTION

I recommend we take the following actions to prevent McDermott's further interference:

a.                                Notice McDermott's deposition in Texas for the date the EZ is first expected to begin loading for departure form Mexico. I cannot conduct this deposition, as Jim Sentner is Zapoteca's lawyer. You need to immediately advise Jim Sentner of the following:

i.

        is employment is terminated;

ii.

        mmediately, as time is of the essence, file a Motion for Substitution with Order substituting Edwin K. nelson, IV as attorney of record for Zapoteca;

iii.

        mmediately forward case file to Edwin K. Nelson, IV; and

iv.

        CC me with your letter to Jim Sentner.

b.        Draft a strong letter to McDermott regarding interference with the business of Zapoteca and civil conspiracy to interfere with the business of Zapoteca. In this letter, advise McDermott of the consequences and, at the same time, advise McDermott that his best interest lies in the movement of the EZ from Mexico.

c.        Include McDermott's name, and circumstances supporting the inclusion of his name, in the proposed interim solution to ASAP stated below. I believe that so doing will tend to cut McDermott's standing with ASAC.

2.        Nabors

    I anticipate Nabors will also create additional problems. My belief is based upon Nabors' prior dealings with other entities. I understand that Nabors was created out of shrewd, and suspect, business dealings. Nabors has a long standing history of entering into contracts, walking from the contracts, involving the assets of these contracts in litigation, and renegotiating the contracts at a lower price than previously agreed in return for the removal of litigation. These additional problems include:

a.        Seize the EZ for the purpose of obtaining security for damages incurred by the alleged breach of the MOA between Nabors and Zapoteca Energy, Inc, (hereinafter Zapoteca")

b.        Seize EZ for security for alleged damages related to the equipment provided by Nabors for transport of EZ.

c.        Seize equipment provided by Nabors

for transport of EZ as it lies aboard EZ.

d.    Use of McDermott to obtain information and interference with Zapoteca's business.

PROPOSED INTERIM SOLUTION

I recommend we take the following actions to prevent Nabor's further interference:

i.    Immediately exercise the arbitration agreement in the MAO between Nabors and Zapoteca. Advise Nabors that Zapoteca has appointed an arbitrator in London. I will provide the name of the arbitrator if you so desire. Further advise Nabors that Zapoteca is willing to place security in acceptable form; i.e., either a bond or Nordic LOU. At the same time advise Nabors of Zapoteca's intentions regarding movement of the EZ, placing Nabors on notice that any attempts to stop Zapoteca's intentions with this movement will result in wrongful seizure, tortuous interference and civil conspiracy claims.

ii.    Advise Nabors of our knowledge of their employment of McDermott, and of McDermott's interference with Zapoteca's business, asserting McDermott is so doing on behalf of Nabors. Advise Nabor's that such interference must cease and desist immediately, or be met with litigation in Texas. Advise Nabors of their potential for involvement in McDermott's lawsuit in Texas.

iii.    File suit against Nabors in Houston, Texas, or add Nabors to McDermott's suit, for tortuous interference with Zapoteca's    business relations and civil conspiracy to interfere with Zapoteca's business. I am advised Charles Phillips has substantial documentation supporting such a claim. Seek an injunction from the Court prohibiting Nabors from contact with McDermott, etc.

3.    ASAC

a.    Seize the EZ for the purpose of obtaining security for materials provided to Zapoteca and EZ.

b.    Pursue civil action against Charles Phillips.

PROPOSED INTERIM SOLUTION

I recommend we take the following actions to prevent ASAC's further interference:

i.    Write ASAC demanding back up information, original invoices and cancelled checks, for all invoices to Zapoteca, paid and outstanding, that relate to the materials provided to EZ and Zapoteca. Advise ASAC that any action against EZ, Zapoteca and Charles Phillips is and will be considered tortuous interference with Zapoteca's business. Advise ASAC of our knowledge of its involvement with McDermott and further advise ASAC of their presence in Texas, McDermott's lawsuit in Texas, and potential for adding ASAC to this lawsuit suit, for tortuous interference with Zapoteca's business relations and civil conspiracy to interfere with Zapoteca's business.

4.    Walter Pinedo

I understand Walter Pinedo (hereinafter "Pinedo") was appointed by the Nordic Defense Club (hereinafter "Nordic") to defend Zapoteca in Mexico. I further understand Pinedo is a partner with Nabors in other ventures.

a.    Seize the EZ for the purpose of obtaining jurisdiction over Zapoteca and/or security for legal services provided to Zapoteca and EZ.

PROPOSED INTERIM SOLUTION

I recommend we take the following actions to prevent Penido's further interference:

i.    Make demand upon Nordic to immediately pay outstanding invoices. Advise Nordic that, despite their assurances Penido had no conflict of interest given the fact Penido was/is a partner of Nabors, one existed and Penido's absolute failure to properly represent Zapoteca is solid proof of the conflict of interest. CC Pinedo on this demand to Nordic.

ISSUE NUMBER TWO

As a backup for all of these potential problems and the proposed interim solutions, Zapoteca should be in a position to immediately post bonds or LOUs for the above listed potential seizures  This should be arranged through the Nordic. I understand Nordic is likely to require 100% counter security for such bonds or LOUs. I suspect further that Nabors has several rigs entered in the Nordic, which places Nordic in the position of having a conflict of interest. It may be possible to pressure Nordic into posting the bonds or LOUs without counter security if we properly pressure Nordic based upon their apparent conflict of interest between Nabors and Zapoteca.

You should advise the Nordic that you intend to retain counsel of your choosing, and fully expect Nordic to honor said counsel's statements for services. I suspect you have this right under the Club agreement.

With regard to arbitration in London, any arbitrator will charge no less that 250 pounds per hour. Rather than pay two lawyers to review all the documents, I believe it will be less costly to have me, under the instructions from the arbitrator, prepare the case for the arbitrator, and present the same in London. As I have close connections with several London arbitrators, I do not believe this will cause a problem - despite the fact London lawyers and arbitrators have a knack for excessively running up fee bills.

ISSUE NUMBER THREE

*k*   Charles Phillips has criminal charges against him in Mexico. These charges need to be dismissed or otherwise properly dealt with.

Based upon my conversations with Charles Phillips, I believe Arturo Bazaldua is an honest and good lawyer. I suggest that this lawyer handle all matters in Mexico in coordination with me.

ISSUE NUMBER FOUR

Legal representation of Zapoteca in Mexico has been incompetent at best. I suggest that Mr. Balzadua handle all further legal representation of Zapoteca in coordination with me. I strongly recommend against the use of any of Nordic's defense lawyers, both in Mexico and Texas  Clearly, the lawyers appointed so far have performed very little service to Zapoteca and for quite handsome fees. Additionally, these lawyers all have connections to Nabors in one way or another. As noted above, I further suspect that Nabors has several rigs entered in the Nordic, which places Nordic in the position of having a conflict of interest.

ISSUE NUMBER FIVE

It is very important that I be apprised of all actions being taken regarding the EZ. My decisions will likely be fluid as events take place. I do not desire to be placed in a position of making decisions without full and complete knowledge of the events taking place and the reasons therefore. Accordingly, I request that I be copied all communication regarding all actions being taken regarding the EZ as the same relates to her presence in

Mexico.

## CONCLUSION

I have tried to make this letter as short as possible. Accordingly, the thought process behind my recommendations is not contained herein. Additionally, my recommendations are made, as noted above, on the brief history of the events as explained to me by you and Charles Phillips.

I look forward to assisting you in this matter. I will keep you apprised of the work I undertake as necessary. In the meanwhile, if you have any questions regarding this matter, please feel free to contact me.

Sincerely,


Edwin K. Nelson, IV