IN THE UNITED STATES DISTRICT COURT
<u>FOR THE EASTERN DISTRICT OF TEXAS</u>
BEAUMONT DIVISION

| | |
|---|---|
| STEVE GRAY,<br>　　　Plaintiff, § § § | |
| vs. § | Civil Action No: <u>1:04CV512</u> |
| ENERGY ZAPOTECA INC. AND § <br> D/V ENERGY ZAPOTECA *IN REM* § <br>　　　Defendants. § | |

PLAINTIFF'S RESPONSE TO DEFENDANT, ZAPOTECA ENERGY, INC.'S
MOTION FOR FINAL SUMMARY JUDGMENT

COMES NOW, Plaintiff, STEVE GRAY, (hereinafter "Plaintiff") and files this response to Defendant Zapoteca Energy, Inc.'s Motion for Final Summary Judgment.

### INTRODUCTION

The defendant, Zapoteca Energy Inc., has filed a Motion for Summary Judgment alleging that Plaintiff, Steve Gray, is not a "seaman" as a matter of law because the D/V Energy Zapoteca was not a "vessel in navigation" at the time of Mr. Gray's injury. Plaintiff asks that the Motion for Summary Judgment be denied because the D/V Energy Zapoteca, was a "vessel in navigation" at the time of Plaintiff's injury since it was the intention of the owners to put the vessel to sea and it was ready for the voyage at the time of Mr. Gray's injury. Plaintiff also urges this Court to deny Defendant's motion because whether or not a vessel is "in navigation" is a fact issue which is inappropriate for summary judgment. There

Page -1-

Petitioner's
Exhibit "B"

exists a genuine issue of material fact regarding the condition of the rig and the intention of the owners at the time of Plaintiff's injury.

## FACTS

The plaintiff, Steve Gray, was injured on or about January 13, 2004 while working aboard the D/V Zapoteca Energy offshore Tuxpan, Mexico. Plaintiff has sued defendant Zapoteca Energy, Inc. and the D/V Energy Zapoteca to recover for his injury, back wages and his entitlement to maintenance and cure. Plaintiff was hired in Texas in November 2003 for the specific purpose of traveling to Tuxpan, Mexico and preparing the D/V Energy Zapoteca for a voyage to a port on the Texas coast and to serve as onboard rig Superintendent during the voyage. See EXHIBIT "1" *Deposition of Plaintiff, Steve Gray, page 42, line17 - page 43, line 18*. The D/V Energy Zapoteca was a Friede and Goldman L-780 jack up rig originally built in 1981 for Protexa. In October 1987, the D/V Energy Zapoteca was damaged by an onboard fire. Defendant purchased the D/V Energy Zapoteca in May 2000 with the specific intention of stripping the structures above the rig's main deck, repairing the jacking system, hull and legs, and converting the rig to a bare-deck, jack-up barge. The owners then intended to sell it to be used for whatever purpose the new owners desired, i.e., jack-up drilling rig, mobile offshore production platform, accommodation or work barge, etc.

The defendants contend that in January 2004 the vessel was "incapable of performing its intended purpose as a drilling rig and/or providing any form of commercial service." (See

Defendant's Motion for Summary Judgment at page 2). That is the first of many misstatements of fact made by Defendant in their Motion. While it is true the rig may not have been capable of serving its original intended purpose as a drilling rig, it was not the intention of Energy Zapoteca to do anything with the vessel other than prepare it for sale. It may very well be that the rig will never again be used as a drilling vessel. In their motion, the defendants admit that it was not their intention to equip the rig as a drilling vessel. (See Page 3 of the Defendant's Motion for Summary Judgment). See also EXHIBIT "2", a brochure distributed by the defendants offering the vessel for sale.

There are numerous other misstatements of fact regarding the vessel's condition made by the defendants in their motion. They are:

1. That the rig had no power or propulsion systems. This statement is partially false and partially misleading. The rig did in fact have diesel generators onboard which provided power to the electric motors of the vessel-jacking system. In addition, the rig had additional generators to provide power for lighting and habitability, such as heat, air conditioning, cooking etc. See EXHIBIT "3", *Equipment Lease Contract with Noble Drilling* and EXHIBIT "4" *Deposition of Steve Gray page 48, line 7 - 21.* The statement that it had no propulsion is true, but misleading, since the D/V Energy Zapoteca was never designed or constructed as a self-propelled jack-up drilling vessel. No jack-up rigs have propulsion motors. They are towed from one location to another.

2. The rig had "no drilling equipment and no crew for the purpose of carrying out drilling operations." This statement is true but also misleading. The rig did not have drilling equipment or a drilling crew since it was not the intention of the owners to use it as a drilling vessel. The rig did have an assigned crew for the purpose of preparing it for tow and transporting it across the Gulf of Mexico. It was the Plaintiff's job to supervise the preparations and for the tow across the Gulf. See EXHIBIT "5" *Deposition of Plaintiff, Steve Gray, page 42, line 17 - page 43, line 18.*

3. The D/V Energy Zapoteca was "not capable of performing its intended purpose as a drilling vessel." While it is true that it was not capable of performing its <u>original</u> intended purpose as a drilling vessel, it was the owners intention to use the rig as a bare deck jack up barge for the purpose of sale. These owners had no intention of employing the Energy Zapoteca as a drilling vessel. The rig was capable of going to sea and transporting any equipment or personnel that Zapoteca Energy, Inc. or any new owners put on it. See <u>EXHIBIT "6"</u>, brochure distributed by Defendants offering vessel for sale.

4. The Energy Zapoteca was "not capable of navigation." This statement is flatly wrong. The vessel had been issued a navigation certificate by the Republic of Panama which was in effect in January 2004. See <u>EXHIBIT "7"</u> It was capable of going to sea. See <u>EXHIBIT "8"</u> *Affidavit of Charles Phillips the rig master at page 3, paragraph 21.*

5. "Prior to April 5, 2004 the D/V Energy Zapoteca was not in satisfactory condition to be towed from Tuxpan, Mexico to Sabine Pass, Texas, because it lacked certification by its classification society, had no load line certificates, minimum/safe manning certificate or radio certificate." Energy Zapoteca Inc. admitted in court on May 7, 2004 that the rig was "capable of sailing" See <u>EXHIBIT "9"</u>, *Hearing transcript of May 7, 2004 at page 21.* Although Plaintiff has not received the discovery on what certificates the vessel had in place at the time of the Plaintiff's injury, the claim that the vessel was not in satisfactory condition to be towed from Tuxpan to Sabine Pass, Texas is false. At the time of Plaintiff's injury the vessel had been equipped with navigation lights and the towing bridle was rigged and ready. It had been inspected by the owners insurance agents and any pre voyage discrepancies had been corrected. All certificates necessary for the vessel to go to sea had been issued and were current. It was the intention of the owners to have the rig manned during the tow. For this purpose they had leased accommodations and a temporary galley which were welded to the deck of the rig. Arrangements had been made for safety life saving equipment, including life rafts, and radios and the riding crew had been hired. In fact, a towing contractor had been hired and was on 48 hours notice. In January 2004,the rig departure from Tuxpan had been delayed many months, not because the vessel was incapable of navigation but because the port authorities would not clear the vessel for departure. It seems a number of local vendors had filed liens against the vessel for non payment for work performed on the rig and local port authorities would not permit the rig to sail until these liens were satisfied. See EXHIBITS No.'s 3, 4, 5 6 7 and 21.

## THE LAW

Generally, summary judgment is disfavored on the issue of whether or not a "vessel is in navigation." See *Tonnesen v. Yonkers Contracting Co., Inc.*, 82 F. 3d. 30 (2nd Circuit 1996). "This policy stems from the terms inherent imprecision" *Latsas v. Shanris, Inc.* 1998 Westlaw 458095 (S.D. New York 1998). Quoting *Bernard v. Binnings Const. Co. Inc.*, 741 F.2d. 824, 829 n.14 (5th Circuit 1984). The 2nd Circuit in *Tonnesen* stated "Courts considering the question on whether a particular structure is a vessel in navigation typically find that the term is incapable of precise definition; attempts to fix unvarying meanings having a firm legal significance to such terms as 'seaman', 'vessel', ' member of a crew' must come to grief on facts."

In the *Latsas* case, the Plaintiff served onboard the SS Galileo. The Defendant ship owner, Shanris moved for partial summary judgment on the issue of whether or not the vessel was "in navigation." The Galileo underwent repairs at Gremerhaven, Germany over a period of what was variously stated to be 4 ½ to 6 months. During some period of the repairs, the vessel had several hull openings. However, there were also periods during the repairs when there were hull plates in place. On this evidence the district court concluded that summary judgment was not proper with regard to the time when the vessel's hull plates were in place. The court stated about that period

> "I simply cannot say, as I would be required to if I were to grant this motion that the law and facts reasonably support only one conclusion; to the contrary the evidence in the record supports competing

>conclusions. For example, the amount of time spent in dry dock - 4 ½
>(four and one half) months - was minimal as compared as that seen in
>other cases where the vessel was deemed not to be in navigation."

Citing further conflicting evidence concerning the status of engines, the status of the boilers, the status of the propellers and the status of the crew, the court concluded that summary judgment was inappropriate.

Energy Zapoteca, Inc. does not contend that the Energy Zapoteca Inc. is not a vessel since they apparently recognize the long standing jurisprudence that a jack up drilling rig is a vessel. See *Clary v. Ocean Drilling & Exploration Co.*, 429 F.Supp 905 (W.D. Louisiana 1997), affirmed, 609 F2d 1120 (5th Cir. 1980). However, the Defendant claims that the Energy Zapoteca cannot be a vessel "in navigation" because it had been out of service for many years. The Defendant analysis focuses on whether the Energy Zapoteca was a vessel when it was laid up and then undergoing repairs and not whether or not it was a vessel at the time of the injury. It may be, that for the many years that the rig was laid up following the fire it was withdrawn from navigation, however, it is the time of the injury which is relevant to the determination of whether or not the vessel is "in navigation." See *Warner v. Fish Meal Co. et.al.* 548. F2d 1193 (5th Cir 1977). In January 2004 when Mr. Gray was injured the vessel was ready for sea and had been therefore returned to navigational status.

"A ship is a considered in navigation when there is an intention to put out to sea and it is being repaired for the voyage." See *First Bank and Trust v. Knachel*, 999 F2d 107 (5th Cir. 1993) *citing New England Fish Company v. Barge Sonya*, 332 F. Supp 463 (D. C. of Alaska 1971). In *First Bank and Trust*, the 5th Circuit considered whether the M/V Four X,

a vessel which was being repaired for a voyage, was actually capable of navigation or was removed from service. Although the vessel was undergoing repairs and had been laid up for a period time, the Court concluded that since it was the intention of the owner to put out to sea and that the ship was being repaired for the voyage that the vessel was "in navigation."

## THE ENERGY ZAPOTECA WAS READY FOR SEA

The Plaintiff, Steve Gray was specifically hired by the Defendant to complete final preparation for a manned tow of the D/V Energy Zapoteca from Tuxpan, Mexico to a port on the Texas coast. See EXHIBIT "10" *Deposition of Plaintiff, Steve Gray, page 41, line 17 - page 42, line 18.* In January 2004 when Plaintiff was injured the rig was fully capable of navigation. In fact, contrary to the contention of the Defendants, the rig was actually capable of navigation on the high seas as early as the Summer of 2003. Zapoteca Energy Inc. and Nabors Drilling International Ltd. entered into a contract whereby Nabors would purchase the jack up barge, Energy Zapoteca from Zapoteca in March 2003. See EXHIBIT "11" *Memorandum of Agreement.* The original delivery date for the vessel was between 1 and 15 April, 2003, but it was extended on several occasions not because the vessel was not capable of going to sea, but because the defendant had failed to pay its vendors in Tuxpan who then filed liens against the vessel. See EXHIBIT "12", *Affidavit of David A. Mochizuki filed with the Brownsville Federal Court.* Nabors had contracted for towing vessels and instructed those vessels to load the necessary towing wire and obtain Port Authority clearance from the Port of Fouchon, Louisiana as early as April 2003. These tugs were to

go to Tuxpan, Mexico and tow the rig back to Texas. See <u>EXHIBIT "13"</u> *Invoice from Harvey Gulf International Marine, Inc. to Nabors Drilling International Ltd. dated 4/30/03*

See <u>EXHIBIT "14"</u> *Invoice of John Leborhis & Assoc., Inc. for the services of marine warranty surveyor to be in attendance April 2, 2003 through April 14, 2003 during the "pre towage preparations while the unit was in the Tuxpan River in Tuxpan, Mexico."* See <u>EXHIBIT "15"</u> *Purchase Order of Nabors Drilling Ltd. dated April 14, 2003.* See also, <u>EXHIBIT "16"</u> *Deck log of M/V Harvey Titan showing vessel left Fourchon on April 6, 2003 for Tuxpan but ordered to turn around next day.* After several delays because of non payment of vendor invoices in Tuxpan, the rig was actually scheduled to be towed from Tuxpan to Freeport, Texas during the period of June 3, 2003 through June 10, 2003. See <u>EXHIBIT "17"</u> *Invoice of John Leborhis & Assoc. Inc. dated June 12, 2003.* Departure from Tuxpan was again delayed until late June because of non payment of vendor invoices and liens by local contractors in Tuxpan. See <u>EXHIBIT "18"</u> *Invoice from Harvey Gulf International Marine, Inc. dated June 28, 2003 and* <u>EXHIBIT "19"</u> *Purchase Order of Nabors Drilling International Ltd. dated June 25, 2003.* There can be no doubt the vessel was ready to sail since it had the necessary navigational equipment onboard at the time. See <u>EXHIBIT "20"</u> *Invoice Harvey Gulf International Marine, Inc. dated June 19, 2003 for rental of navigational lights.* The crew for the voyage had been identified as early as April 9, 2003. See <u>EXHIBIT "21"</u> *crew list signed by Captain Charles Douglas Phillips.* Unfortunately, because of several false starts all necessitated because the port authorities

would not allow the rig to depart, the tow of Zapoteca Energy did not occur in the Summer 2003. See <u>EXHIBIT "22"</u> *Harvey Gulf International Marine, Inc. Invoice of July 29, 2003 removal of the secondary tow wire from the M/V Harvey Titan due to postponement of the rig "Energy Zapoteca" tow from Tuxpan to Freeport, Texas.* See also <u>EXHIBIT "23"</u> *E-Mail of Tammy Nutley of July 18, 2003 to Harvey Gulf International Marine, Inc. regarding the cause of the delay of the tow of the rig.* Ms. Nutley states that "it looks to be another three weeks before they clear up all the legal problems." Believing that its legal problems in Tuxpan had been resolved, the Defendant in December 2003 leased a variety of equipment to ensure that the rig had all the necessary items to finally complete the proposed tow from Tuxpan to Texas. See <u>EXHIBIT "3"</u> *Equipment Rental Lease and Appendix A List of Equipment.* The equipment rented included, VHF standard marine radios, diamond day shaped signal, 12 man life raft, various buoys, chain links, towing plates and other heavy equipment necessary to make up a towing bridle, temporary crew accommodations including a packaged air conditioning unit, sleeper unit, galley unit and a variety of other industrial equipment, including welding machines, air compressors, generators, and fire extinguishers. All this equipment was ready and on board the Zapoteca Energy at the time of Plaintiff's injury. See <u>EXHIBIT "24"</u>, *deposition of Plaintiff, Steve Gray, page 52, line 2- 10 - page 56, line 6.* There can be no doubt that by January of 2004 the rig was capable of navigation and prepared for the voyage and that it was the intention of the owners to put the vessel to sea.

## THE DEFENDANT'S ANALYSIS

The Defendant's are correct in stating that the Courts have used a variety of factors to determine whether or not a vessel is "in navigation" at the time of the event. However, they again concentrate their analysis on the condition of the rig years before the Plaintiff's injury. While it may be true the rig was removed from navigation following the 1987 fire, it is wrong to claim that the rig was not returned to navigation by January 2004. Even the factors cited by the Defendants, which some Courts have considered in assessing whether a vessel has been withdrawn from navigation, do not support the Defendant's argument.

1.  Who controls the repair operation? If the owner maintains control and supervises or acts as general contractor for the repairs, courts favor finding that the vessel is still in navigation. *Wixom v. Boland Marine and Mfg. Co., Inc.,* 614 F2d 956, 957 (5th Circuit 1980). Here, the entire repair operation was controlled by the Defendant Zapoteca Energy, Inc. The Defendant acted as its own general contractor subcontracting out the various machinery repairs, metal work, painting and inspections to the sub contractors of its own choosing. At all times the Defendant maintained control over the repair operations including the time and costs required for the repair work. See *Wixom* 614 F2d at 957, *Slayden v. Sonat Offshore Drilling, Inc.*, 818 F. Supp 1009, 1011 (S.D. of Texas 1993) and *Shanks v. Hercules Offshore, Corp.*, 58 F. Supp. 2d 743, 745 (S. D. Texas 1999). The Defendants discuss at great length the damage resulting from the 1987 fire and the condition of the vessel in May 2000 when they purchased it. They do not mention anywhere in their

motion that their intention was to not return the vessel to its original purpose as a drilling rig but rather to use it as a bare deck, jack up barge which could be used for multiple purposes by the ultimate purchaser. The refurbishing was originally scheduled to be completed by December 2002. See <u>EXHIBIT "25"</u> *Chronology of Activities for Vessel Repair(ZEI 0060)*. By January 2004, all the work the Defendant had intended had been completed. The rig's generator, jack up motors and transmissions were fully functional. See EXHIBIT "26" *Photos of Energy Zapoteca Jacking in August 2001*. All damage to the structure of the main deck, legs, spud cans and jacking system had been inspected, identified and completed. No further repairs to the rig were contemplated by Zapoteca Energy. They had done all they intended to do. See <u>EXHIBIT "2"</u> *Brochure sent to prospective purchasers*.

2. **Whether the ship's power is secured or dismantled.** *Wixom*, 614 F.2d at 957, *Slayden* 818 F. Supp at 1011, *Shanks* 57 S. Supp. 2d at 745. Mr. Osterby, the author of an Affidavit in support of Defendant's Motion for Summary Judgment states on page 2, item 13 that the "D/V Zapoteca Energy was incapable of performing its intended purpose of offshore drilling as it had no power or propulsion system, no drilling equipment and no crew for the purpose of carrying out drilling operations." All three cases cited by the Defendant's for this proposition involve vessels which have their own motive power. To contend that the rig "propulsion system" was inoperable in January 2004 is disingenuous. The Energy Zapoteca has never been equipped with a propulsion system, is not designed for a propulsion system and never will have a propulsion system because it is not a self propelled offshore

drilling rig. Notwithstanding this fact, submersible drilling vessels are "vessels" even though they have no motive power. See *Hicks v. Ocean Drilling & Exploration Co.*, 512 F.2d. 817 (5th Cir. 1975), cert. denied 1996 S. Ct., 777, 423 U.S. 1050, 46 Law Ed. 639.

Furthermore, special purpose floating structures whose function requires exposure to a hazzard of the sea some distance from shore such as a barge, dredge or drilling platform are vessels even when resting on the bottom or berthed for long periods. *Powers v. Bethlehem Steel Corp.*, 477 F.2d. 643, rehearing denied, 483 F.2d. 993, cert. denied 94 S. Ct. 160, 414 U.S. 856, 38 Law Ed. 106 (1st Cir. 1973). The rig did have power on board in January 2004. It had diesel generators which provided power to the rigs jacking motors. In addition, the Defendant had leased a variety of equipment from Noble Drilling for purposes of this tow including diesel generators, air compressors, galley and berthing facilities. While it is true it had no power "for the purpose of carrying out drilling operations" as Mr. Osteby contends, it may very well be that the rig never again has power to carry out drilling operations since it may be converted to serve a purpose other than an offshore drilling rig. But the rig did have electrical power to operate its jacking systems, ballast pumps fire water and for lighting and crew use.

Defendant's key point is that since the original intended purpose of the Zapoteca Energy to function as a drilling rig had been abandoned it cannot be a "vessel in navigation" until it has been restored to its original function. This is wrong. A long line of cases have held a variety of special purpose structures, far removed from the traditional ship and sea

going barges are vessels. Therefore, even a bare decked, barge can be a vessel so long as the primary purpose of the craft is to transport passengers, cargo or equipment from one place to another across navigable waters. *Ducote v. Keller & Co., Inc. 953 F. 2d 1000* (5th Cir. 1992) held that even special purpose barges were vessels where the transportation of the barges were not merely incidental to their primary purposes as work platforms. Here, Zapoteca Energy had refurbished the rig not for the purpose of functioning as an offshore drilling rig but to serve as a bare platform to transport whatever equipment the new owners intended to install. The Energy Zapoteca's sole purpose was to transport equipment and personnel. See also *Manuel v. P.A.W. Drilling & Well Service, Inc.,* 135 F. 3d 344 (5th Cir. 1998) where the Court determined that a barge used to carry a work over rig to offshore wells was a "vessel" since its transportation function was not "incidental."

5. **Whether the ship's crew is dismissed.** *Wixom,* 614 F.2d at 957, *Slayden* 818 F. Supp at 1011, *Shanks* 57 S. Supp. 2nd at 745. While it's certainly true that the drilling crew assigned to the D/V Energy Zapoteca was dismissed after the fire in 1987, in January 2004, the Defendant had identified a riding crew for the voyage, leased galley and berthing facilities for them and intended that they go aboard the vessel for the voyage as soon as local authorities were satisfied that any liens against the vessel were lifted by the Labor Mexican Authorities. Mr. Gray had been specifically hired to supervise the final towing preparations and the towing crew during the tow to Texas.

The Defendant's cite various court opinions which they claim support their argument that they D/V Zapoteca Energy was not "in navigation" in January 2004. The cases they cite are either distinguishable or actually support the Plaintiff's position. Their principle case is *Shanks v. Hercules Offshore Corporation*, 58 F.Supp. 2nd 743 (S.D. Texas 1999). In *Shanks* the Court denied the Defendant's Summary Judgment stating that a fact finder could find that the rig was in navigation during the time of Shanks employment. The Court noted the repair costs of 5 million dollars exceeded the 2.3 million paid for the rig but was insignificant in comparison with the rigs 50 million dollar value at the time it was built. Here, the Defendant contends it spent approximately 10 million dollars in repairing the rig. This figure is in doubt since Defendant's counsel stated in open court that the repair cost was less than half this amount - 4.2 million. EXHIBIT "9" *Transcript of May hearing in Brownsville, Page 11*. Again, this value is small relevant to the estimated 40 to 50 million dollar value of the rig at the time it was built. The Court points out in *Shanks* that the rig was self powered. Here, in January 2004, the rig's generators were functioning in providing power to the jacking system. Furthermore, pumps, generators, and air compressors were leased by the Defendant for this voyage. The *Shanks* court noted that a crew was maintained aboard the vessel at all times. Although no crew lived on board the D/V Zapoteca Energy during the repair, a crew had been identified for the voyage and were ready to go aboard as soon the rig was cleared by the local port authorities. Just as the Court concluded in *Shanks*, on these facts, it cannot be said that as a matter of law the D/V Zapoteca Energy was not a vessel in

navigation.

For the reasons stated the D/V Zapoteca Energy was in fact a vessel "in navigation" at the time of the Plaintiff's injury in January 2004. There is ample evidence to establish that is was the intention of the owners to put the vessel to sea and that it was being prepared for the voyage at the time of the Plaintiff's injury. At a minimum there is certainly a genuine issue of material fact as to the status of the vessel at the time of the Plaintiff's injury. Given the admonishment of the U.S. Supreme Court to apply the Jones Act liberally to accomplish it beneficent purposes, *Cox v. Roth*, 348 U.S. 207, 210, 75 S. Ct. 242, 244, 99 Law Ed. 260 (1955) there is at a minimum a genuine issue of material fact concerning whether or not the D/V Energy Zapoteca was in navigation at the time of the Plaintiff's injury. Defendants Motion should be denied.

*Respectfully submitted,* on this the 22nd day of NOV., 2004.

Michael J. Maloney
Southern District No. 826
Texas Bar No. 12883550
MALONEY, MARTIN, & MITCHELL, L.L.P.
3401 Allen Pkwy., Suite 100
Houston, Texas 77019
Phone: 713/ 759-1600
Facsimile: 713/ 759-6930

**ATTORNEY FOR PLAINTIFF**

## CERTIFICATE OF SERVICE

This is to certify that a true and correct copy of the foregoing has been served on the following counsel of record in accordance with Rule 21a of the *Texas Rules of Civil Procedure*, by either hand-delivery, facsimile, or certified mail return receipt requested, on this **22nd** day of **Nov.**, 2004.

*/s/ M.J. Mulry*
Maloney, Martin & Mitchell, L.L.P.