**MALONEY, MARTIN, & MITCHELL, L.L.P.**
The Clocktower Building
3401 Allen Parkway, Suite 100
Houston, Texas 77019
(713) 759-1600
(713) 759-6930 FAX

# EXHIBIT "9"

IN THE UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF TEXAS
BROWNSVILLE DIVISION

ZAPOTECA ENERGY, INC.          )
                               )
                               )
                               ) CIVIL ACTION NO.
VS.                            ) B-04-048
                               )
CHARLES DOUGLAS PHILLIPS       )
                               )

HEARING
BEFORE THE HONORABLE ANDREW S. HANEN
MAY 7, 2004

APPEARANCES:

For the Plaintiff:        Edwin K. Nelson, IV
                          James E. Ross & Associates
                          3814 Sun Valley Drive
                          Houston, Texas   77025

For the Defendant:        Mr. C. Frank Wood
                          Sanchez, Whittington
                          100 North Expressway 83
                          Brownsville, Texas   78521-2284

Transcribed by:           BARBARA BARNARD
                          Official Court Reporter
                          600 E. Harrison, Box 301
                          Brownsville, Texas   78520
                          (956)548-2591

# CERTIFIED COPY

1    THE COURT:  All right.  B-04-048, Zapoteca Energy versus

2  Charles Douglas Phillips.

3      We're trying to arrest the rig now?

4    MR. WOOD:  Frank Wood for Charles Phillips, Your Honor.

5  Yes, sir.

6    THE COURT:  Tell me where we are.  Where is the rig,

7  first of all?

8    MR. NELSON:  It's being patched.

9    THE COURT:  Okay.  The last time I knew, it was trolling

10  the Gulf of Mexico somewhere.

11    MR. NELSON:  Well, actually she was still in the river

12  in Tuxpan last time.

13    THE COURT:  Okay.

14    MR. NELSON:  Been able to extract her, Your Honor.

15    THE COURT:  All right.  Why do we want to arrest the

16  rig?  What's going on here?

17    MR. WOOD:  Your Honor, Charles Phillips has brought

18  claims for breach of contract, past due and owing wages, and

19  wrongful termination.  The wages claim is what provides us with

20  the opportunity to seize the rig under Rule B, supplemental rule

21  of admiralty.  Also Rule B allows a claimant to make a claim

22  against a defendant using the Texas rules, applying Texas law.

23  And the Texas Civil Practice and Remedy Code, Section 62.001 and

24  62.002 provide that you may arrest or seize property of the

25  defendant if the defendant is not a resident of the state or is

1    a foreign corporation acting in the state, the defendant is

2    about to move from the state permanently and has refused to pay

3    or secure a debt due to the plaintiff, and the defendant is

4    about to remove his property from the state without leaving an

5    amount sufficient to pay his debts.

6          THE COURT:  Are wages secured debts?

7          MR. WOOD:  Wages -- seaman wages are secured debts.

8    There's a maritime lien for seaman wages.  That is a smaller

9    portion of the overall claim of Mr. Phillips, but that is

10   involved in the lawsuit.

11         THE COURT:  Let me -- I'm assuming you're denying this,

12   so I'm not asking you your position yet.

13         MR. NELSON:  You're doing good.

14         THE COURT:  What are we -- aren't we going to end up in

15   just a giant cat fight here?  I mean, it may be a cat fight that

16   the other side initiated, Mr. Woods, but what do we have here?

17   We're going to have Mr. Phillips saying, "Look, you fired me.

18   You owe me this amount of money."  We've got Zapoteca going to

19   say, "Yeah, but you took our rig down there and didn't do X, Y

20   and Z; and, therefore, we don't owe you the money."

21       And I guess what I'm working my way towards is, I mean, have

22   y'all thought about sitting down with a mediator and trying to

23   figure this out before everybody spends a zillion dollars in

24   attorney's fees?

25         MR. WOOD:  We haven't discussed mediation as of yet,

1  Judge.  There's more claims than just the termination.  There's

2  past due and owing wages.  It was a wrongful termination.

3  Mr. Phillips was instructed to perform an illegal act in Mexico

4  by moving the rig, and it's our contention that he was fired for

5  that purpose.  That provides for wrongful termination.

6       We also have a pending criminal matter that was brought

7  about in Mexico against Mr. Phillips based in -- on his

8  employment with Zapoteca Energy, Inc. and the rig Energy

9  Zapoteca.  That criminal case is pending, and Mr. Phillips

10  cannot return to Mexico to work or for any other reason.  And it

11  will remain pending for about three years, according to

12  Mr. Phillips' Mexican attorney.

13       There's also --

14            THE COURT:  Is that something that they have any control

15  over?

16            MR. WOOD:  Your Honor, there were settlement agreements.

17  It was brought about by a lawsuit in Mexico pertaining to the

18  rig in which Zapoteca Energy told Mr. Phillips they would take

19  care of the criminal proceedings upon settlement of that Mexican

20  lawsuit.  They failed to do so.

21            THE COURT:  Did the settlement occur?

22            MR. WOOD:  I believe that Zapoteca Energy, Inc. has paid

23  off the civil lawsuit that the criminal charges stem from.

24            THE COURT:  Okay.  But, you know, now, in the United

25  States -- and I don't profess to be an expert on Mexican law.

1   But in the United States, just because you settled the criminal

2   case doesn't give you -- I mean the civil case doesn't give you

3   any means to get rid of the criminal case.  Do they have the

4   means to do that?

5        MR. WOOD:  They -- it's our contention that they do

6   because of their relationship with the other litigant in Mexico,

7   and that they could have -- it's my understanding, Your Honor,

8   that in Mexico when you have a civil debt, they tend to stem

9   into criminal charges in order to force the payment of the civil

10  debt.  Once the civil debt is paid, they drop the charges.

11       Well, in this case, Zapoteca Energy told Mr. Phillips they

12  would make the settlement and get the criminal charges dropped.

13  They failed to do so.  They made the settlement and left

14  Mr. Phillips with the charges pending.

15       THE COURT:  Okay.  Well, I can see where they -- I mean,

16  I can see where they at least would be under some good faith

17  obligation to try to get it done.  And whether they could

18  actually effectuate that or not is a matter for the courts down

19  there.

20       All right.  What's Zapoteca's position?

21       MR. NELSON:  Well, obviously we refute all the

22  allegations that they've made to date, Your Honor.  We don't

23  believe that there's any factual basis in it.

24       With regard to criminal charges, we cannot get rid of the

25  criminal charges against Charles Phillips.  That's in the hands

1    of the Mexican authorities.  We have no power to do that.

2        But with regard to the attachment, which is why we are here,

3    Rule B is not applicable.  We're found within this district.  We

4    are here.  We have worked here for almost a year under Charles

5    Phillips, his entire business of refurbishing this oil rig right

6    here.  As a matter of fact, Charles Phillips had a power of

7    attorney to act as a legal representative in lawsuits, prosecute

8    and defend.  We've got an agent here, crew members.  And I say

9    crew members.  I use that term loosely.  But people employed

10   through Charles Phillips have come up here.  They have lived

11   here.  They have worked here.  They've obtained visas to come up

12   here and work here.  Phone calls, monies transferred in and out

13   of here, payments to crew members, again, loosely used, have

14   been made here.

15       We've got this lawsuit.  We're here.  They've admitted in

16   their pleadings that we're amenable to service of process.

17   We're here.  There's no provision in Rule B that is met to allow

18   it.

19       Secondly, this is not an admiralty and maritime claim.

20   Simple fact of the matter is Rule B, it must be an admiralty and

21   maritime claim.  That is the provisions of the rules.  That's

22   implicit.

23           THE COURT:  Claim for wages would not be?  Set aside all

24   the retaliatory "You fired me because you wanted me to do an

25   illegal act" stuff.

1    MR. NELSON:  He has to be a seaman, seaman's wages.  In

2  order for him to qualify as a seaman, this rig has to be a

3  vessel.  The rig is not a vessel.  Even if you go to the extent

4  of maybe even considering it a vessel at the time he was

5  employed, it was a dead ship.  And claims for wages, claims to

6  repair dead ships, all of these do not sit and fall under

7  maritime law.  We're here in a civil case on diversity of

8  jurisdiction only.  Rule B does not apply.

9    THE COURT:  What's the status of the -- of the rig right

10  now?  Is it being refurbished?  Is it being sold?  I mean --

11    MR. NELSON:  It's not -- it's on the market to be sold.

12  She's in Sabine Pass because that's the best place in this area

13  for which people can come and look at her, view her.  She's in

14  the market there.  There are no contracts of sale to sell her.

15  We don't even have any negotiations with people to sell her, and

16  she's staying in the status that she is in.  She is still not a

17  rig.

18    THE COURT:  Okay.  What about your -- when last we met,

19  we were worried about you guys being able to get certain

20  records.  Have you gotten the records you requested?

21    MR. NELSON:  Your Honor, we have not.  We have -- if you

22  recall, they represented to the court that they had eight boxes

23  over at Mr. Uhles'.  We have now received nine.  What I have

24  suspected was true, that there were some documents here in

25  Houston that had not been turned over.

1    We have been given 22 or so boxes of documents down in

2    Mexico. They were not turned over to us. We had to drive to

3    Tampico to pick them up. And as far as I know, they are still

4    there. We are going to work bringing them up here to get them

5    to Dix to give them their ten days to look at them.

6         And according to the agreed order and Mr. Uhles' own

7    statements here in court, Charles Phillips was to download all

8    of our business off of his computer, and he has -- and turn it

9    over to us on either disk or CD. That has not been done.

10         THE COURT: Okay. Mr. Woods, can we get that done?

11         MR. WOOD: Yes, Your Honor. I'll be talking with

12    Mr. Phillips about that after the hearing this morning.

13         But with regard to the documents in Mexico, Judge, if they

14    were able to go down and get them and bring them up to Tampico,

15    how come they couldn't bring them to Brownsville? Additionally,

16    the rig sailed. It left Tuxpan, and there were documents in

17    Mexico that were required to be on the rig for it to sail.

18    Those documents are now in Sabine Pass under the control of

19    Zapoteca Energy. We haven't seen them.

20         THE COURT: Well, I think the way we left it, as I

21    recall, is -- and obviously you weren't here, Mr. Wood, but I

22    had ordered Mr. Uhles to produce what Mr. Phillips had here and

23    to effectuate what he could to get the documents turned over in

24    Mexico to them. And I think all of us at least were operating

25    under the belief, because that's what the representations to the

1    court were, and, quite frankly, still are, given what you just

2    said, that Mr. Phillips can't go to Mexico; because if he goes

3    to Mexico, he's going to get arrested.

4              MR. WOOD:  That's correct, Your Honor.

5              THE COURT:  And so the way I left it was everything that

6    he had here was to be turned over and that he was to do what was

7    in his power to do, absent going physically down there, to get

8    that stuff turned over.

9         Now, is that -- is that what's in Tampico now?

10             MR. NELSON:  That has been done, and that is what is in

11   Tampico.

12             THE COURT:  Okay.

13             MR. NELSON:  Or actually in Tuxpan now, Your Honor.  We

14   picked it up in Tampico to bring it to Tuxpan where the rig was.

15             THE COURT:  Okay.  Now, is it still in Mexico, or is it

16   on -- are those boxes now on the rig in Sabine Pass?

17             MR. NELSON:  No, those boxes are not on the rig.  Those

18   boxes are still, as far as I know, in Tuxpan with Meritus'

19   office as per the order.  We advised Charles Phillips' then

20   attorney, Keith Uhles, of the arrival of the boxes at Meritus'

21   office, and he had ten days in which he could sit and look

22   through them.  He had the opportunity to look at them in

23   Meritus' office.

24             THE COURT:  Well, let me ask you this.  What good do

25   those documents down there do anyone?

1    MR. NELSON:  Oh, they're going to come up here.

2    THE COURT:  Well, that's what I'm saying.  You're here,

3    the rig is here, they're here.  Why don't we bring those

4    documents here.

5    MR. NELSON:  We're going to be doing that.  But

6    understand, Your Honor, and excuse my language, this matter is

7    about this big in the scheme of the owners of this thing.  Now,

8    we control 50 some odd ships worldwide.  We're in the process of

9    buying new ships, building new ships, and this is a very minor

10   matter on our part.  It's got its place, but its place is

11   further down the line.  When we have time and are ready, we will

12   bring the documents up, give them here.  They will have their

13   ten days to review those.

14   THE COURT:  What kind of documents are we talking about?

15   MR. NELSON:  As we said earlier, Your Honor, we don't

16   know.  It's four years of documents that would evidence payments

17   to crew, payments out for materials to refurbish.

18   THE COURT:  I mean, all the -- you're thinking they're

19   the business records of the rig?

20   MR. NELSON:  Exactly, Your Honor.

21   THE COURT:  All right.  And that's -- is that what you

22   think it is?

23   MR. WOOD:  That's my understanding as well, Your Honor.

24   THE COURT:  Will any of that pertain to any of the

25   claims going back and forth here?

1        MR. NELSON:  I think it will pertain to whether or not

2    Mr. Phillips misappropriated funds.  I mean, if we've put out

3    $4.2 million in refurbishing and monies went to Mr. Phillips and

4    through his hands, there's going to have to be documentation to

5    show where these monies went.  And if there's a million dollars

6    shortfall, we're going to be left with but one conclusion, that

7    those monies weren't properly spent or spent on Zapoteca Energy

8    business.

9        MR. WOOD:  Your Honor, they haven't amended their

10   pleadings to allege that.  They've merely given us notice that

11   they intend to.

12       THE COURT:  Okay.  All right.  Because I had not heard

13   that before.

14       MR. WOOD:  And there may be other documents in Mexico

15   that pertain to communications between Captain Phillips which

16   relate to his work with Zapoteca Energy, Inc., but we don't have

17   access to them.

18       MR. NELSON:  You have access to them down in Meritus'

19   office as provided by the order.

20       MR. WOOD:  In Mexico.

21       MR. NELSON:  Yes.

22       MR. WOOD:  Mr. Phillips can't go to Mexico.

23       THE COURT:  I understand.  Well, here's what I want.  I

24   want those documents brought to the United States.  And how long

25   do you think it will take to get here?

1      MR. NELSON:  Well, if Mr. Phillips lives in Houston,

2   what I suggest we do, Your Honor, is take them up to offices

3   that we have in Houston.  That will enable him access to them up

4   there.  He can mark them.  We will have them all copied.  We're

5   not going to destroy, we're not going to alter, we're not going

6   to disseminate because you've so ordered.

7      If anything, what we will be doing is we will be looking

8   through them and organizing them in a manner that we can sit and

9   use that should help Charles Phillips in his review of them.

10      THE COURT:  Okay.

11      MR. WOOD:  Your Honor, the lawsuit is here.  You did it

12   last time through Dix Shipping, a neutral party.  We'd like to

13   continue with that agreed order.  Mr. Phillips is more than

14   happy to drive down to Brownsville and review the documents with

15   counsel.

16      THE COURT:  I think Houston is all right.  They'll be

17   available.  He's going to make them available in his office in

18   Houston.  I mean, it's inconvenient for you, Mr. Wood, I know.

19   But in most lawsuits, quite frankly, having the lawyer look at

20   the documents is kind of superfluous anyway.  It's the client,

21   it's Mr. Phillips who's going to know what these documents mean.

22      MR. WOOD:  Can we have them sent to a mutually neutral

23   location then, Judge?  Because the agreed order was to ship them

24   to Dix so that they wouldn't be touched by either party prior to

25   our review, and then they can have the documents.  We're not

1    going to take anything.  We're not --

2          THE COURT:  Well, I'm not going to do that.  They can be

3    provided in his office.  I mean, you know, if there's something

4    destroyed, obviously he's going to have to talk to me about

5    spoliation, and so --

6          MR. NELSON:  It's not going to happen, Judge.

7          MR. WOOD:  Your Honor, can we get a time line then?

8          THE COURT:  Well, that's what I'm working toward.  How

9    long will it take us to get those documents here?  We can't --

10   if we're just talking transfer boxes, can't we fly them up here?

11         MR. NELSON:  Give us two weeks.  We'll have them up

12   here.

13         THE COURT:  Okay.  All right.

14         MR. WOOD:  We've been waiting a month, Your Honor.

15         THE COURT:  That's all right.  I understand.  But

16   nothing has happened that's been untoward either way.

17         MR. NELSON:  Absolutely not.

18         THE COURT:  Well, here's what I want to do.  I want --

19   I'm going to continue my order to -- I'm going to order you guys

20   not to dispose of the rig.

21         MR. NELSON:  I think you're stepping out of bounds.

22         THE COURT:  That's all right.  And I may be.

23         MR. NELSON:  I understand.

24         THE COURT:  And I'm going to do it for 45 days.  I'm

25   going to ask you, Mr. Nelson, to within three weeks give them

1    access to those documents.  Give you two weeks to get them here

2    and sometime -- you know, get them a conference room where they

3    can look at them.  And obviously, Mr. Wood, if you've got

4    anything you haven't turned over, I want you to make sure they

5    have them.

6         MR. WOOD:  Absolutely.

7         THE COURT:  All right.  And in the meantime, while we're

8    waiting for the documents, I want you guys to pick a mediator

9    and go see if you can mediate this thing before you waste the

10   money.  I mean, I'll be glad to try the lawsuit and we'll do it,

11   and -- but it just seems like everybody is going to plow a bunch

12   of money into attorney's fees, and you're just going to be

13   fighting with each other.

14        And it sounds to me like what the best thing to do is for

15   each side to go their separate ways.  I mean, this is kind of a

16   business divorce.  And I don't mean to demean either one of your

17   claims, but, I mean, it's almost -- I mean, when I hear you

18   arguing over some of these payroll records, it's almost like

19   you're arguing over the silverware.  It's almost like, "Look, go

20   your separate ways.  Get on with your lives."  You know,

21   Mr. Phillips probably never wants to work for you-all again.

22   You probably never want Mr. Phillips to work for you again.  So,

23   I mean, let's see if we can resolve this.

24        Why don't you agree on a mediator.  If you can't -- if you

25   can't agree, I'll appoint one.  And in this 45 day period, let's

1   get this mediated.  Let's exchange your -- you know, your

2   mediation documents so everybody knows what everybody is

3   claiming, you know.  You don't have to exchange secret stuff.  I

4   mean, if there's stuff you want to tell the mediator, I mean,

5   the same everyday mediation rules apply.  But make sure, for

6   instance, if you're going to claim that he owes you a million

7   dollars, make sure they know that before the mediation takes

8   place so they know what to expect, because you know nothing is

9   going to happen if somebody gets surprised by a sudden figure

10   claim or something like that.  Again, I mean that for both

11   sides.

12       Now, in the meantime, while I've continued this temporary

13   order, if Zapoteca gets an offer for the rig, they have leave to

14   come down here and say, "Judge, your order is now screwing up my

15   sale."

16           MR. NELSON:  I believe it might be affecting the

17   saleability of it right now, Your Honor, which leaves me concern

18   as to where you are.

19           THE COURT:  Well, I will -- I will revisit -- if you get

20   what looks like a good offer or a -- you know, a firm offer,

21   something like that, come -- I'm giving you leave to come down

22   and I will revisit it.  But I can't imagine, and maybe I'm being

23   naive, that 45 days -- you know, that it doesn't take longer to

24   sell a rig than that, you know.

25           MR. NELSON:  I respect the court's opinion.  I'm almost

1    to the point of thinking we might need to have an evidentiary

2    hearing today to protect the record so that we can prove that

3    this is not a vessel, that she was a dead ship, that this is not

4    a claim for maritime wages, and that this is not a maritime

5    matter.

6          THE COURT:  Well, if we need to do that, I'm willing to

7    do that.  I'm here.  I'm at your -- but it just seems to me like

8    we're -- both sides are going to end up, you know, spinning

9    their wheels and wasting a lot of time and money.

10         MR. WOOD:  Just so the court is aware, Your Honor, there

11   are more damages than just what I was able to expound on

12   earlier.  There's a labor case that Mr. Phillips cannot defend

13   in Mexico in which a 220,000 bond was posted.  And Mr. Phillips

14   may ultimately be liable for that money as well.

15         THE COURT:  Who posted the bond?

16         MR. NELSON:  Zapoteca Energy did, but I think Charles

17   Phillips is also a party plaintiff in a labor suit in Mexico.

18   Therefore, I see a great inconsistency in arguing he can

19   prosecute one down there but cannot defend one down there.

20         MR. WOOD:  Your Honor, that case was over and done with

21   before Mr. Phillips was able to not return to Mexico.

22         THE COURT:  So it no longer exists?

23         MR. WOOD:  Actually there's a judgment out there, I

24   believe.

25         THE COURT:  There's a judgment against Mr. Phillips?

1   MR. WOOD:  No, Your Honor.  There's a judgment
2   Mr. Phillips has.

3   THE COURT:  Okay.  Against?

4   MR. WOOD:  Against Zapoteca Energy, Inc.

5   MR. NELSON:  We're not aware of that, Your Honor.  But
6   if there was one, then he prosecuted a claim as a plaintiff
7   which arose after this matter started, and now he's complaining
8   that he can't defend.  I see some serious inconsistencies in the
9   fact he can prosecute but can't defend.

10   MR. WOOD:  That claim was brought, Your Honor, when he
11   was still in Mexico.

12   MR. NELSON:  There was a claim brought since or actually
13   before Mr. Phillips alleges he was terminated, within a week
14   before he alleges he was terminated, in which he was a party
15   plaintiff.

16   MR. WOOD:  I don't believe that's correct, Your Honor.

17   THE COURT:  Why don't you visit with your client,
18   because this is the first time I've heard that there's a
19   judgment pending.

20   MR. NELSON:  It's the first time the issue has arose.

21   MR. WOOD:  I'm sorry, Your Honor.  It's not a judgment.
22   It's an embargo that's granted in Mexico in the labor case.

23   THE COURT:  It's a what?

24   MR. WOOD:  Embargo.

25   THE COURT:  Tell me what that is.

1      MR. WOOD:  Basically the court has issued an attachment

2 against the vessel in Mexico for a labor claim that was brought

3 by Mr. Phillips and his marine superintendent.

4      THE COURT:  And what is -- when did this all happen?

5 And if so, how did they get the rig out of Mexico if there was

6 this lien against it?  Or was the rig already gone when this

7 happened?

8      MR. WOOD:  The attachment came in --

9      MR. PHILLIPS:  The attachment came down, the embargo

10 came down two or three days after the vessel left.

11      THE COURT:  Okay.  And tell me what is the -- what's the

12 legal affect of embargo?  Is it more or less what I'm just

13 talking about ordering, that they can hold the rig pending the

14 lawsuit?

15      MR. WOOD:  Yes, sir, Your Honor, in Mexico.

16      THE COURT:  All right.

17      MR. NELSON:  That's a moot point because the rig is

18 gone.

19      THE COURT:  Right.

20      MR. NELSON:  Embargo has no effect.

21      THE COURT:  But it's not a judgment?

22      MR. WOOD:  It's not a judgment.

23      THE COURT:  And it just came down by the time -- the

24 reason it wasn't grabbed down there, so to speak, was because

25 the rig had already left?

1        MR. WOOD:  Had left.

2        MR. NELSON:  Actually, Your Honor, I think Mr. Ostbye,

3   who has been down there, might be able to shed some further

4   light for the court if you care to.

5        THE COURT:  Yeah.  No, I'd like to hear it.  What's the

6   status of that?

7        MR. OSTBYE:  Well, before on or about March 10,

8   Mr. Phillips and several other defendants lodged a claim against

9   the rig, a labor claim, trying to get an attachment.  That claim

10  was thrown out.  That was filed in the local labor court in

11  Tuxpan.  That claim was thrown out for jurisdictional issues.

12      Then certain other claimants went into the federal court in

13  Mexico where they filed a labor claim.  There were actually two

14  labor claims, for which we posted two bonds totalling $220,000,

15  one for 180,000 and one for 40,000.  Based on us posting those

16  bonds, the rig was released, and the claims are now pending.  So

17  there are no -- it's factually wrong what they're saying.

18        MR. NELSON:  There are no embargos on this issue by a

19  federal court or a state labor court in --

20        THE COURT:  Okay.  And it's because you posted a bond --

21        MR. NELSON:  That's correct.

22        THE COURT:  -- and if they get a judgment down there,

23  they can go against the bond?

24        MR. NELSON:  Correct.  The bond sits instead of the rig,

25  the vessel.

1        MR. WOOD:  We'll take a bond in this case too, Judge.

2        MR. NELSON:  I use the term vessel loosely.

3   I think all of this is non-issues for the court.

4        THE COURT:  Mr. Nelson, I'm not understanding your dead

5 ship argument; and that's what I'm sitting here reading, your

6 dead ship argument again.  I mean, I understand the concept of a

7 dead ship.  It's mothballed.  But, I mean, at the time the

8 lawsuit was brought, it was in Mexico.  It's now come back to

9 Texas, so isn't it operational?

10       MR. NELSON:  Absolutely not, Your Honor, but that's

11 not -- you're sort of missing the fact.  When it comes to wages,

12 you go to the time that the person was employed, whether it was

13 a dead ship then or not.

14   In 2000, this vessel was a dead ship, and I say vessel

15 loosely because I do not believe she was a vessel.  We'll say

16 structure.

17       THE COURT:  Okay.

18       MR. NELSON:  She was not a vessel.  She was a structure.

19 If you want to consider her a vessel, she was a dead ship, and

20 that's --

21       THE COURT:  And that's because -- because instead of

22 being out in the ocean, it was -- it was tied up to the dock in

23 Mexico?

24       MR. NELSON:  As -- well, that's in part, yes.  But as

25 verified by Mr. Phillips in his pleadings, she's an offshore

1    drilling rig.  That is her intended purpose.   Even today --

2           THE COURT:  I mean, we all concede that, right?  That's

3    what it is, isn't it?

4           MR. WOOD:  That's what it is.

5           THE COURT:  All right.

6           MR. NELSON:  Even today she is not an offshore drilling

7    rig.  She has not been put back into navigation.  She's not been

8    put back into service.  She has not been put back into commerce.

9    She remains a non-vessel for admiralty and maritime

10   jurisdictional purposes.

11          MR. WOOD:  I have to disagree with that, Your Honor.

12   She's perfectly -- she traveled from Tuxpan up here.  The cause

13   of action didn't arise until after she was up and ready to sail.

14   In addition to that, it's my understanding that she could be

15   moved when Mr. Phillips started employment.

16          MR. PHILLIPS:  November of 2000.

17          MR. WOOD:  November of 2000, she was able to be moved.

18   And there's a surveyor's report out there about that time that

19   says she could be moved.  Now, her intended purpose, to be a

20   jackup oil rig.  She moved from Tuxpan up to Sabine.  She will

21   be put in the stream of commerce and sold.  If Zapoteca Energy,

22   Inc. doesn't want to use her herself, but she's perfectly

23   capable of sailing.

24          THE COURT:  I mean, that's what I'm having trouble with.

25          MR. NELSON:  I understand you are, but they're

1  absolutely wrong.  She wasn't -- she had been mothballed.  She

2  had been taken out of service.  She was in disrepair.  His own

3  pleadings say he was hired to refurbish her.  She had had a

4  blowout.  She had had a fire.  There was no motor.  There was no

5  navigation equipment.  There were no accommodations.  There were

6  no derricks.  There was nothing on this vessel that -- and I say

7  vessel loosely --

8          THE COURT:  I know.

9          MR. NELSON:  -- on this structure that had her in any

10 way an offshore drilling rig.

11         THE COURT:  How did it get from Mexico to Sabine Pass?

12         MR. NELSON:  Towed.  Towed.  Judge Kent in *Robert Blake*

13 *versus Excel Environmental* just recently determined that a

14 person who had been working on an offshore drilling rig that had

15 been completed, had been moved from China over to Galveston and

16 was sitting there being provisioned and -- you know, put

17 together ready to go out into navigation, I mean, brand spanking

18 new, was not a vessel, and this man was not a seaman.

19    We don't even have one that's brand spanking new.  We had

20 one that had a blowout, had been taken out of navigation for ten

21 plus years, had not been used as an offshore drilling rig for

22 more than that, had been laid up in Tuxpan for years, sitting on

23 her legs, an absolute derelict.

24         THE COURT:  If he's right, Mr. Wood --

25         MR. WOOD:  I'd be happy to brief.

23

1    THE COURT: Well, I know, and I'm going to ask the --

2    actually order you to do that. But, I mean, but let's assume I

3    agree with him and I say it's a dead ship. Then do I have power

4    to do -- reach out and grab that rig?

5    MR. WOOD: By their own admission, this is a maritime

6    case, Judge. They filed it under Rule 9H. In their pleadings,

7    they admit that it's admiralty. Applying Rule B, which is an in

8    personam action against Zapoteca Energy, Inc., we can use state

9    law pursuant to the Texas Civil Practice and Remedy Code,

10   Section 61.001 and 60 -- I'm sorry, 62, Your Honor. 61, 61.002

11   to attach property of a defendant who is a foreign corporation

12   when that property is within our reach. Therefore, the in

13   personam action against Zapoteca Energy, Inc. allows us to

14   attach the rig.

15   MR. NELSON: First of all, Your Honor, we cannot plead

16   jurisdiction that does not exist. That does not constitute an

17   admission.

18   Secondly, Rule B is under those certain supplemental rules

19   of admiralty and maritime claims. Rule B says in an admiralty

20   and maritime claim, they can use state law. It still must pass

21   the threshold of being an admiralty and maritime claim.

22   Second, the rule says, "if we cannot be found within this

23   district." And there's two parts to that. One is geographical,

24   and one is service. We are here geographically. We have been

25   here geographically. We are amenable to service of process.

1    THE COURT: Let me ask you, Mr. Wood, to respond to that

2  argument, because that's -- I mean, grabbing the rig -- you

3  know, using that legal term, grabbing the rig, I mean, all

4  that -- all that really does, isn't it, is ensures that your

5  client has an asset to go against?

6    MR. WOOD: That's correct, Your Honor.

7    THE COURT: All right.

8    MR. WOOD: Because Zapoteca Energy, Inc. doesn't have

9  any assets other than the rig.

10    THE COURT: The rig is Zapoteca's only asset?

11    MR. NELSON: It is, but there's a lot of wealth behind

12  it. But for your guidance, you cannot tie -- you must tie the

13  security to obtaining jurisdiction. You cannot sit and say we

14  don't have jurisdiction but we're going to get security. You

15  must have both.

16    THE COURT: I understand.

17    MR. NELSON: Okay.

18    THE COURT: I understand that. Well, what does Zapoteca

19  have? Does it have multiple rigs?

20    MR. NELSON: No, we have one rig.

21    THE COURT: Okay. So this is their one asset. I mean,

22  when you were talking the other -- a few minutes ago about this

23  being a small part of their business, what, do they own all

24  these rigs with just separate corporations owning each rig?

25    MR. NELSON: There's different owners.

1          THE COURT:  Okay.  All right.

2          MR. NELSON:  These different owners are very, very large

3    people in the shipping business, some of the biggest in the

4    world.

5          MR. WOOD:  They shield -- but they're shielded, Judge.

6    We're suing Zapoteca, Inc.  We're not suing the owners.

7          THE COURT:  No, I understand that.  I understand that.

8    And, you know, that's why people incorporate, I mean, so the

9    owners can't get sued.  I mean, that's the theory behind it.

10          MR. NELSON:  You know, Your Honor, if there's a judgment

11    entered against us, the judgment is probably going to be

12    honored.  But we're getting ready to file a claim against

13    Mr. Phillips that will far exceed this.  We're going to demand

14    counter security from him.  I don't think he's going to post it,

15    and then our security is going to have to be released, so this

16    whole thing will be abated.  And, you know, that's where we're

17    heading.  This requirement of security, one, you cannot do it.

18    I mean, you can, but you're treading on some very, very deep

19    waters if you do, in my opinion, under Rule B.

20      We're here.  It's an in personam matter.  It's a contract

21    matter.  It's a contract for a tort sounding in contract matter.

22    I don't believe Mr. Phillips was ever a master, to be honest

23    with you.  I don't think he has a license to be a master.  I

24    think it's just a title he's assumed.  All he is is a technical

25    person who was hired to refurbish, at best, a dead structure, a

1   dead vessel.  And there is -- that is not admiralty and maritime

2   law.   Rule B cannot be used for attachment here.

3           THE COURT:  All right.  Mr. Wood?

4           MR. WOOD:  There are numerous e-mails calling him

5   master, calling him seaman.  Even e-mails from Mr. Nelson saying

6   he's a seaman and that his claim should be protected with the

7   rig in Mexico or not.  For him to argue now that he's not a

8   master is contradictory.

9           THE COURT:  Mr. Wood, did you have a different motion, a

10  motion for clarification or something?  Do we need to address

11  that?

12          MR. WOOD:  The motion for clarification, Judge, you took

13  care of.  We did have in the alternative a motion for a

14  temporary restraining order, a temporary injunction, and this is

15  an alternative pleading that will get an injunction against

16  Zapoteca Energy, Inc. ordering them not to move or sell the

17  vessel as opposed to the interim wages claim against the vessel

18  itself for attachment.

19          THE COURT:  Well, for an injunction, you're going to

20  have to prove likelihood that you're going to win, don't you?

21          MR. WOOD:  We have, and I have Mr. Phillips here today.

22  We'd be happy to put him on the stand and have him testify as to

23  bonuses he was promised, again, to the criminal charges, that

24  they would take care of them.

25          THE COURT:  Well, here's what -- here's what I'd like to

1    do.   I'd like to hear that testimony, and I'd like to hear the

2    plaintiff's testimony or whatever evidence they want to put on

3    that this is not a ship or it's a dead ship, that it's not a

4    vessel, because I'm -- you know, obviously I'm concerned about,

5    one, if I have the ability to do what I do, although I think

6    it's the best thing, is --

7            MR. NELSON:  Well, Your Honor, if you want, what I will

8    do to take some of your anguish away, you leave that 45 day

9    order in place.  There is no attachment.  There is no garnish --

10   you know, seizure.  If we have a sale that comes, we come back

11   here, but none of this is disseminated.  It remains within this

12   court and within these people.  And that way I don't press you,

13   I don't end up having to go above you, if necessary, and this

14   makes it easy for you, and it probably satisfies everybody's

15   requirement here.

16           THE COURT:  Is there any problem with that, Mr. Wood?

17           MR. WOOD:  As long as we have assurances that the rig is

18   not going to be sold or moved and we have some sort of interest.

19           THE COURT:  Well, I'm going to order it.  But if they

20   want it, though, I'm going to seal the order.

21           MR. WOOD:  I have no problem with them sealing the

22   order, Judge.

23           MR. NELSON:  I would like that prior order also sealed,

24   Judge.  I mean, it will affect us in trying to market this thing

25   if this is out in public.  If Charles Phillips disseminates this

1    to anybody, as they've said, it's a very small market.  It will

2    affect our abilities to possibly sell it.

3            THE COURT:  Okay.  Here's -- let me do that then.  This

4    is what I'm going to do.  But as a part of this, though, is I'm

5    going to seal the prior order.  I'm going to instruct the

6    parties not to disseminate information about the prior order or

7    this order.  I'm going to institute what I've said with regard

8    to the documents and the 45-day period, but I also want -- and

9    I'm not going to put this in the same order.  But I want,

10   Mr. Wood, you to reply to the arguments they make in response to

11   your motion for arrest and seizure.

12           MR. NELSON:  I would like to add additional briefing,

13   Your Honor, because this was done --

14           THE COURT:  Wait, wait, wait, wait, wait.  You're going

15   to get your chance.

16           MR. NELSON:  Okay.  Very good.

17           THE COURT:  Sitting here looking at my calendar.  I'm

18   going to give you, Mr. Wood, to the 18th.  And then, Mr. Nelson,

19   if you will reply to his reply or respond to his reply, whatever

20   you want to -- however you want to describe it, by the 28th.

21           MR. NELSON:  28th?

22           THE COURT:  Yeah.

23           MR. NELSON:  And his is due when?

24           THE COURT:  The 18th.

25           MR. NELSON:  Okay.

1        THE COURT:  And obviously you're going to copy each

2   other with that.

3        MR. NELSON:  Okay.

4        THE COURT:  And just for the benefit -- and I know y'all

5   understood it, but I'm going to make myself real clear here

6   because I don't want to -- I don't want to say -- I don't want

7   anybody to say they didn't understand this.  And this is for the

8   two clients that are here basically, you, Mr. -- both of you

9   two.  The agreement that we've kind of structured here was based

10  on the fact that they don't want this order out in the

11  marketplace.  So, Mr. Phillips, I'm telling you, it's you who

12  I'm worried about, not because you would necessarily do anything

13  untoward, but because -- I'm not worried about them because

14  it's -- it hurts them more.  I mean, I don't think they're going

15  to shoot themselves in the foot.  But it applies equally.  This

16  means, I mean, I don't want it orally discussed.  I don't want

17  you to talk about it with your friends, your people you meet at

18  church or whatever.  I mean, this is -- you know, not only am I

19  sealing the order, but as part of this, I'm -- we're going to

20  have the parties agree that this is confidential, okay?  Do we

21  understand each other?

22       MR. NELSON:  And could we have that --

23       THE COURT:  I mean, would you say it out loud?

24       MR. PHILLIPS:  Yes.

25       THE COURT:  Okay.  And that goes equally.

1          MR. OSTBYE:  Yes.

2          MR. NELSON:  Could we also have that directed to Charles

3     Phillips' wife who is in this court?

4          THE COURT:  Yes.  Okay.  Ma'am?

5          MRS. PHILLIPS:  Yes.

6          THE COURT:  All right.  Thank you.  Obviously,

7     Mr. Woods, I'm concerned about his argument that this is dry

8     docked.  It's, you know, however you -- you know, as we say in

9     Texas, it's rode hard and put up wet, only this is put up dry,

10    you know, so -- and it -- your claims don't apply and thus, my

11    jurisdiction to do it does not exist.

12         Mr. Nelson, I'm concerned about his wage claim, because I

13    think he may be a -- you know, fall under that.

14         MR. NELSON:  I understand your concern.  I see where you

15    are, but in all due respect --

16         THE COURT:  Well, I know, but you're each going to get a

17    chance to address what I'm concerned about, so you're going to

18    get a chance to convince me he doesn't have a wage claim that

19    would trigger all this.

20         Obviously, Mr. Wood, you can address that too and tell me

21    why it does.  Now, you're going to have a tougher time, you

22    know, with any kind of, you know, retaliatory firing, that type

23    of thing, or the whistle blower.  "You told me to violate the

24    law and I didn't want to do it," because that doesn't ring in

25    admiralty to me, but the wage claim does.  And so as far as that

1    goes, I'm just giving y'all heads up equally of what I'm

2    concerned about.

3              MR. NELSON:  Understood.

4              THE COURT:  All right.  I will draft an order and sign

5    it that consummates this.  I will seal it here, but I'm going to

6    fax a copy to both of your offices.

7              MR. NELSON:  One other issue we have, and I think Frank,

8    Frank and Frankie over there and I discussed this.  We do have

9    these documents that are at Dix.  We would like to move them up

10   to Houston also, and I don't think they have an objection to it

11   because they've had their full time to look at them.

12             MR. WOOD:  We have no problem.  They can take the

13   documents from Dix.  On that issue with the documents, though,

14   Your Honor, they were the one that picked Dix in the last order,

15   and we'd like to have them produced at Dix again.  I know that

16   you've said that you want them to go straight to Houston, Judge,

17   but --

18             THE COURT:  You mean the Mexico documents?

19             MR. WOOD:  The Mexican documents.

20             THE COURT:  I think the Mexican documents can go

21   straight to Mr. Nelson's office.

22             MR. WOOD:  Very good.

23             THE COURT:  All right.  If he needs something from you,

24   Mr. Wood, to -- I mean, Dix says, "I'm not letting anybody have

25   it until someone tells me it's okay," you will make yourself

1  available to call whomever you need to call?

2        MR. WOOD:  I have no problem with that, Your Honor.

3        MR. NELSON:  Frank, if you don't mind calling Cecil at

4  Dix and telling him that he can release the documents to us.

5        MR. WOOD:  I think -- I'll talk to Mr. Nelson about it.

6        MR. NELSON:  We'll work it out, Judge.

7        THE COURT:  All right.

8        MR. WOOD:  We're not the one holding up the documents.

9        THE COURT:  Oh, I understand that.  But I understand --

10  I mean, I don't know the Dix -- people at Dix, and they may

11  think, "Well, gee, we're kind of a stakeholder here.  I'm not

12  going to give it to anybody.  I don't want to get in trouble,"

13  and that's what -- I'm trying to head off that problem --

14        MR. WOOD:  Sure.

15        THE COURT:  -- if it's exists.

16        MR. WOOD:  That's fine, Your Honor.

17        MR. NELSON:  If it does, if he has a problem with it,

18  we'll draft an agreed order, send it over for signature, and

19  then send it to Dix.

20        THE COURT:  All right.

21        MR. WOOD:  That's fine.

22        THE COURT:  Okay.  As I said, I think y'all should pick

23  a mediator.  I will be glad to order one, but mediation to me

24  doesn't work unless both sides have confidence in the mediator.

25  And if I pick one, you may have confidence in him, but

1    Mr. Nelson may not, or vice versa.

2          MR. NELSON:  I don't know any here.   I know one in

3    Houston that is as good as any I've ever been in front of, Bryan

4    Coleman.

5          MR. WOOD:  I don't believe I know him.

6          MR. NELSON:  Yeah.  I've been in front of him three

7    times, and what I've seen him do is amazing.   Although he does

8    not know admiralty and maritime law, he's relatively

9    inexpensive.  He's like 900 a whole day per party as opposed to

10   like Ross Seele who's 2500 a party for --

11         THE COURT:  Man.

12         MR. NELSON:  Oh, we're in the wrong business.

13         MR. WOOD:  Do you know Mark Blakemore?

14         MR. NELSON:  No, but it doesn't --

15         MR. WOOD:  He does a lot of maritime work.

16         MR. NELSON:  I have no problem with anybody that they

17   might recommend.

18         THE COURT:  It might be useful to have someone who knows

19   some maritime, you know, because if you get in these arguments

20   about saying, look, you're never going to win this because of X,

21   Y and Z, you know, it's tough for a mediator to set that aside.

22         MR. NELSON:  It's really a contract action.   The

23   maritime issues are pretty much law issues.

24         THE COURT:  Well, the maritime issues to me are the only

25   reason why we're here as far as how you got here.   But, right,

1   you're claiming -- you're claiming what happened to our

2   $4 million, and you guys are claiming, hey, you promised me X, Y

3   and Z and you never did it, and that pretty much sounds like a

4   contract action.  Because obviously if they gave you money and,

5   you know, you were supposed to do certain things with it and you

6   didn't do it, you breached your orders or whatever.

7        All right.  Is there anything else we can accomplish today?

8            MR. WOOD:  Just as part of that order, Judge, you are

9   going to put in there that if they do have a purchaser for the

10  rig within the 45 days, they do have to file for leave --

11           THE COURT:  Yeah.

12           MR. WOOD:  -- to come back for another hearing?

13           THE COURT:  Yeah.  Anything else?

14           MR. NELSON:  No, Your Honor.

15           MR. WOOD:  No, Your Honor.

16           THE COURT:  Okay.  I mean, my fondest hope, of course,

17  is that you'll -- in the 45-day period, you guys will realize

18  that he didn't squander your million dollars, and you guys will

19  realize that these guys aren't bad guys and you'll go away.

20  But, I mean, if not, you know, we'll try it.  It's easy enough.

21  Easy enough.

22           MR. WOOD:  If they are going to make that claim, we will

23  need to see the documents before mediation.

24           MR. NELSON:  Yes, I understand.  The media -- if we can

25  agree to mediation maybe further out because we got 22 boxes of

1    documents.

2         THE COURT:  Well, I know.

3         MR. NELSON:  Would you have a problem with that?

4         THE COURT:  No.  No.

5         MR. NELSON:  Okay.  I didn't think you would.

6         THE COURT:  And I realize that.  And, I mean, I know you

7    can't -- you walk in the morning of the -- and all of a sudden

8    the plaintiff's claim is three times what you thought it was and

9    they've got some whole new theory, you know, I mean, that just

10   sinks the mediation right there, or defendant, whichever way it

11   works, counterclaim.  I mean, I don't want anybody to waste

12   their time doing this.  I mean, that's why normally I don't

13   require mediation because I think what it's done over the years

14   is as lawyers, at least when I first started, we actually

15   settled lawsuits without mediators the old fashioned way.  We

16   picked up the phone.

17        MR. NELSON:  The way it's supposed to be done.

18        THE COURT:  And I know that's almost out of fashion now.

19        MR. NELSON:  We use mediation as a discovery tool now,

20   it seems.

21        THE COURT:  Well, and everybody is afraid to say, hey,

22   why don't I pay you $10,000 and you guys go away because whoever

23   says that, "Okay.  Now you've just set the floor at $10,000.

24   Now when go into mediation, instead of the floor being zero,

25   it's now $10,000."  Same way from the plaintiff's side.  If I

1    say, "All right. Pay me $50,000," well, I've now put my

2    ceiling. So now no one talks before they talk to a mediator, so

3    in a lot of ways, it's counter productive.

4        Let me ask you this: Let me assume the worst, at least the

5    worst as far as efficiency goes, and you don't settle, and we're

6    really -- you know, we're going to have to try this case. Other

7    than these documents that are coming up from Mexico, what else

8    are y'all going to need? I mean, you're probably going to have

9    to depose some people, obviously each other. But, I mean,

10   there's probably some crew members or some guys down in Mexico

11   you're going to want to depose. I mean, when can we try this?

12        MR. NELSON: It would have to be after September for me.

13   And that's a very short docket, but I think we've got, you know,

14   probably six months worth of discovery.

15        THE COURT: All right. That's all I'm asking. I'm not

16   holding you to something.

17        What do you think?

18        MR. WOOD: That seems fair, Your Honor. We've got --

19   the only problem is, we've got people in different countries.

20        THE COURT: Well, I know. And setting them up and --

21   yeah, I know, I know. I was trying to figure out what else we

22   were dealing with.

23        MR. NELSON: We may need issuance of letters rogatory

24   from the court.

25        THE COURT: All right. Okay. Well, I will get an order

1    out today, and it will be faxed to your respective offices.

2         MR. WOOD:  Thank you.

3         THE COURT:  And as I said, I'm hopeful it will go away;

4    but if not, if it doesn't, you know, I want y'all to send me a

5    letter basically saying, hey, it didn't work or it did work.

6    Or, hey, we haven't gotten there yet.  But I do want to know who

7    your mediator is once you agree on it, but you can just do that

8    by letter.

9         MR. NELSON:  Very good.  Letter fax, letter mail?

10        THE COURT:  Yeah, fax or mail, doesn't matter, either

11   one.  I jut want to know for my own edification, not for any

12   other purpose.  And -- but if it falls apart, what I'll probably

13   do, and we can -- we can do this by conference call, Mr. Nelson,

14   so you don't have to come down here, is just set up a schedule.

15        MR. NELSON:  Okay.

16        THE COURT:  Because we can do -- you know, we don't need

17   the parties for that.  The lawyers and I can do that, and we can

18   do it by conference call.

19        MR. NELSON:  All right.  I appreciate that.

20        THE COURT:  All right.  We'll stand adjourned.

21        MR. NELSON:  Thank you, Your Honor.

22        MR. WOOD:  Thank you, Your Honor.

23                          *  *  *

24      (End of requested transcript)

25                          -oOo-

1    I certify that the foregoing is a correct transcript from

2  the record of proceedings in the above matter.

3

4  Date:  May 25, 2004

5

6                                    Signature of Court Reporter

7                                    Barbara Barnard

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25