# EXHIBIT C

# ENERGY ZAPOTECA

Rio Jamapa No. 45
Entre Rio Papaloapan Y Rio Cazones
Col. Jardines
C. P. 92890
Tuxpan, Vera Cruz
Mexico
Tel/Fax 783-83-48455
energyzapoteca@yahoo.com

March 10, 2004

| | |
|---|---|
| TO: | P. D. GRAM & CO. AS<br>P. O. BOX 1383<br>VIKA, 0114 OSLO<br>NORWAY<br>Tel  47-22017455<br>Fax 47-22-017455 |
| FROM: | Charles Phillips |
| INVOICE: | 2097 – Termination |
| FOR: | Contract services rendered by Charles Phillips onboard the Energy Zapoteca in Tuxpan, Mexico. |
| PERIOD: | March 1, 2004 to March 10, 2004 |
| RATE: | Ten (10) days X $400.00 USD |

Total Amount Due:  $4,000.00 USD  due date:  IMMEDIATELY

Please make electronic transfer to :

Charles D. or Judy H. Phillips
Bank One
P. O. Box 2629
Houston, Texas 77252-2629
Account Number 747-5064740
ABA Routing Number 111000614

Charles D. Phillips

# EXHIBIT D

IN THE UNITED STATES DISTRICT COURT
FOR THE SOUTHERN DISTRICT OF TEXAS
BROWNSVILLE DIVISION

| | | |
|---|---|---|
| ZAPOTECA ENERGY INC, <br> Plaintiff | § § § | |
| VS. | § § | Civil Number B-04-048 |
| CHARLES DOUGLAS PHILLIPS, <br> Defendant | § § § | |

## DECLARATION UNDER PENALTY OF PERJURY OF ERIK OSTBYE

1. My name is Erik Ostbye. I am over eighteen years of age and have never been convicted of a felony. I am of sound mind and otherwise capable of making this Declaration. I have personal knowledge of the facts stated herein as I am a representative of Zapoteca Energy Inc and to the best of my knowledge these facts are true and correct.

### The Rig ENERGY ZAPOTECA

2. The Rig ENERGY ZAPOTECA was built in 1981 for Protexa. The Rig was a Friede & Goldman L-780 Independent Jackup Drilling Rig. (See photograph No. 1 attached hereto).

3. In October 1987 the Rig ENERGY ZAPOTECA was drilling the YUM-2 well for Pemex in the Bay of Campeche when the well blew out and caught fire. The fire raged for more than one month, caused extensive damage to the Rig ENERGY ZAPOTECA, including damage to the rig package and substructure, crews quarters, control room, helideck, which was cut off and dropped to the Gulf floor and later retrieved, pedestal crane, the jacking motors and controls, and the Rig's hull and legs. (See photograph No. 2 attached hereto).

4. The Rig ENERGY ZAPOTECA's jacking motors and controls were replaced and repaired as necessary and the Rig was moved away from the drill site and left the Rig in the Gulf of Campeche until 1989.

5. The Rig ENERGY ZAPOTECA was declared a total loss.

6. After this fire, The Rig ENERGY ZAPOTECA was incapable of being utilized for her intended use.

1

7.  Protexa completely removed the Rig ENERGY ZAPOTECA from navigation and commerce. To date the Rig has not been reintroduced into navigation and commerce.

8.  In 1989, because the Rig ENERGY ZAPOTECA was a hazard to navigation, Protexa moved the Rig to its yard in Tuxpan, Mexico, where the Rig remained, continually and indefinitely removed from navigation and commerce.

9.  In May 2000, Zapoteca Energy Inc purchased the Rig ENERGY ZAPOTECA with the intent to strip the Rig of all structures above the main deck, repair the jacking system, hull and legs, and convert the Rig to a bare deck jack up barge so that the Rig could be sold.

10. Zapoteca Energy Inc never intended to reintroduce the Rig back into navigation and commerce.

11. The purchase price Zapoteca Energy Inc paid for the Rig was $1,437,500.00.

12. At the time Zapoteca Energy Inc purchased the Rig ENERGY ZAPOTECA, the Rig had been continually withdrawn from navigation and commerce, was in total disrepair, was considered a derelict, and was in need of a very substantial amount of rebuilding, repair and refurbishment before she could be brought back into service as a drilling rig. (See photographs No. 3 attached hereto).

13. Zapoteca Energy Inc has removed all structures above the main deck from the Rig ENERGY ZAPOTECA. Energy Zapoteca Inc has repaired the damage to the hull and legs, and the jacking motors and controls of the Rig ENERGY ZAPOTECA. In her present state, the Rig ENERGY ZAPOTECA is merely a hull with three jacking legs.

14. To date, Zapoteca Energy Inc has invested an additional $10,500,000.00 to bring the Rig to her present status. It is estimated that it will cost another $40,000,000.00 to $60,000,000.00 to reconstruct the Rig back to the status of a drilling rig.

15. Due to many legal problems in Mexico created by Charles Douglas Phillips, Zapoteca Energy Inc determined it best to move Rig ENERGY ZAPOTECA to Texas. On or about 5 April 2004, the Rig ENERGY ZAPOTECA was towed to Sabine Pass, Texas where she remains today.

16. Zapoteca Energy Inc is in the process of reevaluating its intent regarding the Rig. No decisions have been made as to what Zapoteca Energy Inc will do with the Rig ENERGY ZAPOTECA.

17. To date, and at all times material hereto, the Rig ENERGY ZAPOTECA has been and remains completely withdrawn from service, navigation and commerce and

2

Zapoteca Energy Inc lacks any prospects of returning the Rig back into service, navigation and commerce.

18. To date, and at all times material hereto, the Rig ENERGY ZAPOTECA has been and remains without certification from her Classification Society, Load Line Certificate, Minimum/Safe Manning Certificate and Radio Certificate, and is considered a "project" by her Classification Society, a term applied to ships and vessels in their construction stage.

19. In December 2000, the date Charles Douglas Phillips asserts he was hired as Master of the Rig ENERGY ZAPOTECA by Zapoteca Energy Inc, the Rig had been completely removed from navigation and commerce for approximately 13 years; there were no prospects of returning the Rig back into service, navigation and commerce as a drilling rig. (See Declaration of Terrence Michael Smith). The Rig was in total disrepair, was considered a derelict, and was in need of a very substantial amount of rebuilding, repair and refurbishment before she could be brought back into service as a drilling rig.

20. The Rig ENERGY ZAPOTECA was not in condition to be towed from Tuxpan, Mexico to Sabine Pass, Texas, until 5 April 2004. (See Declaration of Clifford Arkley).

### Zapoteca Energy Inc's Contacts with the Southern District of Texas

21. From 3 through 8 May 2000, in the Southern District of Texas, Zapoteca Energy Inc representative(s) met with Bill McDermott, Charles Douglas Phillips and Southern International regarding the purchase and refurbishment of the Rig ENERGY ZAPOTECA.

22. From 25 through 26 October 2003, in the Southern District of Texas, Zapoteca Energy Inc representative(s) met with David Kent and Davie Shipyard regarding a partial sale of interest in the Rig ENERGY ZAPOTECA; and met with Terje Reierson of Polaris Offshore Houston regarding a project for Mobile Production for the Rig ENERGY ZAPOTECA.

23. In the Spring of 2003, in the Southern District of Texas, Zapoteca Energy Inc representative(s) entered into lengthy negotiations with Nabors Drilling International Limited, a company authorized to conduct business in the State of Texas, regarding the sale of the Rig ENERGY ZAPOTECA.

24. Zapoteca Energy Inc entered into an agreement to sell the Rig ENERGY ZAPOTECA to Nabors Drilling International Limited. The sale of the Rig to Nabors Drilling International Limited was not consummated.

3

25. From 3 through 4 July 2003, in the Southern District of Texas, Zapoteca Energy Inc representative(s) met with Siggi Meissner of Nabors Drilling International Limited and Ketil Strangeland of Normarine Houston regarding a rider crew dispute with Nabors Drilling International Limited.

26. On 3 July 2003, in the Southern District of Texas, Zapoteca Energy Inc representative(s) met with Charles Douglas Phillips regarding a rider crew dispute with Nabors Drilling International Limited.

27. From 30 July through 3 August 2003, in the Southern District of Texas, Zapoteca Energy Inc representative(s) met with Ketil Strangeland of Normarine, Charles Douglas Phillips, and Siggi Meissner of Nabors Drilling International Limited regarding a rider crew dispute.

28. From 30 October through 5 November 2003, in the Southern District of Texas, Zapoteca Energy Inc representative(s) met with Edwin K. Nelson and Charles Douglas Phillips regarding settlement of dispute with Nabors Drilling International Limited and Protexa; met with Workships and Wintershall regarding inspection of the Rig ENERGY ZAPOTECA, and a project for the Rig as an accommodation, crane and support rig; and met with Charles Douglas Phillips, Workships and Jaap regarding the Rig.

29. From 12 through 21 January 2004, in the Southern District of Texas, Zapoteca Energy Inc representative(s) met with Charles Douglas Phillips, Edwin K. Nelson, and Clifford Arkley regarding preparations to move the Rig ENERGY ZAPOTECA to Texas, and regarding settlements of disputes with ASAC and crew.

30. In February 2004 in the Southern District of Texas, Zapoteca Energy Inc representative(s) met via telephone with Charles Douglas Phillips and Edwin K. Nelson regarding preparations to move the Rig ENERGY ZAPOTECA to Texas, and regarding settlements of disputes with ASAC and crew. (Charles Douglas Phillips refused to meet in Houston, Texas demanding Zapoteca Energy Inc's representatives come to Port Isabelle, Texas, "the place of Zapoteca Energy Inc operations.")

31. From 3 through 12 March 2004, in the Southern District of Texas, Zapoteca Energy Inc representative(s) met with Charles Douglas Phillips regarding the Rig ENERGY ZAPOTECA.

32. In approximately June 2003, Charles Douglas Phillips moved from Tuxpan, Mexico to Port Isabelle, Texas. Charles Douglas Phillips remained in Port Isabelle, Texas until at least March 2004. During this period of time, Charles Douglas Phillips performed substantially all work related to the Rig ENERGY ZAPOTECA that he performed in Tuxpan, Mexico, including, but not limited to the following:

4

    a.     Directing Zapoteca Energy Inc employees, agents, attorneys, service and material providers;
    b.     Hiring and firing Zapoteca Energy Inc employees and agents;
    c.     Meeting Zapoteca Energy Inc shareholders, employees, agents, attorneys and surveyors;
    d.     Paying for the services of Zapoteca Energy Inc employees, agents and attorneys;
    e.     Reporting to Zapoteca Energy Inc shareholders, employees, agents, attorneys and surveyors;
    f.     Negotiating with Zapoteca Energy Inc service and material providers;
    g.     Requesting funding from Zapoteca Energy Inc; and
    h.     Directing disbursement of Zapoteca Energy Inc funds incurred in the process of repairing and refurbishing the Rig ENERGY ZAPOTECA.

In short, Charles Douglas Phillips maintained an office for Zapoteca Energy Inc from which Charles Douglas Phillips conducted substantially all of Zapoteca Energy Inc's business.

33. From the fall of 2003 until April 2004, Zapoteca Energy Inc retained and paid DIX Shipping in Brownsville, Texas to act as agents for the Rig ENERGY ZAPOTECA.

34. At all times material hereto, Zapoteca Energy Inc conducted countless telephone calls and drafted countless correspondence to the Southern District of Texas regarding the Rig ENERGY ZAPOTECA.

35. All Zapoteca Energy Inc contacts with the Southern District of Texas was purposeful and with the understanding that Zapoteca Energy Inc could become involved in litigation arising out of the business conducted in the Southern District of Texas.

PURSUANT TO 28 U.S.C. § 1746, I DECLARE (OR CERTIFY, VERIFY, OR STATE), UNDER PENALTY OF PURGERY UNDER THE LAWS OF THE UNITED STATES OF AMERICA THAT THE FOREGOING IS TRUE AND CORRECT.

EXECUTED ON 27 FEBRUARY 2004.

_____
Erik Ostbye

# EXHIBIT E

Energy Zapoteca recommendations and notes prior to sail away.

Tuxpan location

1). Ensure that the continuous 24hr fire and security watch is maintained and that the unit can be lowered into water at short notice.
2). Ensure that the fire pump suction is immersed at all times and the pump(s) are immedietly available at all times.
3). Ensure regular scour surveys are carried out. If unit is still on current location mid November 03 then scour survey to be carried and report furnished.

Set down site (P Isabel, Texas)

1). Obtain Corp of Engineers last survey.
2). Obtain soil and probable penetration data from 'Fugro' or like.
3). Carry out sidescan sonar and magnetometer survey of proposed site. Divers survey optional.

Required copies (not definitive list)

1). Original operations manual.
2). Stability incline test.
3). Stability calculations.
4). Dynamic stability (accelerations) calculations for expected floating conditions.
5). Record of last dive scour/debris survey.

Tow plan

1). Ocean tug to be approved.
2). Nominated departure and arrival assist tugs to be appraised.
3). Manning and monitoring of unit whilst on passage to be reviewed.
4). Passage plan to be drawn up and approved.

1). All tank lids and space entry covers to be relocated, identified (suggest paint on ID ) and bolted closed. Gaskets to be cleaned /replaced where necessary to ensure water tight integrity.
2). All water tight doors including those down below to have the rubber seals replaced where missing, cleaned of paint where covered.
3). All water tight doors to have dogs free and operating. Doors to be checked for closure and any dogs missing should be replaced replaced.
4). Chain tow bridle legs to be connected directly by shackle to tow chocks. A second shackle should be used as no expanded link is in place. Links that have studs removed (burnt out ) are not acceptable.

*ZEI 0362*
*GRAY* *ZEI 0320*
*PHILLIPS*

5). Emergency tow pendant should be connected separately to barge strong point, not into main tow bridle. Shackle should be at least 55t not 35t that is currently in place.
6). Tri-plate lead shackle (plate to tow pendant) should be 75-90t (dependent on tow vessel BP) not 55t that is currently in place.
7). A verifiable stability condition should be calculated for tow departure.
8). All loose pipe and materials should be securely sea fastened.
9). Loose mud pit agitators currently laying in pits should be removed or sea fastened.
10). Sea fastening clips on all deck containers should be reviewed and in most cases 'beefed up'.
11). Draft marks should be visible on bow/stern locations.
12). All manifold and below deck pipe open ends (especially ends created by machinery removal) should be blanked off and any associated valves checked to be in closed position.
13). Slop tank lid in engine room to be replaced and bolted down.
14). Temporary access on main deck (2) to potable water tanks to be sealed either by welded plate or bolted lid.
15). Main deck drain sumps (numerous locations) to be plugged if water tight integrity of system cannot be proved.
16). Appropriate LSA equipment to be provided for manned voyage assuming 8 riding crew. (recommend second 10 man inflatable raft to be installed port side in cradle plus hydrostatic release). Set of CG approved flares.
17). Communications requirements to be reviewed. (recommend minimum 1 VHF radio base station, one VHF portable hand set with charger and spare charged battery. One GSM telephone with associated charger and spare charged battery. GMDSS hand held unit (one each life raft) for area of operation to be onboard. EPIRB to be carried by unit.
18). Fire fighting equipment to be reviewed taking into account current condition and machinery on board.
19). All deck vents including goosenecks to be covered (wrapped) for duration of planned voyage.
20). Adequate lighting to be provided for deck and enclosed spaces.
21). The main deck generator fuel storage tank should have more adequate sea fastening.
22). Tow bridle recovery system should be installed before departure.
23). Maindeck generators should have more adequate sea fastening.
24). Services and utilities for temporary accommodation should be installed and tested.
25). Drain aways for toilets and wash facilities should be correctly terminated.
26). Adequate storage for fresh and frozen food should be provided.
27). Adequate supplies of potable water should be calculated taking into account number of riding crew and probable duration of voyage.
28). Emergency/salvage pump arrangements should be in place.
29). Navigation lights should be shielded appropriately for their type. At present side and stern lights are visible all round.

ZEI 0321
PHILLIPS

ZEI 0363
GRAY

30). Means to sound tanks (preload etc) should be in place.
31). The lower rail outside of the stern panama fairleads should be removed from directly behind the lead.
32). The generator fuel tank should be supported more adequately.
33). Operations and procedures being carried out should be as per the operations manual.
34). Operations and activities should always be within government, national and when applicable international regulations.
35.) Any residual or entrained water or fluids in tanks or systems should where possible be removed prior to sailing. A record of remaining fluids should be kept.
36). Riding crew members should be adequately trained and have skills/qualifications appropriate for the tasks envisaged.
37). Confirm missing jack motors (2 port leg, 1 stbd and 1 bow) do not compromise jacking ability.
38). Safety railings and foot gratings are missing on several locations. These should be replaced.
39). Damaged or missing tank access ladders should be replaced.
40). Save-all (pollution containment) for generators and fuel tank should be installed asap. Bunded area around edge of maindeck and leg wells should be replaced where removed.
41). Disposal of raw sewerage and wash water should be to an approved tank or container.

ZEI 0322
PHILLIPS

ZEI 0364
GRAY

# EXHIBIT F

IN THE UNITED STATES DISTRICT COURT
FOR THE SOUTHERN DISTRICT OF TEXAS
BROWNSVILLE DIVISION

| | |
|---|---|
| ZAPOTECA ENERGY INC, §<br>Plaintiff §<br>§<br>VS. §<br>§<br>CHARLES DOUGLAS PHILLIPS, §<br>Defendant § | Civil Number B-04-048 |

## DECLARATION UNDER PENALTY OF PERJURY OF CLIFFORD ARKLEY

1. My name is Clifford Arkley. I am over eighteen years of age and have never been convicted of a felony. I am of sound mind and otherwise capable of making this Declaration. I have personal knowledge of the facts stated herein as I was a contractor to PD Gram & Co. AS, Technical Managers of the rig ENERGY ZAPOTECA.

### The Rig ENERGY ZAPOTECA

2. During October 2003, my company, London Offshore Consultants ("LOC"), was requested by PD Gram & Co. AS (as owners Technical Management for the Rig ENERGY ZAPOTECA) to carry out an inspection of the rig. The inspection and subsequent recommendations were with a view to the issuance of a Certificate of Approval for the movement of the unit from Tuxpan, Mexico to Port Isabel, South Texas. I was allocated as Marine Warranty Surveyor to this project.

3. On 19 October 2003, a dialogue was commenced with Mr. Charles Philips and plans made to visit him at his office in South Padre Island, then to travel on to Tuxpan via Renosa and Poza Rica for rig inspection.

4. On 16 October 2003, I proceeded to South Padre Island for discussions with Charles Philips and during the following week traveled on to Tuxpan where on Tuesday, Wednesday and Thursday I attended and inspected the rig.

5. I traveled back to Houston on Friday 31 October 2003 and issued a preliminary list of recommendations (some 41 items) written with the owner's request in mind that the unit was to be manned during the tow. The LOC stand was that an unmanned dead tow was the preferred option.

6. Essentially the rig was bereft of any SOLAS equipment. Certification was non-existent and all (including essential) machinery had been removed. There were

numerous holes and openings compromising the watertight integrity. Unknown and untraceable pipe work had been removed and in places cropped. Some areas of deck had wasted through and there was direct access to the tank spaces below. Some tank access covers were missing and in some locations temporary tank access spaces had been cut into the deck. These did not have approved covers or fitments. There was only temporary crew accommodation on deck and no suitable sanitary facilities, waste disposal or sewage holding tanks. There was no suitable cooking or food storage equipment. Temporary power supply was from a road transportable generator that was not suitable for sea service and had no back up. There was no communications equipment other than one VHF that had limited operation. A major concern was also the Rig's stability. Having been completely altered by the removal of a large amount of machinery and topside structure the accelerations on the legs and their ability to withstand these was in doubt and unproven at this time. The rig was in fact unfit for habitation, uncertificated and unseaworthy. Consequently it was not in condition to navigate or operate as a commercial unit.

7. During the ensuing month of November it became clear that the requirements for a manned tow were not going to be met. The problems of lack of fundamental equipment and certification would be prohibitively expensive and time consuming to overcome. It was recommended again by LOC that an unmanned dead tow be re-considered. A dry tow was also another consideration. It was made clear a Certificate of Approval to move the unit would not be issued for a manned tow.

8. During December 2003 attention and communication was afforded to the stacking site requirements in Port Isabel and on the outstanding requirements for an unmanned tow.

9. During January 2004 I attended a meeting with owners representatives with view to resolving all outstanding requirements for an unmanned, dead, wet tow. Items attended to were stability, jacking equipment, tow assembly, watertight integrity, stacking site and tow vessels.

10. Discussions, reviews and planning took place regularly during February 2004 between myself rig owners and the project manager (Charles Philips)

11. On owners instructions I traveled to Tuxpan on 7 March 2004 to re-inspect the rig and report back on readiness and progress. On Monday 6 March during a discussion with Charles Philips, I was informed that I was not allowed on the rig. On Tuesday 9 March I proceeded to the Rig but was refused access to it by a gangway security person. I discussed the situation with Charles Philips who implied that it would be risky for me to attempt to gain access to the rig as the security guards had instructions not to allow unauthorized persons onboard. Charles Phillips said I was not authorized and my personal safety could not be guaranteed.

12. On Wednesday the 10 March, I accompanied various ENERGY ZAPOTECA owners representatives to the temporary company office in Tuxpan. None of the party was allowed access to the 'office'. I then proceeded to the rig with a police escort and what I understood to be a bailiff acting for ENERGY ZAPOTECA owners. None of our party was allowed onboard.

13. On Thursday 11 March, I was requested to stay onsite until access to the rig was gained. This was expected in the next 24 hrs.

14. On Friday 12 March access to the rig was gained and I carried out my inspection. There was some progress from my previous visit although there was still numerous items outstanding to make the vessel ready for sea. I re-wrote my list of recommendations on the basis the rig would be wet towed, dead and unmanned to the stacking site now going to be Sabine, South Texas.

15. On Saturday 13 March I met with the newly appointed Towmaster/Bargemaster Mr. Austin (Rusty) Alexander. We toured the rig and he took over as owners representative on site. An action plan was prepared for further technical inspection (jacking gear, ballast tanks and rig structure) prior to the jacking down, flotation and tow of the rig to Sabine. Outstanding items already documented were to be dealt with. I departed for Houston the following day.

16. I attended the rig again from 18 to 24 March 2004, being instructed to return to Houston as delays were expected due to legal problems. During this period Austin Alexander tested jacking equipment and controls. He also inspected all other rig equipment from a technical and operational standpoint, Communicating with myself on several occasions on his findings and progress readying the rig. The towing vessel 'Martha Eugenia' was also inspected and approved for the towing operation during this time.

17. I returned to Tuxpan on Sunday 4 April. After inspecting the Rig in the company of Austin Alexander it was decided the close out of required items was nearing completion and the tow vessel was ordered for next day.

18. I completed a final "walk through" at 1330 hrs the same day and a CoA was issued at 1400 hrs. This approved a single voyage under tow as a dead unmanned unit from Tuxpan to Sabine with no deviations. At 1430 the main tugboat was connected and the rig became afloat and underway at approximately 1500 hrs. At 1700 all leg chocks were in place. A final check was carried out and all personnel departed the rig at 1745 hrs.

19. The rig arrived at Sabine pilots stations during Sunday 11 April 2004 and berthed on 12 April. It is currently stacked at the arrival location.

3

PURSUANT TO 28 U.S.C. § 1746, I DECLARE (OR CERTIFY, VERIFY, OR STATE), UNDER PENALTY OF PURGERY UNDER THE LAWS OF THE UNITED STATES OF AMERICA THAT THE FOREGOING IS TRUE AND CORRECT.

EXECUTED ON 27 May 2004.

*[signature]*
Cliff Arkley

4