United States District Court
Southern District of Texas
FILED

JAN 1 8 2005

Michael N. Milby
Clerk of Court

IN THE UNITED STATES DISTRICT COURT
FOR THE SOUTHERN DISTRICT OF TEXAS
BROWNSVILLE DIVISION

| | | |
|---|---|---|
| ZAPOTECA ENERGY, INC. | § | |
| | § | |
| VS. | § | CIVIL NO. B-04-048 |
| | § | In Admiralty; Rule 9(h) |
| CHARLES DOUGLAS PHILLIPS, et al. | § | |

### CHARLES PHILLIPS' ANSWERS TO JUDGE HANEN'S QUESTIONS

COMES NOW, Charles D. Phillips, licensed Master and vessel Captain (hereinafter "Captain Phillips"), who files this his answers to Judge Hanen's questions, as follows:

**QUESTION NO. 1:** On what date did the relationship between Zapoteca and Phillips begin?

**ANSWER:** In May of 2000, Charles Phillips met with Mr. Perry Moore of Southern International Inc. (hereafter "SII") and Christian Kongsli, who Captain Phillips understands then was acting on behalf of Energy Zapoteca, Inc. (hereinafter "Zapoteca") only, in Houston, Texas.[1] Zapoteca at that point had a contract with SII for SII to perform repair and classification work to Zapoteca's just-acquired jack-up barge Rig, the ENERGY ZAPOTECA (hereinafter the "Rig" or the "Vessel").[2] Captain Phillips (who at that time was an employee of SII), understood that the

---

[1] Mr. Kongsli at that time was an investor, 15% shareholder and part owner of Zapoteca, and Captain Phillips understood him to also be one of Zapoteca's principals. Phillips later learned that Kongsli at some point also began acting for the Rig's managers, P.D. Gram & Co. AS (hereinafter "Gram"), although precisely when Kongsli began acting for Gram is unknown at present, and Kongsli has not been deposed yet.)

[2] Zapoteca is a Liberian company which was created on April 17 2000, to acquire title to the Rig. (See ¶ 17 of Exhibit "A", enclosed.) Before Zapoteca took title, another one of Mr. Kongsli's companies, Energy Drilling, Inc., acquired the Rig, from PMM, on March 7, 2000. (See Exhibit "G", enclosed). Zapoteca was created strictly to take title of the Rig; it has no other assets, interests or activities. (See ¶ 18 Exhibit "A" enclosed.) Consequently, it, like other "ship-holding companies," enters into agreements with a vessel management company, who then operates and manages the vessel. Such an agreement occurred here, although Captain Phillips does not know precisely when nor the details of the relationship/agreement between Zapoteca as vessel owner and Gram as vessel managers. The relationship is even more complex here, however, because Mr. Peter Gram, the owner of Gram, also is an investor, 40% shareholder and principal of Zapoteca.

1

contract between SII and Zapoteca initially was to last for a four (4) month period. The purpose of that meeting was for Mr. Kongsli to meet Captain Phillips and discuss the upcoming vessel operations and prepare repair proposals and scheduling. On April 27, 2000, SII sent Captain Phillips to Tuxpan, Mexico, to inspect the Rig. (See ¶¶ 4 and 8 of Exhibit "A", enclosed) (See Exhibit "C", Inventory list of October 15, p. 6, item 58: Invoice 2008 to SII for services rendered on April 27-30, 2000 (See Exhibit "B", enclosed); "Repair and Classification Agreement between SII and Zapoteca Energy.)

More relevant however is the fact that Zapoteca (or perhaps the vessel's managers, Gram) later hired Phillips directly, to be the Master of the Rig and to be Project Manager (supervising the repair and classification work of the Rig). The most recent date that Zapoteca (or perhaps Gram, as discussed further below) hired Phillips to be Master was in August of 2003; during the Spring and Summer of 2003, Phillips was employed briefly by Nabors, who by then had a contract with Zapoteca to purchase the Rig. Under the Agreement between Nabors and Zapoteca, Nabors could (and did) hire Phillips to be Master of the Rig, for that short period of time. However, when that period concluded (on or about August 2, 2003), Phillips returned to being an employee of Zapoteca,[3] and still as the Master of the Rig.

Consequently, we look to August of 2003 as the date Captain Phillips returned to the Rig as the Rig's Master and as an employee of Zapoteca (or perhaps Gram). August 2003 therefore is one of the relevant time periods, and thus one of the times that we look to see if the Rig qualified as a Vessel "in navigation" or "withdrawn from navigation."

---

[3] Or perhaps Gram; it is difficult to determine at present, since by then his supervisor, Mr. Kongsli, also was acting as a representative for Gram, the Vessel's manager, and Kongsli was paid at least expenses by Gram, so it is not clear at present whether Kongsli was acting strictly for Zapoteca, strictly for Gram, or for both, during most of Kongsli's involvement with Captain Phillips and the Rig.

**QUESTION NO. 2:**   Is there a contract between Zapoteca and Phillips?

**ANSWER**: Yes.

**QUESTION NO. 3:**   If a contract exists, is it a written contract?

**ANSWER**:   There is a written contract between SII and Zapoteca, dated approximately May of 2000.  As to the time of Phillips' direct employment for Zapoteca (or Gram; see discussion in item 2 above), the employment arrangement is not reflected in a single document. However, there are numerous e-mails and faxes between the parties, which confirm the engagement of Captain Phillips to work for Zapoteca (and/or Gram) on behalf of the Vessel.

Ultimately Captain Phillips was hired by Zapoteca (directly or via Gram), to perform four functions:

    a.    as Master of the Vessel ENERGY ZAPOTECA;

    b.    as Owner's local representative (for Zapoteca) in Tuxpan, Mexico;

    c.    as Legal representative (including specific authorized powers of attorney) for Zapoteca in Tuxpan, Mexico; and

    d.    as Project Manager, supervising and implementing Rig repairs and classification work.  (See ¶ 2 of Exhibit "A", enclosed.)

**QUESTION NO. 4:**   On what date did the contract arise?

**ANSWER**:  As to SII, Captain Phillips became Project Manager on May 29, 2000.  As to Zapoteca (Gram), Captain Phillips was appointed for the first time as Master of the Rig, by Mr. Kongsli, on July 6, 2000, and then again by Mr. Kongsli (for Zapoteca/Gram) on August 2, 2003. As to Zapoteca, acting through the vessel's managers, Gram, Captain Phillips was appointed as Owner's Representative and Project Manager on December 1, 2000.  As to Zapoteca, through Gram, Captain Phillips was appointed Legal Representative on April 17, 2001.  (See Exhibit

3

"D", enclosed).

**QUESTION NO. 5:** Was the contract related to the maritime employment of Phillips?

**ANSWER**: Yes. Christian Kongsli, acting as owner's representative on July 6, 2000, wrote a letter to Canega, the ship's agent in Tuxpan, Mexico, notifying them that Captain Phillips was "assigned" as the Vessel's captain (i.e., the master)[4] of what Mr. Kongsli then described as "our jack-up vessel, ENERGY ZAPOTECA." (See Exhibit "E", enclosed.) As a result of that letter, Canega requested a "marine" work permit from the Mexican government; the permit was issued to Captain Phillips by the Mexican government on August 11, 2000. It identifies Captain Phillips as the "Master" of the Vessel ["Barcaza"] ENERGY ZAPOTECA (See Exhibit "F", enclosed). That work permit was sought by Zapoteca so that Captain Phillips could perform his work related to the Rig while she was in Mexican waters. Zapoteca was the entity who described to the Mexican authorities what Captain Phillips' position and title were. As far as the Mexican government (including all branches) were concerned, Captain Phillips was always considered the Master of the Rig ENERGY ZAPOTECA, and the Rig was considered a vessel by the Mexican authorities for all purposes under Mexican law.

**QUESTION NO. 6:** If the contract was related to maritime employment, is it necessary for a "vessel" to be involved in same?

**ANSWER**: Not always. For example, a contract to build a ship initially (as opposed to repairing a ship) is not a "maritime contract" (and hence not technically "maritime employment") because the property to be constructed (the vessel) does not yet exist. However, a

---

[4] Here there is no legal distinction between "Master" and "Captain," since there is and has been only one master or captain of the Rig during any of the relevant time periods, Captain Charles Phillips.

4

contract to repair a vessel is a maritime contract, because the vessel has been "born" and once the vessel is a "vessel," even when undergoing repairs, it continues to be viewed legally as a vessel for the purposes of existence of maritime contracts (including maritime liens, breaches of contract, maritime employment, etc.) In short, the fact that a vessel is undergoing extensive repair or refurbishment does not mean that it is no longer a "vessel."

However, that issue is a bit academic here, because Zapoteca's own documents call the Rig a "vessel." (See discussion under item 5 above)

Turning to our facts, when the repair operations began and personnel were officially assigned onboard the rig ENERGY ZAPOTECA, the Rig became an "active vessel" under the rules and regulations of the Secretary of Communications and Transportation of Mexico (SCT) and the port captain of Tuxpan. In addition, Zapoteca as owners acted as the "general contractor" for the repairs and classification work onboard the ENERGY ZAPOTECA. The law in the Fifth Court is clear that, if the owner maintains control and supervises or acts as general contractor for the repairs (which is precisely what Zapoteca did here), courts favor finding that the vessel is "in navigation." *Wixom v. Boland Marine and Mfg. Co.*, 614 F2d 956, 957 (5th Cir. 1980).

**QUESTION NO. 7:** If the contract was related to maritime employment and if the Rig is deemed a "dead ship," is the contract outside the purview of the Court's Admiralty jurisdiction?

**ANSWER:** The term "dead ship" sometimes refers to a vessel without an active power plant aboard, but that issue is not the same as the "in navigation" vs. "withdrawn from navigation" issue, which is the real issue before the Court. Regardless, the Rig was neither a "dead ship," nor "withdrawn" from navigation during the period May 2000 through March 2004.

For example, at no time, either then or before or after the purchase of the Rig, has she ever been dry-docked, moved up on shore or on a marine railway, etc. (which if they existed would be factors to suggest that she had been "withdrawn") or for that matter was she even under the control of a shipyard. (see item 6 above) Also, since the Rig never had or was designed to have any means of self-propulsion, there were no engines or propulsion system which could be removed or rendered inoperable, which also indicates that she was not "withdrawn" from navigation. Her generators, jacking motors, etc. remained aboard and operational, so she was not "dead" in that sense, either. The vessel remained berthed in a navigable waterway, the Pantepac river in Tuxpan, Mexico, throughout the period of repair and refurbishment, and the various navigational and other certificates remained current throughout the relevant time period. In addition, the Rig is flagged under Panamanian law, and Panamanian law specifically provides for "withdrawing" a vessel from navigation. Zapoteca never elected to pursue that option. Instead, Zapoteca consistently and repeatedly chose to keep the Rig's navigation certificates current (which must be renewed every three or four months or they expire), which is a continuing hassle and expense. These factors establish that the Rig was not "withdrawn" from navigation, but remained "in navigation" throughout the relevant time period.

Moreover, the Memorandum of Agreement (purchase contract; see Exhibit "G" enclosed) dated March 7, 2000, by which Zapoteca purchased the Rig, states in clause 5: "Should the vessel become a total or constructive total loss before delivery [to Zapoteca], the deposit shall immediately be released to the buyers [Zapoteca] and the Contract thereafter null and void." This contract makes clear that Zapoteca did not purchase a vessel which it considered at that time to be a constructive total loss, despite the argument now asserted by Zapoteca's counsel. In addition, the rider to the MOA states in clause 18 that Zapoteca shall furnish various types of

6

insurance coverage, which includes the specific kinds of marine coverage that apply to vessels "in navigation" as opposed to those "withdrawn from navigation," That insurance coverage includes: broad-form hull and machinery insurance, including collision coverage, which shall be paid in the event of (future) total loss or constructive total loss of the vessel. Thus, the insurance clause of the purchase agreement makes it clear that the vessel was not viewed at that time as a constructive total loss, but that marine insurance coverages, which would pay in the event of a CTL such as from a collision at sea, would apply.

All that being said, to answer the question hypothetically that if the Rig were deemed to be "withdrawn" from navigation during all of the relevant time periods, the case would still remain within the purview of the Court's Admiralty jurisdiction, because the case still deals with maritime contracts (including maritime employment and termination of employment issues), regardless of whether the vessel is "in navigation" or "withdrawn from navigation" at the time. The "in navigation" vs. "withdrawn from navigation" issue arises, if at all, only in the context of a maritime lien attachment proceeding and whether Captain Phillips and the Mexican crew have *in rem* claims. It does not affect the Court's jurisdiction or ability to enter orders or otherwise establish remedies.

**QUESTION NO. 8:** Was there a contract between Zapoteca and Phillips to repair the Rig? Describe Phillips' role.

**ANSWER:** Initially, not directly, no. Rather, initially Zapoteca hired SII (Phillips' initial employer) to conduct to repair and classification work.

Later, however, Zapoteca (directly or through Gram) hired Phillips to perform and supervise that repair work as a direct employee, and he did. Thereafter his job responsibilities were expanded dramatically. (See item no. 4 above.)

**QUESTION NO. 9:** Who was actually hired to refurbish the Rig? Who hired them?

**ANSWER:** Initially, Zapoteca hired SII, sometime before Zapoteca purchased the Rig in May of 2000, to begin to perform the necessary repair and classification work, which would be required before the Rig could travel to the destination Zapoteca then intended, which was Galveston, Texas. (Note that even in May of 2000, Zapoteca intended to move the Rig, and was taking steps to do so). In November or December of 2000, Zapoteca itself took over the repair and supervision of classification work, previously done by SII, and then appointed Gram to act as Managers of the Rig. Captain Phillips was hired, directly, as the vessel's Master and Project Manager, and in that capacity he was instructed to hire and did hire the vessel's crew, who were also employees of Zapoteca/Gram, who themselves worked on board the Rig, in navigable waters, to physically perform the repairs and refurbishments Zapoteca required.

**QUESTION NO. 10:** What services did Zapoteca and Phillips determine that Phillips would provide in association with the Rig? In other words, what was Phillips hired to do?

**ANSWER:** Captain Phillips was hired to do four jobs for Zapoteca and the Rig: Vessel Master, Owner's Representative, Project Manager (to supervise the Rig's repair and classification work), and finally to be the Legal Representative for Zapoteca (see item number 4 above).

**QUESTION NO. 11:** Did Phillips physically perform repairs on the Rig?

**ANSWER:** Yes. (See ¶ 9 of Exhibit "A", enclosed.) Such work included the following:

    a.    inspection of the Rig's hull, legs, spud cans, and jacking system;

    b.    installing and testing various of the Rig's engines, pumps, machinery, etc., as well as the Rig's jacking system, the switchboard, motor control centers, transformers, air

8

compressors, safety equipment; etc.;

    c.    supervision of all vessel crewmembers, including the vessel's electricians, mechanics, roustabouts, welders and fitters, and all other service personnel (including third parties) working onboard the Rig;

    d.    removal of diesel, oil, and chemicals (pollution control) from the Rig, under the control of the port authorities, and the port captain.

    e.    sand-blasting and painting of hull and legs.

    f.    determining weight calculations for material being loaded and offloaded from the rig.

    g.    installed 8 mooring lines, <u>to float</u> the Rig ENERGY ZAPOTECA in January or February of 2001, for the Rig's dead weight, stability, and incline testing/surveys.

    h.    Captain Phillips also designed and built a small barge, used to service the vessel, which was used to load and unload equipment and machinery to and from the Rig. The work barge was moored alongside the Rig while being used and where stored while not in use;

    i.    Captain Phillips designed and built a personnel basket, used for transferring ship's crew and other personnel to and from the Rig (i.e., from a boat approaching the Rig or from the work barge located alongside).

In addition to the above Master's duties, Captain Phillips as Project Manager and owner's representative also supervised office personnel, including draftsmen involved in reproducing "as-built" drawings for the Rig as a Jack-up Barge. He also established and implemented a quality assurance program for the Rig and for the Rig's refurbishment.

    **QUESTION NO. 12:**    What services did Phillips actually provide in association with

9

the Rig?

**ANSWER**: See item number 11, above. In addition, Captain Phillips was designated as the vessel's Master, as well as Project Manager for the Rig refurbishment. In those capacities he performed hands-on work on the Rig, including marine engineering; electrical, mechanical and structural installation and testing of equipment, and components aboard the Rig, and supervision of the "jacking" of the Rig's legs and spud can system. He conducted non-destructive testing and mapping of the hull, internals, legs, and support structures, plus ultrasonic testing of the towing bits. He supervised the purchasing of equipment and materials to meet Bureau Veritus (BV) and American Bureau of Shipping (ABS) requirements. He installed or supervised the installation of the Rig's towing bridle and emergency towing gear, navigation lights, (2) accommodation units, winch, (2) emergency pumps, life rafts, emergency generator, welding machine, buoys, and air compressor, for Nabors Drilling, for the tow to Freeport, Texas, to occur in May, 2003. (See ¶ 20 of Exhibit "A", enclosed.)

He also supervised the vessel's crew and service personnel, and supervised classification of the Rig under the International Rules and Regulations of Bureau Veritas (the ship's international classification society, to which the ship belonged).

**QUESTION NO. 13:** Where did Phillips perform said services? If not at the same location where the Rig was being repaired, where was the Rig located when repairs were being done?

**ANSWER**: All of the repairs and classification work to the Rig were performed aboard the Rig, which throughout the relevant time period was berthed in the Pantepec river (a navigable waterway) in Tuxpan, Mexico. Separate from that work, office services were performed at the local office of Zapoteca, located near the Rig in Tuxpan, Mexico, until he had to leave Mexico

on May 28, 2003, due to the criminal proceedings asserted against him. Thereafter, he supervised Rig operations and activities from the his apartment/office in Port Isabelle, Texas.

**QUESTION NO. 14:** When did Phillips commence providing his services?

**ANSWER:** On May 29, 2000, SII sent Captain Phillips to Tuxpan, Mexico, to begin the analysis and repairs of the Rig. On July 6, 2000, he was appointed by Zapoteca as Master of the Vessel. On December 1, 2000, Captain Phillips' employment at SII concluded and he (in addition to Master) became Project Manager and Owners' Representative for Zapoteca, all as an employee of Zapoteca/Gram. On April 17, 2001, he was appointed to his fourth role: Legal Representative for Zapoteca. (See item 3 above) On August 2, 2003, Captain Phillips returned to the Rig as Master acting for Zapoteca.[5] Captain Phillips remained the Master of the Rig through the entire time period. Even during the Spring and Summer of 2003, he continued to be Project Manager, Owner's Representative for and Legal Representative of Zapoteca.

**QUESTION NO. 15:** Was Phillips hired to work aboard a vessel in navigable waters?

**ANSWER:** Yes. The Pantepec river in Tuxpan, Mexico, is a navigable waterway and is under the control of Communications and Transportation of Mexico (which is somewhat similar to the U.S. Coast Guard here in the United States) and of the Port Captain of Tuxpan, Mexico. The Rig was berthed in the river throughout the relevant time period, during which repairs and classification work were completed in order to move the Rig to the destination(s) selected by the Rig's respective new owners. All transportation of personnel and equipment to the Rig from August or September of 2000 through early April of 2004 had to occur by boat, since the Rig

---

[5] For a portion of the Spring and Summer of 2003, while he was still Master of the Rig, he was an employee of Nabors because Zapoteca's agreement with Nabors provided that Nabors could hire Captain Phillips to act as Master of the Rig for a short period of time. Once that short period of time concluded, he remained Master of the Rig, but went back to performing that job as an employee of Zapoteca/Gram.

11

was standing in or above the river throughout that time period and was located 30 feet or more away from the bank of the river. It was impossible to reach the Rig except by traveling by boat over water, due to a dispute between Zapoteca and Celesa. Those factors also establish that the Rig was not "withdrawn" from navigation during that time period. See also item number 7 above.

**QUESTION NO. 16:** To what extent did the services provided by Phillips relate to the mission of the Rig?

**ANSWER:** The main mission throughout the relevant time period was to get the Rig ready to sail from Tuxpan, Mexico, to a destination chosen by a prospective buyer and either sell the Rig outright or for Zapoteca to enter into a joint venture agreement (partnership) with another offshore company. Physically accomplishing the main mission of the Rig at the time, which was to repair and refurbish her, was relatively easy. The difficult part (which was not the responsibility of Captain Phillips) was to find prospective purchasers and enter into purchase agreements which Zapoteca could perform (which Zapoteca/Gram's senior management performed alone) and to extricate the Rig from the various maritime attachments ("embargoes") which were placed against the Rig by local contractors and claimants, which issues were being managed by the Rig's managers, Gram, and handled locally by Mexican attorneys, hired and paid by Zapoteca. The Rig remained ready on a continuous basis to be moved to another location within the port of Tuxpan, other ports in Mexico, various locations in the United States, Thailand, the Middle East, and Holland, throughout the period July 2000 to March 2004. Any "impediment" to her ability to move and to depart for any of these or any other locations under discussion was not based on her physical ability or inability to move, but upon the vessel's legal entanglements, including the various embargoes in effect from time to time. These claims kept

her from being able to leave her berth legally, but had no bearing on her physical ability to move, nor on Zapoteca's desire or intent to have her available to be able to physically depart Tuspan.

**QUESTION NO. 17:** Was the contract between Zapoteca and Phillips related to the Rig in its use as such?

**ANSWER:** Yes; see discussions of items 4, 5, 8-13 and 16 above. Zapoteca purchased the Rig with an Addendum stated in the MOA which strickly prohibits Zapoteca from employing the Rig as a drilling rig in Mexican waters. Rather, Zapoteca had the right to employ the Rig in Mexican waters only as an accommodation, production or maintenance unit, and she was being prepared for those jobs during the relevant time period. Note also that when Zapoteca purchased the Rig and took delivery on May 4, 2000, it was no longer a drilling rig at all; all drilling equipment had been removed prior to Zapoteca's purchase. Zapoteca also purchased the Rig as a "Jack-up Rig," not as a "drilling rig." The protocol of delivery and acceptance describes the vessel as a "non-self propelled, self-elevating jack-up platform." (See Exhibit "H", enclosed.) In addition, a Temporary Mooring Permit had been secured by PMM, the vessel's prior owners, on September 15, 1999. (See copy of Certificate and translation, attached as Exhibit "I".) Also, a valid "Navigation Certificate" was secured by PMM from the branch of the Panamanian government handling maritime affairs, on March 2, 2000, (see Exhibit "J", enclosed), which was current and in effect when Zapoteca acquired the Rig.

**QUESTION NO. 18:** What company actually hired Phillips? What individual involved with that company did the hiring?

**ANSWER:** Zapoteca Energy Inc., acting through the vessel's managers, Gram, and acting through the individual of Christian Kongsli, hired Captain Phillips. During the period November 23-28, 2000, Mr. Kongsli came to Tuxpan, Mexico, to meet with Mr. Moore of SII.

During these meetings, Mr. Kongsli informed SII that Zapoteca would be taking over the Rig's operations (including repair and classification work) in Tuxpan. At that time, Kongsli also informed Bill McDermott that his previous services as owner's representative were no longer needed and that he should make plans to depart Tuxpan in December 2000. During these meetings, Mr. Kongsli asked Captain Phillips to stay on the project as Master of the Rig and as Project Manager, supervising repair and classification work. Kongsli also asked Captain Phillips to assume the position of Owner's Representative (the role previously performed by Mr. McDermitt), due to Zapoteca's concerns about cost overruns of the operations with SII.[6] Mr. Kongsli and Captain Phillips agreed that Captain Phillips' monthly salary would remain the same, but that he would be compensated for these additional duties and responsibilities in the form of a bonus, to be paid at the end of the repair/refurbishment work, but prior to the Vessel's departure from Tuxpan.

On December 1, 2000, Captain Phillips began working as Project Manager, and Owner's Representative for Zapoteca. It was agreed that Captain Phillips would follow the same reporting procedures and chain of command as he had done with SII, with the exception that, starting on December 1, 2000, he would be reporting and following the instructions of Christian Kongsli, who for all periods thereafter was his sole supervisor.

On April 17, 2001, Captain Phillips was given a fourth role and position, Legal Representative (including the requisite powers of attorney for Zapoteca) by Gram, so that Captain Phillips could beginning representing Zapoteca as its local corporate representative in

---

[6] Zapoteca was paying $6,000.00 per month, plus hotel, car, telephone, vacation, and expenses for the position of owner's representative alone, which had been performed by Mr. McDermott. By combining the positions (and giving all the "titles" to Captain Phillips), Zapoteca saved approximately $10,000.00 per month; from December 2000 to March 2004, Zapoteca saved approximately $400,000.00 simply by having Captain Phillips perform the services previously performed by Mr. McDermott.

Zapoteca's on-going (and increasingly complex) labor cases in Tuxpan, Mexico. As with the Owner's Representative position, Captain Phillips received no additional salary for these additional responsibilities. Rather, his performance bonus was to address all that extra work, as well.

**QUESTION NO. 19:** For whom did Phillips actually work? Who paid Phillips?

**ANSWER:** Zapoteca, but as instructed through Gram. The relationship between Zapoteca and Gram is exceedingly close, and it was difficult to know which hat Mr. Kongsli was wearing from time to time. For example, Mr. Kongsli, Captain Phillips' only supervisor throughout 2000-2004, is a shareholder in Zapoteca, but is also the designated representative acting on behalf of Gram, the vessel's managers. In addition, Gram was the second largest shareholder of Zapoteca, so in that way it also appears to have authority to act for Zapoteca. (See item 1 above).

Captain Phillips sent his invoices to Gram, in Oslo, Norway, and was paid through an account held in the name of Zapoteca. Captain Phillips submitted his invoices, receipts, reports, etc. to Gram, for review and approval by Mr. Kongsli and then payment by Gram, but through Zapoteca's account. Captain Phillips' pay was sent to him through his bank account in Houston. (Enclosed are Captain Phillips' first and second-to-last invoices for his salary, Exhibit "K"; there were 77 of such invoices sent by Captain Phillips, and paid by Gram/Zapoteca, from December of 2000 through February of 2004. Only the final invoice, for the period March 1-10, 2004, was not paid by Gram or Zapoteca.)

**QUESTION NO. 20:** What services was Phillips actually performing at the time his employment was terminated?

**ANSWER:** He was Master of the Rig ENERGY ZAPOTECA, plus Legal

15

Representative for Zapoteca and Owner's Representative for Zapoteca. On March 10, 2004, Mr. Kongsli was with Captain Phillips, having been with him daily from March 3-11, 2004, on South Padre Island, Texas. Kongsli and Captain Phillips met daily to discuss various Rig-related matters. They discussed the moving operations and details of the plans to move the Rig out of Tuxpan and into Port Isabelle/Brownsville, Texas, inspection of the spud cans by divers, insurance provisions required for the move, satisfying and coordinating with governmental and port authority representatives in Tuxpan, etc. In addition, Kongsli and Phillips met with the Rig's crewmembers' supervisors over a two-day time period, to discuss movement of the Rig, crew contracts for the voyage from Mexico to Texas, and what severance arrangement would be made to the crew under Mexican (controlling) law. Captain Phillips' duties at that time were to supervise vessel operations in Tuxpan, Mexico, including the details of the movement of the Rig, and supervising the Rig's crewmembers, who then were split between Tuxpan and Port Isabelle, Texas, because that is where Captain Phillips had been told that the Rig was bound. His duties at that time also included preparing the Rig for anticipated prompt departure from Mexico. Captain Phillips held regular communications with the crewmembers aboard the Rig, Zapoteca's ship's agents in Tuxpan (Meritus) and Brownsville (Dix Shipping), and the port authorities in Tuxpan, Mexico.

**QUESTION NO. 21:** What services was Phillips actually performing at the time his employment was terminated?

**ANSWER:** (See item 20 above; same Question and Answer).

**QUESTION NO. 22:** When was Phillips fired?

**ANSWER:** March 10, 2004; (See letter from Ed Nelson, Zapoteca's attorney, attached as Exhibit "L"; see also ¶ 12 of Exhibit "A", enclosed.).

**QUESTION NO. 23:** How far along was the refurbishment of the Rig at the time Phillips was fired?

**ANSWER:** All repairs had been completed long before Captain Phillps was fired. In fact, during the Spring of 2002 Zapoteca stopped further refurbishment operations aboard the Rig. By that point the Rig had been repaired and met classification society requirements as a "bare deck" Jack-up Barge. In addition, all requirements which had been issued from the LeBourhis marine survey and from the classification society's surveyors, which were prerequisites to moving the Rig from Mexico to another location, had been met.

To move ahead with further refurbishment, specifically outfitting the Rig with new equipment for specific future work, would have required a decision by Zapoteca (or buyers/future owners of the Rig) which mode of operation the Rig would be used in., i.e., as a Jack-up accommodation unit, as a Jack-up production platform or Jack-up maintenance support unit. (See discussion under item no. 17 above.) As that decision had not been made yet, Zapoteca was determined not to commit the Rig to a single purpose or to spend additional funds until a buyer/new owner could be found, who then could decide which use to select for the Rig.

**QUESTION NO. 24:** Who fired Phillips?

**ANSWER:** Zapoteca's legal counsel (in Texas) Ed Nelson. (See Exhibit "L", his letter of March 10, 2004, in which he indicates that he is acting on behalf of Zapoteca).

**QUESTION NO. 25:** Was Phillips Master of the Rig?

**ANSWER:** Yes. Zapoteca's own documents make that clear. For example, on July 6, 2000, Mr. Kongsli wrote to Canega, the ship's agent at the time, and assigned Captain Phillips as "captain," (i.e., Master) of the "Jack-up vessel ENERGY ZAPOTECA," which he describes repeatedly in that letter as "our vessel." (See Exhibit "M", enclosed.) See also the e-mail from

Ed Nelson, dated December 18, 2003, (Exhibit "N", enclosed) outlining the chain of reporting. It lists the parties as follows:

    P.D. Gram & Co. - as Managers;

    Christian Kongsli - Manager's Liason;

    Charles Phillips - Master.

See also page 3 of Declaration Under Penalty of Perjury of Christian Kongsli, dated March 11, 2004 (copy attached as Exhibit "O"), in which Kongsli states that Phillips was removed from his position as "the Master of the Rig ENERGY ZAPOTECA."

Respectfully submitted,

**THE LANIER LAW FIRM, P.C.**

BY: _____ w/ PERMISSION
CHARLES F. HERD, JR.           BY: C. F. Wilson
TSB# 09504480
ATTORNEY IN CHARGE
LAWRENCE P. WILSON
TSB # 21704100
KEVIN P. PARKER
SBN #15494020
P. O. Box 691408
Houston, TX 77269-1408
(713) 659-5200
Fax: (713) 659-2204

**ATTORNEYS FOR DEFENDANT/COUNTER CLAIMANT, CHARLES D. PHILLIPS AND MEXICAN CREWMEMBERS: JAIME ARTURO CASTELLANOS DIAZ, ALEJANDRES DIAZ COBOS, PEDRO MEIJALIMA, FERNANDO TREJOMAR, MARCO ANTONIO LIZAMA RODRIGUEZ, CIRO ELORZA MARTINEZ, JOSE MUNOZ LOPEZ, AND CANDIDO MALDONADO**

**LOCAL COUNSEL:**

Mr. C. Frank Wood
SANCHEZ, WHITTINGTON, JANIS
& ZABARTE, L.L.P.
100 North Expressway 83
Brownsville, Texas 78521-2284

## CERTIFICATE OF SERVICE

I hereby certify that a true and correct copy of the foregoing instrument has been forwarded to all counsel in accordance with the Federal Rules of Civil Procedure on this the 18th day of January, 2005.

Mr. Robert W. Klawetter
EASTHAM, WATSON, DALE & FORNEY, L.L.P.
808 Travis, 20th Floor
Houston, Texas 77002
**ATTORNEYS FOR PLAINTIFF
ZAPOTECA ENERGY, INC.**

Mr. Lee Haag
Ms. Tonja De Sloover
FULBRIGHT & JAWORSKI, L.L.P.
1301 McKinney, Suite 5100
Houston, Texas 77010-3095

Jaime Arturo Saenz (**formal Response only; documents sent to Mr. Haag only**)
RODRIGUEZ, COLVIN, CHANEY & SAENZ, L.L.P.
1201 East Van Buren
P. O. Box 2155
Brownsville, Texas 78522
**ATTORNEYS FOR INTERVENOR
NABORS DRILLING INTERNATIONAL**

Michael J. Maloney
MALONEY, MARTIN & MITCHELL, LLP
3401 Allen Parkway, Suite 100
Houston, Texas 77019
**ATTORNEYS FOR INTERVENOR
STEVE GRAY**

C. Frank Wood