IN THE UNITED STATES DISTRICT COURT
FOR THE SOUTHERN DISTRICT OF TEXAS
BROWNSVILLE DIVISION

| | | |
|---|---|---|
| ZAPOTECA ENERGY, INC., | § | |
| Petitioner | § | |
| | § | C.A. NO. 04-CV-48 |
| V. | § | |
| | § | |
| CHARLES DOUGLAS PHILLIPS | § | |
| Respondent | § | |

**ZAPOTECA ENERGY, INC.'S SUPPLEMENTAL BRIEF ON SEAMAN
STATUS, VESSEL STATUS, ADMIRALTY JURISDICTION, MARITIME
WAGE LIENS, REMEDIES AND OPPOSITION TO INTERVENTION BY
NABORS DRILLING INTERNATIONAL LIMITED**

TO THE HONORABLE JUDGE OF SAID COURT:

COMES NOW Petitioner, Zapoteca Energy, Inc., (hereinafter sometimes referred to as "Zapoteca") and files this its supplemental briefing on the issues of vessel status, seaman status, Admiralty jurisdiction, maritime wage liens, remedies and opposition to intervention by Nabors Drilling International Limited (hereinafter sometimes referred to as "Nabors"), and would respectfully show the Court the following:

**I.
RELEVANT TIME PERIOD**

Notwithstanding the fact that ENERGY ZAPOTECA has not been a vessel in navigation under the law at any time since the blow-out and fire in 1987, the relevant time period associated with the claims alleged by Charles Phillips herein begins no earlier than August 2003 when his employment with Nabors Drilling ended and he was hired by Zapoteca[1] and it extends no later than March 10, 2004, the date on which his powers were revoked.

---

[1] See p. 6 of Docket No. 48, Captain Phillips' Response to Zapoteca's Motion for Ruling, Et al., and His Supplemental Brief Regarding Vessel Status, Attachment, Temporary Restraining Order and Preliminary Injunction.

**II.**
**"MASTER" AND/OR "SEAMAN" STATUS**

Zapoteca previously briefed the issue of "master" and/or "seaman" status in its Response to Defendant's Motion for Arrest and Seizure of Vessel (Docket No. 20) and its Supplemental Response to Defendant's Motion for Arrest and Seizure of Vessel (Docket No. 24). As requested by the Court, Zapoteca now takes the opportunity to clarify and supplement its previous submissions on this issue.

"Only 'seamen' can recover damages under the Jones Act." *Wixom v. Boland Marine and Mfg. Co.*, 614 F.2d 956, 957 (5th Cir. 1980). The facts herein relevant to a determination of Charles Phillips' status as a master and/or seaman unequivocally establish that he was not a Jones Act seaman as a matter of law at any relevant time period.

For purposes of the Jones Act, the three essential elements for qualification as a "seaman" are as follows:

1.  The vessel on which the claimant is employed must be in navigation;
2.  The claimant must have a more or less permanent connection with the vessel; and,
3.  The claimant must be aboard primarily to aid in navigation.

*Williams v. Avondale Shipyards, Inc.*, 452 F.2d 955, 958 (5th Cir. 1971); *Bodden v. Coordinated Caribbean Transp., Inc.*, 369 F.2d 273, 274 (5th Cir. 1966).

Thus, as a threshold matter, the ENERGY ZAPOTECA, must have been "in navigation" at times relevant to Charles Phillips' claims herein before it is even necessary to consider the particulars of Charles Phillips' employment and/or connection with the rig. As evidenced below, the ENERGY ZAPOTECA was not a vessel "in navigation" at relevant times and, therefore, Charles Phillips was not a master or seaman as a matter of law due to the absence of the first essential element of seaman status enumerated above.

### III.
### <u>VESSEL STATUS</u>

Zapoteca previously briefed the issue of vessel status in its Response to Defendant's Motion for Arrest and Seizure of Vessel (Docket No. 20) and its Supplemental Response to Defendant's Motion for Arrest and Seizure of Vessel (Docket No. 24). As requested by the Court, Zapoteca now takes the opportunity to clarify and supplement its previous submissions on this issue.

For the purpose of determining "seaman" status, a vessel is considered to be "in navigation" only if it is "engaged as an instrument of commerce and transportation on navigable waters." *McKinley v. All Alaskan Seafoods, Inc.*, 980 F.2d 567, 569 (9th Cir. 1992); *Williams v. Avondale Shipyards, Inc.*, 452 F.2d 955, 958 (5th Cir. 1971). With respect to vessels undergoing repairs, Zapoteca acknowledges that vessels which merely temporarily leave commerce, enter a shipyard for minor repairs, and thereafter return to commerce, remain continually in navigation. *Waganer v. Sea-Land Service, Inc.*, 486 F.2d 955, 958 (5th Cir. 1973); *Delome v. Union Barge Line Co.*, 444 F.2d 225, 232 (5th Cir. 1971). In contrast, the "[m]ajor overhaul or refitting of a vessel will take the vessel out of navigation." *McKinley*, 980 F.2d at 570. In fact, major renovations to a vessel can take it out of navigation, even when the vessel's use both before and after the renovation work is the same. *Chandris, Inc. v. Latsis*, 515 U.S. 347, 374, 115 S.Ct. 2172, 2193, 132 L.Ed.2d 314 (1995) (citing *McKinley*, 980 F.2d at 570); *See also West v. United States*, 361 U.S. 118, 80 S.Ct. 189, 4 L.Ed.2d 161 (1959). In this regard, "[a] primary touch-stone for distinguishing between major and minor repairs is the purpose for which the vessel has been idled." *McKinley*, 980 F.2d at 570 (quoting *Waganer*, 486 F.2d at 958). However, in this case, the repair and refurbishment of the ENERGY ZAPOTECA from May 2000 to April 2004 cannot be characterized as anything other than major and substantial. Additional details of the extensive refurbishment project are discussed in subsequent sections of this brief; however, with respect to costs alone, Zapoteca purchased the rig

for $1,437,500 and has invested an additional $10,500,000 on repairs, refurbishment, and associated administrative and legal costs, in order to bring the rig to its current state as a hull with three jacking legs.[2] Zapoteca also estimates it will require an additional $40,000,000 to $60,000,000 to carry out its plan to completely restore the rig to an operable condition capable of functioning as an offshore drilling rig.[3]

## A.    SPECIFIC FACTORS DETERMINATIVE OF NAVIGATIONAL STATUS

The following specific factors have been identified and considered by courts assessing repair work to a vessel in the context of determining whether a vessel has been withdrawn from navigation:

**The nature and extent of the repairs.**  *Wixom v. Boland Marine & Mfg. Co.*, 614 F.2d 956, 957 (5th Cir. 1980); *Shanks v. Hercules Offshore Corp.*, 58 F.Supp.2d 743, 745 (S.D. Tex. 1999);

**Who controls the repair operations.**  *Wixom*, 614 F.2d at 957; *Shanks*, 58 F.Supp.2d at 745;

**The time and cost required for the repair work.**  *Wixom*, 614 F.2d at 957; *Slaydon v. Sonat Offshore Drilling, Inc.*, 818 F.Supp. 1009, 1011 (S.D. Tex. 1993); *Shanks*, 58 F.Supp.2d at 745;

**Whether the ship's power is secured or dismantled.**  *Wixom*, 614 F.2d at 957; *Slaydon*, 818 F.Supp. at 1011; *Shanks*, 58 F.Supp.2d at 745; and,

**Whether the ship's crew is dismissed.**  *Wixom*, 614 F.2d at 957; *Slaydon*, 818 F.Supp. at 1011; *Shanks*, 58 F.Supp.2d at 745.

---

[2]    See ¶¶ 11 and 14 of the Declaration Under Penalty of Perjury of Erik Ostbye previously attached to Zapoteca's Supplemental Response to Defendant's Motion for Arrest and Seizure of Vessel (Docket No. 24) and attached hereto as Exhibit "A" for the Court's convenience.

[3]    See ¶ 12, *Id.*

## 1.    The Nature and Extent of the Repairs

As a result of the 1987 fire aboard the ENERGY ZAPOTECA, the rig was declared a total loss and permanently removed from commerce and navigation by Protexa, its previous owner.[4]   At the time Zapoteca purchased the ENERGY ZAPOTECA in May 2000, the rig had sat idle and inoperable, without power or crew, for approximately thirteen (13) years.[5]   In May 2000, the ENERGY ZAPOTECA was in total disrepair, considered a derelict, and required major repairs, refurbishment and rebuilding before it could serve any commercial purpose, much less function as a drilling rig.[6]   Zapoteca purchased the ENERGY ZAPOTECA with the original intention of stripping all structures above the main deck, repairing the rig's jacking system, hull and legs, converting the rig to a bare-decked jackup barge, and then selling the rig.[7]   At no time since the 1987 fire has the ENERGY ZAPOTECA ever received class certification.[8]   At no time did Zapoteca ever reintroduce the ENERGY ZAPOTECA back into navigation and/or commerce.[9]   The lack of commercial engagement alone precludes the ENERGY ZAPOTECA from being a vessel in navigation at any time relevant to Charles Phillips' claims herein.

---

[4]      See ¶¶ 3, 5 and 7 of the Declaration Under Penalty of Perjury of Erik Ostbye previously attached to Zapoteca's Supplemental Response to Defendant's Motion for Arrest and Seizure of Vessel (Docket No. 24) and attached hereto as Exhibit "A" for the Court's convenience.  Also, see ¶ 4 of the Declaration Under Penalty of Perjury of Erik Ostbye previously attached to Zapoteca's Response to Defendant's Motion for Arrest and Seizure of Vessel (Docket No. 20) and attached hereto as Exhibit "B" for the Court's convenience.

[5]      See ¶¶ 7-9 of the Declaration Under Penalty of Perjury of Erik Ostbye previously attached to Zapoteca's Supplemental Response to Defendant's Motion for Arrest and Seizure of Vessel (Docket No. 24) and attached hereto as Exhibit "A" for the Court's convenience.  Also, see ¶¶ 4-5 of the Declaration Under Penalty of Perjury of Erik Ostbye previously attached to Zapoteca's Response to Defendant's Motion for Arrest and Seizure of Vessel (Docket No. 20) and attached hereto as Exhibit "B" for the Court's convenience.

[6]      See ¶ 12 of the Declaration Under Penalty of Perjury of Erik Ostbye previously attached to Zapoteca's Supplemental Response to Defendant's Motion for Arrest and Seizure of Vessel (Docket No. 24) and attached hereto as Exhibit "A" for the Court's convenience.

[7]      See ¶ 9, Id.

[8]      See ¶ 18, Id.

[9]      See ¶¶ 7 and 17 of the Declaration Under Penalty of Perjury of Erik Ostbye previously attached to Zapoteca's Supplemental Response to Defendant's Motion for Arrest and Seizure of Vessel (Docket No. 24) and attached hereto as Exhibit "A" for the Court's convenience.  Also, see ¶¶ 4 and 6 of the Declaration Under Penalty of Perjury of Erik Ostbye previously attached to Zapoteca's Response to Defendant's Motion for Arrest and Seizure of Vessel (Docket No. 20) and attached hereto as Exhibit "B" for the Court's convenience.

The ENERGY ZAPOTECA sustained extensive damage from the month-long fire in 1987.[10]  To date, Zapoteca has removed all of the structures above the rig's main deck and repaired the damage to the rig's hull, legs, and jacking motors and controls.[11]  The ENERGY ZAPOTECA, in its present state, is nothing more than a hull with three jacking legs and it has never been reintroduced to commerce.[12]

**2.      Who Controls the Repair Operations**

After December 2000, Zapoteca exercised control over the extensive major repairs and refurbishment of the D/V ENERGY ZAPOTECA at Protexa's yard in Tuxpan, Mexico.  However, such control was over an inoperable rig that was incapable of performing its intended purpose of offshore drilling or any other commercial purpose without further modification and which had been unequivocally and continuously withdrawn from navigation and removed from commerce.[13]

**3.      The Time and Cost Required for the Repair Work**

Since purchasing the ENERGY ZAPOTECA for $1,437,500 in May 2000, Zapoteca  has invested an additional $10,500,000 on repairs, refurbishment, and associated administrative and legal costs, in order to bring the rig to its current state as a hull with three jacking legs.[14]  Zapoteca estimates it will require an additional $40,000,000 to $60,000,000 to carry out its plan to completely

---

[10]      See ¶ 3 of the Declaration Under Penalty of Perjury of Erik Ostbye previously attached to Zapoteca's Supplemental Response to Defendant's Motion for Arrest and Seizure of Vessel (Docket No. 24) and attached hereto as Exhibit "A" for the Court's convenience.

[11]      See ¶ 13, *Id*.

[12]      *Id*.

[13]      See ¶¶ 7 and 17, *Id*.  Also, see ¶ 6 of the Declaration Under Penalty of Perjury of Erik Ostbye previously attached to Zapoteca's Response to Defendant's Motion for Arrest and Seizure of Vessel (Docket No. 20) and attached hereto as Exhibit "B" for the Court's convenience.

[14]      See ¶¶ 11 and 14 of the Declaration Under Penalty of Perjury of Erik Ostbye previously attached to Zapoteca's Supplemental Response to Defendant's Motion for Arrest and Seizure of Vessel (Docket No. 24) and attached hereto as Exhibit "A" for the Court's convenience.

restore the rig to an operable condition capable of functioning as an offshore drilling rig.[15]

**4.      Whether the Ship's Power is Secured or Dismantled**

The ENERGY ZAPOTECA's original power system was damaged in the month-long fire in 1987.[16]  The ENERGY ZAPOTECA is merely a hull with three jacking legs, which has been without its original power system for a period of approximately sixteen (16) years.[17]  The only power available to the ENERGY ZAPOTECA during the refurbishment project was provided by temporary generators.

**5.      Whether the Ship's Crew is Dismissed**

As a result of damage to the ENERGY ZAPOTECA from the month-long fire in 1987, the rig was unable to house, feed, or otherwise sustain a crew.[18]  Obviously, the previous crew of the ENERGY ZAPOTECA was dismissed by Protexa and, to date, Zapoteca has not placed a crew aboard the rig with the intention of reintroducing the ENERGY ZAPOTECA back into navigation and/or commerce as a drilling rig or for any other commercial purpose.[19]  The various repair workers involved in the major repair and refurbishment of the ENERGY ZAPOTECA in Tuxpan did not live or take their meals on the rig.[20]

**B.      ILLUSTRATIVE CASES INVOLVING NAVIGATIONAL STATUS**

An examination of court opinions involving the "navigational" status of drilling rigs and barges undergoing repairs, drilling rigs under construction, and even ships, all support the conclusion that the ENERGY ZAPOTECA was not a vessel "in navigation" at any time relevant to Charles Phillips' claims herein.

---

[15]      See ¶ 12, *Id*.
[16]      See ¶ 3, *Id*.
[17]      See ¶ 13, *Id*.
[18]      See ¶ 3, *Id*.
[19]      See ¶¶ 7 and 17, *Id*.
[20]      See ¶ 12, *Id*.

1.      **Drilling Vessels and Barges Undergoing Repairs**

An examination of the relevant facts and conclusions of courts determining the "navigational" status of drilling vessels and barges undergoing repairs in the context of determining "seaman" status demonstrate that the ENERGY ZAPOTECA was not a vessel "in navigation" at any time relevant to Charles Phillips' claims herein.

*Adams v. Weeks Marine, Inc.*, 885 F.Supp. 992 (S.D. Tex. 1995), concerned an alleged injury to Bobby Adams, the caretaker/superintendent, of a moored barge.  Weeks Marine moved for summary judgment on grounds that Adams was not a seaman (because there was no vessel in navigation).  The barge at issue was moored in a shipyard.  The barge's power had been shut off completely.  The entire crew had been dismissed and Adams was the only crew member who remained with the barge, but he lived off the barge and took his meals off the barge.  In assessing the factors relevant to the Fifth Circuit's test for "in navigation," this Court held that the barge was not capable of engaging in navigation or commerce because it had no crew and had no power.  This Court identified the facts that the barge had "no crew, no power, no officers (other than Plaintiff, who was not even living on board the Barge), and no usual work on board the vessel" in support of the conclusion that the vessel was not "in navigation" at the time of the alleged injury and, therefore, "Adams was not a seaman" under the Jones Act.  *Adams*, 885 F.Supp. at 995.  Based on these findings, this Court granted summary judgment in favor of Weeks Marine and dismissed Adams' claim under the Jones Act.  *Adams*, 885 F.Supp. 992, 996 (S.D. Tex. 1995).

*Walker v. Santa Fe International Corp.*, 1993 A.M.C. 339 (E.D. La. 1992), involved the alleged personal injury to Charles Walker, a mechanic assigned to one of Santa Fe International's semi-submersible drilling rigs.  At the time of Walker's alleged injury, the subject drilling rig was "stacked" (i.e., taken out of service) in the Sabine River, near Sabine Pass, and sitting on the river

bottom.  The rig was originally placed in "stacked" status in 1987, nearly three years before Walker's alleged injury, and the rig remained stacked for months afterwards.  Walker was originally assigned to the rig in 1988 and was allegedly injured in 1990.  Prior to Walker's alleged injury, most of the drilling equipment, as well as generators, lifeboats, survival capsules, and several pieces of the rigs navigational equipment had been removed from the rig.  In terms of crew, there was one other person, a watchstander, assigned to the rig in addition to Walker.  Under these facts, the court held there were no material fact issues and as a matter of law the drilling rig was not a vessel in navigation at the time of Walker's alleged injury.  Consequently, Walker was not a seaman under the Jones Act.  *Walker*, 1993 A.M.C. at 341.

*Warwick v. Huthnance Division*, 760 F.Supp. 571 (W.D. La. 1991), concerned the seaman status of Daniel Warwick at the time he was allegedly injured aboard a "stacked" rig undergoing repairs and refurbishment.  It should be noted that Warwick was originally hired as a roughneck in 1988, and he worked in that position on other rigs, but at the time of his alleged injury in May 1989 he was assigned to a stacked inoperable rig.  The rig Warwick was working on at the time of his alleged injury had been stacked at Sabine Pass (where the ENERGY ZAPOTECA is currently stacked) for approximately three years before it was purchased by Warwick's employer.  As a result of being stacked for this period of time, almost every piece of the rig's equipment was deteriorated and inoperable.  Every major piece of the rig's equipment required refurbishment, much of which was performed offsite by third parties.  Obviously, the rig was not capable of performing drilling operations or navigating under its own power at the time of Warwick's alleged injury.  As a result, the court held as a matter of law that the rig was not a vessel in navigation at the time of Warwick's alleged injury and he, therefore, was not a Jones Act seaman.  *Warwick*, 760 F.Supp at 574.

2.      **Drilling Rigs Under Construction**

*Hollister v. Luke Construction Co.,* 517 F.2d 920 (5th Cir. 1975), involved the alleged injury of Steven Hollister aboard a barge that was under construction as a drilling rig. The bare hull of the barge was constructed in Harvey, Louisiana, and subsequently towed to Houma, Louisiana for the construction of living quarters and additional appurtenances necessary to the barge's function and operation as a drilling rig. Hollister's alleged injuries occurred in Houma during the additional construction to outfit the barge as a drilling rig. The Fifth Circuit held that even though the barge was afloat at the time of Hollister's alleged injury, it was not a vessel in navigation. The Fifth Circuit concluded that the barge was still under construction and was not yet "an instrument of commerce and transportation on navigable waters." *Hollister,* 517 F.2d at 921 (citing *Williams v. Avondale Shipyards, Inc.*, 452 F.2d 955, 958 (5th Cir. 1971)). Accordingly, Steven Hollister was not entitled to recover under the Jones Act. *Id.* at 921.

*Garret v. Dean Shank Drilling Co.*, 799 F.2d 1007 (5th Cir. 1986), concerned an alleged injury to Richie Garret during the continued construction of a drilling rig on a barge moored in navigable waters in Louisiana. The barge hull was purchased for the purpose of adding equipment and appurtenances necessary to outfit the barge as a functioning oil and gas drilling rig. The barge hull had been constructed at a shipyard in Houma, Louisiana, and then transported by tug to a shipyard in Harvey, Louisiana for further preparation and work-up. The additional workup to outfit the rig as a functioning oil and gas drilling rig included the addition of a superstructure, various fixtures and appurtenances, crew quarters, kitchen, derrick, stairs and navigation lights. Garret, an employee of the barge owner/defendant, was allegedly injured while performing construction work to outfit the barge for its intended purpose as a drilling rig. At the time of Garret's alleged injury, the barge hull still lacked crew quarters, kitchen, derrick and navigation lights. The Fifth Circuit

identified the "pivotal question" as "whether the vessel has been placed in navigation for its intended purpose." *Garret*, 799 F.2d at 1009. Since the subject barge hull had never been placed in navigation for its intended purpose, the Fifth Circuit held that the incomplete rig was not a vessel in navigation. *Id.* at 1009-10. Therefore, Garret was not a seaman under the Jones Act. *Id.* at 1011.

*Frediteu v. Rowan Companies, Inc.*, 738 F.2d 651 (5th Cir. 1984), also involved the issue of whether an uncompleted drilling rig was a vessel "in navigation." Steven Fredieu was allegedly injured after the uncompleted rig had been towed down the Mississippi River to Belle Chasse, Louisiana. During the transit to Belle Chasse, the uncompleted rig had navigational lights, an operational generator, lighting, plumbing, galley, living quarters and personnel aboard the rig. The additional construction at Belle Chasse was the final "rigging up" phase, which consisted of completion of the jackup legs, construction of the derrick, and construction and installation of various machinery for offshore drilling. In *Fredieu*, the district court made a fact finding that the "rigging up" in Belle Chasse involved the completion of construction and equipment necessary to the rig's function as a drilling rig and thus held that the incomplete rig was not a vessel and was not "in navigation." *Fredieu*, 738 F.2d at 654. The Fifth Circuit affirmed the district court findings that the rig was not "in navigation" and Fredieu, therefore, was not a "seaman" under the Jones Act. *Id.*

*Leonard v. Transoceanic Sedco Forex*, 189 F.Supp.2d 627 (S.D. Tex. 2002), involved the alleged injury to Timothy Leonard aboard a near-completed drilling rig. At the time of Leonard's alleged injury, the rig was complete, except for a few pieces of equipment, and had successfully completed a series of sea trials, had obtained its ABS certification, and was registered as a Panamanian vessel, but was docked in Galveston pending deployment. Leonard, a galley hand employed by a service company, was allegedly injured aboard the rig while it was floating dockside in Galveston, but prior to the time the rig left Galveston to enter commerce as an operating drilling

rig.  Referencing the "pivotal question" of "whether the vessel has been placed in navigation for its intended purpose," identified by the Fifth Circuit in *Garret*, this Court concluded that "the undisputed evidence establishes without a doubt that the Nautilus was not carrying out its intended purpose (drilling) until *after* Leonard was injured.  Therefore, because the Nautilus was not an 'instrumentality of commerce' at the time of Leonard's injury, the applicable Fifth Circuit precedent compels a conclusion that the first criteria of the seaman test fails.  Without a vessel 'in navigation,' there can be no Jones Act coverage." *Leonard*, 189 F.Supp.2d at 630.

**3.    Ships**

The case of *McKinley v. All Alaskan Seafoods, Inc.*, 980 F.2d 567 (9th Cir. 1992), involved a worker who was fatally injured in a fire aboard the hull of an oil drill ship that was being converted to a seagoing fish and crab processing ship.  The oil drill ship hull was originally purchased for $451,000 and an additional $14,082,000 was expended over the course of seventeen months for the conversion.  The conversion work on the vessel was carried out at various shipyards in the southern United States and, with approximately $3,000,000 of work remaining to complete the conversion project, the vessel was moved by sea to Tacoma, Washington in order to continue the conversion work closer to the vessel owner's base of operations in Seattle, Washington.  Necessary U.S. Coast Guard and American Bureau of Shipping certificates were obtained prior to the vessel's move to Tacoma.  However, the vessel carried no cargo and did not engage in commerce during the course of the twenty-eight (28) day journey.  After the vessel's arrival in Tacoma, the conversion work continued and there was a fire aboard the vessel which resulted in McKinley's death. *McKinley*, 980 F.2d 567.

The *McKinley* Court ultimately determined that the vessel was not in navigation as a matter of law at the time of the fire that took McKinley's life.  In reaching its decision, the court

distinguished between "routine or minor" repairs that temporarily take a vessel out of commerce and into a shipyard while the vessel is still considered to be "in navigation" and "major" repairs that will take a vessel out of navigation.  *Id.* at 570   In *McKinley*, the court concluded that the $14,000,000 conversion project constituted more than "major" repairs and the vessel was not in navigation during the reconstruction period.  *Id.*

## C.    SUMMARY OF FACTS AND CIRCUMSTANCES SURRONDING THE ENERGY ZAPOTECA

The facts and circumstances of the ENERGY ZAPOTECA present an even more compelling case of a vessel withdrawn from navigation than do any of the cases cited above.  Here, the ENERGY ZAPOTECA was severely damaged by a fire in October 1987 that raged for over a month and severely damaged the rig.[21]  Consequently, the rig had no power or operable equipment, the rig was unable to house a crew, and, obviously, the rig was rendered unable to perform its intended function of offshore drilling or any other commercial purpose.[22]  The rig was declared a total loss.[23]  Shortly after the fire, the rig was removed from the drilling site and moved to the Gulf of Campeche where it constituted a hazard to the navigation of other vessels.[24]  In 1989, the ENERGY ZAPOTECA was moved to Protexa's yard in Tuxpan, Mexico, where it sat idle, without power and without a drilling crew, for a period of approximately eleven (11) years before Zapoteca purchased it in May 2000.[25]  As a direct result of the 1987 fire, the ENERGY ZAPOTECA was unequivocally removed from commerce and from transportation on navigable waters.[26]  The ENERGY ZAPOTECA is incapable of performing its intended purpose as a drilling rig and/or

---

[21]    See ¶ 3 of the Declaration Under Penalty of Perjury of Erik Ostbye previously attached to Zapoteca's Supplemental Response to Defendant's Motion for Arrest and Seizure of Vessel (Docket No. 24) and attached hereto as Exhibit "A" for the Court's convenience.
[22]    See ¶¶ 3 and 6, *Id.*
[23]    See ¶ 5, *Id.*
[24]    See ¶¶ 4 and 8, *Id.*
[25]    See ¶¶ 8 and 9, *Id.*
[26]    See ¶¶ 7 and 17, *Id.*

serving any other commercial purpose without further modifications.[27]  In March 2001, the American Bureau of Shipping reviewed the classification records of the ENERGY ZAPOTECA and issued a report stating that "[c]lass was suspended in 1988 and, according to available documentation, was never reinstated."[28]  Rig condition surveys conducted by John LeBourhis & Associates from November 2000 to May 2001 identified numerous deficiencies, excessive structural wasting and missing structural members that rendered the ENERGY ZAPOTECA unseaworthy, unfit for a one-way tow, and unfit to return to navigation and commerce.[29]  To this day, the ENERGY ZAPOTECA remains without class certification and is denoted as a "project", a term used to describe a vessel under construction, by its classification society.[30]  At no time did Zapoteca place a crew aboard the ENERGY ZAPOTECA with the intention of reintroducing the rig into navigation and/or commerce as a drilling rig or as any other commercial unit.[31]  The ENERGY ZAPOTECA has never been reintroduced into commerce and was not a vessel "in navigation" at any time relevant to Charles Phillips' claims herein.[32]  Even today, the ENERGY ZAPOTECA has not been returned to "navigation" or reintroduced into commerce and, therefore, is not a vessel in navigation as a matter of law.

---

[27]    See ¶ 14, *Id.*
[28]    See Exhibit "C," Report of ABS Record Review dated 7 March 2001.
[29]    See the Declaration Under Penalty of Perjury of John LeBourhis previously attached to Zapoteca's Supplemental Response to Defendant's Motion for Arrest and Seizure of Vessel (Docket No. 24) and attached hereto as Exhibit "D" for the Court's convenience.
[30]    See ¶ 18 of the Declaration Under Penalty of Perjury of Erik Ostbye previously attached to Zapoteca's Supplemental Response to Defendant's Motion for Arrest and Seizure of Vessel (Docket No. 24) and attached hereto as Exhibit "A" for the Court's convenience.
[31]    See ¶ 10, *Id.*
[32]    See ¶¶ 7 and 12, *Id.*

D.     THE ONE-TIME TOW TO SABINE PASS, TEXAS DOES NOT
       CONSTITUE "IN NAVIGATION"

Zapoteca anticipates that Charles Phillips will argue that the ENERGY ZAPOTECA
returned to "navigation" as a result of the one-time tow from Tuxpan, Mexico to Sabine Pass, Texas
in April 2004.  Such an argument by Charles Phillips is without merit and fails for several reasons.

First, the one-time tow of the ENERGY ZAPOTECA occurred after the revocation of
Charles Phillips' powers on March 10, 2004 and, therefore, after the alleged events giving rise to
Charles Phillips' claims herein.  The ENERGY ZAPOTECA was not even in satisfactory condition
to make the dead (unmanned) tow until April 5, 2004, when warranty surveyor Cliff Arkley of
London Offshore Consultants conducted his final inspection and issued the tow certificate on April
5, 2004.[33]  However, the true condition of the ENERGY ZAPOTECA was revealed when Cliff
Arkley first inspected the rig in October 2003 and found the rig was essentially bereft of any
SOLAS (Safety of Lives at Sea) equipment (necessary for a crew); certification was non-existent;
all (including essential) machinery had been removed; the rig had numerous holes, voids and
openings that compromised its water tight integrity; unknown and untraceable piping had been
removed and cropped; areas of the deck were wasted through and there was direct access to the tank
spaces below; some tank access covers were missing; some tanks had temporary access spaces cut
into the deck; there were no permanent crew accommodations (necessary for a crew); no suitable
sanitary facilities (necessary for a crew); no suitable food preparation or storage facilities (necessary
for a crew); there was only a temporary power supply from a portable generator not suitable for sea
service and which had no back up system; there was no communication equipment except for one
VHF radio with limited operation; the rig's stability was a major concern due to the removal of
large amounts of machinery and topside structures; the rig was unfit for habitation, uncertificated

_____

[33]      See Exhibit "E," Certificate of Approval dated April 5, 2004.

and unseaworthy; and, it was not in a condition to navigate or operate as a commercial unit.[34]  In early November 2003, Cliff Arkley issued a preliminary list of recommendations identifying forty-one (41) discrepancies requiring correction for purposes of a manned tow.[35]  Based on the condition of the ENERGY ZAPOTECA, Cliff Arkley recommended a dead (unmanned) tow and it quickly became apparent that the requirement for a manned tow simply could not be met.[36]  Even after Zapoteca decided to change its plan to a dead tow, it was still not until April 5, 2004, that the ENERGY ZAPOTECA was finally approved for a single dead tow to Sabine Pass without any deviations.[37]

Second, the ENERGY ZAPOTECA was neither engaged in commerce nor capable of carrying out its intended purpose as an offshore drilling rig or serving any other commercial purpose during the actual tow to Sabine Pass and, therefore, certainly was not "in navigation."[38]  The ENERGY ZAPOTECA was floated for purposes of the tow, but was only approved for a "dead tow" without a crew on board.[39]

Third, even to this day, the ENERGY ZAPOTECA is laid up at Sabine Pass incapable of performing offshore drilling operations or any other commercial purpose without further

---

[34]    See ¶¶ 4 and 6 of the Declaration Under Penalty of Clifford Arkley previously attached to Zapoteca's Supplemental Response to Defendant's Motion for Arrest and Seizure of Vessel (Docket No. 24) and attached hereto as Exhibit "F," for the Court's convenience.

[35]    See Exhibit "G," Energy Zapoteca recommendations and notes prior to sail away.  Also see ¶ 5 of the Declaration Under Penalty of Clifford Arkley previously attached to Zapoteca's Supplemental Response to Defendant's Motion for Arrest and Seizure of Vessel (Docket No. 24) and attached hereto as Exhibit "F" for the Court's convenience.

[36]    See ¶¶ 5 and 7 of the Declaration Under Penalty of Clifford Arkley previously attached to Zapoteca's Supplemental Response to Defendant's Motion for Arrest and Seizure of Vessel (Docket No. 24) and attached hereto as Exhibit "F" for the Court's convenience.

[37]    See Exhibit "G," Certificate of Approval dated April 5, 2004.

[38]    ¶¶ 7 and 17 of the Declaration Under Penalty of Erik Ostbye previously attached to Zapoteca's Supplemental Response to Defendant's Motion for Arrest and Seizure of Vessel (Docket No. 24) and attached hereto as Exhibit "A" for the Court's convenience.

[39]    ¶ 18 of the Declaration Under Penalty of Clifford Arkley previously attached to Zapoteca's Supplemental Response to Defendant's Motion for Arrest and Seizure of Vessel (Docket No. 24) and attached hereto as Exhibit "F" for the Court's convenience.

modification and it certainly is not engaged in commerce.[40]  The ENERGY ZAPOTECA was withdrawn from navigation by its previous owner after the fire in 1987 and, to date, the rig has never returned to navigation or commerce.[41]  Thus, any argument by Charles Phillips that the ENERGY ZAPOTECA was "in navigation" at any time since the fire in October 1987 fails.

## E.    TITLES, LABELS AND REFERENCES ARE NOT CONCLUSIVE OF LEGAL STATUS

Zapoteca acknowledges that Charles Phillips called himself a master and there are documents labeling him as such.  Similarly, there are many documents which label the ENERGY ZAPOTECA as a vessel.  Zapoteca also notes that counsel for Charles Phillips has repeatedly referred to the ENERGY ZAPOTECA'S Panamanian registration certificates as "navigation" certificates.  Such labels, titles and references are not conclusive tests and/or standards under the law to determine Charles Phillips' status as a master and/or seaman or to determine the ENERGY ZAPOTECA'S status as a vessel in navigation.  If such were the case, a warranty surveyor such as Cliff Arkley would not need to inspect the actual physical condition of a jackup rig or other craft to determine its ability to float, safely support a crew and/or safely make a passage under tow.  Instead, under the purported logic argued by Charles Phillips, Cliff Arkley would merely need to examine the current registration certificate in order to approve the ENERGY ZAPOTECA to sail the oceans of the world without limitation or restriction.  The legal tests and standards determinative of these issues as set forth herein clearly demonstrate that the ENERGY ZAPOTECA was not vessel in navigation and Charles Phillips was not a master and/or seaman as a matter of law.  As promulgated

---

[40]    ¶¶ 7 and 17 of the Declaration Under Penalty of Erik Ostbye previously attached to Zapoteca's Supplemental Response to Defendant's Motion for Arrest and Seizure of Vessel (Docket No. 24) and attached hereto as Exhibit "A" for the Court's convenience.
[41]    ¶¶ 7 and 17, *Id*.

by the United States Supreme Court in *West v. United States*, 361 U.S. 118, 122 (1959), a determination of navigational status should focus on the "status of the ship, the pattern of the repairs, and the extensive nature of the work contracted to be done." In this regard, the Declarations Under Penalty of Perjury of Erik Ostbye, John LeBourhis and Clifford Arkley directly address the status of the rig and the extensive nature of the major repair and refurbishment project involving the ENERGY ZAPOTECA.

**IV.**
**ADMIRALTY JURISDICTION**

Zapoteca previously briefed the issue of admiralty jurisdiction in its Response to Defendant's Motion for Arrest and Seizure of Vessel (Docket No. 20) and its Supplemental Response to Defendant's Motion for Arrest and Seizure of Vessel (Docket No. 24). As requested by the Court, Zapoteca now takes the opportunity to clarify and supplement its previous submissions on this issue.

This lawsuit was filed in the Brownsville Division of the Southern District of Texas because it was the necessary venue to obtain service on Charles Phillips as of March 12, 2004. Obviously, many circumstances have changed since the filing of this lawsuit. For example, Charles Phillips is now in Houston. Also, it is now apparent that the initial pleading of admiralty jurisdiction by Zapoteca was in error because the ENERGY ZAPOTECA clearly was not a vessel in navigation under the law at any time relevant to this lawsuit. Interestingly, it was Charles Phillips' own counsel, Mr. Keith Uhles, who first informed this Court at a hearing on March 18, 2004, that he did not see a basis for admiralty jurisdiction.[42] Mr. Uhles reached this conclusion after speaking with Charles Phillips, reviewing documents and reviewing Zapoteca's lawsuit. Charles Phillips' present

---

[42]    See p. 4 of Exhibit "H," transcript of Hearing on TRO Before the Honorable Andrew S. Hanen, March 18, 2004.

lawyer now takes the opposite position and incorrectly contends that admiralty jurisdiction exists. This reversal of position by Charles Phillips is not unlike the reversal of position by Zapoteca which Charles Phillips persistently argues as a basis for this Court to "exercise" subject matter admiralty jurisdiction that simply does not exist, because it is not supported by the law or the facts.  This case presents a complex set of circumstances, which in hindsight presents no basis for admiralty jurisdiction.  Moreover, subject matter jurisdiction cannot be waived, created, or even coaxed into existence, by virtue of pleading it when it does not exist.  Notwithstanding Zapoteca's former counsel's position regarding admiralty jurisdiction at the inception of this case, the law and the evidence demonstrate that the rig was not a vessel in navigation at relevant times and, therefore, subject matter jurisdiction based on admiralty does not exist.

Even if the ENERGY ZAPOTECA was a vessel at any relevant time, which Zapoteca denies, this Court has no admiralty jurisdiction to attach and garnish the rig in an in personam action under Rule B or to arrest the rig in an in rem action under Rule C, because Rule E(3)(a) provides that process in rem or of maritime attachment and garnishment "may be served only within the district."  *See* Rule E(3)(a) of the Supplemental Rules for Certain Admiralty and Maritime Claims (emphasis added).  Although there are additional requirements of Rule B and C that cannot be met, as discussed below, the fact that the ENERGY ZAPOTECA is located in the Eastern District and, therefore, may not be served with process in rem or of maritime attachment and garnishment within the Southern District absolutely bars arrest or attachment and garnishment by this Court.

A.    **RULE B DOES NOT APPLY**

In addition to the bar under Rule E(3)(a) as discussed above, the requirements of Rule B of the Supplemental Rules for Certain Admiralty and Maritime Claims cannot be met for several reasons.  First, because the ENERGY ZAPOTECA was not a vessel in navigation at any relevant

time, Charles Phillips was not a master or seaman of the rig, his work was not maritime in nature, and he has no claims based in admiralty or maritime law. Second, because Charles Phillips' request for attachment of the rig as security relates to his counterclaims brought herein, Zapoteca is found within the district by virtue of bringing this lawsuit in the Southern District of Texas. Third, Rule B attaches only to property within the district. *See Great Prize, S.A. v. Mariner Shipping Pty., Ltd.*, 967 F.2d 157, 159-60 (5th Cir. 1992).

Attachment under Texas law is not available to Charles Phillips because it is predicated on Rule B(1)(e). Since Rule B does not apply, attachment under Texas law does not apply. Even if Texas law attachment was not otherwise barred by the inapplicability of Rules B and E, this remedy is not available to Charles Phillips because his claims are not liquidated and the exception for torts and unliquidated demands under TEX. CIV. PRAC. & REM. CODE §61.005 is not applicable. *See 21 Turtle Creek Square, Ltd. V. New York State Teachers' Retirement Sys.*, 425 F.2d 1366, 1368-69 (5th Cir.), *modified on other grounds*, 432 F.2d 64 (5th Cir. 1970), *cert. denied*, 401 U.S. 955, 91 S.Ct. 975, 28 L.Ed.2d 239 (1971); *S.R.S. World Wheels, Inv. v. Enlow*, 946 S.W.2d 574, 576 (Tex. App. -- Fort Worth 1997, no writ); *Sharman v. Schuble*, 846 S.W.2d 574, 576 (Tex. App. -- Houston [14th Dist.] 1993, orig. proceeding).

## B.     RULE C DOES NOT APPLY

In addition to the bar under Rule E(3)(a) as discussed above, the requirements of Rule C of the Supplemental Rules for Certain Admiralty and Maritime Claims cannot be met for several reasons. First, because the ENERGY ZAPOTECA was not a vessel in navigation at any relevant time, Charles Phillips was not a master or seaman of the rig, his work was not maritime in nature, and he has no claims that give rise to a maritime lien. Second, Rule C is applicable only to property within the district. *See L.B. Harvey Marine, Inc. v. M/V RIVER ARC*, 712 F.2d 458, 459 (11th Cir.

1983); *Am. Bank of Wage Claims v. Registry of Dist. Court of Guam*, 431 F.2d 1215, 1218 (9th Cir. 1970); *Rolls Royce Indus. Power (India) v. M/V FRATZIS M*, 905 F.Supp. 106, 107 (S.D. N.Y. 1995).

As a final matter, Charles Phillips has been fully aware of the ENERGY ZAPOTECA'S presence in the Eastern District of Texas since he first filed a Motion to Arrest on April 26, 2004 and asked this Court to order the United States Marshal for the Eastern District to arrest the rig. Although Charles Phillips knows the rig is not in the Southern District, he continues to ask this Court to arrest and/or attach the ENERGY ZAPOTECA.

## V.
## MARITIME WAGE LIENS

Zapoteca previously discussed the issue of maritime wage liens in its Response to Defendant's Motion for Arrest and Seizure of Vessel (Docket No. 20) and its Supplemental Response to Defendant's Motion for Arrest and Seizure of Vessel (Docket No. 24). As requested by the Court, Zapoteca now takes the opportunity to clarify and supplement its previous submissions on this issue.

Zapoteca does not concede that the ENERGY ZAPOTECA was a vessel at any time relevant hereto. Furthermore, Zapoteca does not concede that Charles Phillips was a "master" of the ENERGY ZAPOTECA. Charles Phillips' services rendered in relation to the ENERGY ZAPOTECA were not maritime in nature, and thus did not give rise to a maritime lien.

Assuming that the ENERGY ZAPOTECA is a vessel, which Zapoteca specifically denies, federal maritime law provides a maritime lien for a master's wages under certain limited circumstances. 46 U.S.C. §11112. This provision, however, is not always applicable and does not provide a master with the "same" wage remedies as crewmembers. *See Rothman v. S/S PRESIDENT TAFT*, 1995 A.M.C. 1250 (N.D.Cal. 1994); 46 U.S.C. §11112. For example, even

though federal maritime law provides a master's lien for wages in certain circumstances, this right does not include a master's entitlement to penalty wages. 46 U.S.C. §10313; *George v. Kramo Ltd.*, 796 F.Supp. 1541, 1547 – 1548 (E.D.La. 1992); *Ramsey v. M/V Modock*, 1131, 1133 – 1134 (E.D.La. 1974), *aff'd*, 546 F.2d 908 (5th Cir. 1977). Such distinction between masters and crewmembers is based upon the consideration that crewmembers, unlike masters, are "ignorant and helpless" "ward[s] of admiralty." *See George*, 796 F.Supp. at 1548 (quoting *Warner v. Goltra*, 293 U.S. 155 (1934)). As a master is presumed to be able to "drive a bargain for himself," he must endure discrimination in wage recovery remedies and stand upon his own rights. *Id.*

Until recent amendments to the Title 46 of the United State Code, a master in the United States had no right to a lien for wages under any circumstances. *See Barker v. M/V BLUE CAT*, 372 F.2d 626, 628 (5th Cir. 1967). In fact, as early as 1828, courts held that a master did not have a maritime wage lien. *Payne v. SS Tropic Breeze*, 423 F.2d 236, 243 (1st Cir. 1970). In 1968, this "ancient" rule was abrogated by Congress' enactment of legislation "giving masters of American vessels liens for wages of the same rank and priority as seamen's wage liens." *Id.*; formerly 46 U.S.C. §606. In 1986, as an after-thought to the overhaul and revision of the federal shipping statutes contained in Title 46, similar legislation was passed. 46 U.S.C. §11112; *Rothman*, 1995 A.M.C. 1850.

The current statute, however, only grants a maritime lien for master's wages in certain, limited circumstances. Specifically, the new statute provides only that "[t]he master of a documented vessel has the same lien against the vessel for the master's wages and the same priority as any other seaman serving on the vessel." 46 U.S.C. §11112. That is, the wage lien statute only applies to masters of certain vessels. The general definitions of Title 46, Subtitle II, define "documented vessel" as "a vessel for which a certificate of documentation has been issued under

chapter 121 of this title." 46 U.S.C. §2101.  Chapter 121, in turn, provides rules regarding issuance of Certificates of Documentation, which can only be issued to vessels meeting certain American-ownership guidelines.  46 U.S.C. §12102.  That is, a master of a vessel that does <u>not</u> maintain a Certificate of Documentation issued under Chapter 121 is not entitled to lien protection under §11112.

The ENERGY ZAPOTECA was not issued a Certificate of Documentation under Chapter 121.  Furthermore, even if the ENERGY ZAPOTECA was a vessel, which it is not, it would not be eligible to receive such a certificate.  The ENERGY ZAPOTECA's Panamanian registration absolutely precludes application of Chapter 121 and the limited circumstances of Chapter 121 do not apply in this situation.  Thus, even if Charles Phillips was the master of a vessel, which he is not, this section does not afford him a maritime lien.

## VI.
## REMEDIES

Imposition of "remedies" against Zapoteca for its initial pleadings regarding the ENERGY ZAPOTECA's status as a vessel and the rig's anticipated tow to Port Isabel in the Southern District of Texas is unwarranted, inappropriate, and unreasonable.  Although Zapoteca concedes that its position has changed in the course of these proceedings, its initial pleadings, however inaccurate, were objectively reasonable when made.  Indeed, the Federal Rules of Civil Procedure do not require perfection.  *See Navarro-Ayala v. Hernandez-Colon*, 3 F.3d 464, 468 (1st Cir. 1993).  Burdening a party for mistakes of law or changes of fact allows hindsight to take undue precedence over the actual circumstances at the time the representations were offered.  *F. D. I. C. v. Calhoun*, 34 F.3d 1291, 1296 - 1297 (5th Cir. 1994).  Remedies imposed against a party for its conduct should only be used in exceptional circumstances and require a showing that the allegedly improper representations were patently unmeritorious, frivolous, or false.  *See id.* at 1300; *Unigard Sec. Ins.*

*Co. v. Lakewood Eng'g & Mfg. Corp.*, 982 F.2d 363, 370 (9th Cir. 1992). If there is any reasonable basis for factual representations made and if any legal representations were well-founded at the time of submission, this "reasonableness under the circumstances" forbids the imposition of remedies against a party. *See Calhoun*, 34 F.3d at 1296.

Zapoteca's indication to the Court that the ENERGY ZAPOTECA was in Mexico but was being towed to the Brownsville area was based on several months of ongoing preparations and efforts to move the rig to Port Isabel. The ENERGY ZAPOTECA was, in fact, being prepared for towing to Port Isabel over an extended period of time. A business decision was made to change the itinerary and stack the ENERGY ZAPOTECA at Sabine Pass. At no time was the representation that the ENERGY ZAPOTECA was to be delivered to Port Isabel offered to mislead the Court or for any other improper purpose. Additionally, the future location of the ENERGY ZAPOTECA was not determinative of the emergency relief sought by Zapoteca at the time this suit was filed, but was merely an associated fact. The representation was absolutely made in good faith and hindsight should not be indulged to penalize Zapoteca for a simple change in circumstances.

As for Zapoteca's initial and incorrect assertions that the ENERGY ZAPOTECA was a vessel and that the case arose in admiralty, even the most experienced counsel occasionally make mistakes of law, especially in complex litigation. As is evident from previous hearings in this matter, some of the legal issues involved herein are complex and require substantial time to resolve. In particular, inaccurate representations as to venue and jurisdiction are common, and courts are hesitant to reprimand parties for such mistakes, even if contrary facts are known to the parties at the time the representations were made. *See, e.g., City of El Paso, Texas v. City of Socorro, Texas*, 917 F.2d 7, 8 – 9 (5th Cir. 1990); *Walker v. Carnival Cruise Lines, Inc.*, 681 F.Supp. 470, 471 (N.D.Ill. 1987). As for this matter, it is obvious that these assertions were reasonable at the time they were

made considering that Charles Phillips now contends, contrary to his first attorney's position at the March 18, 2004 hearing, that this is an admiralty matter and the ENERGY ZAPOTECA is a vessel. Any such previous assertions by Zapoteca obviously were not frivolous or otherwise unmeritorious but were simply wrong. These initial assertions were not proffered for any improper purpose, such as harassment, as clearly Zapoteca was entitled to the relief it sought, including emergency judicial intervention.

Zapoteca's initial representations were made in good faith and have not prejudiced the Court or Charles Phillips. Admiralty jurisdiction was not and is not required for the relief sought by Zapoteca. Even in the absence of admiralty jurisdiction, the Court maintains (and has always maintained) the subject-matter jurisdiction of diversity. As for Charles Phillips, the absence of the ENERGY ZAPOTECA from this district does minimally affect his ability to obtain security, but only as to this Court. Zapoteca has never attempted to conceal the location of the ENERGY ZAPOTECA and Charles Phillips has had full knowledge of the rig's location since at least April 26, 2004 when he first moved for arrest and seizure in this lawsuit. Charles Phillips has had and still has the ability to file an action in the Eastern District of Texas, where the ENERGY ZAPOTECA is stacked at Sabine Pass. Such a suit would provide Charles Phillips with the security he seeks. Thus, no past representations made by Zapoteca impede Charles Phillips' ability to pursue his claims. In this matter where Zapoteca's past representations certainly did not create any irreconcilable prejudice, the imposition of remedies against Zapoteca is unjustified and unreasonable.

## VII.
## OPPOSITION TO INTERVENTION BY NABORS

Zapoteca previously briefed its opposition to intervention by Nabors in its Response to Nabors Drilling International Limited's Motion to Intervene (Docket No. 49) and its Motion to Stay

Intervention, Motion to Compel Arbitration, and Supplemental Response in Opposition to Nabors Drilling International Limited's Amended Motion to Intervene (Docket No. 67). As requested by the Court, Zapoteca now takes the opportunity to clarify and supplement its previous submissions on this issue.

Zapoteca's previous submissions in opposition to intervention by Nabors clearly demonstrate that Nabors does not meet the requirements for either intervention of right or permissive intervention. In addition, the Court should not consider any form of ancillary or supplemental jurisdiction to allow Nabors to intervene in this lawsuit. First, the underlying dispute between Nabors and Zapoteca is subject to arbitration and, pursuant to the Memorandum of Agreement entered into by Nabors and Zapoteca on March 18, 2003, Nabors and Zapoteca have referred their dispute to binding arbitration in London, under English law. Nabors and Zapoteca have both appointed London counsel and arbitrators. Second, Nabors (like Charles Phillips) is requesting this Court sitting in the Southern District of Texas to secure its claims by arresting and/or attaching the ENERGY ZAPOTECA in the Eastern District of Texas. For these reasons, Nabors should not be allowed to intervene in this lawsuit.

## VIII.
## CONCLUSION

Based on the foregoing, Charles Phillips is not a master and/or seaman because the ENERGY ZAPOTECA was not a vessel in navigation at any time relevant herein. Admiralty jurisdiction does not exist and Charles Phillips has no maritime lien for wages. There is no reasonable basis for remedies against Zapoteca and Nabors' request to intervene should be denied.

20466♦5PJGH2153.SCH

Respectfully submitted,

*/s/ Robert L. Klawetter*
_____
Robert L. Klawetter
Attorney-In-Charge
State Bar No. 11554700
S. Dist. Bar No. 2471
Scott C. Hall
State Bar No. 24041043
S. Dist. Bar No. 37366
The Niels Esperson Building
808 Travis, 20th Floor
Houston, Texas 77002
(713) 225-0905 - Telephone
(713) 225-2907 - Telefacsimile

Counsel for **Zapoteca Energy, Inc.**

OF COUNSEL:

EASTHAM, WATSON, DALE & FORNEY, L.L.P.

## CERTIFICATE OF SERVICE

I certify that I filed the foregoing pleading on **February 11, 2005**, electronically, and that a true and correct copy of the foregoing will be served on counsel of record via the Electronic Case Filing System of the United States District Court for the Southern District of Texas, Brownsville Division, and/or by certified mail, return receipt requested, and/or by telefax as enumerated below.

*/s/ Robert L. Klawetter*
_____
Robert L. Klawetter

| **VIA ECF SYSTEM:** | **CM/RRR #7002 3150 0005 7366 0900** |
|---|---|
| Tonja Dee De Sloover | Edmund Lee Haag, III |
| tdesloover@fulbright.com | Fulbright and Jaworski, L.L.P. |
| | 1301 McKinney |
| Charles F. Herd, Jr. | Houston, Texas 77010 |
| cherd@lanierlawfirm.com | |
| | **CM/RRR #7002 3150 0005 7366 0917** |
| Charles Frank Wood | Jaime Arturo Saenz |
| fwood@swjz.com | Rodriguez, Colvin, Chaney & Saenz, L.L.P. |
| | 1201 East Van Buren |
| | P.O. Box 2155 |
| | Brownsville, Texas 78522 |