# EXHIBIT "A"

IN THE UNITED STATES DISTRICT COURT
FOR THE SOUTHERN DISTRICT OF TEXAS
BROWNSVILLE DIVISION

| | | |
|---|---|---|
| ZAPOTECA ENERGY  INC, | § | |
| Plaintiff | § | |
| | § | |
| VS. | § | Civil Number B-04-048 |
| | § | |
| CHARLES DOUGLAS PHILLIPS, | § | |
| Defendant | § | |

## DECLARATION UNDER PENALTY OF PERJURY OF ERIK OSTBYE

1.  My name is Erik Ostbye. I am over eighteen years of age and have never been convicted of a felony. I am of sound mind and otherwise capable of making this Declaration. I have personal knowledge of the facts stated herein as I am a representative of Zapoteca Energy Inc and to the best of my knowledge these facts are true and correct.

### The Rig ENERGY ZAPOTECA

2.  The Rig ENERGY ZAPOTECA was built in 1981 for Protexa. The Rig was a Friede & Goldman L-780 Independent Jackup Drilling Rig. (See photograph No. 1 attached hereto).

3.  In October 1987 the Rig ENERGY ZAPOTECA was drilling the YUM-2 well for Pemex in the Bay of Campeche when the well blew out and caught fire. The fire raged for more than one month, caused extensive damage to the Rig ENERGY ZAPOTECA, including damage to the rig package and substructure, crews quarters, control room, helideck, which was cut off and dropped to the Gulf floor and later retrieved, pedestal crane, the jacking motors and controls, and the Rig's hull and legs. (See photograph No. 2 attached hereto).

4.  The Rig ENERGY ZAPOTECA's jacking motors and controls were replaced and repaired as necessary and the Rig was moved away from the drill site and left the Rig in the Gulf of Campeche until 1989.

5.  The Rig ENERGY ZAPOTECA was declared a total loss.

6.  After this fire, The Rig ENERGY ZAPOTECA was incapable of being utilized for her intended use.

7.   Protexa completely removed the Rig ENERGY ZAPOTECA from navigation and commerce. To date the Rig has not been reintroduced into navigation and commerce.

8.   In 1989, because the Rig ENERGY ZAPOTECA was a hazard to navigation, Protexa moved the Rig to its yard in Tuxpan, Mexico, where the Rig remained, continually and indefinitely removed from navigation and commerce.

9.   In May 2000, Zapoteca Energy Inc purchased the Rig ENERGY ZAPOTECA with the intent to strip the Rig of all structures above the main deck, repair the jacking system, hull and legs, and convert the Rig to a bare deck jack up barge so that the Rig could be sold.

10.  Zapoteca Energy Inc never intended to reintroduce the Rig back into navigation and commerce.

11.  The purchase price Zapoteca Energy Inc paid for the Rig was $1,437,500.00.

12.  At the time Zapoteca Energy Inc purchased the Rig ENERGY ZAPOTECA, the Rig had been continually withdrawn from navigation and commerce, was in total disrepair, was considered a derelict, and was in need of a very substantial amount of rebuilding, repair and refurbishment before she could be brought back into service as a drilling rig. (See photographs No. 3 attached hereto).

13.  Zapoteca Energy Inc has removed all structures above the main deck from the Rig ENERGY ZAPOTECA. Energy Zapoteca Inc has repaired the damage to the hull and legs, and the jacking motors and controls of the Rig ENERGY ZAPOTECA. In her present state, the Rig ENERGY ZAPOTECA is merely a hull with three jacking legs.

14.  To date, Zapoteca Energy Inc has invested an additional $10,500,000.00 to bring the Rig to her present status. It is estimated that it will cost another $40,000,000.00 to $60,000,000.00 to reconstruct the Rig back to the status of a drilling rig.

15.  Due to many legal problems in Mexico created by Charles Douglas Phillips, Zapoteca Energy Inc determined it best to move Rig ENERGY ZAPOTECA to Texas. On or about 5 April 2004, the Rig ENERGY ZAPOTECA was towed to Sabine Pass, Texas where she remains today.

16.  Zapoteca Energy Inc is in the process of reevaluating its intent regarding the Rig. No decisions have been made as to what Zapoteca Energy Inc will do with the Rig ENERGY ZAPOTECA.

17.  To date, and at all times material hereto, the Rig ENERGY ZAPOTECA has been and remains completely withdrawn from service, navigation and commerce and

Zapoteca Energy Inc lacks any prospects of returning the Rig back into service, navigation and commerce.

18.   To date, and at all times material hereto, the Rig ENERGY ZAPOTECA has been and remains without certification from her Classification Society, Load Line Certificate, Minimum/Safe Manning Certificate and Radio Certificate, and is considered a "project" by her Classification Society, a term applied to ships and vessels in their construction stage.

19.   In December 2000, the date Charles Douglas Phillips asserts he was hired as Master of the Rig ENERGY ZAPOTECA by Zapoteca Energy Inc, the Rig had been completely removed from navigation and commerce for approximately 13 years; there were no prospects of returning the Rig back into service, navigation and commerce as a drilling rig. (See Declaration of Terrence Michael Smith). The Rig was in total disrepair, was considered a derelict, and was in need of a very substantial amount of rebuilding, repair and refurbishment before she could be brought back into service as a drilling rig.

20.   The Rig ENERGY ZAPOTECA was not in condition to be towed from Tuxpan, Mexico to Sabine Pass, Texas, until 5 April 2004. (See Declaration of Clifford Arkley).

### Zapoteca Energy Inc's Contacts with the Southern District of Texas

21.   From 3 through 8 May 2000, in the Southern District of Texas, Zapoteca Energy Inc representative(s) met with Bill McDermott, Charles Douglas Phillips and Southern International regarding the purchase and refurbishment of the Rig ENERGY ZAPOTECA.

22.   From 25 through 26 October 2003, in the Southern District of Texas, Zapoteca Energy Inc representative(s) met with David Kent and Davie Shipyard regarding a partial sale of interest in the Rig ENERGY ZAPOTECA; and met with Terje Reierson of Polaris Offshore Houston regarding a project for Mobile Production for the Rig ENERGY ZAPOTECA.

23.   In the Spring of 2003, in the Southern District of Texas, Zapoteca Energy Inc representative(s) entered into lengthy negotiations with Nabors Drilling International Limited, a company authorized to conduct business in the State of Texas, regarding the sale of the Rig ENERGY ZAPOTECA.

24.   Zapoteca Energy Inc entered into an agreement to sell the Rig ENERGY ZAPOTECA to Nabors Drilling International Limited. The sale of the Rig to Nabors Drilling International Limited was not consummated.

25. From 3 through 4 July 2003, in the Southern District of Texas, Zapoteca Energy Inc representative(s) met with Siggi Meissner of Nabors Drilling International Limited and Ketil Strangeland of Normarine Houston regarding a rider crew dispute with Nabors Drilling International Limited.

26. On 3 July 2003, in the Southern District of Texas, Zapoteca Energy Inc representative(s) met with Charles Douglas Phillips regarding a rider crew dispute with Nabors Drilling International Limited.

27. From 30 July through 3 August 2003, in the Southern District of Texas, Zapoteca Energy Inc representative(s) met with Ketil Strangeland of Normarine, Charles Douglas Phillips, and Siggi Meissner of Nabors Drilling International Limited regarding a rider crew dispute.

28. From 30 October through 5 November 2003, in the Southern District of Texas, Zapoteca Energy Inc representative(s) met with Edwin K. Nelson and Charles Douglas Phillips regarding settlement of dispute with Nabors Drilling International Limited and Protexa; met with Workships and Wintershall regarding inspection of the Rig ENERGY ZAPOTECA, and a project for the Rig as an accommodation, crane and support rig; and met with Charles Douglas Phillips, Workships and Jaap regarding the Rig.

29. From 12 through 21 January 2004, in the Southern District of Texas, Zapoteca Energy Inc representative(s) met with Charles Douglas Phillips, Edwin K. Nelson, and Clifford Arkley regarding preparations to move the Rig ENERGY ZAPOTECA to Texas, and regarding settlements of disputes with ASAC and crew.

30. In February 2004 in the Southern District of Texas, Zapoteca Energy Inc representative(s) met via telephone with Charles Douglas Phillips and Edwin K. Nelson regarding preparations to move the Rig ENERGY ZAPOTECA to Texas, and regarding settlements of disputes with ASAC and crew. (Charles Douglas Phillips refused to meet in Houston, Texas demanding Zapoteca Energy Inc's representatives come to Port Isabelle, Texas, "the place of Zapoteca Energy Inc operations.")

31. From 3 through 12 March 2004, in the Southern District of Texas, Zapoteca Energy Inc representative(s) met with Charles Douglas Phillips regarding the Rig ENERGY ZAPOTECA.

32. In approximately June 2003, Charles Douglas Phillips moved from Tuxpan, Mexico to Port Isabelle, Texas. Charles Douglas Phillips remained in Port Isabelle, Texas until at least March 2004. During this period of time, Charles Douglas Phillips performed substantially all work related to the Rig ENERGY ZAPOTECA that he performed in Tuxpan, Mexico, including, but not limited to the following:

    a.    Directing Zapoteca Energy Inc employees, agents, attorneys, service and material providers;

    b.    Hiring and firing Zapoteca Energy Inc employees and agents;

    c.    Meeting Zapoteca Energy Inc shareholders, employees, agents, attorneys and surveyors;

    d.    Paying for the services of Zapoteca Energy Inc employees, agents and attorneys;

    e.    Reporting to Zapoteca Energy Inc shareholders, employees, agents, attorneys and surveyors;

    f.    Negotiating with Zapoteca Energy Inc service and material providers;

    g.    Requesting funding from Zapoteca Energy Inc; and

    h.    Directing disbursement of Zapoteca Energy Inc funds incurred in the process of repairing and refurbishing the Rig ENERGY ZAPOTECA.

In short, Charles Douglas Phillips maintained an office for Zapoteca Energy Inc from which Charles Douglas Phillips conducted substantially all of Zapoteca Energy Inc's business.

33.    From the fall of 2003 until April 2004, Zapoteca Energy Inc retained and paid DIX Shipping in Brownsville, Texas to act as agents for the Rig ENERGY ZAPOTECA.

34.    At all times material hereto, Zapoteca Energy Inc conducted countless telephone calls and drafted countless correspondence to the Southern District of Texas regarding the Rig ENERGY ZAPOTECA.

35.    All Zapoteca Energy Inc contacts with the Southern District of Texas was purposeful and with the understanding that Zapoteca Energy Inc could become involved in litigation arising out of the business conducted in the Southern District of Texas.

PURSUANT TO 28 U.S.C. § 1746, I DECLARE (OR CERTIFY, VERIFY, OR STATE), UNDER PENALTY OF PURGERY UNDER THE LAWS OF THE UNITED STATES OF AMERICA THAT THE FOREGOING IS TRUE AND CORRECT.

    EXECUTED ON 27 FEBRUARY 2004.

Erik Ostbyc

# EXHIBIT "B"

IN THE UNITED STATES DISTRICT COURT
FOR THE SOUTHERN DISTRICT OF TEXAS
BROWNSVILLE DIVISION

ZAPOTECA ENERGY, INC.,           §
    Plaintiff                         §
                                      §
VS.                              §          Civil Number B-04-048
                                      §
CHARLES DOUGLAS PHILLIPS,        §
    Defendant                         §

## DECLARATION UNDER PENALTY OF PERJURY OF ERIK OSTBYE

My name is Erik Ostbye. I am over eighteen years of age and have never been convicted of a felony. I am of sound mind and otherwise capable of making this Declaration. I have personal knowledge of the facts stated herein as I am a representative of Zapoteca Energy Inc.

In approximately June of the year 2003, Charles Douglas Phillips moved from Tuxpan, Mexico to Port Isabelle, Texas. Charles Douglas Phillips remained (and as far as I know may remain) in Port Isabelle, Texas until March of the year 2004. While Charles Douglas Phillips was in Port Isabelle, Texas he performed daily work for Zapoteca Energy Inc, which work related to the Rig ENERGY ZAPOTECA and the business of Zapoteca Energy Inc.

In approximately the year 1989, the Rig ENERGY ZAPOTECA suffered a blow out, resulting in a large fire causing extensive damage to the Rig. After this blow out and fire, the Rig ENERGY ZAPOTECA was unusable as a jack-up drilling rig or for any other commercial or marine purpose.

After this blow out and large fire, and prior to May of the year 2000, the Rig ENERGY ZAPOTECA was stacked, mothballed or otherwise removed from service. The Rig ENERGY ZAPOTECA was unable to be moved or towed subsequent to being stacked, mothballed or otherwise removed from commercial and marine commerce and navigation.

In May of year 2000, when Zapoteca Energy Inc purchased the Rig ENERGY ZAPOTECA. At the time of Zapoteca Energy Inc's purchase of the Rig ENERGY ZAPOTECA, the Rig ENERGY ZAPOTECA had been removed from commercial and marine commerce and all navigation.

All equipment and accommodations and the helicopter pad were removed from the Rig ENERGY ZAPOTECA. The Rig ENERGY ZAPOTECA continually remained stacked, mothballed or otherwise removed from commercial and marine commerce and

1

navigation, standing above water on her legs affixed to the bottom of the river in Tuxpan, Mexico, until approximately 5 April 2004.

As of today's date and at all times material hereto, the Rig ENERGY ZAPOTECA has not been certified by her Classification Society. As of today's date and at all times material hereto, the Rig ENERGY ZAPOTECA has been without a Load Line Certificate, a Minimum/Safe Manning Certificate and a Radio Certificate. Pursuant to the Classification Society of the Rig ENERGY ZAPOTECA, the Rig ENERGY ZAPOTECA is considered a "project," a term applied to ships or vessels in their construction stage.

PURSUANT TO 28 U.S.C. § 1746, I DECLARE (OR CERTIFY, VERIFY, OR STATE), UNDER PENALTY OF PURGERY UNDER THE LAWS OF THE UNITED STATES OF AMERICA THAT THE FOREGOING IS TRUE AND CORRECT.

EXECUTED ON 3 MAY 2004.

_Erik Ostbye_

# EXHIBIT "C"



**ABS Group Inc.**

MARINE SERVICES

# MODU "ENERGY ZAPOTECA"

## REPORT OF ABS RECORD REVIEW

| | |
|---|---|
| Project ID No.: | S-67462A1 |
| Report No.: | 8120446 |
| Report Date: | 7 March 2001 |
| Location: | Houston, Texas |

*Accomplished*
*At the Request of*

**Mr. Bill McDermott**
Materials

*On Behalf of*

## Energy Zapoteca Project
**Attn.: Captain Charles Phillips - Project Manager**
**Edificio Del Mar, Garizurieta No. 2, Desp 402/403**
**CP 92800 Tuxpan, Vera Cruz**
**Mexico**

Engineering & Facility Verification Division
16855 Northchase Drive, Houston, Texas 77060-6008 USA
Tel: (281) 877-6752 / Fax: (281) 877-5991
e-mail: bemsley@eagle.org

ZEI 1241
*PHILLIPS*



**MARINE SERVICES**

Engineering & Facility Verification Division
16855 Northchase Drive
Houston, Texas 77060-6008 USA
Tel: (281) 877-6110 / Fax: (281) 877-5991

**Page 1 of 5**

| Project ID Number: | Report Number: | Office Location: | Date: |
|---|---|---|---|
| S67462C1 | 8120446 | Houston, Texas | 7 March 2001 |

## REVIEW OF ABS CLASS SURVEY RECORDS FOR

## M/V "ENERGY ZAPOTECA"

### (ex. Zapoteca)

**THIS IS TO CERTIFY** that the undersigned Representative of ABS Group Inc., Engineering & Facility Verification Division, Marine Services Department did at the request of Mr. Bill McDermott and on behalf of Energy Zapoteca Project and with the authorization of the vessel owners, attend the Head Office of the American Bureau of Shipping in Houston, Texas on 6 and 7 March 2001 to review and report on the classification status and survey reports pertaining to the MODU "ZAPOTECA". Please note that vessel's particulars and report contents noted herein below are as abstracted from the current ABS Record and/or the official vessel survey records of the American Bureau of Shipping, which were made available for purposes of this review.

## VESSEL PARTICULARS

TYPE OF VESSEL ..................................... Barge / Mobile, Self Elevating, Drilling Platform

LAST KNOWN REGISTERED OWNER ... Perforaciones Maritimas Mexicanas S.A.

BUILDER ................................................. Gotaverken Arendal AB, Gothenburg, Sweden
Hull No. 919

YEAR BUILT ............................................ 1981

LAST KNOWN FLAG / REGISTRY .......... PANAMANIAN / PANAMA

ABS IDENTIFICATION NUMBER ........... 8120446

OFFICIAL NUMBER.................................. 9969-L

CLASSIFICATION ..................................... (When Classed Was ✠A1 Self Elevating Drilling Unit)

CLASS SUSPENDED................................. June 30, 1988  (Reason:  Non-compliance with rules as per section 1 paragraph 29 / Pending Repairs / Expired Certs.)

LENGTH OVERALL.................................. 179.95'  (54.8488M)

BREADTH................................................. 175.0'    (53.34M)

DEPTH...................................................... 25.0'     (7.62M)

*Condition, Damage, P&I, Machinery, & Cargo Surveys / Owner's Rep. / Class Record Reviews / SafeHull Cond. Assessment*

This certificate or report is granted or issued subject to the condition that it is understood and agreed that nothing herein shall be deemed to relieve any designer, manufacturer, seller, supplier, repairer or operator of any warranty, express or implied and ABS Group Inc. liability shall be limited to the acts and omissions of it's employees, agents, and subcontractors. Under no circumstance whatsoever shall ABS Group Inc. be liable for any injury or damage to any person or property occurring by reason of negligent operation, misuse of or any defect in materials, machinery, equipment or other items other than defects in items actually inspected by ABS Group Inc. and ascertainable by normally accepted testing standards, or defects reflected in documents reviewed by ABS Group Inc. and ascertainable by normally accepted testing standards, or defects reflected in documents reviewed by ABS Group Inc. and which are covered by this certificate or report.

GRP 001M (1/99)

**ZEI 1242**
**PHILLIPS**



**MARINE SERVICES**

Engineering & Facility Verification Division
16855 Northchase Drive
Houston, Texas 77060-6008 USA
Tel: (281) 877-6110 / Fax: (281) 877-5991

Page 2 of 5

| Project ID Number: | Report Number: | Office Location: | Date: |
|---|---|---|---|
| S67462C1 | 8120446 | Houston, Texas | 7 March 2001 |

DRAFT.......................................... 15.164'

FREEBOARD ............................................. 10.026'

REGISTERED TONNAGES...................... Gross 3675 / Net 2661

ORIGINAL CARGO GEAR...................... One (1) 41.4 Ton Capacity Crane and one (1) 19.6 Ton Crane.

## ADDITIONAL VESSEL INFORMATION

According to available correspondence, subject drilling rig was seriously damaged on or about 10 October 1987 and was subsequently declared a Constructive Total Loss by underwriters. Via correspondence dated 19 February 1988 ABS acknowledged to owners that they were aware of the rig's present status and additional information with respect to status and owner's intentions was requested at that time.

Correspondence dated 7 June 1982, indicated that the rig may have suffered some leg damage due to a punch-through ("soil failure"):
- "Material of *(leg structure)* bracing members used in original construction was DIN 1626 ST 52, normalized (min. yield 52 KSI)."
- ..."material used for replacement *(should)* have...charpy V notch value of 25 foot pounds at -10°C test temperature in addition to minimum yield of 52 KSI."

*Note: Although the correspondence made mention of it, no survey report could be found that dealt with any such damages.*

Correspondence dated 13 May 1981 indicates that upon completion of original construction the rig was dry-towed to Sabine Pass where it was off-loaded. At that time fractures were found in platform bottom plating just outboard of port and starboard leg wells *(similar to those found on sister unit that was shipped earlier)*. However, no ABS Class damage repair survey was located.

Also found in correspondence from 1981 was reference to "gear tooth failures" and a recommendation that the jacking machinery be opened up and further examined in nine (9) months time. No further reference to any discrepancies in the jacking systems could be found in the available survey reports, however, ABS correspondence of 25 February 1981 does indicate that there was concern about the

---

*Condition, Damage, P&I, Machinery, & Cargo Surveys / Owner's Rep. / Class Record Reviews / SafeHull Cond. Assessment*

This certificate or report is granted or issued subject to the condition that it is understood and agreed that nothing herein shall be deemed to relieve any designer, manufacturer, seller, supplier, repairer or operator of any warranty, express or implied and ABS Group Inc. liability shall be limited to the acts and omissions of it's employees, agents, and subcontractors. Under no circumstance whatsoever shall ABS Group Inc. be liable for any injury or damage to any person or property occurring by reason of negligent operation, misuse of or any defect in materials, machinery, equipment or other items other than defects in items actually inspected by ABS Group Inc. and ascertainable by normally accepted testing standards, or defects reflected in documents reviewed by ABS Group Inc. and ascertainable by normally accepted testing standards, or defects reflected in documents reviewed by ABS Group Inc. and which are covered by this certificate or report.

GRP 001M (1/99)

**ZEI 1243**
*PHILLIPS*

**MARINE SERVICES**

**ABS Group Inc.**

Engineering & Facility Verification Division
16855 Northchase Drive
Houston, Texas 77060-6008 USA
Tel: (281) 877-6110 / Fax: (281) 877-5991

Page 3 of 5

| Project ID Number: | Report Number: | Office Location: | Date: |
|---|---|---|---|
| S67462C1 | 8120446 | Houston, Texas | 7 March 2001 |

safety arrangement of the jacking machinery. Accordingly, ABS was of the opinion the National Supply standard design was not satisfactory, as a simple brake failure could cause extensive damage. Specifically, "The present arrangement is such that a lever in each individual brake mechanism activates a limit switch in the jack machinery MCC. Each group of twelve (12) signals at the MCC is further connected to one (1) signal lamp for each leg and located on the jack control console. Our experience shows that an improper adjustment and/or small variation of the switch lever will result in a lack of the visual warning that a disc brake is engaged. Further, we are of the opinion that the present warning system is not reliable and that improvements are called for, or rather that interlocks be considered for future designs."

**CERTIFICATES ISSUED BY ABS**

There are no known valid certificates issued for the "ZAPOTECA" by ABS.

**ABS CLASS SURVEY STATUS**

Class was suspended in 1988 and, according to available documentation, was never reinstated.

**LAST GAUGINGS**

There were no gaugings found in the available records for this drilling unit.

**HISTORICAL INFORMATION**

**Mexico City Report No. MX0491, dated 3 June 1986**

LAST DRYDOCKING SURVEY: (Underwater Inspection in Lieu of Drydocking Survey)

An examination of footing, legs, struts & bracing members below the waterline, including leg connections to cans, was carried out by a qualified diver using closed circuit television with 2-way communication, and the condition was found to be satisfactory, based on the aforementioned examination. (A copy of the diver's report and pertinent video tape were submitted with the survey report to ABS Headquarters.)

When jacked-up, the outside of the bottom plating, side plating, sea chests, strainers, the covers to outside access openings and their fastenings, were examined and were found to be satisfactory.

---

*Condition, Damage, P&I, Machinery, & Cargo Surveys / Owner's Rep. / Class Record Reviews / SafeHull Cond. Assessment*

This certificate or report is granted or issued subject to the condition that it is understood and agreed that nothing herein shall be deemed to relieve any designer, manufacturer, seller, supplier, repairer or operator of any warranty, express or implied and ABS Group Inc. liability shall be limited to the acts and omissions of its employees, agents, and subcontractors. Under no circumstance whatsoever shall ABS Group Inc. be liable for any injury or damage to any person or property occurring by reason of negligent operation, misuse of or any defect in materials, machinery, equipment or other items other than defects in items actually inspected by ABS Group Inc. and ascertainable by normally accepted testing standards, or defects reflected in documents reviewed by ABS Group Inc. and ascertainable by normally accepted testing standards, or defects reflected in documents reviewed by ABS Group Inc. and which are covered by this certificate or report.

GRP 001M (1/99)

*ZEI 1244*
*PHILLIPS*



**MARINE SERVICES**

Engineering & Facility Verification Division
16855 Northchase Drive
Houston, Texas 77060-6008 USA
Tel: (281) 877-6110 / Fax: (281) 877-5991

Page 4 of 5

| Project ID Number: | Report Number: | Office Location: | Date: |
|---|---|---|---|
| S67462C1 | 8120446 | Houston, Texas | 7 March 2001 |

A Provisional Load Line Certificate was issued at this time after completion of Special Periodical Survey No. 1 of Hull while the unit was offshore from Ciudad del Carmen, Mexico, pending the issuance of final certificate.

Machinery and electrical installations, including those in hazardous areas, as well as all fire fighting apparatus were generally examined and found to be in satisfactory condition.

At time of this survey the following tanks were opened-up, cleaned, gas freed, examined internally and externally and found in satisfactory condition. After such inspections, the tanks were closed and hydro-tested as required by the Rules and found satisfactory.

- No. 1 Ballast center tank @ Frames 00-5.
- No. 2 Ballast port tank @ Frames 1.5-08.
- No. 2 Ballast starboard tank @ Frames 1.5-08.
- No. 6 Ballast port tank @ Frames 17-25.
- No. 6 Ballast center tank @ Frames 17-25.
- No. 7 Ballast center tank @ Frames 22-25.
- No. 7 Ballast port tank @ Frames 22-25.
- No. 7 Ballast starboard tank @ Frames 22-25.
- No. 3 drill water port tank @ Frames 7-11.
- No. 3 drill water starboard tank @ Frames 7-11.
- No. 4 drill water port tank @ Frames 11-17
- No. 4 drill water starboard tank @ Frames 11-17
- Potable water port forward tank @ Frames 18-20.
- Potable water port after tank @ Frames 20-22.
- No. 5 storage tank port @ Frames 17-18.
- No. 5 storage tank starboard @ Frames 17-18.
- Service port tank @ Frames 14-14.5.
- Service port tank @ Frames 15.5-17.
- Lube oil port tank @ Frames 12-12.5.
- Dirty oil port tank @ Frames 15-16.
- Diesel oil port tank @ Frames 15-17.
- Separator port tank @ Frames 17.5-18.
- Bilge hold port tank @ Frames 17-18.
- Bilge hold @ Frames 17-18.

---

*Condition, Damage, P&I, Machinery, & Cargo Surveys / Owner's Rep. / Class Record Reviews / SafeHull Cond. Assessment*

This certificate or report is granted or issued subject to the condition that it is understood and agreed that nothing herein shall be deemed to relieve any designer, manufacturer, seller, supplier, repairer or operator of any warranty, express or implied and ABS Group Inc. liability shall be limited to the acts and omissions of it's employees, agents, and subcontractors. Under no circumstance whatsoever shall ABS Group Inc. be liable for any injury or damage to any person or property occurring by reason of negligent operation, misuse or any defect in materials, machinery, equipment or other items other than defects in items actually inspected by ABS Group Inc. and ascertainable by normally accepted testing standards, or defects reflected in documents reviewed by ABS Group Inc. and ascertainable by normally accepted testing standards, or defects reflected in documents reviewed by ABS Group Inc. and which are covered by this certificate or report.

GRP 001M (1/99)

**ZEI 1245**
*PHILLIPS*



**ABS Group Inc.**

**MARINE SERVICES**

Engineering & Facility Verification Division
16855 Northchase Drive
Houston, Texas 77060-6008 USA
Tel: (281) 877-6110 / Fax: (281) 877-5991

Page 5 of 5

| Project ID Number: | Report Number: | Office Location: | Date: |
|---|---|---|---|
| S67462C1 | 8120446 | Houston, Texas | 7 March 2001 |

**Beaumont Report No. BT14984, dated 5 June 1981**

Additions

- A fixed automatic gas detection and alarm system was installed.
- The port and starboard pedestal mounted cranes were provided with hook load indicators.
- Electrical equipment installed in hazardous areas was placed in proper order.

**Note:** The crane manuals placed on board do not contain full information required.

**Gothenburg, Sweden Report No 1963, dated 27 March 1981**

Modification

Plug and socket for the foot throttle connection into the Driller's Console have been removed and the opening in the console blanked off. The foot throttle cable has been led through a cable gland into the pressurized console.

**SUMMARY:**

The foregoing covers only the significant portions of the ABS Survey records. Notwithstanding any and all information contained herein, the specific present condition of the vessel may only be determined by a comprehensive condition survey.

The undersigned Representative last visited the offices of the American Bureau of Shipping on 7 March 2001.

This report was prepared and submitted without prejudice as to rights and/or interests of whom it may concern.

**ABS GROUP INC. / E & FV Division / Marine Services**

Richard F. Goss
Senior Marine Surveyor

*Condition, Damage, P&I, Machinery, & Cargo Surveys / Owner's Rep. / Class Record Reviews / SafeHull Cond. Assessment*

This certificate or report is granted or issued subject to the condition that it is understood and agreed that nothing herein shall be deemed to relieve any designer, manufacturer, seller, supplier, repairer or operator of any warranty, express or implied and ABS Group Inc. liability shall be limited to the acts and omissions of it's employees, agents, and subcontractors. Under no circumstance whatsoever shall ABS Group Inc. be liable for any injury or damage to any person or property occuring by reason of negligent operation, misuse of or any defect in materials, machinery, equipment or other items other than defects in items actually inspected by ABS Group Inc. and ascertainable by normally accepted testing standards, or defects reflected in documents reviewed by ABS Group Inc. and ascertainable by normally accepted testing standards, or defects reflected in documents reviewed by ABS Group Inc. and which are covered by this certificate or report.

GRP 001M (1/99)

ZEI 1246
*PHILLIPS*

# EXHIBIT "D"

IN THE UNITED STATES DISTRICT COURT
FOR THE SOUTHERN DISTRICT OF TEXAS
BROWNSVILLE DIVISION

ZAPOTECA ENERGY, INC.,    §
    Plaintiff    §
        §
VS.    §    Civil Number B-04-048
        §
CHARLES DOUGLAS PHILLIPS,    §
    Defendant    §

## DECLARATION UNDER PENALTY OF PERJURY OF JOHN LEBOURHIS

My name is John Lebourhis. I am over eighteen years of age and have never been convicted of a felony. I am of sound mind and otherwise capable of making this Declaration. I have personal knowledge of the facts stated herein.

I President of John LeBourhis & Associates, Inc. John LeBourhis & Associates, Inc. are marine surveyors specializing in jack up offshore oil rigs.

In approximately the year 1987, the Rig ENERGY ZAPOTECA was working in the Gulf of Campeche when the well suffered a blow out, resulting in a large fire causing extensive damage to the Rig. After this blow out and fire, the Rig ENERGY ZAPOTECA was unusable as a jack up drilling rig or for any other commercial or marine purpose.

In approximately May 2000, Zapoteca Energy Inc purchased the Rig ENERGY ZAPOTECA from Protexa. At the time of Zapoteca Energy Inc's purchase of the Rig ENERGY ZAPOTECA, the Rig had been removed continually from navigation and commerce for a period of approximately 13 years.

During the period of 8 November 2000 through 3 May 2001, John LeBourhis & Associates, Inc. performed three surveys of the Rig ENERGY ZAPOTECA for the purpose of checking the condition of the Rig for a one-trip towage to the United States Gulf, Galveston, Texas. Our surveys focused on the structural integrity of the Rig's legs.

During the time frame of these surveys, the Rig ENERGY ZAPOTECA was what I consider to be unseaworthy.

Our surveys found numerous deficiencies, excessive wastage and missing structural members, in the condition of the legs of the Rig ENERGY ZAPOTECA. These deficiencies needed to be temporarily repaired in order for the Rig to make the one trip voyage to Galveston, Texas. These defeciencies need to be permanently repaired before the Rig could be placed back into navigation and commerce.

1

At no time during our surveys was the Rig ENERGY ZAPOTECA placed into condition to make the one trip voyage to Galveston, Texas, let alone navigation and commerce.

Attached to my Declaration are true and correct copies of correspondence I received from Charles Douglas Phillips regarding the Rig ENERGY ZAPOTECA.

PURSUANT TO 28 U.S.C. § 1746, I DECLARE (OR CERTIFY, VERIFY, OR STATE), UNDER PENALTY OF PURGERY UNDER THE LAWS OF THE UNITED STATES OF AMERICA THAT THE FOREGOING IS TRUE AND CORRECT.

EXECUTED ON 27 MAY 2004.

Captain John LeBourhis

2

*faxed to*
*Henry*
*11-28-00*

ENERGY ZAPOTECA
TUXPAN, MEXICO

JOHN LeBOURHIS & ASSOCIATES
1505 Highway 6 South Suite 120
Houston, Texas 77077

ATTN:  Captain John Lebourhis                                    11/27/2000

Dear John:

Reference your fax ZAP00-1109

Please be advised that all ballast tanks will be operational for the lightship survey

The spud cans will have to be inspected before we jack up at the 2nd location.
The cans will be flooded and secured before we start the jacking up operation
to repair the bow leg.

The project has been somewhat delayed as the engines will not meet the
requirements for Bureau Veritas. Please inform Mr. Henry K. Slikinski
of this short delay. We will require that Mr. Slikinski be onboard for the
jacking up operations and the inspection of all legs.

Please continue with the stability study for the Energy Zapoteca. If you require
any addition information please advise.

Best Regards

Charles Phillips
Project Manager
Energy Zapoteca

CC: Mr. Christian Koogsh

FROM : ZAPOTECA-P          ENERGY-BPoE    FAX NO. : 5278346793                    11 Dec. 2000 03:24PM P1

ENERGY ZAPOTECA
TUXPAN, MEXICO

JOHN LEBOURHIS & ASSOCIATES, INC.
1505 Highway 6 South, Suite 120
Houston, Texas 77077

ATTN: Captain John LeBourhis                                    12/11/2000

Dear John;

Reference our telephone conversation last week.

The plan is to jack down the Energy Zapoteca the first week in January using only one of the temporary generators. The rig will be jack down to an air gap of approximately 6 feet to do some repairs on the hull. During the repairs on the bottom of the hull, the divers will remove all trash from the top of the spud cans.

The rig will then be jacked down to perform the dead weight survey. After the dead weight survey has been completed, the rig will be moved out into the river and towed to one of two locations yet to be determined.

The rig will be moored along side the dock for the inspection of the spud cans by Bureau Veritas. The spud cans will be cleaned by the divers using a high pressure unit. The rig will remain moored at the dock for approximately 30 days.

Please send me your recommendations for mooring the rig at either location 1 or 2.

I will send you a fax requesting the date that your surveyor should arrive in Tuxpan. Your surveyor will be present for the jacking down operation, removing trash from the spud cans, dead weight survey, moving the rig, and the mooring of the rig along side the dock.

Please be advise that your invoice has been forwarded to Mr. Kongsli for payment.

Thanking you in advance for your help in this matter.

Best Regards

Charles Phillips
Owners Representative
Energy Zapoteca

FROM : ZAPOTECA-P        ENERGY-BPoE     FAX NO. : 5278346793          20 Feb. 2001 12:35PM P1

ENERGY ZAPOTECA
TUXPAN, MEXICO

JOHN LEBOURHIS AND ASSOCIATES, INC.
1505 Highway 6 South, Suite 120
Houston, Texas 77077

2AP01- 0170

ATTN: Captain John LeBourhis

Dear John;

The cleaning of the inside of the bow and stbd spud cans have been completed.
We had many problems with the high levels of H2S gas in the spud cans and also
in the mud.

We have today started the sand blasting on the stbd leg cord connections to the spud
can. The NDT personnel are testing inside of the stbd spud can.

The inside of the stbd spud can looks new. For your information, there are 30 bolt on
anodes on the inside of the spud can. The anodes are 60/70% in good condition.
The Bureau Veritas surveyor recommends that we change out only 3 anodes.

All the vent valves, inductors valves, jetting rings, and swing valves on the stbd and bow
spud cans are being opened up for inspection, testing, and repaired as required. All reach
rods are being replaced.

The divers have reported that there is no evidence of any structural damage to the spud
cans. The Bureau Veritas surveyor inspected the inside of the stbd spud can and found
no problems.

The port leg remains in the stand-by position in case of an emergency.

The Owners have decided to repair the bow leg instead of just bracing it for a tow.
Please pass this information on to Sr. Henry. I will require Sr. Henry for the jacking up
operation and for the inspection of the port and stbd legs. I will be able to give you
a date after we start the inspection of the port spud can.

I will keep you advised.

Best Regards

Charles Phillips
Project Manager
Energy Zapoteca



*to inform HENRY*

**ENERGY ZAPOTECA**
**TUXPAN, MEXICO**

**JOHN LEBOURHIS & ASSOCIATES, INC.**
**1505 HIGHWAY 6 SOUTH, SUITE 120**
**HOUSTON, TEXAS**

ATTN: Captain John LeBourhis

2/24/2001

Dear John;

Please schedule your surveyor to leave for Tuxpan, Mexico on March 29, 2001.

We will begin the jacking up operation on March 26, 2001.

The metallurgist company will do the inspection of the burned sections on the port and stbd legs.

Best Regards

Charles Phillips
Project Manager
Energy Zapoteca

Case 1:04-cv-00048    Document 91-2    Filed in TXSD on 02/11/2005    Page 24 of 44

ZAPOTECA

ENERGY ZAPOTECA
TUXPAN, MEXICO

JOHN LEBOURHIS & ASSOCIATES, INC.
1505 HIGHWAY 6 SOUTH, SUITE 120
HOUSTON, TEXAS

ATTN: Captain John LeBourhis

3/29/2001

Dear John;

Please reschedule Henry to arrive in Tuxpan on Monday, April 1, 2001.

I spoke with Henry late yesterday and advised him to change his ticket to depart tomorrow due to some problems with the jacking system.

We now have found that the sand blasting personnel damaged some of the electrical cables in the wire ways on the stbd leg. We are now in the process of changing out these cables.

Sorry for any delays.

Best Regards

Charles Phillips
Project Manager
Energy Zapoteca

ENERGY ZAPOTECA
TUXPAN, MEXICO

*To file ZAPOTECA*

JOHN LEBOURHIS & ASSOCIATES, INC.
1505 HIGHWAY 6 SOUTH, SUITE 120
HOUSTON, TEXAS

ATTN: Captain John LeBourhis

7/12/2001

Dear John;

Please inform your surveyor Mr. Henry Sliwinski that he will not be required for the meeting with Bureau Veritas next week.

The project team will meet with Bureau Veritas to obtain a new scope of work to complete the leg repairs. The Owners would prefer to leave the top 2 bays on legs 2 and 3 as is. The Owners feel that the top 2 bays would never be used unless the rig was converted to a 300 foot jackup.

The subject of stress relieving of the top 2 bays on legs 2 and 3 will be discussed. The replacement of the rack teeth of the top 2 bays will also be discussed.

Depending on the results of our meeting with Bureau Veritas, we should know what will be required to obtain final approval on the legs.

Please inform Mr. Sliwinski that I should have a schedule for him sometime next week.

Best Regards,

Charles Phillips
Project Manager
Energy Zapoteca

# EXHIBIT "E"



**MARINE & ENGINEERING CONSULTANTS**

London Offshore Consultants, Inc.
16800 Imperial Valley Drive, Suite #280
Houston, Texas 77060, USA
Telephone: (281) 987-7400   Fax: (281) 987-7438
Email: houston@locamericas.com   www.locamericas.com

## Certificate of Approval

LOCH6318/CA/C002

### ENERGY ZAPOTECA

### SAILAWAY AND VOYAGE OF 'ENERGY ZAPOTECA' FROM CURRENT LOCATION, TUXPAN PORT, MEXICO TO THE STACKING LOCATION, ALONGSIDE AT SABINE SHIPYARD, TEXAS, USA

This is to certify that this office, acting on behalf of P.D.Gram has reviewed the procedures and witnessed the preparations for the sailaway and voyage of the jack up unit 'ENERGY ZAPOTECA' from its current position, Tuxpan river, Mexico, to the stacking location alongside Sabine Shipyard, Texas, USA.

Tow tug is:  *MHRTH EVGENIA*

This operation is hereby approve..

This Certificate of Approval is issued without prejudice to any insurance interests or to any or all parties concerned.

For and on behalf of
**London Offshore Consultants, Inc.**

_____                    1400 hrs 05 APRIL 2004.

C Arkley

**ZEI 0511**
*PHILLIPS*

# EXHIBIT "F"

IN THE UNITED STATES DISTRICT COURT
FOR THE SOUTHERN DISTRICT OF TEXAS
BROWNSVILLE DIVISION

| | | |
|---|---|---|
| ZAPOTECA ENERGY INC, | § | |
| Plaintiff | § | |
| | § | |
| VS. | § | Civil Number B-04-048 |
| | § | |
| CHARLES DOUGLAS PHILLIPS, | § | |
| Defendant | § | |

## DECLARATION UNDER PENALTY OF PERJURY OF CLIFFORD ARKLEY

1.  My name is Clifford Arkley. I am over eighteen years of age and have never been convicted of a felony. I am of sound mind and otherwise capable of making this Declaration. I have personal knowledge of the facts stated herein as I was a contractor to PD Gram & Co. AS, Technical Managers of the rig ENERGY ZAPOTECA .

### The Rig ENERGY ZAPOTECA

2.  During October 2003, my company, London Offshore Consultants ("LOC"), was requested by PD Gram & Co. AS (as owners Technical Management for the Rig ENERGY ZAPOTECA) to carry out an inspection of the rig. The inspection and subsequent recommendations were with a view to the issuance of a Certificate of Approval for the movement of the unit from Tuxpan, Mexico to Port Isabel, South Texas. I was allocated as Marine Warranty Surveyor to this project.

3.  On 19 October 2003, a dialogue was commenced with Mr. Charles Philips and plans made to visit him at his office in South Padre Island, then to travel on to Tuxpan via Renosa and Poza Rica for rig inspection.

4.  On 16 October 2003, I proceeded to South Padre Island for discussions with Charles Philips and during the following week traveled on to Tuxpan where on Tuesday, Wednesday and Thursday I attended and inspected the rig.

5.  I traveled back to Houston on Friday 31 October 2003 and issued a preliminary list of recommendations (some 41 items) written with the owner's request in mind that the unit was to be manned during the tow. The LOC stand was that an unmanned dead tow was the preferred option.

6.  Essentially the rig was bereft of any SOLAS equipment. Certification was non-existent and all (including essential) machinery had been removed. There were

1

numerous holes and openings compromising the watertight integrity. Unknown and untraceable pipe work had been removed and in places cropped. Some areas of deck had wasted through and there was direct access to the tank spaces below. Some tank access covers were missing and in some locations temporary tank access spaces had been cut into the deck. These did not have approved covers or fitments. There was only temporary crew accommodation on deck and no suitable sanitary facilities, waste disposal or sewage holding tanks. There was no suitable cooking or food storage equipment. Temporary power supply was from a road transportable generator that was not suitable for sea service and had no back up. There was no communications equipment other than one VHF that had limited operation. A major concern was also the Rig's stability. Having been completely altered by the removal of a large amount of machinery and topside structure the accelerations on the legs and their ability to withstand these was in doubt and unproven at this time. The rig was in fact unfit for habitation, uncertificated and unseaworthy. Consequently it was not in condition to navigate or operate as a commercial unit.

7.  During the ensuing month of November it became clear that the requirements for a manned tow were not going to be met. The problems of lack of fundamental equipment and certification would be prohibitively expensive and time consuming to overcome. It was recommended again by LOC that an unmanned dead tow be re-considered. A dry tow was also another consideration. It was made clear a Certificate of Approval to move the unit would not be issued for a manned tow.

8.  During December 2003 attention and communication was afforded to the stacking site requirements in Port Isabel and on the outstanding requirements for an unmanned tow.

9.  During January 2004 I attended a meeting with owners representatives with view to resolving all outstanding requirements for an unmanned, dead, wet tow. Items attended to were stability, jacking equipment, tow assembly, watertight integrity, stacking site and tow vessels.

10. Discussions, reviews and planning took place regularly during February 2004 between myself rig owners and the project manager (Charles Philips)

11. On owners instructions I traveled to Tuxpan on 7 March 2004 to re-inspect the rig and report back on readiness and progress. On Monday 6 March during a discussion with Charles Philips, I was informed that I was not allowed on the rig. On Tuesday 9 March I proceeded to the Rig but was refused access to it by a gangway security person. I discussed the situation with Charles Philips who implied that it would be risky for me to attempt to gain access to the rig as the security guards had instructions not to allow unauthorized persons onboard. Charles Phillips said I was not authorized and my personal safety could not be guaranteed.

2

12.    On Wednesday the 10 March, I accompanied various ENERGY ZAPOTECA owners representatives to the temporary company office in Tuxpan. None of the party was allowed access to the 'office'. I then proceeded to the rig with a police escort and what I understood to be a bailiff acting for ENERGY ZAPOTECA owners. None of our party was allowed onboard.

13.    On Thursday 11 March, I was requested to stay onsite until access to the rig was gained. This was expected in the next 24 hrs.

14.    On Friday 12 March access to the rig was gained and I carried out my inspection. There was some progress from my previous visit although there was still numerous items outstanding to make the vessel ready for sea. I re-wrote my list of recommendations on the basis the rig would be wet towed, dead and unmanned to the stacking site now going to be Sabine, South Texas.

15.    On Saturday 13 March I met with the newly appointed Towmaster/Bargemaster Mr. Austin (Rusty) Alexander. We toured the rig and he took over as owners representative on site. An action plan was prepared for further technical inspection (jacking gear, ballast tanks and rig structure) prior to the jacking down, flotation and tow of the rig to Sabine. Outstanding items already documented were to be dealt with. I departed for Houston the following day.

16.    I attended the rig again from 18 to 24 March 2004, being instructed to return to Houston as delays were expected due to legal problems. During this period Austin Alexander tested jacking equipment and controls. He also inspected all other rig equipment from a technical and operational standpoint, Communicating with myself on several occasions on his findings and progress readying the rig. The towing vessel 'Martha Eugenia' was also inspected and approved for the towing operation during this time.

17.    I returned to Tuxpan on Sunday 4 April. After inspecting the Rig in the company of Austin Alexander it was decided the close out of required items was nearing completion and the tow vessel was ordered for next day.

18.    I completed a final "walk through" at 1330 hrs the same day and a CoA was issued at 1400 hrs. This approved a single voyage under tow as a dead unmanned unit from Tuxpan to Sabine with no deviations. At 1430 the main tugboat was connected and the rig became afloat and underway at approximately 1500 hrs. At 1700 all leg chocks were in place. A final check was carried out and all personnel departed the rig at 1745 hrs.

19.    The rig arrived at Sabine pilots stations during Sunday 11 April 2004 and berthed on 12 April. It is currently stacked at the arrival location.

3

PURSUANT TO 28 U.S.C. § 1746, I DECLARE (OR CERTIFY, VERIFY, OR STATE), UNDER PENALTY OF PURGERY UNDER THE LAWS OF THE UNITED STATES OF AMERICA THAT THE FOREGOING IS TRUE AND CORRECT.

EXECUTED ON 27 May 2004.

Cliff Arkley

4

Resume of:

**Captain Clifford Arkley FICS, MNI**
**Certificated Nautical Surveyor**
**15135 Memorial Drive #2101**
**Houston, Texas 77079**
**USA**
**Tel: 1-281-496-7803**
**EMAIL:**

## QUALIFICATIONS

Fellow of the Institute of Chartered Shipbrokers
Member of the Nautical Institute
Certificate in Nautical Surveying (Nautical Institute)
MCA Masters Certificate, (Senior Master Offshore Oil) valid Nov 05
Certificate as ISO/ISM Lead Auditor (IRCA )

All above passed by examination

UKOOA. Offshore Medical and Helicopter Survival, in force.
ENG 1. Medical. H2S Training. (AgipKOC, OKIOK induction)

## Languages

A working knowledge of Russian.

## Fields of expertise:

Marine & Fleet management   (Specialist Caspian Sea & FSU countries), offshore construction/oil, ISM and Safety auditing, Rig moving (Semi-submersible & Jack-up), Towing Operations (ocean & infield). Vessel/rig/structure/cargo inspection, audit and surveying (P&I). Project cargo management. Chartering and vessel utilization.

## CAREER SUMMARY

An experienced offshore operator in the oil and gas industry moving ashore twelve years ago. Have graduated in the period ashore to senior management, consultancy positions (five years Marine Operations Manager) Being also for two years (until Feb 00) the senior field representative Acting Technical Field Director for the Cheleken (Emirate National Oil Co/Dragon Oil) Joint Venture Turkmenistan.

Extensive experience world-wide as Master with appointments to a wide variety of support vessels. Including Anchor Handling, Mooring Installation, Supply Construction (marine civil and offshore), Dive Support and Survey vessels. During this period qualified as a Chartered Shipbroker and Nautical Surveyor. Have operated in: **FSU** (Russia, Kazakhstan, Turkmenistan, Azerbijan, Sakhalin). **W Africa**, (Nigeria,

Cameroon, Angola,Congo, Zaire) **N Sea**, (All sectors also W Shetland), **S America**, (Brazil) **Far East,** (Singapore, Indonesia, Thailand, Vietnam, Phillipines, India. **Middle East,** Saudi Arabia, Qatar, Egypt, Libya, Tunisa, Malta.

## EMPLOYMENT HISTORY

### Oct 03 to present

Contracted as Principal Master Mariner to London Offshore Consultants, Houston, USA.

### May 02 to October 03

Contracted as Marine Manager for Global Maritime Inc Houston. Management of marine warranty surveyors, marine resources and consultants.

### March 01 to April 02

Focusing on own Marine Consulting, Surveying and Inspection Company, . Seconded to the Bechtel-Enka JV based in Bautino, Kazakhstan. Primarily as Fleet Operations, Safety and Start-up Manager for this new venture. The JV chartered in and owned fleet in excess of 20 vessels. The project (which is seasonal) is to develop man-made islands for the development and production of newly discovered (AgipKOC operations) NE Caspian fields offshore.
Followed on and continuing  with UKOOA vessel inspections, rig-moves and ISM project progression for UK and International clients.

Previous four months rig-move and audit projects Dec 01 - April 02 as Tow-master

Semi, Pride N Sea Kildrummy Field to Invergordon
Semi, Sedco 711 Lewis field 9/13a to 9/19BC Mobil Exxon
Semi, Noble Ton Van Langeveld, Invergordon to Tullich field, Kerr McGee
semi, Glomar Grand Banks, Beechnut to Blackhorse, A-Hess to Pan Canadian
semi, Sedco 704 Captain Field to Captain B template. Texaco.
semi, Sedco 711 Gannet to Lewis Field, Shell/Exxon-Mobil.
semi, Ocean Princess, Buchan infield, Talisman.

Auditor/Inspector/Marine Adviser

Anglian Duke, AHTS, Soton UK, UKOAA audit fit for purpose and purchase
Boss 300 , Construction Barge, Douala Cameroun. Audit fit for purpose and purchase.
Seacor Venture, AHTS, Luanda Angola, Audit fit for purpose, Ranger Oil.
Inspection of deepwater mooring jewellery (ex Schehalion) Maersk Assister.
ERRV proving trials, Shell Shearwater field N Sea
Consultant to 'SILT UK' harbour dredging and pipeline trenching company.
Chevron, Escravos

### Sept 00 to February 01

Short term appointment as Marine Master for Global Marine Drilling Co. Duties include overseeing and advising deck operations, rig-moving, stability and general logistics. Some instructions and training to Russian speaking personnel.

### July 00

Refresher course in Russian language at the University of Westminster, London.

### Jan 96 to June 00

Appointed as Marine Operations Manager (Also Acting Technical Director since December 97) for the Cheleken Joint Venture (a subsidiary of Emirates National Oil Co) based in Cheleken, Turkmenistan. The company operate and produce the Lam and Zadanov offshore oil and gas fields Caspian Sea. Duties include but were not limited to overseeing and managing all aspects of the company's logistics and marine support. Marine management (14 vessels) and offshore operations, freight forwarding, travel, warehouse and camp supervision (110 expatriate personnel, 900 local personnel ).

### Jan 95 to Dec 95

Appointed as Marine Superintendent and Marine Offshore Co-ordinator for the newly emergent Larmag-Cheleken joint venture operating offshore Turkmenistan.
Day to day control of all marine assets, fleet personnel (350 ) plus all vessels (at the time 23 units). Co-ordinating between Marine, Drilling, Workover and Construction departments.

### Dec 93 to Jan 95

Marine Superintendent/Project cargo Co-ordinator for Seaport Shipping of Bristol UK. Overseeing and controling the movement of project cargoes from manufacturer to sites (world-wide).

### March 93 to Dec 93

Appointed as a Marine Surveyor for SGS Saudi Arabia. Evaluating accepting appointments. Surveys included: hold status, draft, off/on hire, bunker, cargo damage, vessel damage, cargo condition.

### April 91 to Jan 93

Engaged as a Senior Deck Instructor at The National Sea Training College, Gravesend UK. Instructing /teaching, RT operations, computer literacy, sea survival, chart-work, navigation, and general ship knowledge.

### April 88 to April 91

Appointed as Master for Swire Pacific, Hong Kong. Based in the Far East. Anchor handling, towing, survey and dive support. Some supervising of barge load-out to offshore locations was also undertaken.

**April 77 to April 88**

After one year as Chief Officer promoted to master for Zapata Marine Service (now Tidewater), graduated from dive support, straight supply and construction to the fleet's larger and more powerful AHTS vessels, served on a world-wide basis in most of the offshore operating areas. North Africa, Middle East, East Coast South America, North sea, West Africa, Mediterranean, Indian sub-continent and Far East

# EXHIBIT "G"

Energy Zapoteca recommendations and notes prior to sail away.

Tuxpan location

1). Ensure that the continuous 24hr fire and security watch is maintained and that the unit can be lowered into water at short notice.
2). Ensure that the fire pump suction is immersed at all times and the pump(s) are immedietly available at all times.
3). Ensure regular scour surveys are carried out. If unit is still on current location mid November 03 then scour survey to be carried and report furnished.

Set down site (P Isabel, Texas)

1). Obtain Corp of Engineers last survey.
2). Obtain soil and probable penetration data from 'Fugro' or like.
3). Carry out sidescan sonar and magnetometer survey of proposed site. Divers survey optional.

Required copies (not definitive list)

1). Original operations manual.
2). Stability incline test.
3). Stability calculations.
4). Dynamic stability (accelerations) calculations for expected floating conditions.
5). Record of last dive scour/debris survey.

Tow plan

1). Ocean tug to be approved.
2). Nominated departure and arrival assist tugs to be appraised.
3). Manning and monitoring of unit whilst on passage to be reviewed.
4). Passage plan to be drawn up and approved.

1). All tank lids and space entry covers to be relocated, identified (suggest paint on ID ) and bolted closed. Gaskets to be cleaned /replaced where necessary to ensure water tight integrity.
2). All water tight doors including those down below to have the rubber seals replaced where missing, cleaned of paint where covered.
3). All water tight doors to have dogs free and operating. Doors to be checked for closure and any dogs missing should be replaced replaced.
4). Chain tow bridle legs to be connected directly by shackle to tow chocks. A second shackle should be used as no expanded link is in place. Links that have studs removed (burnt out ) are not acceptable.

ZEI 0362
GRAY  ZEI 0320
PHILLIPS

5). Emergency tow pendant should be connected separately to barge strong point, not into main tow bridle. Shackle should be at least 55t not 35t that is currently in place.

6). Tri-plate lead shackle (plate to tow pendant) should be 75-90t (dependent on tow vessel BP) not 55t that is currently in place.

7). A verifiable stability condition should be calculated for tow departure.

8). All loose pipe and materials should be securely sea fastened.

9). Loose mud pit agitators currently laying in pits should be removed or sea fastened.

10). Sea fastening clips on all deck containers should be reviewed and in most cases 'beefed up'.

11). Draft marks should be visible on bow/stern locations.

12). All manifold and below deck pipe open ends (especially ends created by machinery removal) should be blanked off and any associated valves checked to be in closed position.

13). Slop tank lid in engine room to be replaced and bolted down.

14).Temporary access on main deck (2) to potable water tanks to be sealed either by welded plate or bolted lid.

15). Main deck drain sumps (numerous locations) to be plugged if water tight integrity of system cannot be proved.

16). Appropriate LSA equipment to be provided for manned voyage assuming 8 riding crew. (recommend second 10 man inflatable raft to be installed port side in cradle plus hydrostatic release). Set of CG approved flares.

17). Communications requirements to be reviewed. (recommend minimum 1 VHF radio base station, one VHF portable hand set with charger and spare charged battery. One GSM telephone with associated charger and spare charged battery. GMDSS hand held unit (one each life raft) for area of operation to be onboard. EPIRB to be carried by unit.

18). Fire fighting equipment to be reviewed taking into account current condition and machinery on board.

19). All deck vents including goosenecks to be covered (wrapped) for duration of planned voyage.

20). Adequate lighting to be provided for deck and enclosed spaces.

21). The main deck generator fuel storage tank should have more adequate sea fastening.

22). Tow bridle recovery system should be installed before departure.

23). Maindeck generators should have more adequate sea fastening.

24). Services and utilities for temporary accommodation should be installed and tested.

25). Drain aways for toilets and wash facilities should be correctly terminated.

26). Adequate storage for fresh and frozen food should be provided.

27). Adequate supplies of potable water should be calculated taking into account number of riding crew and probable duration of voyage.

28). Emergency/salvage pump arrangements should be in place.

29). Navigation lights should be shielded appropriately for their type. At present side and stern lights are visible all round.

ZEI 0321
PHILLIPS

ZEI 0363
GRAY

30). Means to sound tanks (preload etc) should be in place.

31). The lower rail outside of the stern panama fairleads should be removed from directly behind the lead.

32). The generator fuel tank should be supported more adequately.

33). Operations and procedures being carried out should be as per the operations manual.

34). Operations and activities should always be within government, national and when applicable international regulations.

35.) Any residual or entrained water or fluids in tanks or systems should where possible be removed prior to sailing. A record of remaining fluids should be kept.

36). Riding crew members should be adequately trained and have skills/qualifications appropriate for the tasks envisaged.

37). Confirm missing jack motors (2 port leg, 1 stbd and 1 bow) do not compromise jacking ability.

38). Safety railings and foot gratings are missing on several locations. These should be replaced.

39). Damaged or missing tank access ladders should be replaced.

40). Save-all (pollution containment) for generators and fuel tank should be installed asap. Bunded area around edge of maindeck and leg wells should be replaced where removed.

41). Disposal of raw sewerage and wash water should be to an approved tank or container.

ZEI 0322
PHILLIPS

ZEI 0364
GRAY

# EXHIBIT "H"

```
 1                  IN THE UNITED STATES DISTRICT COURT
                        SOUTHERN DISTRICT OF TEXAS
 2                          BROWNSVILLE DIVISION

 3       _____
                                    )
 4       ZAPOTECA ENERGY, INC.      )
                                    )
 5                                  )  CIVIL ACTION NO.
         VS.                        )  B-04-048
 6                                  )
         CHARLES DOUGLAS PHILLIPS   )
 7       _____)

 8

 9                             HEARING ON TRO
                   BEFORE THE HONORABLE ANDREW S. HANEN
10                           MARCH 18, 2004

11       APPEARANCES:

12       For the Plaintiff:        Edwin K. Nelson, IV
                                   James E. Ross & Associates
13                                 3814 Sun Valley Drive
                                   Houston, Texas   77025

14       For the Defendant:        Mr. Keith N. Uhles
                                   Royston, Rayzor, Vickery & Williams
15                                 P.O. Box 3509
                                   Brownsville, Texas   78523-3509
16

17       Transcribed by:           BARBARA BARNARD
                                   Official Court Reporter
18                                 600 E. Harrison, Box 301
                                   Brownsville, Texas   78520
19                                 (956)548-2591

20

21

22

23

24

25
```

1    documentation, we are absolutely stymied.  We are having to

2    incur incredible costs daily.  That doesn't include opportunity

3    costs, and we need to get these documents so that we can move

4    forward.

5         THE COURT:  Who is currently on the rig?

6         MR. NELSON:  As of right now, we have gained access to

7    the rig.  But over the past week, the crew has been on the rig

8    denying us access under instructions from Charles Phillips, as

9    we understand it.

10        THE COURT:  Okay.  All right.  Mr. Uhles, let me hear

11   from you.

12        MR. UHLES:  Your Honor, first of all, there's one thing

13   I want to make sure -- there's two things I want to make sure I

14   bring up upfront.  One of them is the issue of admiralty

15   jurisdiction.  Quite frankly, Your Honor, I got hired yesterday

16   on this case, okay?  So I've had an opportunity to look at some

17   of the documents and to go through the petition, their request.

18   I've had a chance to talk to Captain Phillips.  I don't think

19   that the admiralty jurisdiction is an issue that we have to

20   resolve today, but I do want the court to know that just my

21   initial look at it is I don't see it.  So there may be an issue

22   of jurisdiction, but I would hope that -- I don't think that we

23   have incredibly differing interests in regard to these

24   documents, and I think that we can resolve this issue today.  I

25   would certainly hope we can.

1    I mean, I could have signed a TRO that would have lasted much

2    longer than the way I did it that lasted four days or five days,

3    but I figured let's get everybody in here and let's talk about

4    it, try to resolve it.

5        All right.  Anything else we can do today?

6            MR. NELSON:  I don't think so, Your Honor.  Thank you

7    very much for your time.

8            THE COURT:  All right.  We stand adjourned.

9            MR. UHLES:  Thank you.

10                                * * *

11        (End of requested transcript)

12                                -oOo-

13    I certify that the foregoing is a correct transcript from

14    the record of proceedings in the above matter.

15

16    Date:  March 26, 2004

17

18                        _Barbara Barnard_
                           Signature of Court Reporter
19                         Barbara Barnard

20

21

22

23

24

25