United States District Court
Southern District of Texas
FILED

FEB 1 1 2005

Michael N. Milby
Clerk of Court

IN THE UNITED STATES DISTRICT COURT
FOR THE SOUTHERN DISTRICT OF TEXAS
BROWNSVILLE DIVISION

ZAPOTECA ENERGY INC.,　　　　§
　　　　Plaintiff　　　　　　　　§
　　　　　　　　　　　　　　　　§
VS.　　　　　　　　　　　　　　§　　Civil Number B-04-048
　　　　　　　　　　　　　　　　§
CHARLES DOUGLAS PHILLIPS,　　§
　　　　Defendant　　　　　　　 §

## CAPTAIN PHILLIPS' BRIEF ON JURISDICTION AND REMEDIES

TO THE HONORABLE JUDGE OF SAID COURT:

COMES NOW the Defendant and Counter-Plaintiff, Charles Douglas Phillips ("Phillips" or "Captain Phillips"), and files this his Brief on Jurisdiction and Remedies and would show the Court as follows:

### I.

### BACKGROUND

On March 12, 2004, Plaintiff Zapoteca Energy Inc. ("Zapoteca") filed this proceeding against Captain Phillips, seeking a temporary restraining order and preliminary injunction. Alleging that its cause of action "centers around services of a master of a jack-up oil rig designed and built for offshore drilling," Zapoteca invoked this Court's Admiralty jurisdiction, as well as this Court's jurisdiction based on the parties' diversity of citizenship.[1]  The Application was accompanied by a Declaration executed by Zapoteca shareholder Christian Kongsli.  Mr. Kongsli declared that the rig was presently located in Tuxpan, Mexico and that Zapoteca was "presently engaged in daily business and in operations for the sailing of the rig Rig ENERGY ZAPOTECA from Tuxpan,

---

[1]　　Application for Temporary Restraining Order and Preliminary Injunction ¶3, March 12, 2004.

Mexico to Port Isabelle, Texas.[2]  The Declaration further referred to other operations necessary to sail the rig; referred to "the crew" of the Rig ENERGY ZAPOTECA and referred to Phillips as "the master" of the Rig.[3]  As a result of this suit, Zapoteca obtained an agreed order from this Court requiring Captain Phillips to return to Zapoteca the various vessel-related papers and property it was claiming.

In April 2004, Captain Phillips filed a counterclaim against Zapoteca as well as a motion for arrest and seizure of the vessel which Zapoteca had alleged was sailing for Port Isabelle in the Southern District of Texas.[4]  Captain Phillips also requested seizure of the vessel pursuant to Chapter 61 of the Texas Civil Practices & Remedies Code.

Following the filing of Captain Phillips' motion for arrest and seizure, and having obtained by injunction the vessel-related papers and property it was claiming, Zapoteca reversed itself and began to argue that this Court could not have admiralty jurisdiction over this case.[5]  The Court has requested briefing from the parties regarding its jurisdiction and the various remedies allowed by its jurisdiction and the conduct and allegations of the parties.

## II.

## DISCUSSION

Neither party questions whether this Court has jurisdiction in this case.  Zapoteca does not dispute the existence of this Court's diversity jurisdiction over the subject matter of this action; and

---

[2]    Declaration under Penalty of Perjury of Christian Kongsli, March 11, 2004.

[3]    *Id.*

[4]    Application for Temporary Restraining Order and Preliminary Injunction, March 12, 2004 ¶5.

[5]    Supplemental Response to Defendant's Motion for Arrest and Seizure of Vehicle ¶3.A.

Captain Phillips also agrees the Court has subject matter jurisdiction. Zapoteca likewise has conceded to the Court's *in personam* jurisdiction over Zapoteca. In addition to having diversity jurisdiction, this Court also has Admiralty jurisdiction because this case involves, among various claims, compensation due to Captain Phillips while he was working as the master of the rig Rig ENERGY ZAPOTECA and thus involves a maritime contract.[6] Thus, the Court has diversity <u>and</u> Admiralty jurisdiction to hear and resolve the various issues in this case.

**A.    This Court's Diversity Jurisdiction Empowers It to Attach the Vessel Pursuant to Chapter 61 of the Texas Civil Practice & Remedies Code.**

Zapoteca does not contest the existence of this Court's diversity jurisdiction in this case.[7] Thus, regardless of whether Admiralty jurisdiction exists, this Court has jurisdiction to proceed with this case and to use whatever state law remedies exist for the attachment of Zapoteca's Rig. FED.R.CIV.P. 64 expressly recognizes the powers of this Court to invoke state law remedies for seizure of property. Rule 64 reads in part as follows:

**Rule 64. Seizure of Person or Property.**

At the commencement and during the course of an action, all remedies providing for seizure of person or property for the purpose of securing satisfaction of the judgment ultimately to be entered in the action are available under the circumstances and in the manner provided by the law of the state in which the district court is held, existing at the time the remedy is sought, subject to the following qualifications: (1) any existing statute of the United States governs to the extent to which it is applicable; (2) the action of which any of the foregoing remedies is used shall be commenced and prosecuted or, if removed from state court, shall be prosecuted pursuant to these rules.

Thus, this Court has the power to employ remedies allowed by Texas law for the seizure of

---

[6]    The case also involves the seamen's wage claims of the intervenors, the Mexican crewmembers, so the Court has Admiralty jurisdiction as to their maritime contracts, too.

[7]    Application for Temporary Injunction ¶3.

Zapoteca's property.

Chapter 61 of the Texas Civil Practice & Remedies Code allows for the pre-trial attachment of property in cases such as this one. Section 61.001 requires the plaintiff to show: (1) the defendant is justly indebted to the plaintiff; (2) the attachment is not sought for the purpose of injury or harassing defendant; and (3) the plaintiff will probably lose his debt unless the writ of attachment is issued. In addition to these requirements, §61.002 sets out specific grounds for the writ of attachment. If a plaintiff can show <u>any one</u> of these grounds, in addition to the grounds set out in §61.001, he is entitled to obtain a writ of attachment. These grounds make attachment available if: (1) the defendant is a foreign corporation [§61.002(1)]; (2) the defendant is about to move from the state permanently and has refused to pay or secure the debt [§61.002(2)]; (3) the defendant is about to remove his property from this state without leaving an amount sufficient to pay his debts [§61.002(5)]; or (4) the defendant is about to convert all or part of his property into money for the purpose of placing it beyond the reach of his creditors.

This Court can and should issue a writ of attachment in this case because Captain Phillips has satisfied all of the §61.001 general grounds, as well as the above-named specific grounds set out in §61.002. Captain Phillips' affidavit sets out in details Zapoteca's debt to Captain Phillips.[8] In addition, Captain Phillips has submitted a detailed calculation of his damages in this case.[9] Captain Phillips has further established by affidavit that he will probably lose his debt unless a writ of

---

[8]    Affidavit of Charles Douglas Phillips ¶¶13 and 14. This Affidavit was attached to Captain Phillips' Brief in Support of his Motion for Arrest and Seizure of the Vessel. A copy of the Affidavit is attached hereto for the Court's convenience, attached as Exhibit A.

[9]    Charles Douglas Phillips' calculation of damages, attached as Exhibit C to Captain Phillips' Brief in Support of his Motion for Arrest and Seizure of the Vessel. A copy of this calculation is also attached hereto for the Court's convenience, attached as Exhibit B.

attachment is issued[10] and that this attachment is not being sought for the purpose of injuring or harassing Zapoteca.[11]

In addition to these general grounds, Captain Phillips has established and it is undisputed that Zapoteca is a foreign corporation.[12] He has established that the Rig is capable of being moved from Texas waters (which likely is self-evident, since it was moved <u>into</u> Texas waters after the case was filed).[13] Zapoteca itself has admitted that it desires to move the Rig so that it can sell it.[14] Thus, this case involves a defendant who is a foreign corporation and who desires to remove from Texas its sole asset. If this occurs, Captain Phillips will have no way of collecting the wages and other damages Zapoteca owes to him. To this point, Zapoteca's only objection to the application of Chapter 61 has been that Captain Phillips has not yet posted a bond. However, §61.023(a)(3) requires the bond to be executed in an amount fixed by the judge, and the Court has not yet fixed such an amount. Captain Phillips remains ready to post a bond as provided in the statute, if and when the Court determines that such is appropriate and sets the amount.

Therefore, as a result of this Court's undisputed diversity jurisdiction in this case, it has the authority, pursuant to FED.R.CIV.P. Rule 64 and Chapter 61 of the Texas Civil Practice & Remedies Code, to issue a writ of attachment for the rig Rig ENERGY ZAPOTECA.

---

[10]    May 14, 2004 Affidavit of Charles Phillips ¶¶18-21.

[11]    August 10, 2004, Affidavit of Charles Phillips, ¶17; also, ¶5 February 8, 2005 Affidavit of Charles Phillips, copy attached as Exhibit C.

[12]    May 14, 2004 Affidavit of Charles Phillips ¶17.

[13]    May 14, 2004 Affidavit of Charles Phillips ¶¶20 and 21.

[14]    Zapoteca's Motion for Rehearing On Court Order dated July 8, 2004, filed November 4, 2004; see also Zapoteca's Motion to Modify the Court's Order, filed February 2, 2005.

**B.    This Case is Subject to This Court's Admiralty Jurisdiction.**

In addition to diversity jurisdiction, this Court also has Admiralty jurisdiction over this case.

As recognized by Zapoteca in its application for a temporary restraining order:

> This is an admiralty cause of action within the meaning of Rule 9(h) of the Federal Rules of Civil Procedure as this matter centers around services of a master of a jack-up oil rig designed and built for offshore drilling.[15]

Zapoteca's invocation of Admiralty jurisdiction is consistent with the well-established principle that federal courts have Admiralty jurisdiction over maritime contracts.  As Zapoteca's representative, Christian Kongsli, declared under penalty of perjury, Captain Phillips worked for Zapoteca as the "master of the Rig ENERGY ZAPOTECA at the time it was engaged in daily business and in operations for the sailing of the rig from Tuxpan, Mexico to Port Isabelle, Texas."[16]  Captain Phillips' counterclaim against Zapoteca arises from its agreement to employ him as master of the Rig ENERGY ZAPOTECA.  Since the case arises from a maritime contract, and from the services of the master of a rig (i.e. a vessel), it is subject to this Court's Admiralty jurisdiction, and the Court should exercise that jurisdiction over that maritime cotract.

**1.    The Court Already Exercised its Admiralty Jurisdiction as to the Vessel-Related Documents and Property.**

The Court will recall that when Zapoteca first filed its TRO and Injunction on March 12, 2004, and pursued its claims through March 18, 2004, Zapoteca's basis for demanding the vessel-related documents, records, equipment, etc. it contended was in the hands of Captain Phillips (or the vessel's crew) was because those requested items "related to the business of Zapoteca and Rig

---

[15]    Application for Temporary Restraining Order and Preliminary Injunction ¶3.

[16]    Declaration Under Penalty of Perjury of Christian Kongsli, dated March 11, 2004.  This Declaration was attached to Zapoteca's Application for a Temporary Restraining Order.  For the Court's convenience, an additional copy is attached hereto as Exhibit D.

ENERGY ZAPOTECA and that all such records, documentation and equipment is an absolute necessity and requirement for Zapoteca and the Rig ENERGY ZAPOTECA to continue to conduct daily business operations" (See Application for TRO, ¶¶ 7, 8 and 13) and that Captain Phillips' failure to turn over such items promptly "has materially hindered Zapoteca's daily business and efforts to sail the Rig ENERGY ZAPOTECA from Tuxpan, Mexico, to Port Isabelle, Texas." (See TRO, ¶¶ 10 and 11)

As a consequence of such allegations, and as supported by Christian Kongsli's Declaration under Penalty of Perjury (dated March 11, 2004), the Court exercised the jurisdiction and authority Zapoteca asserted it had (including its Admiralty jurisdiction) and ordered Captain Phillips to turn over the records, documents, equipment, etc. (See Order of March 18, 2004; Note that the last page of that Order directs Captain Phillips to direct the Rig's "current and former crew members" to turn over various equipment, computers, tools and supplies related to or concerning "the Rig."

Zapoteca's request, and the Court's Order, therefore directs Captain Phillips personally and as the vessel's master to order her crew to turn over "equipment, computers, tools and supplies" related to the Rig. That Order in effect directs Captain Phillips and the Rig's crew to turn over items which are considered "appurtenances" of the vessel ENERGY ZAPOTECA, and Captain Phillips, pursuant to that Order, turned over such items and "appurtences.".[17] A vessel's "appurtenances" includes equipment, tools and supplies found aboard or used by her.[18] Hence, the Court already has exercised its Admiralty jurisdiction by ordering the vessel's master (and her crew) to turn over the

---

[17]  See ¶ 1 of Affidavit of Captain Phillips, dated February 8, 2005, copy attached as Exhibit E.

[18]  Note also that the definition of "vessel" in the MOA/Purchase Order Purchase Agreement between Zapoteca and Nabors has a broad definition of what is included in the definition of the "vessel," and specifically includes the same types of items addressed here.

-7-

specified items, which includes "equipment, computers, tools and supplies. . . of the Rig," all of which Zapoteca contends to be "an absolute necessity and requirement" for the Rig to continue to conduct daily business operations, including her reported by Zapoteca to be upcoming (and allegedly delayed) voyage from Tuxpan to Port Isabelle.

Captain Phillips did not contest and does not challenge that the Court's exercise of its Admiralty jurisdiction (and specifically the Court's *in rem* jurisdiction, by ordering Captain Phillips to turn-over the vessel-related properties Zapoteca sought, and record, in its TRO.) in ordering him (and the crew) to turn over these items, which certainly fall within the definition of appurtenances of a vessel and thus within the Court's Admiralty *in rem* jurisdiction.  But once the Court has exercised its Admiralty jurisdiction and ordered certain parties to do certain things under that jurisdiction, it should not then decide that the case, once in Admiralty (including *in rem* jurisdiction), is no longer within that jurisdiction, since the jurisdiction originally existing continues throughout the development of the case thereafter.  See *Smith v. Humble Oil & Refining Co.*, 425 F.2d 1287, 1287 (5th Cir. 1970) (holding that once a court assumes jurisdiction of an *in rem* proceeding, it maintains that jurisdiction to the exclusion of any other court).

## 2.    The Rig ENERGY ZAPOTECA Was a Vessel in Navigation.

Despite its original claim that this case was subject to the Court's Admiralty jurisdiction, Zapoteca now contends just the opposite.  Specifically, Zapoteca argues that the rig Rig ENERGY ZAPOTECA has "never" during the relevant time period been a vessel in navigation and that this Court now does <u>not</u> have Admiralty jurisdiction.[19]   Recall that the controlling test of whether a

---

[19]       However, Zapoteca admitted, in response to the Court's Questions during the December 14, 2004, status conference that, before the Humble fire in 1989, the Rig "absolute" was a vessel: "It was a vessel." (See transcript of December 14, 2004, status conference, p. 15, attached as Exhibit F) In the context of that discussion, to

vessel such as the one at issue is: (1) in navigation is evidence of an intent to put the vessel to sea; and (2) evidence that the vessel is being repaired for the voyage. "A ship is considered in navigation when there is an intention to put out to sea and is being repaired for the voyage." See *First Bank and Trust v. Knachel*, 999 F.2d 107 (5th Cir. 1993), citing *New England Fish Co. v. Barge Sonya*, 332 F.Supp. 463 (D.C. Alaska 1971). In the *First Bank and Trust* case, the Fifth Circuit considered whether the vessel under discussion, the M/V FOUR X, which at that time was a vessel being repaired for a voyage, was actually capable of navigation during the relevant time period or had been sufficiently "removed" from service to have lost her vessel in navigation status. Although the vessel in that case was undergoing extensive repairs and had been laid up for a substantial period of time, the Fifth Circuit concluded that <u>since it was the intention of the owners to put the vessel to sea and that she was being repaired for that anticipated voyage</u>, the vessel was held to be "in navigation" during the relevant time period, which was even before the vessel in fact went to sea.

The same standard should be applied here. If it is, it is evident (and there are numerous documents which support) that it was the intention of the ENERGY ZAPOTECA's owners to "send her to sea," which is to say to move the Rig from her then current berth in the Pantepec River to one of various destinations being considered at various times (depending on which contract of sale was being considered at the moment), and with such destinations being: Brownsville, Texas; Freeport, Texas; Galveston, Texas; Europe; West Africa; etc. In addition, it is evident (and should be

---

have been "absolutely" a vessel at that time would have meant that the Rig also was a vessel "in navigation," and Zapoteca would not concede that since the vessel was operating in navigable waters before that 1989 fire. Accordingly, the question relevant here is whether, afterward, what is agreed to have been a "vessel in navigation" has been sufficiently "withdrawn" in commerce that her "in navigation" status has been lost, and not reestablished thereafter. Once a vessel is "in navigation," the presumption that she remains so and the burden is on the owner to assert that she was "withdrawn from navigation" to such an extent that her vessel status has been lost. Zapoteca cannot meet that test here especially since she navigated during her voyage from Mexico to Texas in April 2004.

undisputed, given the extent of documents supporting it) that the Rig was or is being repaired in anticipation of the voyage. Even Zapoteca would have to concede that during the relevant time period the Rig was being repaired and refurbished so she would be capable of going on her voyage as soon as the owner determined the destination.

Given the extent of the legal claims asserted against the Rig in Mexico, it is important to recognize that the test of "vessel in navigation" status is not based on whether there are legal impediments which preclude a vessel from being able to depart and proceed on her voyage. The test is whether a vessel physically is capable of going on a voyage. During the relevant time period, there was nothing which physically prevented the Rig from pursuing a voyage. The impediments were that the owners had not determined earlier where she would go and could not get her maritime attachments sufficiently cleared that the Mexican Courts and port authorities would permit the vessel to move. Those conditions are dramatically different than whether a vessel is capable of moving. For example, comparing the instant facts with most of the classic "withdrawn from navigation" cases reveals that this vessel (unlike those withdrawn vessels): (1) was and continued to be in navigable waters; (2) had never been removed from navigable waters; (3) had never been placed on the land, dry dock or marine railway; (4) did not have a coffer dam or other permanent securing device holding her permanently in place (and in fact there were no such devices attached to this Rig), etc. In addition, this Rig never had and never was designed to have its own propulsion system or means on sailing on her own power, so the absence of such engines, etc. are irrelevant to the analysis. In fact, she has reasonably been described as a "barge," since barges do not have their own mode of power and, and as a general rule, also do not have living quarters, life-saving equipment, etc. No one would argue however that the so-called "dumb barges" are not vessels in navigation, even when

-10-

they are being repaired, as long as they are not physically removed from the waterway and placed aboard land, such that it is physically impossible for them to move in water, especially when that barge's owners intend to send her on the upcoming voyage and the repairs being undertaken are performed so that she can proceed with that voyage. That same analysis applies here.

A review of the relevant evidence here establishes that the Rig was a vessel in navigation during the relevant time period:

1.    Throughout the relevant time period (which generally is the calendar year 2003 and the period January - April of 2004), the Rig had and maintained current navigation certificates, which were consistently renewed and remained in effect, by the navigational authorities in Panama, which is the maritime state where the vessel was "flagged" and whose maritime authority issues and controls the existence of various certificates, including the vessel's navigation certificate (See Documents Regarding Vessel Status, Nos: 3, 13, 14, 18, 23, and 49);

2.    The Vessel remained in or on the navigable waterways throughout the relevant time period (either in the Pantepec River in Tuxpan, Mexico, the Gulf of Mexico, or the Sabine River in Texas);

3.    The Vessel was in a "jacked-up" or "jacked-down" position on the navigable waterways beneath her ("jacked-up" while moored in the river in Tuxpan and in Sabine; "jacked-down" during her voyage from Tuxpan, Mexico to Sabine, Texas) and the Fifth Circuit law is clear that a "jacked-up" rig is a vessel in navigation, regardless of whether in the "jacked-up"or "jacked-down" position. See *Clary v. Ocean Drilling & Exploration co.*, 429 F. Supp. 905 (W.D. LA. 1997), affirmed 609 F.2d 1120 (5th Cir. 1998) (See Documents Regarding Vessel Status, No. 11);

4.    The Rig's owners were preparing the Vessel for her voyage from Tuxpan to Texas during much of the relevant time period, which culminated in the voyage of the Rig from Tuxpan, Mexico to Sabine Pass, Texas in April 2004 (See Documents Regarding Vessel Status, Nos: 7, 11, 20, 22, 24, 26, 30, 32, 33, 37, 40, 41, 45, 53, 57, 70 and 72);

5.    The Rig had a master and crew throughout the relevant time period, at least until March 9 and 10, 2004, when Zapoteca summarily fired them, which firing (and non-payment of crew's wages) form a portion of their claims in this case and which constitute breach of a maritime contract (See Documents Regarding Vessel Status, Nos. 38, 41, 46, 48, 51, 52, 53, 57, 59, 60, 71, 74 and 81);

-11-

6.   The Rig maintained typical marine insurance coverages (hull, protection and indemnity, tower's liability, marine pollution/certificates of financial responsibility, etc.) that routinely apply to vessels in navigation, and her legal representation is addressed in part by her P&I club/liability insurers, as is customary for vessels in navigation (as opposed to those which are actually withdrawn from navigation) (See Documents Regarding Vessel Status, Nos. 10 and 24);

7.   The Rig maintained lights, stability certificates, vessel surveys, life-saving equipment, living accommodations, generators, etc. as are typical of vessels in navigation, during at least a portion of the relevant time period, and certainly preceding and during her voyage from Mexico to Texas (See Documents Regarding Vessel Status, Nos. 32, 62 and 63);

8.   Zapoteca issued numerous letters and representations, as did its agents (including the Rig's ship's agents in Mexico and in Brownsville) referring to the Rig as a "Vessel" and her crew compliment as "master" or "crew" (including representations to governmental officials in Mexico and the U.S. Consulate in Matamoros, Mexico and Mexico City, Mexco) (See Documents Regarding Vessel Status, Nos: 18, 20, 25, 26, 33, 40, 41, 43, 45, 57, 60, 66, 74, 78, 81, 89 and 91);

9.   The U.S. government and the U.S. Coast Guard consider her a vessel in navigation, and have required a valid COFR (Certificate of Financial Responsibility) before she can enter U.S. waters, which certificate was issued and remains in effect today (See Documents Regarding Vessel Status, Nos. 34 and 95)

10.  There are various other evidences and indices that the Rig was capable of navigation and ready for sea which are not repeated here, but are incorporated by reference. (See for example pp. 7-9 of Plaintiff Steve Gray's response to Defendant Zapoteca's Motion for Final Summary Judgment, filed in the Eastern District of Texas, Beaumont Division, Cause No. 104-CV-512, a copy of which was attached as Petitioner's Exhibit "B" to Steve Gray's Motion to Appear Amicus Curiae, filed December 3, 2004, which Motion was granted by the Court on December 7, 2004; pp. 1-9 of Amicus Curiae Steve Gray's Response to Zapoteca's Motion for Summary Judgment, a copy of which is enclosed for the Court's convenience as Exhibit G)

**3.   Zapoteca is Estopped From Denying That the Rig ENERGY ZAPOTECA Is Not a Vessel in Navigation.**

Even if Zapoteca otherwise could establish that the Rig ENERGY ZAPOTECA was not a

vessel in navigation, it is estopped from doing so because it has invoked this Court's Admiralty

-12-

jurisdiction on the basis of its allegation that the Rig is and was subject to the Court's Admiralty jurisdiction. Specifically, in its Application for Temporary Restraining Order and Preliminary Injunction, Zapoteca alleged that this was an Admiralty cause of action because it centered around the services of a master of a jack-up oil Rig which was designed and built for offshore drilling.[20] Zapoteca further alleged that the Rig ENERGY ZAPOTECA was engaged in operations for the sailing of the rig from Tuxpan, Mexico to Port Isabelle, Texas.[21] In support of its Application for Temporary Restraining Order and Preliminary Injunction, Zapoteca attached a Declaration Under Penalty of Perjury executed by one of its shareholders, Christian Kongsli. Mr. Kongsli declared under oath that the Rig was "presently engaged in daily business and in operations for the sailing of the Rig ENERGY ZAPOTECA from Tuxpan, Mexico to Port Isabelle, Texas."[22] Mr. Kongsli further <u>declared that Phillips was the master of the Rig</u> and that he had failed to take necessary steps required for sailing the Rig, which included preparing and providing ballasting procedures and <u>moving the Rig</u> from its present location in Tuxpan to other docks in Tuxpan.[23] Additionally, Mr.Kongsli declared that the Rig ENERGY ZAPOTECA <u>had a crew</u> and that Captain Phillips was hindering Zapoteca's <u>efforts to sail</u> the Rig to Texas.

Thus, Zapoteca has sworn under oath that the Rig ENERGY ZAPOTECA had a master and a crew and was engaged in operations in preparation for sailing. Zapoteca's sworn statement that the Rig ENERGY ZAPOTECA had a master and a crew constitutes a sworn statement that the Rig

---

[20]    Application for Temporary Restraining Order and Preliminary Injunction ¶3.

[21]    *Id.* at ¶5.

[22]    Declaration Under Penalty of Perjury of Christian Kongsli, dated March 11, 2004.

[23]    *Id.*

was a vessel because only a vessel can have a master and a crew. Likewise, its statements that it was engaged in operations for the sailing of the Rig indicate that Zapoteca had <u>immediate plans for sailing the Rig</u> from Mexico to Brownsville, Texas. These statements indicate the vessel in fact was in navigation in March of 2004.

In *New Hampshire v. Maine*, 532 U.S. 742, 749 (2001), the United States Supreme Court recognized the principle of judicial estoppel and defined it as follows:

> Where a party assumes a certain position in a legal proceeding, and succeeds in maintaining that position, he may not thereafter, simply because his interests have changed, assume a contrary position, especially if it be to the prejudice of the party who has acquiesced in the position formerly taken by him. (case citation omitted). This rule, generally known as judicial estoppel "generally prevents a party from prevailing in one phase of the case on an argument and then relying on a contradictory argument to prevail in another phase."

*New Hampshire*, 532 U.S. at 749.

Federal courts have used these principles to estop parties from taking contrary positions in admiralty cases. In *In Re Double D Dredging*, 467 F.2d 468(5th Cir. 1972), the plaintiff's decedent drowned when he fell from a pontoon line while attempting to return from shore to a dredge owned by the appellees. The shipowner filed a sworn pleading in support of a shipowner's Limitation of Liability proceeding in which he swore that the waters in question were navigable waters and that the decedent was a seamen and crew member under the Jones Act. The plaintiff then filed a Jones Act claim against the vessel's owner, which was consolidated into in the Limitation proceeding. During the Jones Act trial, the shipowner changed its position, maintaining now that the decedent was <u>not</u> a Jones Act seamen and that the vessel was not on navigable waters. The Fifth Circuit reversed a judgment for the shipowner on a Jones Act claim, holding that <u>as a matter of law</u> the shipowner was estopped from disputing at the Jones Act trial whether or not the accident occurred

-14-

on navigable waters. The Fifth Circuit court stated:

> We hold as a matter of law the shipowner, as to the navigability issue, was estopped from raising that issue. It is unimportant whether this is because of the prior specific pleadings or the holding of navigability implicit in the court's denial of limitations on the merits rather than on the absence of admiralty jurisdiction.
>
> . . .
>
> The court's relaxation of the injunction at the claimant's request was likewise based upon the shipowner's contention, which the judge accepted, that the right to limit was solely for the admiralty. Without this, decedent's claims would have gone on in state as well as federal court. Shipowner's seeking the valuable protection of the Limitation of Liability Act, could not repudiate the basis on which the court in the now-consolidated proceeding was acting.

*Double D Dredging*, 467 F.2d at 469-70.

In this case, Zapoteca is acting as the shipowner acted in *Double D. Dredging*. Zapoteca invoked this Court's Admiralty jurisdiction on the basis that this case involved a jack-up oil rig busily preparing for the operation of sailing from Mexico to Texas. Having invoked this Court's Admiralty jurisdiction, and having obtained the relief it sought, Zapoteca should not now be allowed to change its position and argue that the Court does not have that same jurisdiction because the Rig suddenly is not a vessel in navigation.

Another district court reached a similar conclusion in *Gonzalez v. M/V DESTINY*, 2002 WL 31962167 (S.D.Fla. 2002). In that case, the plaintiff's decedent died from injuries sustained while working as a member of the crew of the vessel DESTINY. His representative filed a sworn verified complaint, alleging that the decedent was a seamen, and asserting a maritime lien on the vessel. Thereafter, in an amended motion for arrest, the plaintiff's decedent specifically relied on Mr. Alvarez's status as a seamen and argued that the DESTINY was a vessel in navigation at the time of the accident. In subsequent pleadings, the plaintiff continued her assertion that the decedent was

-15-

a Jones Act seamen and on that basis the court granted her a jury trial. Thereafter, the defendants filed a motion for partial summary judgment, seeking a limitation of relief to pecuniary damages as required by the Jones Act. Ms. Gonzalez responded by arguing for the first time that the decedent was not a seamen, but was a non-seafarer, entitled to full relief (i.e. greater damages) under the Florida Wrongful Death Act. The district court held that plaintiff's decedent was estopped from changing her position on the decedent's Jones Act status. *Id.* at 5.

Zapoteca is attempting the same tactic in this case. It has obtained the benefit of an order requiring the return of the vessel-related property it was claiming, based upon its assertion of this Court's Admiralty jurisdiction. Now, apparently fearful that the Court's exercise of the same jurisdiction will result in the arrest of the Rig, it has changed its position and now argues that this Court is without Admiralty jurisdiction because the Rig, (even though it has traveled from Mexico to Texas during the pendancy of the case) now is not a vessel in navigation. Having obtained the relief it sought by alleging that the vessel was in navigation during relevant time periods, Zapoteca should be estopped from now alleging that the Rig is or was not a vessel in navigation. Stated another way, the Court should not countenance Zapoteca's attempt to maintain completely inconsistent positions in order to: 1) obtain the relief it desires at one stage in these proceedings; and 2) avoid an attachment of its Rig at another stage of these proceedings. This Court should therefore hold that Zapoteca is estopped from asserting that the Rig ENERGY ZAPOTECA is not a vessel in navigation.

### 4.   This Court's Admiralty Jurisdiction Allows It to Attach the Rig ENERGY ZAPOTECA.

This Court's Admiralty jurisdiction gives it the power to exercise the attachment remedies

set forth in the Supplemental Rules for Certain Admiralty and Maritime Claims. Pursuant to this authority, Captain Phillips has moved for the Court to attach the Rig ENERGY ZAPOTECA. Zapoteca objects to an attachment on two grounds. First, it contends that attachment remedies can be employed only against parties who cannot be found within the district. Zapoteca contends that it can be found and that attachment is therefore inappropriate. Second, Zapoteca contends that this Court cannot attach the Rig because she presently is located outside the boundaries of the Southern District of Texas. Neither of these arguments preclude Admiralty attachment of the Rig in this case.[24]

### a.    Zapoteca Is Not "Found Within the District."

According to Supplemental Rule B, attachment can occur only "if a defendant is not found within the district." Zapoteca is a Liberian corporation who, at the time it filed suit, had no agents, representatives or offices in the state of Texas. It alleges that it could be found in the district based upon its activity in the Southern District before this suit was filed and based upon the fact that Zapoteca's counsel alleged that Zapoteca's lawyer could receive service of Captain Phillips' counterclaim.

Federal courts have recognized that an attachment serves two purposes. First, it secures the defendant's appearance; second, it assures satisfaction in case the plaintiff's suit is successful. *Swift & Co. Packers v. Compania Columbiana del Caribe S.A.*, 339 U.S. 684, 693 (1950); *Heidmar Inc. v. Ammonia Ravennate di Armamento Sp.A.*, 132 F.3d 264, 268 (5th Cir. 1989). In order to effectuate these purposes, the courts have held that a defendant is present in the district if: 1) the

---

[24]    Likewise, none of Zapoteca's arguments preclude attachment of the writ under state law. As shown above, Captain Phillips has satisfied the requirements for Chapter 61 of the Texas Civil Practice & Remedies Code. Attachment pursuant to Chapter 61 can take place outside of the Southern District of Texas.

defendant can be found within the district in terms of jurisdiction; and 2) the defendant can be found within the district for service of process. *Heidmar*, 132 F.3d at 268; *LaBanca v. Ostermunchner*, 664 F.2d 65, 67 (5th Cir. 1981).

Zapoteca argues that is satisfies the jurisdictional part of the test by pointing to its business activities in Texas before it filed this lawsuit. Zapoteca asserts that its affidavit outlines in detail actions it took within the Southern District of Texas between May of 2000 and March of 2004, but hardly mentions anything after that date.[25] The only business activity which Zapoteca cites as occurring at the time suit was filed (on March 12, 2004) was the activity of Captain Phillips, which Zapoteca alleges occurred through March of 2004.[26] However, Zapoteca cannot rely on Captain Phillips' activity within Texas at the time suit was filed because Zapoteca fired Captain Phillips on March 10, 2004, two days before it filed this suit. Therefore, as of March 12, 2004, when this suit was filed, Zapoteca had no business presence in the Southern District of Texas and no property within the Southern District which could be attached as a means of satisfying any judgment against it. Indeed, despite its representation to this Court that the Rig ENERGY ZAPOTECA was on its way to Port Isabelle, Zapoteca diverted the Rig away from the Southern District and sailed it to a port in Sabine Pass, Texas. Thus, while the Defendants may be able to show that they had sufficient contacts with Texas at the time of the events giving rise to this litigation to constitute "minimum contacts" for purposes of subject matter jurisdiction, it had no presence in Texas at the time it filed

---

[25]     Affidavit of Eric Ostbye ¶¶21-33, dated February 27, 2004. Interestingly, the affidavit states that it was executed on February 27, 2004, but Mr. Ostbye is swearing to the occurrence of events in March and April of 2004.

[26]     Zapoteca also mentions that it retained and paid Dix Shipping in Brownsville "to act as agents for the Rig ENERGY ZAPOTECA" through April 2004. However, Zapoteca does not provide any information as to whether Dix actually acted as its agent in Brownsville or did anything on behalf of Zapoteca.

suit, much less on April 21, 2004, the date Captain Phillips initiated his counterclaim. Thus, Zapoteca could not be "found within the District" on March 12 or April 21, 2004.

Zapoteca also cannot show that it had an agent for service of process in the Southern District at the time it filed suit. Zapoteca argues that its attorney was its agent for service of process by virtue of the fact that Phillips alleged in his counterclaim (and Zapoteca conceded) that a copy of the counterclaim could be served on Zapoteca's attorney in Houston. Zapoteca's argument is incorrect because service of a counterclaim on a litigant's attorney is <u>not</u> the same as service of process under Rule 4.

Under Rule 4, which controls service of process, a complaint must be served with a clerk-issued summons by a U.S. marshal or any other person who is not a party and is at least eighteen years of age. FED.R.CIV.P. 4(a)-(c). Service on corporations can be obtained only by serving officers, managing or general agents of the corporation or other persons designated under state law. FED.R.CIV.P. 4(h)(1), (e)(1). Rule 4 likewise requires service of process to occur within one hundred and twenty days of the filing of the complaint. FED.R.CIV.P. Rule 4(m).

Captain Phillips did not serve Mr. Nelson with process as defined by FED.R.CIV.P. 4, nor did he plead that Nelson was Zapoteca's agent for service of process. Instead, Captain Phillips alleged that Zapoteca was already a party to this suit, and thus could be served by serving a copy of the pleading on its attorney.[27] This was not service of process under Rule 4, but service of a pleading under Rule 5, which allows pleadings to be served by serving the party's counsel. FED.R.CIV.P. 5(a)-(b). Thus, the fact that Zapoteca's attorney received a copy of the counterclaim does not make him an agent for service of process for purposes of Zapoteca being found in the Southern District

---

[27]    Plaintiff's Original and First Amended Counterclaim ¶1.02.

of Texas. Consequently, Zapoteca is not "found within the District," as required by Rule 4(h).

Consistent with this approach, courts historically have been hesitant to recognize attempts by vessel owners to designate "agents" for service in order to avoid attachment remedies, as Zapoteca is attempting here. The district court in Puerto Rico cogently stated the reason for this hesitance in *Navieros inter Americanos S.A. Inc. v. M/V VASILIA EXPRESS*, 930 F.Supp. 699, 707 (D.P.R. 1996) *aff'd in part, rev'd in part on other grounds,* 120 F.3d 304 (1st Cir. 1997). In *Navieros*, the defendant argued (just as Zapoteca is here) that the appointment of its trial counsel as agent for service of process precluded the use of an attachment remedy against it. The district court vehemently rejected this argument, holding:

> On this second prong of the test, the precise question is whether an officer, a managing or general agent, or other responsible representative of defendant could have been found in the district by the marshal for service of process on Vasilia Inc. This court finds that the short answer to the question is no. Vasilia Inc. has no corporate officer present in this district. The corporation has no management presence here. Trans-Caribbean Maritime Corp., as intervening plaintiff and the ship's port agent, cannot be unilaterally appointed by Vasilia Inc. and be assigned the responsibilities of a general agency or other managerial or official corporate presence after the litigation was instituted, for the sole purpose of defeating the otherwise traditional remedy of maritime attachment under Rule B. The same applies for the post-litigation appointment of counsel for defendants as an agent for service of process. While such appointment facilitates litigation and empowers counsel to waive required notices or service, it cannot be said to impede a Rule B attachment over a foreign defendant with no formal corporate or official presence in this district. If Vasilia Inc.'s maneuver of appointing agents for service of process after litigation has commenced has the intended effect of defeating Rule B remedies, then the maneuver has the unacceptable effect of defeating a traditional maritime remedy available not only in the United States of America but on almost all other maritime jurisdictions in the world to effectively deal with the problem of fixing responsibility against foreign ship owners with no presence at the place where the attachment is made. Endorsing Vasilia Inc.'s theory is tantamount to granting a foreign defendant the power to effectively repeal the use of Rule B by simply resorting to the mechanism of appointing an adverse party or trial counsel as agent for purposes of service of process.

*Navieros,* 930 F.Supp. at 707.

Thus, the court in *Navieros* recognized that defendants should not be able to impede maritime attachment remedies by selectively appointing or claiming agents for service of process.

By claiming Nelson as its agent for service of process, Zapoteca is simply seeking to avoid attachment of its only asset which can satisfy a judgment in favor of Captain Phillips or the Mexican crewmembers. Zapoteca should not be allowed to impede an Admiralty attachment by claiming, after suit was filed, that its attorney also was its agent for service of process. Ruling for Zapoteca on this question would have the effect of allowing a defendant, which has no assets, offices or employees in the Southern District of Texas, to avoid attachment on the grounds that it nevertheless can create a fictitious basis to be found within the district. Allowing a defendant to avoid attachment under these circumstances would negate one of the main purposes of attachment, which is to assure satisfaction for the plaintiff in case his suit was successful. *Heidmar*, 132 F.2d at 368.

Zapoteca had no jurisdictional presence in the Southern District of Texas, either when it filed its suit on March 12, 2004, or when Captain Phillips filed his counterclaim on April 21, 2004. Similarly, Zapoteca had no agent for service of process during any of these times. For these reasons, the Court should reject Zapoteca's argument that it could be found within the district at the time this suit was filed.

**b.      This Court Can Attach the Rig ENERGY ZAPOTECA Even Though It Is Not Within the Boundaries of the Southern District.**

Zapoteca's final objection to attachment is that this Court lacks the authority to attach the Rig ENERGY ZAPOTECA because it is now located in the navigable waters of the Eastern District of Texas, rather than the Southern District. While in a typical case writs of maritime attachment may only be served within the district, Zapoteca has waived its right to complain of the location of the

Rig by filing this case in this Court and invoking the Court's jurisdiction over Zapoteca and the Rig. Specifically, Zapoteca represented to this Court that the Rig was <u>preparing to sail from Tuxpan, Mexico to Port Isabelle, Texas</u> and that Captain Phillips' conduct purportedly was preventing that voyage from taking place.[28] Zapoteca invoked this Court's Admiralty jurisdiction in an attempt to compel Captain Phillips to return the vessel-related property that Zapoteca was claiming, so that it could continue its business operations <u>and commence its voyage</u> from Tuxpan, Mexico to Port Isabelle, Texas. Thus, Zapoteca invoked this Court's Admiralty jurisdiction <u>in order to be able to sail</u> the Rig ENERGY ZAPOTECA from Mexico <u>to Port Isabelle</u>. Zapoteca's filing of this suit acts as a waiver of its objection to maritime attachment on the grounds that the Rig is not located within the Southern District of Texas.

The Fifth Circuit recognized that a party could waive an argument that a *res* was not within the territorial jurisdiction of the court by voluntarily submitting or consenting to the submission of the *res* to the court's jurisdiction. In *Treasure Salvors Inc. v. Unidentified Wrecked and Abandoned Sailing Vessel*, 569 F.2d 330 (5th Cir. 1978), the plaintiffs filed suit in a Florida district court for possession and confirmation of title to an unidentified wrecked and abandoned vessel. *Treasure Salvors Inc.*, 569 F.2d at 333. The United States intervened in the case, agreed to the Court's Admiralty jurisdiction, answered, and counterclaimed, also asserting title to the vessel. *Id.* After the trial court ruled for the plaintiffs, the government contended on appeal that the court lacked *in rem* jurisdiction to determine the rights of the parties to that portion of the vessel which was situated beyond the territorial jurisdiction of the court. The Fifth Circuit court rejected this argument and held that the government waived its right to assert that the *res* must be with the territorial jurisdiction

---

[28]    Application for Temporary Restraining Order ¶¶5, 9, 10, and 11.

of the court. Specifically, the court stated:

> In this case, as in the three cases we have discussed, the court had *in personam* jurisdiction over the claimants, thus rendering the vessel's arrest non-essential to the resolution of the action. The United States intervened in plaintiff's *in rem* action as a party defendant and filed a counterclaim, asserting a property right in the *res*. The government, by intervening in this action and by stipulating to the court's admiralty jurisdiction, waived the usual requirement that the *res* be present within the territorial jurisdiction of the court and consented to the court's jurisdiction to determine its interests in the extraterritorial portion of the vessel.

*Treasure Salvors*, 569 F.2d at 335.

In reaching this conclusion, the Fifth Circuit court relied on three other cases, all of which held that the territorial location of the vessel is not essential to the court's subject matter jurisdiction and can be waived by a litigant's submission of their claim to the jurisdiction of an admiralty court. *Booth Steamship Co. v. Tug Dalzell No. 2*, 1966 A.M.C. 2615 (S.D.N.Y. 1966) (holding that a claimant who admitted the court's jurisdiction over the *res* has agreed that the vessel was within the court's *in rem* jurisdiction, regardless of the fact that the *res* actually was located outside the territorial jurisdiction of the court)[29]; *Reed v. Steamship YAKA*, 307 F.2d 203 (3rd Cir. 1962), *rev'd on other gds.*, 373 U.S. 410 (1963)(holding that a claimant who voluntarily appeared and answered in an *in rem* proceeding waived his right to object to attachment on the ground that the *res* was outside the territorial jurisdiction of the court); *Continental Grain Co. v. Barge FBL-585*, 364 U.S. 19 (1960)(affirming with the claimant's consent the transfer under 28 U.S.C. §1404(a) to a district in which the *res* was not present).

---

[29] The Court noted: "[A]ctual local seizure [of the vessel] or a tangible substitute thereof, such as the posting of a bond, is not a prerequisite to the maintenance of an *in rem* action." When the vessel-owner asserts that the vessel "was or during the pendency of these proceedings would be within the court's jurisdiction," by asserting ownership over the vessel, and by filing a general appearance, "have submitted that vessel to the jurisdiction of this Court." (Id. At 334). The Court further noted: "The Supreme Court appears to favor the position that the presence of the *res* within the district is not an absolute prerequisite to the Court's [Admiralty] jurisdiction." (Id.)

Under the rationale of *Treasure Salvors*, this Court should reject Zapoteca's argument that it lacks jurisdiction over the *res*. <u>Zapoteca invoked this Court's Admiralty jurisdiction</u> by filing this lawsuit. Further, it repeatedly represented to the Court that the vessel <u>would be sailing to Port Isabelle, Texas.</u> It therefore has agreed to this Court's jurisdiction over the *res*, and it should not be allowed to object to it based merely on the fact that it elected to sail the vessel to Port Sabine, Texas, rather than to Port Isabelle. Since Zapoteca has waived its right to complain of the location of the Rig, it cannot be heard to argue that this Court lacks jurisdiction over the Rig because the Rig is located in Sabine Pass.

### c.    Various Equitable Orders, Including the Prior "Status Quo" Court Order, Can Be Issued.

Within the Court's Admiralty jurisdiction, and certainly within the Court's broad equitable powers which are pendant to its diversity jurisdiction, the Court can enter such orders as it believes equity requires. The Court's equitable powers are broad and well established and includes entering such interim orders as will keep one party's claims or allegations from destroying those of another. See Federal Rules of Civil Procedure 64.

Of course, among the Court's various options is simply to keep in effect the previous "Status Quo" Order of July 8, 2004, which essentially orders Zapoteca not to move, sell, encumber, or allow diminution in value of the Rig, pending further orders of the Court, while at the same time allowing Zapoteca to market the Rig for sale. That Order is a classic example of the Court's broad equitable powers, as it prohibits Zapoteca from taking steps which will prejudice Captain Phillips' and the various Intervenor's prospects for security for their claims, while at the same time not impeding Zapoteca's stated goal of marketing the Rig for sale. Indeed, Zapoteca's request that the Order be

-24-

sealed and that other parties not discuss any such Order also is an equitable provision, since it meets Zapoteca's request to the Court that it continue to be able to market the Rig. There of course are numerous other equitable orders that the Court could enter, which are limited only by the Court's or a party's creativity and judgment, and the entire breadth of those equitable orders remain available to the Court in this proceeding.

## III.

## CONCLUSION

This Court has both *in personam* and Admiralty jurisdiction in this case. Accordingly, it has the authority to attach the Rig ENERGY ZAPOTECA pursuant to both Chapter 61 of the Texas Civil Practice & Remedies Code and Rule B of the Supplemental Admiralty Rules. This Court should therefore proceed with this case and issue such writs of attachment posting of security in lieu of attachment, and all other equitable relief, as it deems the facts warrant.

Respectfully submitted,

**THE LANIER LAW FIRM, P.C.**

BY: _____
        CHARLES F. HERD, JR.
        TSB# 09504480
        Attorney in Charge
        LAWRENCE P. WILSON
        TSB # 21704100
        KEVIN P. PARKER
        SBN #15494020
        P. O. Box 691408
        Houston, TX  77269-1408
        (713) 659-5200
        Fax: (713) 659-2204

**ATTORNEYS FOR DEFENDANT/COUNTER CLAIMANT, CHARLES D. PHILLIPS AND THE FOLLOWING MEXICAN CREWMEMBERS: JAIME ARTURO CASTELLANOS DIAZ, ALEJANDRES DIAZ COBOS, PEDRO MEIJALIMA, FERNANDO TREJOMAR, MARCO ANTONIO LIZAMA RODRIGUEZ, CIRO ELORZA MARTINEZ, JOSE MUNOZ LOPEZ, AND CANDIDO MALDONADO**

**LOCAL COUNSEL:**

Mr. C. Frank Wood
SANCHEZ, WHITTINGTON, JANIS
& ZABARTE, L.L.P.
100 North Expressway 83
Brownsville, Texas  78521-2284

## CERTIFICATE OF SERVICE

I hereby certify that a true and correct copy of the foregoing instrument has been forwarded to all counsel in accordance with the Federal Rules of Civil Procedure on this the _11_ day of February, 2005.

Mr. Robert W. Klawetter
EASTHAM, WATSON, DALE & FORNEY, L.L.P.
808 Travis, 20th Floor
Houston, Texas 77002
**ATTORNEYS FOR PLAINTIFF**
**ZAPOTECA ENERGY, INC.**

Mr. Lee Haag
Ms. Tonja De Sloover
FULBRIGHT & JAWORSKI, L.L.P.
1301 McKinney, Suite 5100
Houston, Texas 77010-3095

Jaime Arturo Saenz (**formal Response only; documents sent to Mr. Haag only**)
RODRIGUEZ, COLVIN, CHANEY & SAENZ, L.L.P.
1201 East Van Buren
P. O. Box 2155
Brownsville, Texas 78522
**ATTORNEYS FOR INTERVENOR**
**NABORS DRILLING INTERNATIONAL**

Michael J. Maloney
MALONEY, MARTIN & MITCHELL, LLP
3401 Allen Parkway, Suite 100
Houston, Texas 77019
**ATTORNEYS FOR INTERVENOR**
**STEVE GRAY**

C. Frank Wood