# EXHIBIT "A"

IN THE UNITED STATES DISTRICT COURT
FOR THE SOUTHERN DISTRICT OF TEXAS
BROWNSVILLE DIVISION

ZAPOTECA ENERGY, INC.,            §
    Plaintiff/Counter-defendant,   §
                                   §
v.                                §          CASE NO. B-04-048
                                   §
CHARLES DOUGLAS PHILLIPS,         §
    Defendant/Counter-claimant.    §

## AFFIDAVIT OF CHARLES DOUGLAS PHILLIPS

THE STATE OF TEXAS    §
                      §
COUNTY OF HARRIS      §

BEFORE ME, the undersigned authority, on this day personally appeared CHARLES PHILLIPS, who being by me duly sworn on oath stated and said the following:

1.    My name is CHARLES DOUGLAS PHILLIPS, I am over eighteen, am competent to make this affidavit, and have personal knowledge of the facts herein stated.

2.    In May 2000, I was hired by SOUTHERN INTERNATIONAL, INC to act as Project Manager on the Rig ENERGY ZAPOTECA in Tuxpan, Mexico. In June of 2000, I was appointed Master of the Rig ENERGY ZAPOTECA by Christian Kongsli, one of the shareholders (Owners) of ZAPOTECA ENERGY, INC. In December of 2000, I was hired by ZAPOTECA ENERGY, INC. to remain as Master on the Rig ENERGY ZAPOTECA and also serve as the Owners' Representative of the Rig ENERGY ZAPOTECA. In May of 2001, I was given a general Power of Attorney to handle all legal matters for ZAPOTECA ENERGY, INC. in Mexico.

3.    The terms of my employment with ZAPOTECA ENERGY, INC. were that I was to receive a salary of twelve thousand and no/100 dollars ($12,000.00) per month, plus a per-diem in Mexico in the amount of $2,000.00 Pesos per week, housing allowance of $15,000.00 Pesos per month, and car allowance of $11,000.00 Pesos per month. Upon my return to the United States in May of 2003. my salary remained the same at twelve thousand and no/100 dollars ($12,000.00) per month. with my per-diem being $75.00 USD per day, housing allowance of $2,250.00 USD per month, and car allowance of $500.00 per week at the time of my termination.





EXHIBIT
A

4. Upon being hired by SOUTHERN INTERNATIONAL, INC. in May of 2000 as Project Manager, I traveled to Tuxpan, Mexico, and immediately began work on the Rig ENERGY ZAPOTECA.

5. The Rig ENERGY ZAPOTECA is a Friede & Goldman L-780 Independent Leg Jack-up Barge/Rig.

6. In May of 2000, the Panamanian provisional (navigation) certificate was issued to ZAPOTECA ENERGY, INC. for the Rig ENERGY ZAPOTECA.

7. In the Summer of 2000, the Rig ENERGY ZAPOTECA, although damaged by a "blow-out", was fully capable of being towed or moved.

8. In May of 2000, I was employed by SOUTHERN INTERNATIONAL, INC. to perform work on the Rig ENERGY ZAPOTECA for its use in the marine industry as a jack-up barge/rig.

9. During my employment with SOUTHERN INTERNATIONAL, INC and ZAPOTECA ENERGY, INC., I physically worked on the Rig ENERGY ZAPOTECA in order to prepare the Rig ENERGY ZAPOTECA for moving and use in the marine industry as a jack-up barge/rig.

10. During my employment with ZAPOTECA ENERGY, INC., and as a direct result of my employment with ZAPOTECA ENERGY, INC., I was charged with a crime in the Country of Mexico and forced to leave Mexico in May of 2003. I must remain outside of the Country of Mexico for a period of not less than three (3) years in order to avoid prosecution for a crime directly resulting from ZAPOTECA ENERGY, INC 'S actions.

11. During my employment with ZAPOTECA ENERGY, INC., I was involved in a labor case in Mexico whereby a writ of attachment was issued against the Rig ENERGY ZAPOTECA in favor of me and my superintendent, for failing to pay us past due and owing wages The amount of the writ of attachment against the Rig ENERGY ZAPOTECA is $1,115,568.00 USD, of which approximately $500,000.00 USD is directly attributable to wages owed by the Rig ENERGY ZAPOTECA to me.

12. On or about March 10, 2004, I was terminated by ZAPOTECA ENERGY, INC. for failing to perform an illegal act under the laws of the Country of Mexico and move the Rig ENERGY ZAPOTECA from its moored location in the Port of Tuxpan, Mexico, to another location while the Rig ENERGY ZAPOTECA was subject to attachment by the Mexican Labor Court.

13. Upon my termination, I was owed, and remain owed, by ZAPOTECA ENERGY, INC. approximately $20,000.00 in back wages for my services as Master, Owners' Representative and Legal Representative of the Rig ENERGY ZAPOTECA, in addition to $165,000.00 in the form of an agreed severance/bonus payment for the work I performed for ZAPOTECA ENERGY, INC. on the Rig ENERGY ZAPOTECA.

14. The afore described due and owing wages directly result from my services as Master, Owners' Representative and Legal Representative of the Rig ENERGY ZAPOTECA.

15. After my termination, I was named as a defendant in a Mexican Labor Case directly resulting from my role as Master, Owners' Representative and Legal Representative of the Rig ENERGY ZAPOTECA. The costs associated with the defense of this action is in excess of $220,000.00 USD.

16. After my termination, ZAPOTECA ENERGY, INC. maintains no office, agent, officer, shareholder, representative, or property within the United States, other than the Rig ENERGY ZAPOTECA.

17. ZAPOTECA ENERGY, INC. is a foreign corporation incorporated under the laws of Liberia, with its principal place of business and registered agent located at 80 Broad Street, City of Monrovia. County of Montserrado, Republic of Liberia.

18. ZAPOTECA ENERGY, INC.'s only asset is the Rig ENERGY ZAPOTECA.

19. In April of 2004, the Rig ENERGY ZAPOTECA was moved from Tuxpan, Mexico to Sabine Pass, Texas, and as of the making of this affidavit, it remains in Sabine Pass, Texas.



20. In April/May 2003, the Rig ENERGY ZAPOTECA was equipped with two (2) living quarters, portable navigation lights, pumps, tugger, generator, safety equipment, and towing gear.

21. I have seen the Rig ENERGY ZAPOTECA since its arrival in Sabine Pass, Texas and it remains fully capable of being moved or towed to any port of ZAPOTECA ENERGY, INC.'S choosing.

22. I have read the foregoing pleading to which this affidavit is attached, and the contents contained therein are true and correct.

FURTHER AFFIANT SAYETH NOT

_____
CHARLES DOUGLAS PHILLIPS

THE STATE OF TEXAS        §
                          §
COUNTY OF HARRIS          §

SWORN TO AND SUBSCRIBED TO BEFORE ME by the said CHARLES DOUGLAS PHILLIPS to certify which witness my hand and seal of office on this _17th_ day of _may_____, 2004.

SUNNY ROBINSON
MY COMMISSION EXPIRES
September 17, 2006

_____
Notary Public, State of Texas

My Commission Expires:

# EXHIBIT "B"

IN THE UNITED STATES DISTRICT COURT
FOR THE SOUTHERN DISTRICT OF TEXAS
BROWNSVILLE DIVISION

ZAPOTECA ENERGY, INC., §
     Plaintiff/Counter-Defendant, §
      §
      §       CASE NO. B-04-048
v. §
      §       Admiralty Rule 9(h)
CHARLES DOUGLAS PHILLIPS, §
     Defendant/Counter-Plaintiff. §

## CHARLES DOUGLAS PHILLIPS' CALCULATION OF DAMAGES

1.    Wages, Severance & Expenses . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . $185,000.00

Mr. Phillips' claim for wages, severance & expenses is based on Zapoteca Energy, Inc.'s termination of his contract prior to its expiration. This includes normal wages Mr. Phillips would have received, plus his promised severance or bonus in the amount of $165,000.00 and expenses associated with Mr. Phillips repatriation.

2.    Wrongful Termination . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . $324,000.00

Mr. Phillips' claim for wrongful termination is based on his termination by Zapoteca Energy, Inc. for failing to perform an illegal act. *See Hauck v. Sabine Pilots, Inc.*, 672 S.W.2d 322 (Tex.App.-Beaumont 1984). The calculation of damages is based on two (2) years salary, including Christmas bonuses and payment for vacation time provided to Mr. Phillips under his employment arrangement. This amount does not included allowances provided to Mr. Phillips for housing, car, and per diem.

3.    Criminal Charges . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . $486,000.00

As a direct result of Mr. Phillips' employment with Zapoteca Energy, Inc., criminal charges were brought against Mr. Phillips in Mexico. These charges were to be dismissed with the assistance of Zapoteca Energy, Inc., but Zapoteca Energy, Inc. has failed to do anything to alleviate the situation. As a result, Mr. Phillips is unable to return to Mexico and seek employment for a period of three (3) years. Accordingly, this calculation of damages amounts to three (3) years of lost income.



EXHIBIT
C

4.    1st Mexican Labor Case . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . $500,000.00

Mr. Phillips is seeking damages resulting from an award in a labor case in Mexico against Zapoteca Energy, Inc. in which the Rig ENERGY ZAPOTECA was attached for failing to pay wages to the crew members and Mr. Phillips.   The amount of the judgment and attachment in the Mexican labor case is $1,115,568.00 USD, with the above amount attributable to Mr. Phillips.

5.    Defense of 2nd Mexican Labor Case  . . . . . . . . . . . . . . . . . . . . . . . . . . . $220,000.00

While not only being a plaintiff in a Mexican Labor Case, Mr. Phillips was also named a defendant in a separate labor case resulting from his employment with Zapoteca Energy, Inc. The cost of defense of the labor case, judgment and attachment obtained against Mr. Phillips totals $220,000.00 USD.

**TOTAL AMOUNT OF DAMAGES SOUGHT: . . . . . . . . . . . . $1,715,000.00**

# EXHIBIT

## "C"

IN THE UNITED STATES DISTRICT COURT
FOR THE SOUTHERN DISTRICT OF TEXAS
BROWNSVILLE DIVISION

| | | |
|---|---|---|
| ZAPOTECA ENERGY, INC. | § | |
| | § | |
| VS. | § | CIVIL NO. B-04-048 |
| | § | In Admiralty/Rule 9(h) |
| CHARLES DOUGLAS PHILLIPS, et al. | § | |

## AFFIDAVIT OF CHARLES D. PHILLIPS

| | |
|---|---|
| STATE OF TEXAS | § |
| | § |
| COUNTY OF HARRIS | § |

Before me, the undersigned officer, on this day personally appeared Charles D. Phillips who, after first being duly sworn, deposes and says on oath as follows:

1.      My name is Charles D. Phillips.  I am over the age of 21 years.  I have never been convicted of a felony or a crime of moral turpitude, and I am not otherwise disqualified from making this affidavit.  Except where otherwise stated, I have personal knowledge of every fact to which I testify in this affidavit, and every fact to which I testify in this affidavit is true and correct to my personal knowledge.

2.      I am 61 years old and a U.S. Citizen.  My home address is 14227 Misty Meadow Lane, Houston, Texas 77079.

3.      I am a licensed Master.  I received my first Master's license from the United States Coast Guard on December 14, 1984.  That license covers "any gross tons and oceans."  My Master's license number is 560648 and issued by the U.S. Coast Guard in New Orleans, Louisiana.  In addition, I also hold a United States Coast Guard license as an Able-bodied Seaman/Lifeboatman.  I also hold certificates from Noble Denton & Associates as a Marine

Move Supervisor for Mobile Offshore Drilling Units and am a Certified Rig Mover from Global Marine.

4.    In 1980, I was the Master of the DAN PRINCE, a jack-up drilling rig registered and flagged in Liberia. While under tow from Dutch Harbour, Alaska, to Abijahn, West Africa, the vessel sank due to severe weather with no loss of life. At the end of the investigation and hearings, I received a commendation from the U.S. Coast Guard Admiral and the hearing board for my actions and performance as Master for my efforts to save the Vessel and in maintaining the safety of the crew.

5.    I have never had any negative action or proceedings taken against of my Coast Guard licenses. None of these licenses has ever been suspended or revoked.

6.    In regard to the Rig, ENERGY ZAPOTECA, sometimes called the NABORS 660 (hereinafter "the Vessel"), I originally was an employee of Southern International, Inc. ("Southern") and was hired by Southern in May of 2000 to become project manager having to do with refurbishing the Vessel. At that time I also became the Master of the Vessel. My employer initially was Southern, but I was assigned to the Vessel and working under the supervision of the Vessel's managers, P.D. Gram & Co. ("Gram"). My understanding is that the Vessel's title owner is Zapoteca Energy, Inc. ("Zapoteca"), which to my knowledge was created strictly to acquire title in the Vessel. However all Rig operations, supervision, management, repair, etc., were seen to by the Vessel's managers, Gram, since Zapoteca has no actual employees or officers. If it does, I never met them. I was appointed Master of the ENERGY ZAPOTECA in the Summer of 2000 by Mr. Christian Kongsli. In December 2000, I was under the supervision of Gram. My instructions came from the Vessel's

managers, Gram. I was told that Mr. Kongsli, to whom I reported, was authorized by Gram as my supervisor. That was also true in late 2003 and even through mid-March of 2004.

In the Spring of 2003, I went to work for Nabors Drilling as Master of the ENERGY ZAPOTECA/NABORS 660. I continued to work for Gram and Zapoteca as the owners' representative and legal representative. That was after Nabors had entered into a Memorandum of Agreement to purchase the Vessel. However, in August of 2003, I left Nabors' employ and returned to the employment of Gram as the Master of the ENERGY ZAPOTECA. Throughout 2003 I was the Master of the Vessel and was either an employee of Nabors or Gram, depending on the time frame. (During the Nabors time period, Nabors paid me a portion of my Master's wages, but not the balance. That issue later was settled.) Throughout my period as a Gram employee, I submitted my payroll and other items to Gram and received my paycheck and reimbursement of various expenses from Gram as Master. I also continued to report to Gram, through my supervisor and contact, Mr. Kongsli. Again, to my knowledge, Zapoteca had no actual employees. Rather, the Vessel again was managed by Zapoteca's managers, Gram, just as had occurred earlier.

7.     During the period of March 3-11, 2004, Mr. Kongsli, my supervisor at Gram, came to Port Isabelle, Texas, to meet with me and discuss progress of the Vessel's improvements, my bonus, meetings with the crew members, and final preparations of the Vessel for her intended ocean tow from Tuxpan, Mexico, to what I was told would be Port Isabelle, Texas. Mr. Kongsli did not indicate to me that he was unhappy with my performance, nor did he request that I provide any documents, files, or other papers to him. However, in a sudden shock to me, on March 10, 2004, I received a fax letter from Zapoteca's attorney, Ed Nelson, with whom I had dealt on numerous occasions over the

preceding five months or so and with whom I had exchanged correspondence well over a hundred times. While Mr. Nelson was Zapoteca's counsel, he gave me advice as the Vessel's Master and as the local representative of Zapoteca, upon which I routinely relied. He frequently told me that he had received instructions from Gram or Zapoteca and was passing those instructions to me. He also gave me a good deal of legal advice on how to handle the various claims against or concerning Zapoteca in Mexico. Several of the claims were against Zapoteca and against me personally. On several occasions he assured me that my own claims as a merchant mariner, seaman and the Vessel's Master, were protected under controlling law, so I did not need to worry when Zapoteca did not pay me promptly, postponed payment of my bonus, etc. On March 10, 2004, the same day I had been meeting with Mr. Kongsli, I got a letter from Mr. Nelson indicating that my employment was terminated. I was shocked that I was being terminated for refusing to move the Vessel without permission of the Port Captain and the Labor President.

8.    I later learned that Zapoteca, in a meeting in Oslo, Norway, on February 18, 2004, revoked my Power of Attorney without any justification. I did not learn of this February 18, 2004 meeting or revocation until I was served on March 15, 2004, with the Application for TRO filed by Zapoteca on March 12, 2004.

9.    Although I had been told that the Vessel would be towed to Port Isabelle, Texas, I later learned that in fact Zapoteca had no intent to do so, and in fact had been planning with Nabors, who was intending to buy the Rig, that the Rig was to be taken to Freeport, Texas, or points further east. I believe that I was being misinformed intentionally of the intended destination of the Vessel, in Gram's or Zapoteca's desire to keep me from becoming more alarmed about not being paid and trying to take steps to protect my claims,

including seeking an embargo from the appropriate Mexican court. After I was fired on March 10, 2004, I did seek an embargo order from the appropriate Mexican labor court. That Embargo Order was issued on April 7, 2004. However, Zapoteca and Gram were successful in having the Vessel leave Tuxpan before the court officials could attach the Vessel, thus thwarting the intent of the Mexican judicial officials in trying to hold the Vessel within the Mexican court's jurisdiction. If she had not departed as quickly as she did, the Vessel would have been attached under Mexican law, which I understand is similar to an arrest in Admiralty under United States law.

10.    One of the civil disputes Zapoteca had in Mexico was based on alleged charges owed to Protexa/Celesa. As the local representative of Zapoteca and the Vessel, I was questioned by a Mexican court representative. I had a Mexican attorney representing me, who was hired by Zapoteca and paid by Zapoteca. He advised me on how to answer various questions. Protexa/Celesa later asserted that one of my answers was incorrect and on that basis were able to get criminal charges issued against me in Mexico. Zapoteca agreed shortly after the civil claims were asserted by Protexa, and again after the criminal charges were asserted, that it would protect me from both the civil and criminal charges and take all steps necessary to be sure those claims and charges against me personally were completely dropped, both by Protexa/Celesa and by the appropriate judicial authorities. In late May 2003, my wife and I had to flee Mexico due to fear that an arrest warrant was forthcoming. Zapoteca confirmed that to me and indicated that they would be sure in resolving the civil claim with Protexa that all the criminal charges against me would be dropped and withdrawn. In June 2003, an agreement was drawn up between Zapoteca and Protexa whereby Protexa was obligated "to obtain the total and final discharge of the charges against me." In late

June, 2003, the agreement was changed without informing me. Christian Kongsli and Henirk Aadnesen with Nodisk Legal Services changed the agreement from "total and final discharge" to "everything within Protexa's power to obtain the total discharge of the criminal charges against me. I learned on August 2, 2003, in a meeting with Mr. P. D. Gram and Mr. Christian Kongsli in Houston, Texas, that the agreement with Protexa had been changed and that the criminal charges were not dropped. Shortly after that meeting, I learned that an arrest warrant had been issued in early July, 2003, by the criminal court in Tuxpan, Mexico. Since then, I have not been able to return to Mexico and, based on the advices from Zapoteca's Mexican counsel to me, I will not be able to return to Mexico, even to visit, for a period of at least 4-5 years, and possibly later. I have been advised by Zapoteca's counsel that it will take at least that long before the criminal charges against me cannot be pursued.

11.    Around the period of time that I dealt with the Vessel, she had various insurance coverages in effect, which would be typical of commercial vessels in navigation. For example, she had collision hull coverage (the vessel equivalent of property damage), collision liability (if she ran into or was run into by another vessel), protection and indemnity coverage (which is somewhat similar to comprehensive general liability coverage as might apply on a homeowners' policy), employee and wage protection coverage, and even navigation and tower's liability coverage. These coverages were renewed or put into effect in conjunction with the anticipated and ultimately successful towage of the Vessel from Mexico to Texas. Those coverages were in effect in the Summer of 2000, and were renewed or extended, including specifically tower's liability coverages, in 2003 and 2004, after Zapoteca and Nabors had contracted for the sale and delivery of the Vessel to Nabors in international or Texas waters.

12.    As reflected in the counter-claim filed in this case, I have various claims against Zapoteca, the Vessel and Gram, (collectively "Vessel Interests") which include:

(a)    The Vessel Interest's failure to pay me my back wages and employment benefits prior to and through the date of my termination of employment, March 10, 2004;

(b)    The Vessel Interest's wrongful termination of my employment and retaliatory discharge of me, based on my failure to have the Vessel moved within the port of Tuxpan, Mexico, which had I done so would have been in violation of local orders and would have made me subject to immediate arrest and imprisonment;

(c)    The Vessel Interest's contractual obligation to pay me my $165,000 bonus, which was agreed to be paid in the Spring of 2003 and later in the Summer of 2003, but which I indicated that I would defer until the Spring of 2004;

(d)    The Vessel Interest's debt to me of my portion of the Embargo Order issued by the Mexican court on April 7, 2004, of which my portion is approximately $800,000 to $900,000;

(e)    My entitlement to hold harmless, defense and indemnity obligations having to do with Mexican labor cases in which I personally am named and may have some liability by virtue of being Zapoteca's local representative in Mexico; and

(f)    Zapoteca's liability to me for failing to get the criminal charges totally dismissed and withdrawn, thereby damaging my reputation and prohibiting my return to Mexico, where I otherwise could gain employment for a period of some 5-6 years or more.

13.    I have a substantial likelihood of success on the merits of my claims against Zapoteca and the Vessel because, in part, I was the Vessel's Captain and had not been paid

my wages and benefits, either prior to or after Zapoteca's attorney, Mr. Ed Nelson, fired me on March 10, 2004. Zapoteca owes me back wages, fringe benefits, reimbursement of housing, car allowance, phone allowance, repatriation (including moving expenses to the United States) and the bonus I had agreed to for exceptional work I had done on the refurbishment of the Vessel, and work done to ready the Vessel to be brought to the United States (and specifically Texas) in the Fall of 2003 and the Spring of 2004. I have a substantial likelihood of recovery on the other claims (b, d, e & f above) as well.

14. Accordingly, I have asserted my counterclaim in this court against Zapoteca and seek damages in excess of $2,000,000.00, plus interest, costs and attorney's fees. I should be permitted to attach property of Zapoteca to secure these amounts and claims.

15. Zapoteca, the defendant as to my claims, is a Liberian corporation with no place of business in the State of Texas. Further, upon information and belief, Zapoteca has no assets anywhere in the state of Texas, with the sole exception being the Vessel, located at the Sabine Shipyard, Sabine Pass, Jefferson County, Texas. Accordingly, upon successful prosecution of this suit, I will have a post-judgment lien against the Vessel. I already have one or more pre-judgment liens, based on my seaman's wage claim, abrupt discharge on March 10, 2004, and the Mexican "Embargo Order."

16. Upon information and belief, the Vessel is a risk for departure. If the Vessel departs, I will be left without means to recover my damages from Zapoteca. I fear that Zapoteca will remove the Vessel from the jurisdiction of this Court.

17. Zapoteca is justly indebted to me. A writ of attachment in my favor is not sought for the purpose of injuring or harassing, and I will probably lose the debt unless an attachment is issued.

18.    I will suffer immediate and irreparable injury if the Court does not grant a Rule B or C attachment or if a temporary restraining order or preliminary injunction is not issued because I will be left without means to recover my damages from Zapoteca. The harm to me outweighs the harm to Zapoteca if the temporary restraining order and preliminary injunction are not granted, as this is the sole asset of Zapoteca's in which I can satisfy a potential judgment lien and Zapoteca is not currently conducting business with the Vessel, as she presently is docked or "stacked" at the Sabine Shipyard, Sabine Pass, Jefferson County, Texas.

19.    Granting a temporary restraining order and preliminary injunction is in the public interest in that it secures a judgment lien in my favor, since I live and work in Texas, am a Texas resident and U.S. citizen and Zapoteca is an overseas company. Further, it will prohibit Zapoteca, a foreign corporation, from avoiding its liabilities and debts to me by further encumbering its only asset in Texas upon which I can satisfy a judgment.

20.    If the pre-judgment relief I seek is not granted, I have no other adequate remedy at law. Should my request for TRO, preliminary injunction and Rule B & C attachment or arrest be denied, I will be without remedy to prevent Zapoteca from disposing of or further encumbering the Vessel. I will be left without means to recover my damages for Zapoteca's wrongful termination/retaliatory discharge, failure to pay to me my earned seaman's wages, and failure to protect me from civil and criminal proceedings in Mexico or from personal liabilities for Zapoteca's and the Rig's debts and liabilities, etc.)

21.    If so ordered, I will obtain a bond or other such surety or bond payable to Zapoteca Energy, Inc., in the above-referenced action in the amount and under the terms fixed by the Court's order and on the further condition that I will prosecute this suit to effect

and pay the extent of the penal amount of the bond or surety all damages and costs that may be adjudged against me for wrongfully suing out such writ of attachment.

22.    If so ordered, I also will obtain a bond or other such surety on the amount payable to Zapoteca Energy, Inc., in the above-referenced action in the amount and under the terms fixed by the Court's order for the payment of such costs and damages as may be incurred or suffered by any party who is found to have been wrongfully enjoined or restrained by a temporary restraining order, preliminary injunction, and permanent injunction.

23.    Regarding the Christian Kongsli affidavit of March 11, 2004, attached as Exhibit "A" to the TRO filed on March 12, 2004; I state as follows:

(a)    Christian Kongsli would have had full knowledge that the Vessel was not coming to Port Isabel, Texas, when he signed his affidavit on March 11, 2004;

(b)    On March 3, 2004, I provided the ballast program and tanks, and towing procedures to Mr. Kongsli. The next day (March 4, 2004) he forwarded them to Erik Ostybe, Per Johansen, and Meritus in Tuxpan, Mexico and Gram in Norway;

(c)    On Page 2, paragraph 4, Chrisian Kongsli should have been aware when he signed his affidavit that the attachments (embargoes) from the Labor Court had not been lifted and that the Vessel could not legally be moved from her location in Mexico. Zapoteca, Zapoteca's counsel in Mexico and its counsel in Houston were also aware that the Labor Court attachments on the Vessel prohibited any movement of the Vessel from her then- present location.

(d)    In late June, 2003, I was not terminated or reprimanded for not moving the Vessel to APITUX dock, as instructed by Gram; I also was not terminated or

reprimanded for not allowing onboard Christian Kongsli, Henrik Aadnesen (with Nordisk Legal), our agent with Meritus, or the Port Inspector. At that time, the Vessel had two attachments (embargoes) in effect by the Labor Court and could not be moved from her then-present location. The Labor Court President assigned the crew as watchman for the Labor Court onboard the Vessel. Christian Kongsli instructed the agent for Meritus to cancel the inspection by the port inspector after learning that the Vessel could not be moved until all attachments had been lifted. On July 10, 2003, I received an e-mail from Gram, (Mr. Kim Steimler), stating: "Charlie, let there be no doubt in your mind that we recognize that you have protected our interest and done it well."

 24. Regarding the Erik Ostybe affidavit filed on May 28, 2004 in the Supplemental Response to Defendant's Motion for Arrest and Seizure of Vessel, I state as follows:

 (a) Erik Ostybe should have been fully aware based on the Memorandum of Agreement between Zapoteca and Nabors, entered in March 2003, that the Vessel was approved for a tow from Tuxpan, Mexico to Freeport, Texas in April/May 2003. He also should have been fully aware that the tow from Tuxpan, Mexico to Freeport, Texas was approved by their insurance company and survey company for a "manned tow." He also should have been fully aware that the entire purchase price of the Vessel was transferred to Zapoteca's bank account in Norway and England.

 (b) Erik Ostybe also should have been aware that the Vessel was made ready for a manned tow for Nabors in April, May or June of 2003 and August of 2003.

 (c) Even after Nabors cancelled the MOA in early September 2003, Zapoteca continued to make plans to take the Vessel to Freeport, Texas for Nabors.

25.    Regarding Cliff Arkley's affidavit, attached to Zapoteca's Supplemental Response filed on May 28, 2004; I state as follows:

(a)    There are various letters, faxes and e-mails from the Vessel's hull insurers' surveyors, London Offshore Consultants (including Cliff Arkley and his supervisor, Kevin Highfield) discussing conditions to be met before the proposed manned tow, beginning in December of 2003.  Starting then and running through February and even March of 2004, London Offshore Consultants (including Mr. Arkley) were proceeding with steps for the manned tow.  Christian Kongsli, acting on behalf of Gram as Vessel managers and Zapoteca Energy, Inc. as the Vessel's owners, and on behalf of the Vessel ENERGY ZAPOTECA (herein sometimes collectively "Vessel Interests") in early February 2004 indicated that Gram or Zapoteca would provide the life rafts which would be required for the "riding crew."   Similar correspondence confirmed that the Vessel would be towed, (i.e., a "wet tow" movement).   Mr. Kongsli on behalf of Gram or Zapoteca was making arrangements for Visas for the Mexican citizens who would be on the riding crew.  However, to the best of my knowledge as of the date of my termination of employment on March 10, 2004, neither Zapoteca nor Gram had made arrangements to get the life rafts aboard the Vessel, which was a pre-condition to the Vessel being able to be towed with a riding crew aboard.  Consequently, she could only be towed in an unmanned status until that life saving gear was placed aboard.  It was never placed aboard, so the Vessel ultimately was towed, unmanned.

(b)    In addition, Zapoteca was well aware that Nabors had rented an accommodation quarters, which had been placed aboard the rig, in anticipation of the manned tow from Tuxpan, Mexico to Texas in April or May of 2003.  This in fact was the

same accommodation quarters that Zapoteca rented from Nabors under an agreement entered into in December of 2003. Neither Nabors nor Zapoteca would consider that accommodation quarters to be "unfit for habitation," as suggested by Mr. Arkley.

(c)    In addition, the Vessel Interests, including their insurer, were communicating among themselves that they were very concerned that London Offshore Consultants were "very much to blame" in the "delay in moving this rig." These statements and related documents make clear that delays associated with having the Vessel ready for a manned tow were not caused by me, but were caused by Gram or Zapoteca in not getting life rafts aboard promptly or by Vessel Interests' surveyors in delaying and making unnecessarily complex the arrangements for the towage of the rig.

FURTHER AFFIANT SAYETH NOT:

Charles D. Phillips

SWORN TO AND SUBSCRIBED BEFORE ME on this _10th_ day of August, 2004.

Notary Public in and for the State of Texas

Shari Carnahan
Printed Name of Notary

SHARI L. CARNAHAN
NOTARY PUBLIC
State of Texas
Comm. Exp. 02-14-2005

My Commission Expires: _2-14-05_