United States District Court
Southern District of Texas
FILED

FEB 1 1 2005

Michael N. Milby
Clerk of Court

IN THE UNITED STATES DISTRICT COURT
FOR THE SOUTHERN DISTRICT OF TEXAS
BROWNSVILLE DIVISION

| | | |
|---|---|---|
| ZAPOTECA ENERGY, INC. | § | |
| | § | |
| VS. | § | CIVIL NO. B-04-048 |
| | § | In Admiralty; Rule 9(h) |
| CHARLES DOUGLAS PHILLIPS, et al. | § | |

### CAPTAIN PHILLIPS' BRIEF REGARDING MARITIME LIEN STATUS

TO THE HONORABLE JUDGES OF SAID COURT

COMES NOW, Captain Charles Phillips, a licensed ship's master and former captain of the Jack-up Barge ENERGY ZAPOTECA and pursuant to the Court's request at the conclusion of the status conference of December 14, 2004, hereby submits this his brief on maritime lien claims, as follows.

### I. MARITIME LIENS IN GENERAL

What is a maritime lien? A maritime lien is a property a right, right in a vessel, a "jus in re." It is figuratively the giving of the ship as security for a debt or claim. "A maritime lien has been defined as a privileged claim upon a thing in respect of service to it or injury caused by it, to be carried into effect by legal process."[1]

> "The outstanding characteristic of a maritime lien is that possession of the vessel, unlike a common law lien, is not necessary to its validity. The maritime lien gives the lienor a right of action against the vessel herself and ignores the owner personally. The ship is personalized. The ship is regarded as competent to contract and is liable for her obligations and torts."[2]

---

[1] See Norris, *The Law of Seamen*, 4th Edition, Martin J. Norris, 1985, by the Lawyers-Operative Publishing Company, Vol. 1, Chapter 20, p. 578; this treatise will be referred to periodically herein as *Norris*.

[2] (Id.)

Maritime liens are enforced in a court in Admiralty and by a proceeding or allegation *in rem* against the vessel. Such *in rem* claims are asserted by Captain Phillips and the intervening crewmembers, who assert martime liens against the vessel for various claims made the basis of this case.

## II.   "VESSEL" IS DEFINED BROADLY

The natural second question is: to what vessels do martime liens arise? The answer is: to a very broad group. The statutory definition of a vessel includes: "every description of water-craft or other artificial contrivance used, or capable of being used, as a means of transportation on water." See 1 USC § 3.[3] This definition is so broad that it encompasses essentially all navigable structures intended for or which can be used for transportation. See *Cope v. Vallette Dry Dock Co.*, 119 U.S. 625, 30 L.Ed. 501, 7 S. Ct. 336 (1887).

> The term "vessel" is all-embracing. In general, it may be said that it includes any craft or thing capable of mobility and whose element is in the water and used in the furtherance of commerce and navigation. In *Saylor v. Taylor*, [77 F.476 (4th Cir. 1896)]the court, in holding that a dredge was a vessel and the men employed upon her entitled to a wage lien, stated as follows:
>
>> At first blush it would seem a stretch of the rule to hold a dredge and her accompanying scows to belong to the same class with ocean steamships. The idea of commerce does not come into the mind primarily in connection with such craft; but, when it is borne in mind that they are constructed to move upon the water, and nowhere else, and that, while thus moving upon the water, they are subject to all the rules that govern other water craft as to lights, collisions, etc., it will be seen that they have that mobility and capacity to navigate which are recognized as the prime elements in determining the subjects of maritime liens. And so it seems

---

[3] Note that the definition includes "capable of being used;" whether a vessel actually is used as a means of transportation on water is not the test. Rather, is it possible that the vessel could be used for transportation on water? If so, the law would include that property as a "vessel."

2

a stretch of the imagination to class the deck hands of a mud dredge in the quiet waters of a Potomac creek with the bold and skillful mariners who breast the angry waves of the Atlantic; but such and so far-reaching are the principles which underlie the jurisdiction of the courts of admiralty that they adapt themselves to all the new kinds of property and new sets of operatives and new conditions which are brought into existence in the progress of the world. Hence it is that in all times and in all countries those who are employed upon a vessel in any capacity, however humble, and whose labor contributes in any degree, however slight, to the accomplishment of the main object in which the vessel is engaged, are clothed by the law with the legal rights of mariners, 'no matter what may be their sex, character, station or profession'.

A "vessel" need not have independent motor power and may be dependent on towage but nevertheless is a vessel subject to maritime liens. To the usual craft which we think of as vessels can be added the following: Scows; pile drivers; racing yachts; flatboats; a schooner tied to a wharf and used as a restaurant and for dancing, but equipped for sailing and capable of being towed; a houseboat not permanently attached to the shore, but lacking motor power; a bulk lighter moored to a bulkhead and used in construction of work; as well as a comparable boat used in connection with the construction of a concrete pier in a navigable river.

A wreck has been considered a "vessel"; also a craft on which cargo is stored during the winter after close of navigation. A dismantled vessel no longer used in commerce but still retaining some characteristics of a vessel and movable has been held the subject to a lien.[4]

During the relevant time period involved in this case, the ENERGY ZAPOTECA was a water-craft "or other artificial contrivance" <u>capable</u> of being used as a means of transportation on water. In fact, as the Court knows and Zapoteca Energy, Inc. (hereinafter "Zapoteca") must concede, the Rig in fact <u>made a voyage on the navigable waters</u>; she <u>moved</u> in transportation on water in April of 2004, when she was towed from

---

[4] <u>Norris</u>, Vol. 1, p.p. 55-56; most internal citations omitted; however, see *Kibadeaux v. Standard Dredging Co.*, 81 F.2d 670 (1936 5th Cir.), cert denied 299 U.S. 549, 81 L.Ed. 404, 57 S. Ct. 12; See also *Saylor v. Taylor*, 77 F.476 (4th Cir. 1896); 77 F. 476 (1896, CA4 Va.).

3

Tuxpan, Mexico to Sabine Pass, Texas.[5] By virtue of that voyage alone, she showed that she was "used, or capable of being used, as a means of transportation on water." Accordingly, her status as a vessel and as a vessel in navigation is clear. Consequently, maritime liens can arise against her.

### III.   WHAT ARE "SEAMEN"?

"Seaman" (often called interchangeably "members of the crew" or "crewmembers") is a flexible term, which is dependent on the context of the particular case or statute under which the term is applied. *Warner v. Goltra*, 293 U.S. 155, 79 L.Ed. 254, 255, 55 S.Ct. 46 (1934). In 46 USC § 10101 (3), a seaman has been defined as: "every person who shall be employed or engaged to serve *in any capacity* aboard the vessel." (emphasis added). Not surprisingly, the list of workers found to be seamen is lengthy; and includes fishermen, fish processors, maintenance men, specialized workers necessary for the particular use or activity of the vessel, etc. For example, employees of a catering service who served food aboard ship and did minor maintenance work were considered "crew" and granted a lien for crew's wages. *General Electric Credit & Leasing Corp. v. Drill Ship MISSION EXPLORATION*, 668 F.2d 811 (5th Cir. 1982); *Kavanaugh & Co. of Bank of Scotland v. Sabay*, 211 F.3d 261 (5th Cir. 2000); *Seattle Trust & Savings Bank v. M/V YUKON*, 1986 WL 15731 (W.D. Wash. 1986).

It has been stated that a seaman is not limited to a person who can "hand, reef and steer" the ship, but also includes all those employed aboard the vessel *in any capacity* whose labor contributes *in any degree* to the furtherance of the main object in which the vessel in question is engaged. *See Saylor v. Taylor*, 77 F. 476 (4th Cir. 1896). As can be

---

[5]   In addition, she carried various cargo and equipment, including the property alleged by Nabors to still be its property. In that circumstance, she not only moved herself; she also carried the property (i.e., cargo) of another aboard her during her voyage.

4

seen, the traditional definition of seaman as a person who contributes directly in the navigation of the ship is unduly narrow; in fact, the definition of seaman and crewmember includes <u>all</u> those persons employed by the vessel whose work contributes toward or furthers the general work or purpose of the ship at that time. For instance, on a gambling ship, it includes the casino workers who operate the roulette wheel, serve drinks, and vacuum the rug, since those workers contribute to the furtherance of the object of that vessel, which is to entertain its patrons via gambling. Accordingly, the activities of the vessel in question, and what is happening aboard her at the time of the incidents in question, influence and sometimes control whether the persons working aboard her are defined as "seamen" or "crewmembers."

Here, during the time period in question (including throughout 2003 and the first four months of 2004), Captain Phillips was the recognized and acknowledged master of the ENERGY ZAPOTECA and he and her crewmembers, whom he hired and supervised and to whom were paid crew's wages, were involved in the maintenance, repair and refurbishment of the Rig, in order to improve her condition and make her more attractive to prospective buyers. In addition, an inordinant amount of time was spent by Captain Phillips in trying to clear the Rig of her legal impediments, which arose in Mexico, primarily because her owners did not promptly pay various creditors, who then filed *in rem* and related claims against the Vessel, thereby delaying her voyage and complicating her ability to meet sales contracted terms, (particularly delivery and the freedom from maritime liens warranty terms, such as those in the Sales Contract between Zapoteca and Nabors, which is the subject of Nabors' intervening complaint).

## IV. THE SEAMAN'S "SACRED" WAGE LIEN CLAIMS

Courts of Admiralty have long regarded seamen as "wards of the admiralty court" and have accorded to them the highest consideration in protecting their wage claims. In the views of Mr. Justice Story and Lord Stowell, the seamen's claims for wages are "sacred liens, and as long as a plank of the ship remains, the seaman is entitled, against all other persons, to the proceeds [of the ship] as security for his wages." *Sheppard v. Taylor*, 30 U.S. 675, 710, 8 L.Ed. 269, 282 (1831); The JOHN G. STEVENS, 170 U.S. 113, 42 L.Ed. 969, 18 S. Ct. 544 (1898); see generally Norris, Vol. 1, p.p. 583-584. Because of the great protection that seamen are accorded by federal courts sitting in admiralty and their claims' "sacred lien" status, seamen's wage liens generally outrank maritime liens of other creditors, and in fact are paid above all creditors except *custodia legis* expenses and salvage awards.

There are numerous documents confirming the crewmembers' status, entitlement to prompt payment of their wages and the proposal for settlement of their severance wages. The first such document discovered by counsel for Captain Phillips is the enclosed e-mail of March 28, 2003, from Captain Phillips to Mr. Kongsli, in which he describes what crews' wages (including specifically Christmas bonuses and severance pay) were due at that time. (See Exhibit "A" enclosed.)

## V. THE MASTER'S MARITIME LIEN CLAIMS UNDER U.S. LAW

U.S. statutory law has been inconsistent whether a ship's master, separate from her crew, has a maritime lien to enforce his wage claims. In 1968 Congress gave to masters the same right to a wage lien as any other seaman, but limited it to vessels which are documented, registered, enrolled or licensed under the laws of the United States. 46

U.S.C. § 6, later repealed. (Masters of foreign vessels, such as the Rig ENERGY ZAPOTECA, were not entitled to that same lien.) However, the statute was repealed, thereby returning masters to the status of the general maritime law and the law of the ship's flag.[6]

However, there are a few exceptions to the general rule described above. For example, where the person in charge of the vessel bears the title of "master" or "captain," but it is determined that he does not exercise any of the responsibilities of a master in the normal sense of the term (such as controlling the vessel's movement or the employment, hiring or supervising of crewmembers), then that person has been held to be a "seaman" and therefore entitled to a seaman's wage lien. *See Wandtke v. Anderson*, 74 F.2d 381 (9th Cir. 1934), *American Bank and Trust Co. v. The American Oil Crew Vessel SALVOR*, 206 F.Supp. 444 (S.D. TX 1962), *et al.* Here, Captain Phillips (under Zapoteca's instruction) certainly hired and supervised the vessel's crew, but if the Court is persuaded that he did not otherwise exercise the responsibilities of a master in the broad sense of that term, then he would be construed as a seaman, not a master, and therefore he is entitled to the priority maritime lien claim of a seaman (asserting claims for non-payment of wages, etc.), rather than as a master.

Another exception to the general rule is that a master does have a maritime lien for disbursements he made on behalf of the ship. *Ex parte Clark*, F.Cas. No. 2796 (1843) D.C. Mass; *Payne v. SS TROPIC BREEZE*, 423 F.2d 236 (1st Cir. Puerto Rico 1970), cert. denied; 400 U.S. 964, 27 L.Ed. 2d 383, 91 S.Ct. 363. Here, Captain Phillips did pay, from his own account and out of his own pocket, disbursements on behalf of the

---

[6] Here, the ENERGY ZAPOTECA flies the Panamanian flag. Panama grants a maritime lien in favor of a vessel's master; see discussion in section VI, below.

vessel, primarily because the ship's owners would not provide him with funds to make such payments, and at that point he did not wish the lien claims against the Rig to increase further.[7]

Consequently, Captain Phillips does have a maritime lien under U.S. law to protect the disbursements that he himself incurred for the benefit of the vessel, which are totally separate from and arise independent of conventional wage claims. (See Exhibit B, enclosed affidavit of Captain Phillips, dated February 8, 2005, confirming the advances he himself paid on behalf of the Rig.

## VI. PANAMANIAN MARITIME LAW ENTITLES CAPTAIN PHILIPS AND THE CREW TO MARITIME LIENS

As indicated above, a maritime lien can arise under these facts by virtue of U.S. law (as discussed in Section V above) or under the law of the vessel's flag, which U.S. law "adopts" as supplemental law controlling the vessel. Here, the Rig bears the flag of Panama, so we look to Panamanian law to see whether it grants a lien to the master or crew of the Rig.

Panamanian law does so; it recognizes a maritime lien in favor of the master and the crew, who stand on equal footing, as holding maritime liens for nonpayment of their wages. The relevant statute of the Panamanian Civil Code is Article 1507 of Chapter II, Privilege Credits on Vessels, which specifically grants a maritime lien for "salaries, compensations and indemnities to the master and crew for their last voyage." That

---

[7] See Paragraph 6 of Captain Phillips' Affidavit of February 8, 2005, attached hereto as Exhibit B; see also the Affidavit of Arturo Bazaldua dated December, 2004, was Zapoteca's criminal defense attorney in Mexico, whom Zapoteca hired and paid to advise Captain Phillips and defend him from the criminal charges asserted against him in Tuxpan as a result of the civil claims brought by Celesa against Zapoteca and in turn Captain Phillips as the local representative for Zapoteca. As Atty. Bazaldua refers to him, even in December of 2004, as "Captain" Phillips, Zapoteca should not now be heard to assert that he is not a captain (or a Master, since here the two terms are used interchangeably) (See Documents Regarding Vessel Status, No. 101).

8

provision controls the issue here. The definition of "salaries, compensations and indemnities" is even broader than merely wages, so it is broad enough to include the "wages" at issue here, including specifically: (a) earned but unpaid back wages; (b) vacation pay; (c) severance pay; (d) due but unpaid or unreimbursed living expenses (which are part of the master's and crew's salary package); (e) bonuses; and (f) penalty wages (under the U.S. Statute).

Enclosed as Exhibit E (also No. 105 to the Documents Regarding Vessel Status) is the affidavit of Mr. Raul Jaen Guardia, a licensed Panamanian attorney, who specializes in Panamanian maritime law. As is clearly stated in Mr. Jaen's affidavit, he discusses and evaluates controlling Panamanian maritime law (both statutory and decisional), as well as the legal treatises written by recognized Panamanian maritime legal authorities, and demonstrates that, without a doubt, Panamanian law recognizes the existence of a maritime lien in favor of both master and crew for their wage claims "and indemnities" at issue here.

Mr. Jaen's affidavit[8] specifically addresses the two questions raised by the Court in its Order of February 3, 2005:

    (1)    Does Panamanian maritime law entitle a master to a wage lien?

    (2)    Does Panamanian maritime law give a master status as a crew member?

---

[8] Mr. Jaen's affidavit specifically addresses other issues recently raised by the Court, including whether the Rig is a "vessel," whether the Rig is a vessel "in navigation," etc. He opines that the answers to both of those questions also is "yes." He also discusses the unusual provision under Panamanian law that a vessel owner/operator (here, Zapoteca or P.D. Gram) can withdraw its vessel from navigation by filing the proper, application, with the governmental vessel navigation office. But no one acting on behalf of the vessel filed or requested such a "withdrawal" from navigation for the vessel. Instead, Zapoteca chose to continue to keep the vessel's temporary navigation certification (which expires every four months if not renewed repeatedly) in effect. These steps show not only that Zapoteca did not withdraw the vessel from navigation, but repeatedly took the necessary steps to keep the vessel in navigation. For these reasons, Mr. Jaen's affidavit also is included in Captain Phillips' brief, Documents Regarding Vessel Status, filed herewith, but discussed in detail only above.

As addressed in the affidavit, the answer to both questions is an unequivocable "yes." Panamanian maritime law grants to both the crew of a vessel and the master of a vessel a maritime lien for non-payment of their wages (which is included within the term "salaries" of the statute), as well as for other "compensations and indemnities" to which they are due. In addition, the master shares the same status as a "mere" crew member and he is entitled to maritime liens, just as the crew, to protect such claims. See discussion in Mr. Jaen's affidavit and, in particular, Article 1507(3) of the relevant statute.

Consequently, there is no doubt but that the master and crew of the ENERGY ZAPOTECA have and are entitled to maritime liens for their wage claims, as well as for "compensations and indemnities" which together certainly are broad enough to include living expenses, bonuses, severance pay, penalty wages, etc., and specifically as to Captain Phillips, also would include the indemnity he seeks from Zapoteca regarding the civil suits and criminal charges outstanding against him personally in Mexico, which Zapoteca agreed to indemnity and protect him from, but has failed to do so.

### VI.   ZAPOTECA IS ESTOPPED FROM DISPUTING PHILLIPS' SEAMAN'S STATUS OR LIEN CLAIMS

As the Court is aware, there are numerous items of correspondence between Captain Phillips and his supervisors (primarily Christian Kongsli, acting on behalf of P.D. Gram & Co., the ship's managers, and who also was a part owner in Zapoteca Energy, Inc.), as well as with Zapoteca's Texas counsel, Ed Nelson. In numerous of

those correspondences, Captain Phillips is referred to as "master" or as "captain."[9] Likewise, the vessel's crew are described repeatedly as "crewmembers" or "crew."[10]

More significantly, when Captain Phillips became uneasy that his agreement for wages and bonus wages would not be honored by Zapoteca, he was specifically assured by Zapoteca's counsel, Ed Nelson, that <u>Captain Phillips' maritime lien claims are "fully valid under U.S. Law."</u>[11] That statement is not only a legal opinion, issued to Captain Phillips by Zapoteca's counsel, but is also an admission which is binding now upon Zapoteca, who is and should be estopped from contending otherwise.[12] Such is even more true when <u>the purpose of that representation was to provide assurance to Captain Phillips that his maritime lien claims against Zapoteca were valid and fully enforceable in a federal court in the United States</u>, so that he did not need to do anything at that time (in February/March of 2004) to secure or prosecute his maritime lien claims in Mexico. Captain Phillips detrimentally relied on that advice and did not take steps then to perfect or secure his maritime lien, so attorney Nelson's letter had its desired effect. Zapoteca should not gain the benefit of now arguing the contrary position, and in fact is and must be estopped from reneging on the representations and assurances it provided to Captain Phillips.

---

[9] See for example, the letters of February 9 and 10, 2004, from Mr. Nelson (Document No. 75 and 76 of Documents Regarding Vessel Status), in which Captain Phillips is referred to as "Master" and "seaman," and Mr. Kongsli's letter of July 6, 2000, which assigned Captain Phillips as the "Captain" of the "vessel" ENERGY ZAPOTECA (Document No. 8 of Documents Regarding Vessel Status).
[10] See for example, Document Nos. 20, 38, and 82 in Documents Regarding Vessel Status.
[11] See Document Nos. 75 and 76 in Documents Regarding Vessel Status.
[12] See generally the description of the estoppel issue; p. 14 of Captain Phillips' Brief on Jurisdiction and Remedies.

## VII. WHAT DO WAGES INCLUDE?

As the most obvious maritime lien claim is for protection of the maritime employer's failure to pay crewmembers' wages, the natural question is: how broad is the definition of seamen's "wages." In an word, "wages" is broad. Wages includes all regular, overtime and additional contractual benefits to which the seaman is entitled, plus so-called "penalty/double wages" under the federal statute, 46 U.S.C. § 10313, all of which apply to Captain Phillips and the Mexican crewmembers/intervenors.

"Wages" also includes (and also relevant here) the following: (1) completion bonuses, which apply to Captain Phillips; and (2) living allowances, which applies to both Captain Phillips and the Mexican crewmembers. The controlling case is *Williams v. Great Lakes Dredge & Co.*, 726 F.2d 278 (6th Cir. 1984), in which the district court awarded roughly $124,000 to each of two workers as penalty wages. Although their contracts of employment included payment of a completion bonus and travel allowances, they did not receive either payment. Rather, their employer contended that neither the completion bonus nor travel allowance was "part of wages." The district court and the court of appeals disagreed with the employer, and concluded that both elements of pay were a portion of "wages." That means that not only were those wages due, but the penalty wages under the federal wage penalty statute, 46 U.S.C. § 10313, also applied. Finally, it appears that more recent case law has established that bonuses of whatever kind are "wages." *Id.* Consequently, the court determined both that those elements of wages were due and that the penalty wage statute applied to them (which is how the award reached some $124,000 for each of the two men.)

### IX.   A MARITIME LIEN EXISTS FOR OTHER CLAIMS, AS WELL

As discussed above, the law is clear that maritime liens exist to protect seamen's wage claims, as well as for their penalty wages. While wages, severance, statutory wages, living expenses, reimbursement of living and travel expenses, and penalty wages are the only claims of the Mexican crewmembers, they are not the only claims of Captain Phillips, who also has claims for indemnity, retaliatory discharge, loss of future earnings (for failing to be able to return to Mexico for work) etc. While Zapoteca presumably will argue that it was entitled to terminate Captain Phillips employment without cause and with or without notice (See Ed Nelson's termination letter dated March 10, 2004, a copy of which is attached as Exhibit F), the law is clear that a ship's captain may <u>not</u> be fired for refusing to perform an illegal act, such as moving a vessel in violation of standing orders of the local court or port captain. That was the situation that got Captain Phillips fired, even though his immediate supervisor, Mr. Kongsli, was with him daily for most of the week leading up to his termination letter of March 10, 2004, and Mr. Kongsli <u>never</u> criticized, reprimanded, disciplined or otherwise complained whatsoever to Captain Phillips about any of these matters. The documents are clear that Zapoteca directed Captain Phillips to prepare to move the Rig and in fact to move it from one mooring berth in the port of Tuxpan to another, even though Zapoteca knew that the local port captain's orders <u>prohibited the vessel from being moved</u> before the maritime lien claims had been cleared by the local Mexican court, the local port captain received an order to that effect,

13

and the port captain then issued his own order allowing the vessel to move.[13]

Finally, when Zapoteca filed its TRO on March 12, 2004, it included in its motion a copy of an e-mail from Captain Phillips to Kim Steimler with P.D. Gram & Co. dated March 2, 2004, which states as follows:

> Unless I receive written confirmation from the port captain and labor president, I will not move the rig from its present location." I will not go against the Mexican Authorities just to accommodate [P.D. & Gram's] request [to move the Rig without governmental clearance]. What you are doing and ordering me to do is not correct operational procedures. Your wanting me to go against the rules and Mexican authorities is a clear breach. Quite simple: If you have this authorization [from the Mexican governmental authorities, permitting legal movement of the Rig], I am requesting, as master of the ENERGY ZAPOTECA, that you fax it to me. Then, we can put this issue to rest... simple![14]

Zapoteca included this e-mail in its TRO motion to suggest that Captain Phillips was not following their orders (to move the Rig, despite no evidence of governmental clearance to do so), but what that correspondence establishes is that Captain Phillips was asking that such clearance be granted, and that he be provided with a copy, so that he <u>legally could move</u> the Rig. The fact that he requested but never received such a vessel clearance order shows that he was doing his job properly, that Zapoteca was asking him to do what it knew was illegal, and that Zapoteca, rather than getting a clearance order, chose to fire their captain, preferring to attempt to move the Rig without getting the attachments lifted. Despite Zapoteca's efforts, the Rig was not moved from its then present location until April 5, 2004, which was shortly <u>after</u> the attachments were removed.

---

[13] See the letter from Arturo Bazaldua, dated November 28, 2003, Mexican attorney employed and paid by Zapoteca to advise and defend Captain Phillips as to the criminal charges, wherein he advised Zapoteca and Ed Nelson that the attachments (embargos) clearly <u>forbid the movement of the vessel</u>. The Rig's agent, Meritus on November 5, 2003, acting for Zapoteca, also confirmed that <u>the vessel could not be moved until the attachments (embargos) are lifted</u>; copies enclosed as Exhibits C and D.

[14] See Document No. 85 to Documents Regarding Vessel Status.

If Captain Phillips had moved the vessel without receiving those clearances and those release orders from the local court and the port captain in Tuxpan, he would have been <u>in violation of Mexican law</u> and he <u>personally</u> could and would have been arrested and put in jail as the master of the vessel who was attempting to move the vessel in an illegal manner. The same thing would occur in the United States, if a vessel owner attempted to move a vessel which was under the authority of the captain of the port of the United States Coast Guard. Just as in Mexico, the Coast Guard would stop the vessel from being moved, including detaining and arresting the vessel's master, if necessary, and then turning him over to the local police authorities, who could put that master in jail, if the offense was serious enough. Likewise, if a ship were under arrest by a U.S. Federal Judge, pursuant to a Marshal's usual notification to the vessel that it could not be moved pending a resolution of that arrest order, and the ship's master or crew attempted to depart the port in contravention of that order, you could be sure that the U.S. Marshal would do whatever was required to stop the vessel, including arresting and jailing the ship's officers and crew, if necessary. See for example, *Borden v. Amoco Coastwise Trading Co.*, 985 F. Supp. 692 (S.D. Tex. 1997); *Edgar v. Tyson Seafood Group, Inc.*, 1999 AMC 2278 (West. Dist. of Wa. 1999); *Stetson v. The F/V SEA CLOUD*, 673 F. Supp. 1130 (1987 DC Mass).

### X.     MARITIME LIENS SHOULD BE RECOGNIZED HERE UNDER THE COURT'S EQUITABLE POWERS

For centuries, admiralty courts have taken great care to protect seamen, which under U.S. law are widely recognized as the wards of the admiralty court. In 1823, in *Harden v. Gordon*, F. Cas No. 6047 (1823, CC Me); Justice Story, in a memorable opinion, noted 119 years later by the U.S. Supreme Court in *Garret v. Moore-*

*McCormack Co.*, 317 US 239, 87 L Ed 239, 63 S. Ct. 246, (1942), laid down those principles which in a large measure explain the "ward of the admiralty" theory and its application to release of claims improvidently signed by seamen, when he said:

> Every court should watch with jealousy an encroachment upon the rights of seamen, because they are unprotected and need counsel; because they are thoughtless and require indulgence; because they are credulous and complying ; and are easily overreached. But courts of maritime law have been in the constant habit of extending toward them a peculiar protecting favor and guardianship. They are emphatically the wards of admiralty; and though not technically incapable of entering into a valid contract, they are treated in the same manner as courts of equity are accustomed to treat young heirs, dealing with their expectancies, wards with their guardians and cestuis que trust with their trustees. They are considered as placed under the dominion and influence of men, who have naturally acquired a mastery over them; and as they have little of the foresight and caution belonging to persons trained in other pursuits of life, the most rigid scrutiny is instituted into the terms of every contract in which they engage. If there is any undue inequality in the terms, any disproportion in the bargain, any sacrifice of rights on one side which are not compensated by extraordinary benefits on the other, the judicial interpretation of the transactions, is that the bargain is unjust and unreasonable, that advantage has been taken of the situation of the weaker party, and that pro tanto the bargain ought to be set aside as inequitable.

The protective attitude of the admiralty courts was further explained in *The David Pratt*, F Cas No. 3597 (1839, DC Me), when Judge Ware stated:

> . . . A court of admiralty is, as to all matters falling within its jurisdiction, a court of equity. Its hands are not tied up by the rigid and technical rules of the common law, but it administers justice upon the large and liberal principles of courts which exercise a general equity jurisdiction. It is particularly fit that it should be free from the artificial and technical rules of the common law in dealing with contracts between seamen and ship owners. They are parties who do not stand in making their contracts, on even ground. Merchants are shrewd, careful, familiar with the forms of business, watchful and far-sighted in providing for their own interests; while seamen are ignorant, improvident, and necessitous, a most useful and necessary class of persons to a maritime and commercial people both in peach and war, gallant and fearless of personal danger but wholly unable to defend their rights against the superior knowledge, sagacity, and wealth of their employers. They are therefore wisely, upon principles of public policy, as well as private justice, placed under the

protection of the law. They are permitted to sue *in forma pauperis* because if they were not allowed to come into court in this way, but were required to find security for costs, like other parties, it would amount to a practical denial of justice.

As the above citations show, courts acting under their Admiralty jurisdiction extend considerable protection in favor of merchant mariners, their "wards," especially when they have been over-reached by their (frequently more crafty) employers. The courts are quick to protect such mariners, including even setting aside the settlement contracts (not applicable here) between them and their maritime employers.

Such principles of equity and protection should be exercised here in favor of Captain Phillips and the Mexican crew, who should be granted maritime liens to protect their claims, especially in the face of heavy-handed treatment and duplicitous conduct, culminating now in Zapoteca's position, despite its assurances earlier to the contrary, that Captain Phillips is not the "master," that the Mexican crewmembers are not "crew," that neither have maritime liens to protect their wages, and even that the Rig is not even a vessel in navigation, despite the fact that the Rig in fact made a voyage during the relevant time period!

## XI. CONCLUSION

For the reasons described above, both Captain Phillips and the Mexican Crew have a maritime lien to enforce payment of and security for their seaman's wages (including bonus wages and travel allowances, plus penalty wages), under the well-established authorities and principles described above, and because Zapoteca has conceded that the crewmembers are crewmembers and that Captain Phillips, as the master of the vessel, has a seaman's claim "fully valid" under U.S. law and is estopped now from contending otherwise. In addition, Captain Phillips has a maritime lien to

protect his claims for disbursements that he paid on behalf of the vessel and for his wrongful discharge, as he had made a prima facie case that he was discharged for failing to move the vessel in violation of local and controlling law. In short, these claims give rise to maritime liens, which may be secured against the vessel *in rem* and for which her owners, Zapoteca Energy, Inc. should be required to post a surety bond in lieu of an *in rem* attachment of the vessel for the various claims of Captain Phillips and of the Mexican crewmembers/intervenors herein.

Respectfully submitted,

**THE LANIER LAW FIRM, P.C.**

BY: _____
CHARLES F. HERD, JR.
TSB# 09504480
ATTORNEY IN CHARGE
LAWRENCE P. WILSON
TSB # 21704100
KEVIN P. PARKER
SBN #15494020
P. O. Box 691408
Houston, TX 77269-1408
(713) 659-5200
Fax: (713) 659-2204

**ATTORNEYS FOR DEFENDANT/COUNTER CLAIMANT, CHARLES D. PHILLIPS AND MEXICAN CREWMEMBERS: JAIME ARTURO CASTELLANOS DIAZ, ALEJANDRES DIAZ COBOS, PEDRO MEIJALIMA, FERNANDO TREJOMAR, MARCO ANTONIO LIZAMA RODRIGUEZ, CIRO ELORZA MARTINEZ, JOSE MUNOZ LOPEZ, AND CANDIDO MALDONADO**

**LOCAL COUNSEL:**

Mr. C. Frank Wood
SANCHEZ, WHITTINGTON, JANIS
& ZABARTE, L.L.P.
100 North Expressway 83
Brownsville, Texas 78521-2284

## CERTIFICATE OF SERVICE

I hereby certify that a true and correct copy of the foregoing instrument has been forwarded to all counsel in accordance with the Federal Rules of Civil Procedure on this the 11th day of February, 2005.

Mr. Robert W. Klawetter
EASTHAM, WATSON, DALE & FORNEY, L.L.P.
808 Travis, 20th Floor
Houston, Texas 77002
**ATTORNEYS FOR PLAINTIFF
ZAPOTECA ENERGY, INC.**

Mr. Lee Haag
Ms. Tonja De Sloover
FULBRIGHT & JAWORSKI, L.L.P.
1301 McKinney, Suite 5100
Houston, Texas 77010-3095

Jaime Arturo Saenz **(formal Response only; documents sent to Mr. Haag only)**
RODRIGUEZ, COLVIN, CHANEY & SAENZ, L.L.P.
1201 East Van Buren
P. O. Box 2155
Brownsville, Texas 78522
**ATTORNEYS FOR INTERVENOR
NABORS DRILLING INTERNATIONAL**

Michael J. Maloney
MALONEY, MARTIN & MITCHELL, LLP
3401 Allen Parkway, Suite 100
Houston, Texas 77019
**ATTORNEYS FOR INTERVENOR
STEVE GRAY**

C. Frank Wood