# DOCUMENT
# NO. 104

IN THE UNITED STATES DISTRICT COURT
FOR THE SOUTHERN DISTRICT OF TEXAS
BROWNSVILLE DIVISION

ZAPOTECA ENERGY, INC.        §
                             §
VS.                          §        CIVIL NO. B-04-048
                             §        In Admiralty/Rule 9(h)
CHARLES DOUGLAS PHILLIPS, et al.  §

### AFFIDAVIT OF CHARLES D. PHILLIPS

STATE OF TEXAS        §
                      §
COUNTY OF HARRIS      §

Before me, the undersigned officer, on this day personally appeared Charles D. Phillips who, after first being duly sworn, deposes and says on oath as follows:

1.      My name is Charles D. Phillips. I am over the age of 21 years. I have never been convicted of a felony or a crime of moral turpitude, and I am not otherwise disqualified from making this affidavit. Except where otherwise stated, I have personal knowledge of every fact to which I testify in this affidavit and every fact to which I testify in this affidavit is true and correct to my personal knowledge.

2.      During the hearing/status conference held on December 14, 2004, I heard the lawyers for Zapoteca state that the Rig ENERGY ZAPOTECA was "totally destroyed," a "total loss,"etc., as a result of a fire which they claim occurred on the Rig (as opposed to the drilling package/derrick, which is located on the cantilever adjacent to the Rig) in 1989. Those statements are not correct, for the reasons described herein.

3.      Certain equipment aboard the Rig (specifically the drilling package, drilling substructure, and the cantilever), all of which were positioned 65 feet aft of the

1

stern of the "Zapoteca," was destroyed in the "fire" Zapoteca now complains of, which occurred in 1989.

4.    The Rig itself was <u>not</u> damaged by the fire.  It was the "wellhead," which is just below the drill floor (all of which was located 65 feet <u>aft</u> of the Rig), that was burning, <u>not</u> the Rig "Zapoteca."

5.    After the fire, PMM/Protexa removed the accommodation unit (which was not damaged by the fire, and was still fully operational, valuable, and usable) and placed it onboard one of its barges.  It then rented the accommodation unit to Pemex.  Likewise, the Rig's cranes also were not damaged by the fire, so were still operable, valuable, and useable, so PMM/Protexa also removed the Rig's offshore Link-Belt cranes, rented them out and placed them aboard a McDermott barge.  Likewise, the Rig's helideck was not damaged by the fire, and was still valuable, useable and operable, so PMM/Protexa also removed the Rig's helideck and placed it onboard another barge for use on one of its other barges.

6.    PMM/Protexa also removed all drilling equipment and associated equipment from the Rig, which equipment also was not destroyed by the fire. PMM/Protexa placed that equipment onboard the Zapoteca's sister Rig, the TOTONACA, where that equipment continued to be used.

7.    Zapoteca Energy, Inc. had been negotiating throughout the Spring of 2002 through the Summer of 2003 with Protexa for the return of one of the Rig's Link-Belt Cranes and the Rig's entire helideck.  Neither the crane nor the helideck had been damaged by the "fire," so were still fully operable, usable and valuable.  At the end of those negotiations, Zapoteca chose to give up the crane and helideck as part of its

agreement with Protexa, in order to get the "export document" back from Protexa/Celasa, so that the ENERGY ZAPOTECA could depart Mexico.

8.    In 2001, Bureau Veritas, the Classification Society in effect for the Rig, inspected the Rig's 3 jacking units, along with the 36 gears/pinions/motors (all of which are located on the Rig, not on the cantilever) and concluded that there was <u>no damage</u> to them whatsoever as a result of the "fire." In fact, the B.V. surveyor stated that the 2 aft jacking units (shown as Item E on the enclosed diagram, Exhibit A), which was equipment relatively close to the wellhead fire on the cantilever, were 75 feet from the "fire," which was far enough away so as to be undamaged by the fire.

9.    All inspection reports and approvals of the Rig from Bureau Veritas were located in the Zapoteca files at the time I turned these files over in March of 2004. Copies or originals of such reports and related documents also should be in the files of Bureau Veritas.

10.    Attached hereto as Exhibit A are schematic diagrams and details for the Rig. The circled area shows the cantilever, drill floor, substructure, pipe rack deck, and derrick, all of which were destroyed by the fire. The schematic drawings show the equipment not damaged by the fire, which is all the areas shown as A, B, C, D, and E.

11.    The cantilever (and the equipment on it) was cut off from the Rig and discarded after the fire, because that and only that is the equipment that was damaged.

12.    Attached hereto as Exhibit B is a "vivid fire photograph" provided recently by Zapoteca's counsel. The photograph depicts the location of the fire itself (i.e. the flames) coming from the wellhead, which is on the cantilever, not on the Rig. Only the supply boat on the left is applying water to the fire (on the cantilever). The other

boats are spraying water on the Rig, even though the fire never reached it, in order to keep the Rig itself cool, so no damage to the Rig itself would occur. Those effort were successful, as no damage whatsoever to the Rig itself occurred as a result of or following the fire.

FURTHER AFFIANT SAYETH NOT:

_____
Charles D. Phillips

SWORN TO AND SUBSCRIBED BEFORE ME on this 96th day of February, 2005.

_____
Notary Public in and for the State of Texas

RHONDA K. HARSHBARGER
NOTARY PUBLIC, STATE OF TEXAS
MY COMMISSION EXPIRES
NOV. 21, 2008

_____
Printed Name of Notary

My Commission Expires:_____

4

# EXHIBIT A

ZAPOTECA

Zapoteca Specifications:

Cantilever Substructure:

The drilling package consists of the following:

1. Cantilever          50 feet
2. Drill floor         26 feet
3. Substructure        20 feet
4. Pipe rack deck      12 feet
4. Derrick            147 feet

Length Center of well Over Stern Max        40 Feet

Height of Substructure above main deck:    20 feet


The fire on the drilling package was 26 feet above the main deck of the Zapoteca.

No stern shell plating had to be replaced due to the fire.    Item A
Location of the Port and Stbd cranes.  Item B
Location of the accommodations.  Item C
Location of Helideck.  Item D
Port & Stbd jacking units.  Item E

THE ~~CIRCLED AREAS~~ ~~THE DERRICK, WELL HEAD AND CANTILEVERS~~ THE WELL HEAD FIRE OCCURRED ONLY HERE. THIS IS THE ONLY EQUIPMENT DESTROYED BY THE FIRE.



ONLY THIS WAS DESTROYED BY FIRE

SIDE VIEW

AFT VIEW

TOP VIEW

TANK VIEW

ZAPOTECA



ITEM E

SIDE VIEW
ITEM B

ITEM C

AFT VIEW

TOP VIEW

TANK VIEW

ITEM A

ITEM E

ZAPOTECA

ITEM D

ITEM B

# EXHIBIT B



ZEI 0686
PHILLIPS

# DOCUMENT NO. 105

## AFFIDAVIT OF MR. RAUL JAEN GUARDIA

On this date, personally appeared RAUL JAEN GUARDIA, who being first duly sworn, deposes and says as follows:

1.   I am of legal age, competent to testify, have personal information as to all factual matters reflected herein, and provide the following as my legal opinion and as my free act and deed:

2.   I am an attorney at law duly admitted to practice in the Courts of the Republic of Panama since 1983 and a partner of the law firm CARREIRA PITTI, P.C. ATTORNEYS, whose offices are located on 55 Street, El Cangrejo, Building 225, Panama City, Republic of Panama.

3.   I received my legal education at the University of Santa Maria La Antigua, Catholic University of Panama, where I was awarded a Bachelor of Laws Degree in the year 1983.

4.   I am admitted to practice before the Supreme Court of Panama and all subordinate Courts of that country.

5.   I have a Master of Laws (LL.M.) Degree from the University of Ottawa, Canada 1988.

6.   I am a member of the National Bar Association of Panama and the Maritime Law Association of Panama ( Member of the Board of Directors 1994-1988 and 1998-2000)

7.   Since 1988, I have been litigating maritime and corporate matters in Panama, Republic of Panama, and have acted as consultant in Panamanian Law in general, and Panamanian Maritime Law, in particular.

8.   I have been requested by Mr. Charles F. Herd, Jr., from the LANIER LAW FIRM in the United States of America, located at 6810 FM 1960 West, Houston, Texas 77269-1448, to provide a legal opinion with regard to the application and operation under Panama Maritime Law as it concerns the Panamanian-flag vessel, ENERGY ZAPOTECA, official number Certificate of Registration No. 28909-PEXT-1 Extension 376-04, having gross registered tonnage of 3,675.32 and having her owners of record reflected as Zapoteca Energy, Inc., a Liberian corporation. (That

*A:\AFFIDAVIT URGENT.wpd*

*Page 1*



Vessel will be referred to herein as "the Rig" or "the vessel.") I have been asked in particular:

(A)   Whether under Panamanian law, the Rig would be a "vessel" and if so, a vessel "in navigation," and

(B)   Whether the crew and/or master of the Rig have a maritime lien against the Rig in the event of non-payment of their wages (or similar wage-related claims, including severance monies) and indemnities due to them by the vessel owners.

9.   I have researched the status of the Rig ENERGY ZAPOTECA, which is described as a jack-up barge Rig and which is currently licensed under the law of Panama No. 28909-PEXT-1 Extension No. 376-04. I have studied the Vessel's files in the office of Panama Maritime Authority, Directorate General of Merchant Marine in Panama City.

10.   The Rig's navigation certificate (Patente) is current through December 31, 2004,. Patente is still on effect due to owners have three months to re-issue a new provisional or a permanent one; and has been kept current since an active navigation certificate was applied for by the Rig's former owner, Protexa/Celesa, and received on March 2, 2000. The Vessel's navigation certificates have been kept current and have never gone out of effect from March 2, 2000, through at least December 31, 2004. All of her permissions were Provisional (i.e. temporary) Navigation Patents (i.e. the Vessel's legal representative(s) never requested Permanent Navigation Patents/Certificates). That means the temporary certificates must be renewed and extended approximately every 4 months, or they will expire and lapse. The owners carefully and timely filed to have the Navigation Certificates updated and extended, so they never expired or lapsed.

11.   I also have reviewed the Vessel's records in the Panama Maritime Authority at Directorate General of Merchant Marine in Panama City, to determine the legal status of the Rig under Panamanian Law. The status of the Rig is "vessel in navigation" because there is no record and/or notice sent to the office of the Panama Maritime Authority requesting permission to lift her status as a Vessel under the Registry.

*A:\AFFIDAVIT URGENT.wpd*

*Page 2*



Under Panamanian Law, a drilling rig is considered to be a vessel under navigation, unless the Panama Registry is duly notified otherwise. The Panama Registry was never notified, or requested, that the Rig be classified in any way or manner other than a vessel in navigation.

13.    Panama has a procedure by which a vessel-owner can <u>withdraw</u> a vessel from navigation. Indeed, the owner of a vessel just have to file an application for withdrawall or cancellation. Is it then reviewed by the Panama Maritime Authority and if all is in order, does Panama Maritime Authority then issue a Resolution to delete and/or cancel the Registration of such a vessel. With the abovementioned application, said shipowner must submit evidence that the vessel is up to date in payments to the National Treasury, and free from encumbrances, only then the vessel is withdrawn. I have viewed the records at the office of the Panama Maritime Authority, Directorate General of Merchant Marine in Panama City, to see if there has been any such filing or request, by the owners or anyone else, for the Rig to be filed or placed as "withdrawn" from navigation. There has been no such filing or request, nor has that office otherwise determined that the vessel is "withdrawn" from navigation.

14..    Therefore, I can state with certainty because: (1) the owners kept the navigation certificates current; and (2) the owners filed nothing to have the Vessel withdrawn from navigation, that under Panamanian Law, there is no doubt whatsoever that the Rig ENERGY ZAPOTECA would be found to be: (a) a vessel; and (b) "in navigation," throughout the period of March 2, 2000, through today's date.

15.    Second, I have been asked to provide my legal opinion on the status of the crew's claims and master's claims under Panamanian Law in the event of non-payment of their wages (including severance and other portions of their wages and compensation package) by the Vessel's owners, and in the event such occurred, whether those claims constitute maritime liens under Panamanian Law. The short answer is "yes"– the details are as follows:

A.    First, the Panamanian Code of Commerce under Chapter II, Privileged Credits on Vessels, Article 1507(3), the Master and crew members have a Maritime Lien for unpaid wages, salaries, compensations and indemnities against the Rig ENERGY ZAPOTECA.



**B.**  Second, we must consider and translate the entire Article 1507 of the Commercial Code of the Republic of Panama. The English translation is as follows:

Article 1507: The following credits shall have priority in respect to the ship, and may be recovered from the price thereof in the order herein set forth:

1.  Court costs incurred in the common interest of maritime creditors;

2.  Expenses, compensations, salaries and salvage for the last voyage;

3.  Salaries, compensations, and indemnities to the Master and crew for their last voyage;

4.  Salaries, and wages to stevedores and pier handlers directly hired by the owner, the vessel Manager or the Master of the ship for loading and unloading thereof upon its last arrival;

5.  Compensation payable for damages due to fault or negligence;

6.  Amounts due in General Average;

7.  Ship's mortgage;

8.  Amounts due by reason of debts incurred in providing for the vessel's needs and stores.

9.  Amounts taken on bottomry on the ship's hull and rigging for ammunition, arms, and tackle, if the contract was entered into and signed before the ship left the port wherein said obligations were incurred; and insurance premiums for the last six months;

10.  Salaries of pilots, keepers and maintenance and custody expenses affecting the ship, her tackle and ammunition after her last voyage and entry into port;

11.  Indemnities to stevedores and passengers for failure to deliver the cargo or for damage thereto chargeable to the Master or the crew during the last voyage;

*A:\AFFIDAVIT URGENT.wpd*



12.   The price of the last sale of the ship and interest due during the last two years.

16. In addition, according to legal doctrine (as noted by recognized Panamanian legal scholars), as well as the jurisprudence of the Maritime Court of Panama and the Supreme Court of Justice, the meaning and interpretation of Article 1507 (3) is a very broad one, and it includes all types of salaries, compensations and indemnities owed to the Master and crew members. In other words, under the above-cited Article, it is clear and beyond any doubt, that Panama Law recognizes a lien against a vessel for all wages, wage-related severance and penalties for non-payment or late payment, reimbursement of living expenses, travel or related costs which are incident to employment, bonuses, vacation pay, fringe benefits, work-required expenses and the like, as well as indemnizations in favor of the Master and crew, who are considered and are taken into account as employees of the vessel, and that the maritime lien that they possess is ranked in the third place of priority according to such a Law.

17.   Enclosed is a certified and /notarized copy of the relevant Panamanian Code of Commerce, which specifically is Article 1507, Chapter II, Privileged Credits on Vessels. The English translation of Article 1507, including especially subsection (3), is stated accurately in Paragraph 16(B) above.

19.   Most recently, I have been provided with and have reviewed, the Order dated February 3, 2005, issued by the Honorable Andrew S. Hanen, United States District Judge, United States District Court for the Southern District of Texas, Brownsville Division, in Cause No. B-04-048; styled ZAPOTECA ENERGY, INC. v. CHARLES DOUGLAS PHILLIPS, ET AL. I note in particular that the Court has asked me to address two specific questions stated there. In the Order, the Court asks two questions:

1.   Does Panamanian maritime law entitle a master to a wage lien?

2.   Does Panamanian maritime law give a master status as a crew member?

For the reasons described above, I can state, as to the two questions addressed in that Order, the following:

A.   I can state beyond doubt that, according to Article 1507 subsection (3) of the Panama Code of Commerce



(described and translated above), Panamanian Maritime Law entitles a master to a wage lien, including specifically a maritime lien against the Vessel involved here, to protect his claim for wages, compensation and indemnifications (as described above) which are owed to him; and

B.     Likewise, I also declare that, according to Article 1507 number (3) (described and translated above), Panamanian Maritime Law gives the master equal status as a crew member, who stands even with and in the same stead as all other crewmembers of the Vessel.

20.     I understand that this Affidavit is to be used in Court in an action against a vessel and her owners and managers for various claims, including the payment of salaries, wages, indemnizations, compensations and indemnities for the Master and the crewmembers who have worked on board the Vessel. The above statements and opinions apply precisely in and to such circumstances and parties.

21.     FURTHER AFFIANT SAYS NAUGHT

SWORN TO AND SUBSCRIBED BEFORE ME on this 10th., day of February, 2005.

RAUL JAEN GUARDIA

NOTARY PUBLIC IN AND FOR THE REPUBLIC OF PANAMA
Licdo. Boris Barrios González
Notario Público Primero
del Circuito de Panamá

*A:\AFFIDAVIT URGENT.wpd*

*Page 6*



# MARITIME LAW

## OF THE

## REPUBLIC OF PANAMA

Prepared for the
Directorate General of Consular and Maritime Affairs
of the Ministry of Finance and Treasury
of the Republic of Panama
and revised by
**Mr. Julio R. Chanson,**
Director
of the Representative Office to the Directorate General in New York

We hereby express our acknowledgement to Mr. **Joel R. Medina** and Ms. **Sandra Rina Palazio** (Attorneys at Law) for their previous contribution in preparing the material related to this subject.



ment or transfer of a preferred credit, the endorsement shall likewise entail transfer of the preference.

## CHAPTER II
## PRIVILEGED CREDITS
## ON VESSELS

**ARTICLE 1507:** The following credits shall have priority in respect to the ship, and may be recovered from the price thereof in the order herein set forth:

1. Court costs incurred in the common interest of maritime creditors;
2. Expenses, compensations, salaries and salvage for the last voyage;
3. Salaries, compensations, and indemnities to the Master and crew for their last voyage;
4. Salaries and wages to stevedores and pier handlers directly hired by the owner, the vessel Manager or the Master of the ship for loading and unloading thereof upon its last arrival;
5. Compensation payable for damages due to fault or negligence;
6. Amounts due in general average;
7. Ship's mortgage;
8. Amounts due by reason of debts incurred in providing for the vessels' needs and stores;
9. Amounts taken on bottomry on the ship's hull and rigging for amunition, arms and tackle, if the contract was entered into and signed before the ship left the port wherein said obligations were incurred; and insurance premiums for the last six months;
10. Salaries of pilots, keepers and maintenance and custody expenses affecting the ship, her tackle and ammunition after her last voyage and entry into port;
11. Indemnities to stevedores and passengers for failure to deliver the cargo or for damage thereto chargeable to the Master or the crew during the last voyage;
12. The price of the last sale of the ship and interest due during the last two years.
(Text of Art. 1507, as subrogated by Art.1 of Law 40 of 1946).

**ARTICLE 1508:** The encumbrance of the vessel for payment of a maritime credit shall be cancelled by judicial sale thereof.

The vessel disposed of non-judicially shall be transferred to the buyer subject to all maritime credits encumbering the same. The encumbrance of the vessel for payment of such maritime credits shall be extinguished after six (6) months have transpired, counted from the date of definite registration at the Public Registry of the transfer of property.

The provisions of the immediately preceding paragraph shall not apply to the naval mortgage.
(Text of article 1508 as subrogated by article 4 of Law 43, 1984)

**ARTICLE 1509:** The preference shall not be extinguished with respect to a preferred creditor who, before expiration of the period mentioned in the foregoing article, shall have brought legal action to assert his preference.

## CHAPTER III
## PRIVILEGED CREDITS ON THE
## FREIGHT

**ARTICLE 1510:** The following credits shall have priority over the cargo and shall contest in the price thereof in the order set forth in this article:

1. Court costs incurred in the common interest of creditors;
2. Expenses, compensations and salaries for assistance and salvage for the last voyage;
3. Salaries, retributions and compensations due to the Master and members of the crew for the voyage in which the freight was earned;

- 44 -

[black rectangular marking]



4. Amounts due for contribution in general average;
5. Bottomry loans on the freight earned;
6. Insurance premiums;
7. Principal and interest due by virtue of indebtedness incurred by the Master on the freight, with legal formalities;
8. Indemnities to stevedores or charters for failure to deliver the cargo or for damage thereto chargeable to the Master or to the crew during the last voyage;
9. Any other debt incurred by a bottomry loan or with a duly recorded ship mortgage or pledge on the freight.

## CHAPTER IV
## PRIVILEGED CREDITS
## ON CARGO

ARTICLE 1511: The following credits shall have priority over the cargo and shall contest in the price thereof in the order set forth in this article:

1. Court costs incurred in the common interest of creditors;
2. Expenses, compensations and salaries for assistance and salvage for the last voyage;
3. Commercial taxes or fiscal dues on the cargo itself at the place of loading;
4. Transportation and loading expenses;
5. Warehouse rental on cargo unloaded;
6. Amounts due for contribution in general average;
7. Bottomry loans and insurance premiums;
8. Principal and interest due on indebtedness incurred by the Master on the cargo with due formalities.
9. Any other loan with pledge on the cargo, if the lender holds the bill of lading.

## CHAPTER V
## MARINE MORTGAGE

ARTICLE 1512: Merchant vessels may be mortgaged in the manner established in the Civil Code for the mortgaging of immovables.

The provisions of said Code shall apply to ship mortgages insofar as they do not conflict with the provisions of this Chapter.

ARTICLE 1512A: The Consuls referred to in Article 1083-A are authorized to receive and process applications for Preliminary Registration of documents creating, amending or releasing mortgages or assignment of mortgaged credits on vessels in the National Merchant Marine, as provided in the following articles.
(Text of Article 1512-A as subrogated by article 5 of Law 43, 1984)

ARTICLE 1512B: Preliminary Registration of Mortgages on national vessels shall be made as follows:

a) The interested party shall apply to the Consuls for Preliminary Registration in a form to be furnished by the Directorate General of the Public Registry Office, where it shall be shown, at least, the names and domiciles of the mortgage debtor and mortgage creditor, the amount secured, the interest rate, maturity of principal and interest, actual and former name of the vessel, the number of her navigating patente, her tonnages and principal measurements and the value or price assigned to the vessel in case of auction, which data shall be obtained from the mortgage filed with the Consul by the interested party.

b) After collating the data in the form with the data in the mortgage document and ascertaining that the registration fees thereon have been paid, the Consul shall transmit the text of the application of the interested party to the Public Registry Office in the City of Panama, stating that payment has been made and giving the number of the corresponding receipt.