IN THE UNITED STATES DISTRICT COURT
FOR THE SOUTHERN DISTRICT OF TEXAS
BROWNSVILLE DIVISION

United States District Court
Southern District of Texas
FILED

FEB 1 1 2005

Michael N. Milby
Clerk of Court

| | | |
|---|---|---|
| ZAPOTECA ENERGY, INC. | § | |
| | § | |
| VS. | § | CIVIL NO. B-04-048 |
| | § | In Admiralty; Rule 9(h) |
| CHARLES DOUGLAS PHILLIPS, et al. | § | |

## DOCUMENTS REGARDING VESSEL STATUS

COMES NOW, Charles D. Phillips, licensed Master and vessel Captain (hereinafter "Captain Phillips"), who files this his listing of various documents regarding the "vessel in navigation" status of the Jack-up Rig/vessel ENERGY ZAPOTECA, respectfully submitting the following list[1]:

1.      ENERGY ZAPOTECA marketing brochure (Document created sometime in 2001; exact date unknown).  The Rig is described as "a Baredeck jack-up barge," a "self-elevating barge" and "the barge." (See p. 2).  Note the final page; the "Owner/Manager" is listed as "P.D. Gram & Co. AS" and the "marketing" is by "Christian Kongsli" individually.

2.      Temporary Mooring Permit, September 15, 1999 - June 2000, acquired by the vessel's then owner, PMM/Protexa.  (A vessel "withdrawn from navigation" does not have this.)

3.      Panamanian Navigation Certificate, issued March 2, 2000 (even before Zapoteca acquired the Rig).  (Note: the certificate is issued for a "non-propulsion vessel," without a radio aboard.)  This certificate was renewed continually, approximately every 4 months, and so never lapsed. The Rig always had a current navigation certificate throughout the time period at issue.

4.      March 7, 2000, MOA/Sales Agreement between PMM (Protexa) and Energy

---

[1]   The documents, generally in chronological order, are attached hereto for ease of reference; the numbers relate to the exhibit number marked on each document.

Drilling Company, Inc. Title later was transferred to a new company, Zapoteca Energy, Inc., (hereinafter "Zapoteca"), which company was created simply to hold title to the Rig. Note that the form used is the "Norwegian Shipbrokers' Association's Memorandum of Agreement for Sale and Purchase of Ships." Throughout the document, the Rig is called "The Vessel"; Clause 17 reads: "The Vessel, with everything belonging to her . . ."). Clause 5 states: "Should the vessel become a total or constructive loss ("CTL") before delivery, the deposit shall be immediately released to the Buyers and the contract thereafter considered null and void." That clause makes clear that the vessel was not a CTL at the time Zapoteca acquired her. There also is the standard warranty regarding freedom from maritime liens (Clause 9), which arise only in the context of the sale of a ship. Paragraph 18, insurance, has the standard policies and insurance provisions, including: hull and machinery; protection and indemnity; drill barge, etc. that apply to merchant vessels in navigation. Clause 24 indicates that the vessel will not be employed in Mexican waters for drilling, but may be used "as an accommodation, production or maintenance unit." That provision confirms that Zapoteca did not intend at the moment of acquisition that the vessel be returned to a drilling rig; rather, it planned to reconfigure her for some other purpose. Such continues to be the situation today.

5.    April 17, 2000, Articles of Incorporation of Zapoteca Energy, Inc. Note stamp on first page: "Bureau of Maritime Affairs of Liberia."

6.    Delivery confirmation, dated May 4, 2000. PMM/Protexa delivers "the Vessel described below. . ."

7.    May 5, 2000, Repair and Classification Agreement between Southern International, Inc. ("SII") and Zapoteca Energy. Note: Rig at that time is the ZAPOTECA, to be renamed ENERGY ZAPOTECA. Repair and classification work to be completed by June 30,

2000; per Section 6.1, some 45 days later. Owners to maintain marine insurance applicable to vessels under Section 9.3.

8.      On July 6, 2000, Mr. Kongsli, acting on behalf of Zapoteca, advised Canega, the Vessel's agent, that Charles D. Phillips was designated "captain" of the Rig, which it twice indicated in the letter was "our vessel." The letter also lists "our marine personnel," which is a reference to the crewmembers hired later to work on and aboard the Rig. The purpose of the letter was for Canega to then petition the Mexican government to issue maritime work permits for those men.

9.      August 11, 2000, Captain Phillips' Maritime Work Permit, issued by the Mexican government. Phillips is "authorized to work as Captain of the Vessel ENERGY ZAPOTECA located at the Celsea Dock, Tuxpan, Veracruz." (Translation also enclosed).

10.     Marine insurance coverages for the Vessel, effective May 1, 2000, and continuing. These are classic marine insurance policies, which apply to vessels "in navigation," not other kinds of property and certainly not vessels "withdrawn" from navigation. Coverage specifically includes "transits programs" (i.e., voyages) of the rig within the geographical confines of the Gulf of Mexico and in the Port of Tuxpan. Coverage also includes the classic "perils of the seas" provision, which applies to ships at sea, not those withdrawn from navigation. Collision liability (Clause 7 on page 2) also includes liability "to any other vessel." (Recall that "collision" in a maritime context is the unintended striking between mobile ships; "allision" is the striking of a ship against a fixed object, such as a dock.) Throughout these coverages, the Rig is described as "the vessel."

11.     November 17, 2000, letter from John LeBourhis (marine surveyors) indicating that the Rig is jacked-up; moored in water; in the Pantepec River in Tuxpan, Mexico. Purpose of

the survey is to make the Vessel "fit for a single towage to Galveston, Texas." Detailed discussions of light-ship data, etc. arise for vessels <u>in</u> navigation, not other equipment. The surveyor listed various recommendations, which were addressed in due course thereafter.

12.    Current printout of Nordisk Members' Rules for its Ship-owners and Members. In Section 1.2, "member" is a person or company who has entered a ship with the Association. In Section 2.1 and 2.2, a person who "owns, charters, has control over or is the manager of a ship can enter such ship in the Association" and the definition of ship "shall include drilling vessels and other floating structures at sea which are used in the exploitation of oil or gas." The Rig ENERGY ZAPOTECA has met and still meets this definition; it is a "ship;" and the owner/managers are "members" under the Association's rules (which is why you see Nordisk's representatives, and now its attorneys, Eastham, Watson, Dale & Forney, defending its member and otherwise involved in this matter).

13.    January 4, 2001 to April 4, 2001 - Navigational Certificate for Rig.

14.    April 4, 2001 to July 4, 2001 - Navigational Certificate for Rig.

15.    April 17, 2001. P.D. Gram and Zapoteca's appointment of Captain Phillips as Legal Representative to act on behalf of Zapoteca in Mexican labor cases, which cases resulted in maritime liens ("embargoes") being placed against the Rig in Mexico.

16.    An example of the salary invoices from Captain Phillips to P.D. Gram, dated December 14, 2000, through March 10, 2004. (Note: "Master" and ship's stamp used repeatedly.) There were approximately 77 of these invoices submitted, approved and paid by Zapoteca/Gram; only the final invoice, covering the period March 1-10, 2004, which also was submitted by Captain Phillips, was <u>not</u> approved or paid by Zapoteca or Gram.

17.    December 4, 2001, letter from the Secretary of Communication and Transportation (which governs the merchant marine, merchant vessels and navigation in Mexico), which acknowledges Charles Phillips as the Captain of the vessel ENERGY ZAPOTECA.

18.    January 4, 2002, letter from Panamanian ship counsel to vessels' manager (P.D. Gram) confirming extension of the Panamanian Navigation Certificate (which continued in effect through various extensions and is still in effect today; see item 2 above), references to tonnage certificates, vessel's inspections, etc.  All these documents, and the letter itself, reflect that this is a vessel <u>in</u> navigation; see the note that these records "must be <u>kept onboard of vessel</u>."

19.    February 20, 2002, fax from Kongsli reflecting the possibility of Rig purchase by Pemex and that Zapoteca would present the Rig in its then-upgraded and current-classed status for 15 million dollars, with Pemex to invest 10 million dollars for final outfitting.  (This was one of several proposals Zapoteca explored with various proposed purchasers/joint venture partners throughout 2000-2003).

20.    May 8, 2002, letter between Vessel's managers (P.D. Gram) and Captain Phillips regarding <u>engagement of the ship's crew</u> to continue repairs and ready the ship for sailing.

21.    May 24, 2002, letter from Ship's P&I Club, Nordisk, to Captain Phillips, acting under direction of Mr. Kongsli, which refers to Phillips as "Captain" and reflects that Nordisk, the P&I representative for the ship, is actively involved in addressing the ship's (already mounting) legal claims in Mexico.

22.    June 19, 2002, e-mail from Arne Blystad (one of the owners of Zapoteca) to Captain Phillips, requesting information regarding a tender from Pemex for accommodation rigs: "It seems to me that might be perfect for our unit."

23.    December 1, 2002 to April 4, 2003 - Panamanian Navigational Certificate for Rig.

24.    January 28, 2003, fax confirming marine insurance coverage for the "ship" Energy Zapoteca; notice of assignment describes the "vessel" as the Panamanian flag rig Energy Zapoteca and again lists various traditional insurance coverages which apply to such vessels, *i.e* marine, hull, port risks, towage, etc.  It specifically includes "tow down river for customs clearance and then towage to Brownsville, Texas."

25.    March 3, 2003, e-mail from Arne Blystad (one of the owners) to Nor-Marine, the broker in the Nabors purchase of the Rig ENERGY ZAPOTECA.  The Rig is classed with B/V (Bureau Veritas), flag-Panama, and with Panamanian Navigation Certificate 28909 PEXT-1. "The vessel shall be delivered as is with her class AR PR BV letter March 1, 2002 and other certificates as pr (sic) time of inspection."

26.    March 18, 2003, Memorandum of Agreement (Sales Contract) between Zapoteca and Nabors Drilling.  The definition of "vessel" includes a broad description of the Rig:

> "with everything belonging to it, whether onboard, on shore, or on order, including all broached or unbroached provisions, inventory, stores, spare part, spare equipment, rig site inventory, shore base spare parts, drawings and specifications, operating manuals, and all the other documents pertaining to the Energy Zapoteca, including without limitation the equipment and inventory described on Exhibit 1."

Under clause 5(d); the Agreement states: "the vessel shall be <u>delivered</u> and <u>taken over safely afloat</u> as soon as practicable <u>after the vessel has left Tuxpan</u>, Mexico, <u>under wet tow</u> and <u>moved into international waters northbound</u> for Corpus Christi, U.S.A." (emphasis added.)

27.    March 19, 2002, letter from Rigzone (a ship broker) confirming that the ENERGY EUROPA "does not exist at all," rather is a "design concept based on the ENERGY ZAPOTECA hull." Only the ENERGY ZAPOTECA exists; the ENERGY EUROPA[2] is the same rig, but with an accommodation unit hypothetically added.

28.    March 28, 2003, preliminary recommendations from LeBourhis (marine warranty surveyor) for towage prep, wet towage from Tuxpan to Corpus Christi area "with a departure around April 12, 2003". Items 14-16 specify crew's accommodations, life-saving equipment, towage lights, etc. Item 20 requires enough fuel onboard to keep the 3 generator units running. The Rig's crew is to have communications and operational coordination with the towing vessel.

29.    March 28, 2003, e-mail to Kongsli from Phillips. Phillips reminds Kongsli what wages and benefits have not been paid to the Rig's crew (or himself) and recommends such payments, plus a severance package, and that such be agreed before the crew is told that Nabors has bought the Rig, so the crew will not worry that they will be left unpaid when their employment for Zapoteca is concluded (which sadly is exactly what happened anyway).

30.    March 31, 2003, letter from P.D. Gram to Meritus, ship's agent, indicating the ship will be departing Tuxpan shortly, but the company office will remain open "while our owner's representative, Captain Phillips, resolves all outstanding matters" (i.e. continuing legal claims on file in Mexico against the Rig or Zapoteca).

---

[2]  Zapoteca denies any knowledge of the ENERGY EUROPA. However, the Inventory List, prepared by Zapoteca or its attorneys on October 15, 2004, that Zapoteca possesses a file of documents on the ENERGY EUROPA; See page 12, box 11, folder 7.

31.    April 6, 2003, invoice from Captain Phillips to P.D. Gram, for his severance pay (equal to 6 month's salary, or $72,000), since vessel is expected to depart and his employment to end shortly thereafter. Also, the earlier invoices, from December 2001 and 2002, for the crew's Christmas bonuses, finally were paid.

32.    April 9, 2003, e-mail from P.D. Gram re: Nabors and its surveyor's agreement to place ship's crew on board the Rig. Nabors will install an accommodation module on the Rig (where those men will eat, sleep, etc.).

33.    April 10, 2003, letter from P.D. Gram to Nabors indicating Nabors could hire Captain Phillips and his crew as Nabor's own riding crew after Nabors took possession and title of the Rig in international waters offshore Mexico. Nabors in fact hired Captain Phillips and the Rig's crew for several weeks during the period April-August, 2003, to perform certain work aboard the Rig at the request of Nabors, with full knowledge and agreement of Zapoteca. On August 2, Captain Phillips returned to the Rig as her Master and the crew as her crew and again acting under the instructions of Zapoteca/P.D.Gram.

34.    April 21, 2003, letter from Nabors' agent to U.S. Coast Guard, Freeport, Texas, Port Director, Freeport, Brazos Pilots, et al., announcing expected ENERGY ZAPOTECA departure from Tuxpan, Mexico. Also attached is U.S. Coast Guard Channel Obstruction application and a copy of the U.S. Coast Guard COFR certificate for vessels.

35.    Assigning crewmembers onboard the Rig ENERGY ZAPOTECA/NABORS 660 for the tow from Tuxpan, Mexico, to Freeport, Texas. Invoice to Nabors fro the riding crew wages dated April 9, 2003.

36.    April 29, 2003, LeBourhis marine warranty surveyors issued a pre-tow inspection report for the Rig ENERGY ZAPOTECA.    This request shows that all recommendations previously noted by Lebourhis are in order.

37.    May 12, 2003, letter from LeBourhis to Kongsli.  Equipment aboard and properly installed, and Rig is ready for intra-harbor relocation and then the towage to Freeport or Corpus Christi, Texas.    Warranty certificates of approval to be issued prior to departure, and surveyor will ride the Rig during voyage.

38.    May 23, 2003, letter from P.D. Gram to Nabors that marine surveyor LeBourhis is to issue the required towing certificates.  "We will use CP [Captain Phillips] and our approved crew to take the Rig from APITUX [the customs dock in Tuxpan] until closing point in International Waters.   Thereafter, Nabors will use their own rider crew."   Note: Vessel's manager describes the workman then aboard as "our approved crew" to take the Rig from a berth in Tuxpan into international waters; that certainly constitutes a crew sailing aboard a vessel in navigation and performing services related to that voyage!

39.    May 30, 2003, letter from P.D. Gram to Captain Phillips regarding Protexa to drop its claims against the Rig and Captain Phillips personally, as required by Zapoteca's written agreement with Protexa.  Captain Phillips was asked to arrange for port tugs, so that the Vessel could depart June 1, 2003.

40.    May 30, 2003, letter from P.D. Gram to local ship's agent, copy Captain Phillips and Nordisk, stating vessel ready to depart; asking for assistance that Protexa not assert claims that will delay departure and will withdraw claims made against Captain Phillips personally. Zapoteca tells Protexa that "Protexa will be held responsible for any delays in departure caused by Protexa's [legal] actions."

41. June 12, 2003, letter from P.D. Gram to Captain Phillips indicating that the vessel's managers anticipate moving the Rig to the APITUX dock "and change crew then." Note: both <u>intent to move</u> and acknowledgement that the Rig's workers are <u>crewmembers</u>.

42. June 16, 2003, letter from the (Meritus De Mexico, the ship's agent) to Captain Phillips (identified as "owner's representative"), indicating that the ship was <u>under arrest for a maritime lien</u> issued by the Mexican Labor Court.

43. June 17, 2003, Power of Attorney granted by Zapoteca's boardmember, Owen Michael Lewis, to Mr. Kongsli and Henrick Aadnesen (Mr. Aadnesen is an in-house attorney at Nordisk, the Rig's P&I insurers.) Note that in Part 2, "Special Power for Administrative Acts," the power of attorney specifically addresses the following:

> The Administration of the Rig named "ENERGY ZAPOTECA," of 3,675.32 gross registered tons, which includes <u>the management, operation and transportation of the said vessel</u>, and to enter into negotiation, and all related acts, such as contracting and paying for <u>ship's agents</u>, port duties and expenses, mooring, fees, towing, supplying, etc. on behalf of Zapoteca Energy, Inc." (emphasis added)

44. June 20, 2003, letter from the ship's agent to Captain Phillips regarding the payment of "dockage," which are storage charges for a ship laying at a navigable berth, not for a ship "withdrawn from navigation."

45. June 22, 2003, letter from Nordisk to Kongsli, indicating that "<u>vessel will be free to leave</u>." The following day Nabors will provide towing tugs and a riding crew and the Rig will depart that day or a few days thereafter.

46. July 2, 2003, letter from vessel's agent in Tuxpan indicating that the <u>crew is onboard</u>, but will not permit visitors aboard until their outstanding crews' salaries are paid. (Apparently, Zapoteca was to pay a portion of their crews' salary, and Nabors was supposed to pay a separate portion, but the crew wasn't being paid!)

47.    July 18, 2003, e-mail from Nabors regarding <u>postponement of vessel's movement due to legal problems</u> of Zapoteca, possibly can leave in three weeks.

48.    July 22, 2003, fax from Kongsli "to Captain Phillips." Zapoteca posts security for a crewman's claim. Kongsli was to travel to Houston "to solve the rider crew settlement."

49.    August 4, 2003, Panamanian Navigational Certificate extension, indicating it remained in effect (and was never out of effect) from May 9, 2000 – August 4, 2003.  Note also that the ENERGY ZAPOTECA is described as "the vessel."

50.    August 7, 2003, letter from Nordisk to Phillips enclosing the signed Settlement Agreement with Protexa and indicating, for the first time, that Protexa is no longer required to "obtain the total and final discharge of the charges against you (Captain Phillips)."  Instead, Protexa is to have ratified the discontinuance of the criminal proceedings against Zapoteca's local representative, "Captain Charles Douglas Phillips" and now is required [only] to do everything in its power to obtain the total discharge of Captain Phillips' criminal charges."  The agreement also requires Protexa to provide the vessel's export license, "the relevant <u>sailing document</u>."  Zapoteca will be responsible for mooring fees after July 1, 2003.  Protexa will refrain from further arrest, detaining or delay of the sailing of the Rig.  Note in the "Release Agreement" that the address for Zapoteca Energy, Inc. is C/O P.D. Gram & Co., AS in Oslo, Norway.

51.    August 13, 2003, letter from P.D. Gram & Co. indicating <u>crews' salary</u> that was not paid for that month.  Captain Phillips responded that Mr. Kongsli (via copy) has taken over financing, effective June 2003.  Note fax from Kim Steimler of P.D. Gram:  Nabors' crew coming onboard Rig late August 2003.

52.     October 2, 2003, e-mail from Captain Phillips to Ana Luisa, Meritas' agent, to inform the port captain that the crew members onboard the ENERGY ZAPATECA are preparing the Rig for expected storm conditions.

53.     October 8, 2003, letter to Mexican Labor Court from P.D. Gram indicating that Captain Phillips could not attend the Ruben Monroy labor claim because he was busy making arrangements to move the Rig to the U.S. "in the near future" and also because he cannot return to Mexico "due to some legal matters that our attorney . . . is trying to resolve." (These are the criminal charges that still are outstanding against Captain Phillips.)

54.     October 14, 2003, e-mail from Highfield/LOC to Captain Phillips. Site approval to be conducted before tow approved by underwriters for movement to destination location.

55.     October 24, 2003, report and notes from Steve Gray (Rig superintendent) to Captain Phillips, regarding survey and inspection (on October 22 and 23) by surveyor Cliff Arkley, a subcontractor of London Offshore Consultants ("LOC"). Note that "Cliff commented about how good the Rig appeared overall (p.2). Note that only 14 items needed attention (see p. 5); all these items were addressed and corrected shortly thereafter

56.     November 26, 2003, e-mail from Ed Nelson to Mr. Kongsli. Nelson proposes the "Plan," stating as follows:

> The "plan" is designed to deceive anyone who might file an action and attach the Rig EZ [ENERGY ZAPOTECA] into believing the Rig EZ would not be leaving Mexico until late January. The hope is that this person or entity or these persons or entities [such as the Rig's Master and crew] would feel secure enough to hold off on filing a claim and attachment, allowing us to have these existing attachments removed. . . [Thus], the Rig EZ would be free to sail. (emphasis added).

57.     December 7, 2003, e-mail from Dix Shipping in Brownsville regarding getting an extension of time for the Mexican crewmembers to remain in the Brownsville area under the

C-1/D Visa, since they are "joining the vessel only" so have a fairly short visa, whereas the riding crew will "come in via the vessel," so have a 29-day visa.

58.   December 10, 2003, e-mail from Mr. Kongsli to Ed Nelson (Zapoteca's Texas Counsel), referencing "possible criminal charges" to be asserted against Captain and Mrs. Phillips, among other various legal matters pending against the Rig in the fall of 2003. Note Zapoteca's efforts to have the Rig leave Mexico by filing a lawsuit in Mexican Federal Court, hoping to get that court to order the Port Captain in Tuxpan to allow the Rig to depart, despite the existence of maritime liens on file against the Rig.

59.   December 11, 2003, e-mail from Charles Phillips to Christian Kongsli, that "crew members will attend the first day of navigation course in Tuxpan." The Panamanian Provisional [Navigation] Certificate will expire December 31, 2003 (so you need to get it renewed).

60.   December 16, 2003, letter from vessel agent, Meritus De Mexico, to U.S. Embassy in Matamoros, Mexico, advising that the vessel ENERGY ZAPOTECA will be going to Port Isabel, Texas, for further repairs in January 2004, and that four of her crewmembers are assigned to the Vessel and will need a visa. The various crewmembers received "in transit" Visas, C-1/D, as they will be traveling by sea aboard the Rig.[3]

61.   December 18, 2003, letter from Ed Nelson, reflecting "chain of command," with Captain Phillips listed as "Master."

---

[3]   The crew members' names and positions who are intervenors/proposed intervenors in the case are as follows:
   A.   Pedro Mejia Lima, Rig Engineer and Quality Control Officer
   B.   Jose Munoz Lopez, Electrician
   C.   Jaime Castellanos Diaz, Crew Administrator and Translator
   D.   Ciro Elorza Martinez, Deck Foreman and Mechanic
   E.   Marco Antonio Lizama Rodriguez, Deck Hand and Assistant Mechanic
   F.   Alejandro Diaz Cobos, Deck Hand and Watchman
   G.   Candido Maldonado, Deck Hand, Watchman, Delivery Driver
   H.   Fernando Trejo Mar, Equipment Administrator and Storekeeper

62.     December 19, 2003, list of Vessel-related equipment owned by Nabors, but placed on the Rig. That equipment later was carried aboard the Rig on her voyage from Tuxpan to Sabine Pass, Texas. (Note: maritime carriage of this equipment makes it "cargo" under maritime law.) The towing gear and equipment were stored aboard the Rig from April through December 18, 2003.

63.     December 19, 2003, Equipment Lease Agreement between Nabors and Zapoteca. Per Item 6, "Return of Equipment": "If the purchase option is not exercised, the Equipment will be delivered to [Nabors] at Port Freeport, Texas, USA. Zapoteca will notify [Nabors] upon the Rig's departure from Tuxpan and give at least three days notice prior to arrival in Freeport, [Texas]."

64.     December 22, 2003 e-mail from Roberto Lara (naval architect). As of December 22, 2003, there were two embargoes (attachments) on the Rig ENERGY ZAPOTECA that have to be cleared before any departure. Regarding Clearance documents, "he can extend to us a "Tightness Certificate" of the platform. This certificate means that the platform is in order [i.e. seaworthy and safe] to be towed for Mexican authorities." Before the Tightness survey, they have to make another survey, "Security for Navigation," to review all the security (safety) devices to be onboard (for example: fire-fighting, lights, signal, extinguisher, inflatable rafts, etc.).

65.     January 5, 2004, e-mail from Silverio Cruz to Captain Phillips regarding LOC, marine surveyors, recommendations and the status regarding completion of each item. Note that the vast majority of items already were completed.

66.     January 8, 2004, e-mail from Kongsli to P.D. Gram voicing numerous complaints about LOC and how their conduct and recommendations had delayed the Vessel's movement.

Owners to go to Mexico in mid-January to prepare for tow, for ultimate <u>voyage</u> "across the Atlantic." Trans-harbor move within Port of Tuxpan expected January 17; depart Tuxpan for Port Isabel January 19. "Requirements for manned tow will be complete."

67.    January 9, 2004, letter from Steve Gray, Rig Superintendent, to the Captain of the Port and Harbor Master, enclosing the clearance documents (approximately 3 inches thick), for the export of the Rig from Mexico.[4]  Note that in January of 2004, Mr. Gray indicates the repairs were completed for the category of vessel involved. "Ships and Floating Rigs."

68.    January 11, 2004, e-mail from Ed Nelson to Ola Rothe with P.D. Gram & Co., Managers of the Rig, regarding the proposed "Fix it Guy" "David Gonzales is very highly politically connected and quite powerful in Mexico." "David Gonzales was aware of the Rig EZ and problems associated therewith prior to our meeting.  David Gonzales is very good friend with Walter Pinedo and is closely tied to Celasa/Protexa."

Ed Nelson states:  "I have given this some serious thought.  It seems we have had problems in the past obtaining "Shelters" from the Mexican officials.  It might be that we should discuss with David Gonzales his thoughts, ability, and seek him to assist us in obtaining the "Shelters."  Remember, that <u>if we obtain a "Shelter," we will not be required to post security</u> on the "Shelter" claims <u>and the associated attachments will be automatically lifted</u>."

Effect:  in January 2004:  Zapoteca was still trying to depart Mexico without paying its creditors or posting security to have the maritime liens/embargoes lifted.

69.    January 10, 2004, fax in English and Spanish to Engineer Roberto Lara and Silverio Jeminez Cruz, from ship's agent, Ana Luisa Nunez, re: documents required to weigh anchor. Note, <u>first item required before Rig can depart is "4 releases to seizure of property</u>."

---

[4]  The Court will recall from the hearing on January 19, 2005, that Zapoteca was ordered to produce the folder containing these export and/or clearance documents.  Despite that Order, Zapoteca to date has not done so.

70.     January 15, 2004 - Certificade de Estangueidad/"Watertight Integrity Certificate" issued on January 15, 2004, by the Harbor Master-Inspector, with Secretary of Commerce and Transportation Stamp. This certificate confirms the vessel's seaworthiness.

71.     January 15, 2004, e-mail from Arkley (subcontractor to LOC) re: "Bullet Points" of items addressed during pre-tow status meeting in Houston, held January 14, 2004. These points make clear that Arkley anticipated a manned tow of the Rig. (For example, life rafts and radios were to be on board the Rig, for the "riding crew.")

72.     January 18, 2004, e-mail from Captain Phillips to Mr. Kongsli (with a copy to Mr. Steimler at P.D. Gram) indicating that a <u>certificate to depart was issued,</u> the fuel and water have been loaded aboard, and the Rig was waiting on the tug and issuance of export documents in order to depart Mexico.

73.     January 26, 2004, e-mail from Mr. Kongsli to P.D. Gram regarding need for insurance coverage and maritime certificates to be onboard for a departure in early February. Note: Additional time is required to post security on the various legal claims asserted against the Rig in Mexico.

74.     February 5, 2004, e-mail from Kongsli regarding the towage of the Rig by the M/V GULF DUKE. Kongsli agreed to provide two 10-man life rafts for the <u>crewmembers aboard the Rig during the tow.</u>

75.     February 9, 2004, e-mail from Zapoteca's attorney, Ed Nelson to Captain Phillips, in which Nelsen advises Captain Phillips as follows:

> . . . [Y]ou have been advised by others with knowledge of maritime law that <u>you are fully protected as a seaman under U.S. law,</u> sale or no sale [of the Vessel]. I concur with this advice. (emphasis added)

Mr. Nelson adds later in the letter:

"I let it be known among the crew that we are declaring war on anyone who gets in our way, that Owners have the financial ability to carry out the war, and that anyone we declare war on will be squashed like a grape. I believe the crew fully understands Owners' and my will and ability to so act."

76.    February 10, 2004, e-mail from Zapoteca attorney Ed Nelson to Captain Phillips, stating:  "Jonathon [Feffer, of Mystic Shipping in New York, an associate of Zapoteca] and I have both advised you that you are a seaman and your wage claims will follow the Rig. I would assume that you have also confirmed this with your own attorney."  (emphasis added)

77.    February 18, 2004, Zapoteca's Revocation of Phillips' Power of Attorney dated April 17, 2001 and June 1, 2001.[5]  In his stead, Ed Nelson (Zapoteca's Texas counsel) and Per Johanson were appointed and given such powers.  (Note: Phillips was not notified that his powers had been revoked until March 10, three weeks later, when attorney Nelson wrote him the March 10, 2004 termination letter; see item 87 below).

78.    February 23, 2004, e-mail from Kongsli to Eric Ostbye (then of Blystad Shipping; now allegedly of Zapoteca).  The Port Authority in Tuxpan request a minimum of 5-6 crewmembers to be aboard the Rig during the tow from the Celesa/Protexa berth to the Apitux berth.  Capitan Phillips responds that there are 8 members from the weekly crew list, plus 6 for the riding crew, who have obtained visas for entry into the Brownsville area.

79.    February 26, 2004, e-mail from Captain Phillips to various parties confirming the crew is made up 100% of Mexican workers and request Zapoteca/Gram consider a Mexican captain for the outbound trip.  Also follow-up regarding life-rafts for the riding crew.

80.    March 1, 2004, e-mail from Kongsli regarding tow of the Rig by the M/V GULF DUKE and that tug will bring life rafts for the Rig's crew.

---

[5]  In its revocation of the POA, Zapoteca lists the year of the POA as 2002; it actually was 2001.

81.    March 1, 2004, e-mail from Kongsli re: Rig's "master" during transit.  If Mexican master could not get visa, then Captain Phillips, as vessel captain, will be "bringing her into Port Isabel."

82.    March 2, 2004, e-mail from Kim Steimler of P.D. Gram to Captain Phillips, advising that the Mexican captain/barge master will stay aboard and take the Rig to Brownsville; that man was to "go aboard today and to prepare for the [Rig] move to Apitux and further tow to Brownsville.  Please also confirm that the crew with visas is onboard and ready [for the voyage to Texas]."  (emphasis added.)

83.    March 6, 2004, e-mail from P.D. Gram regarding the Rig's life-rafts will be trucked to Tuxpan, rather than coming aboard the tug.  (Captain Phillips was concerned that there might be a further delay of the voyage with the life-rafts coming by truck.)

84.    March 6, 2004, e-mail from Highfield of LOC to Steimler of P.D. Gram, confirming that the tug GULF DUKE is approved for tow of the Rig from Tuxpan to Port Isabel, Texas.  However, no site survey for Port Isabel was issued (at least as of March 10, 2004, the date Captain Phillips was fired.).[6]

85.    March 6, 2004, e-mails between Steimler (of P.D. Gram, "as agent to owners") and Phillips.  (Note:  Captain Phillips' supervisor, Mr. Kongsli, is meeting in Port Isabel daily with Captain Phillips during the period March 3-11, while Mr. Steimler remains in Norway.)  Steimler's comments make clear that owners intend to depart Tuxpan shortly, regardless of status of maritime liens/embargo claims and whether they have been lifted by the Court, or whether the Harbor Master and Port Captain will prevent the Rig from departing.  Note:  these alleged "vessel release" documents were being withheld from Captain Phillips, so he was not able to

present them to any local officials.  Note also:  only <u>original</u> documents are recognized by the Mexican government or courts; no unapostiled copies, e-mails or faxes are accepted.

86.    March 9, 2004, e-mail from Ola Rothe (attorney for P.D. Gram) to Captain Phillips regarding various instructions, including "that you have instructed <u>crewmembers now in Brownsville</u> to return to Tuxpan ASAP in order to proceed with required operations [necessary to commence the Rig's voyage to Texas]." (emphasis added).  Note:  on the day the crew was fired, and the day before Captain Phillips was fired, P. D. Gram is still calling the Rig's crew "crewmembers."

87.    March 10, 2004, letter from Ed Nelson, counsel for Zapoteca, to Captain Phillips, terminating his employment, and his authority as owners' representative and legal representative for Zapoteca (and master; see March 11 affidavit of Kongsli, item 89 below), effective immediately.

88.    March 11, 2004, Declaration Under Penalty of Perjury of Christian Kongsli. <u>Captain Phillips is referred to repeatedly as "the Master of the Rig ENERGY ZAPOTECA" and the crew as "the crew of the Rig ENERGY ZAPOTECA."</u>  There also are numerous references to "efforts to sail the Rig," to "move the Rig from its present location," etc.

89.    March 12, 2004, e-mail from Erik Ostybe (of Blystad Shipping, now acting for Zapoteca) to Gulf Coast Marine in Sabine Pass, Texas, confirming that the Rig is bound for Sabine Pass, Texas.

90.    Original Petition, filed March 12, 2004, Zapoteca's application for TRO and Preliminary Injunction, etc., filed in this Court, with accompanying Declaration under Penalty of

---

[6]  The Court will recall from the hearing on January 19, 2005, that Zapoteca was ordered to produce all site approvals and related documents for the Rig's various contemplated destination locations in Texas.  Despite that Order, Zapoteca to date has not done so.

Perjury of Christian Kongsli, dated March 11, 2004.

91.     March 18, 2004, Agreed Order, with attached note regarding the "former crewmembers of the Rig ENERGY ZAPOTECA," signed by Judge Hanen, and letter, signed by Captain Phillips and his attorney, with language as provided by Zapoteca's counsel, by which Captain Phillips (using the official ship's stamp for the ENERGY ZAPOTECA and which includes "Captain Charles Phillips" on the stamp mark), directs the "Current and Former Crewmembers of Rig ENERGY ZAPOTECA" to turn over various documents, equipment, etc. The precise language in this letter was dictated and provided by Zapoteca's counsel, Ed Nelson, who clearly at that time believed that the Rig was a vessel and that the men working or previously working aboard her "were crewmembers."  (See also Court hearing of March 18, 2003, regarding Nelson's statements and the Court's approval of the form of that letter.)

92.     May 17, 2004, affidavit of Phillips, confirming the type of Rig (¶5), navigation certificate (¶6), addition of towing-related equipment (¶20), and vessel's continuing ability to navigate today (¶21).

93.     April 5, 2004, fax to United States Coast Guard from Gulf Coast Marine & Associates, Inc. re:  Rig movement application for the "Energy Zapoteca" going to Sabine Pass, Texas, area.

94.     April 5, 2004, Certificate of Approval by LOC for towage to Sabine Pass, Texas.

95.     April 8, 2004, fax to United States Coast Guard from Gulf Coast Marine & Associates, Inc. re:  Energy Zapoteca.   ENERGY ZAPOTECA confirmation that COFR was posted on website.

96.    April 12, 2004, U.S. Customs Vessel Entrance or Clearance Statement -- refers to "vessel," i.e. name of vessel, year vessel built, vessel operating draft, tonnage, ship's agent. Second page continues with reference to "vessel."

97.    April 12, 2004, collection receipts for tax of Energy Zapoteca paid by Aztec Marine Agencies, Inc.

98.    April 12, 2004, Collection receipt for "Special Tonnage Tax," paid by Aztec Marine Agencies, Inc.

99.    April 12, 2004, e-mail from Aztec Marine to Erik Ostybe re:  "Vessels arrived Sabine Pass Pilots Station."

100.    October 15, 2004, "Inventory List," prepared by Zapoteca or its counsel, which purports to describe the Rig-related documents it possessed.  Note that the first item, Box 1, was sent to Eric Ostybe, who offices in Connecticut, even though the Court's Order of March 18, 2004 stated that such documents were to be maintained in Texas; first by Dix Shipping in Brownsville, and then at Ed Nelson's offices in Houston, Texas.  Note also the reference to the ENERGY EUROPA, p. 12, box 11, folder 7, which reflects that Zapoteca does have such records and knowledge of Intership and the ENERGY EUROPA, despite its assertions contained in its supplemental motion objecting to Nabors Intervention (December 13, 2004) and the accompanying affidavit of Eric Ostybe, who denied knowledge of both Intership and the ENERGY EUROPA.

101.    Affidavit of  Arturo Bazaldua re: criminal charges against Captain Phillips.  He concludes that the criminal charges against Captain Phillips remain pending, and in essence recommends: "Do not return to Mexico."

102.    Affidavit of Gilberto Rodriguez Martinez, Mexican labor lawyer, regarding Rig's status as a "vessel" under Mexico law and the existence of maritime liens ("embargoes") against it.

103.    February 8, 2005, Affidavit of Captain Phillips, addressing:

(a)    Vessel-related documents and property he produced under Court Order of March 18, 2004; (¶ 1&2);

(b)    Master's work he did aboard the vessel (¶ 3)

(c)    Kongsli was his direct supervisor throughout, including March 3-11, 2004 (¶ 4);

(d)    Purpose of his pursuing his maritime attachment (¶ 5); and

(e)    Advances made by Captain Phillips for the benefit of the vessel; and latest agreement with Mr. Kongsli addressing payment of bonus (¶6).

104.    February 9, 2005, Affidavit of Captain Phillips, providing details of what property related to the Rig was damaged as a result of the 1989 wellhead fire. Fire damage was limited to the deck, drilling package, and cantilever only, not to the Rig itself, or any items or equipment on the Rig itself.

105.    February 10, 2005, affidavit of Raul Jean, Panamanian maritime attorney, addressing the two questions addressed in the Court's Order of February 3, 2005. Note also: He has reviewed the Rig's Navigation records and various papers on file in governmental offices in Panama, and states:

(a)    The Navigation Certificates are current and have never been out of effect;

(b)    Under Panamanian maritime law, the Rig is a vessel (i.e. a ship);

(c)    Under Panamanian maritime law, there is a procedure by which a vessel owner can withdraw a vessel from navigation;

(d)     The ENERGY ZAPOTECA's owners did nothing to qualify the vessel as withdrawn from navigation;

(e)     The Rig ENERGY ZAPOTECA is, without a doubt, a "vessel in navigation" under Panamanian law;

(f)     Under Panamanian maritime law, the vessel's crew has a maritime lien for non-payment of their wages, severance pay, related benefits, and "indemnities," and

(g)     Under Panamanian maritime law, the vessel's master has a maritime lien for non-payment of his wages, severance pay, related benefits, and "indemnities," just as applies for crewmembers.

This is but a partial listing of the documents, most of which are from Zapoteca or its agents, describing the Vessel's status, Zapoteca's continuing intent to have the Vessel depart Tuxpan, the work done by the Rig's crewmembers, etc., all of which confirms:  (a)  that owners had an intent to "put the vessel to sea" (i.e., move the Rig to another location); and (b) that the owners were preparing/repairing the Rig, in anticipation of that voyage/movement.

The above evidence is more than sufficient to meet both prongs of this test, which Captain Phillips contends is the controlling standard in the Fifth Circuit; see *First Bank & Trust v. Knachel*, 999 F.2d 107 (5th Cir. 1993).  Consequently, there is more than sufficient evidence for the Court to hold that the Rig in fact was a "vessel in navigation" during one or more of the times of the causes of action arising in this case.

Respectfully submitted,

**THE LANIER LAW FIRM, P.C.**

BY: _____

CHARLES F. HERD, JR.
TSB# 09504480
ATTORNEY IN CHARGE
LAWRENCE P. WILSON
TSB # 21704100
KEVIN P. PARKER
SBN #15494020
P. O. Box 691408
Houston, TX  77269-1408
(713) 659-5200
Fax: (713) 659-2204

**ATTORNEYS FOR
DEFENDANT/COUNTER CLAIMANT,
CHARLES D. PHILLIPS AND
MEXICAN CREWMEMBERS:
JAIME ARTURO CASTELLANOS
DIAZ, ALEJANDRES DIAZ COBOS,
PEDRO MEIJALIMA, FERNANDO
TREJOMAR, MARCO ANTONIO
LIZAMA RODRIGUEZ, CIRO
ELORZA MARTINEZ, JOSE MUNOZ
LOPEZ, AND CANDIDO
MALDONADO**

**LOCAL COUNSEL:**

Mr. C. Frank Wood
SANCHEZ, WHITTINGTON, JANIS
& ZABARTE, L.L.P.
100 North Expressway 83
Brownsville, Texas  78521-2284

## CERTIFICATE OF SERVICE

I hereby certify that a true and correct copy of the foregoing instrument has been forwarded to all counsel in accordance with the Federal Rules of Civil Procedure on this the 11th day of February, 2005.

Mr. Robert W. Klawetter
EASTHAM, WATSON, DALE & FORNEY, L.L.P.
808 Travis, 20th Floor
Houston, Texas 77002
**ATTORNEYS FOR PLAINTIFF**
**ZAPOTECA ENERGY, INC.**

Mr. Lee Haag
Ms. Tonja De Sloover
FULBRIGHT & JAWORSKI, L.L.P.
1301 McKinney, Suite 5100
Houston, Texas 77010-3095

Jaime Arturo Saenz (**formal Response only; documents sent to Mr. Haag only**)
RODRIGUEZ, COLVIN, CHANEY & SAENZ, L.L.P.
1201 East Van Buren
P. O. Box 2155
Brownsville, Texas 78522
**ATTORNEYS FOR INTERVENOR**
**NABORS DRILLING INTERNATIONAL**

Michael J. Maloney
MALONEY, MARTIN & MITCHELL, LLP
3401 Allen Parkway, Suite 100
Houston, Texas 77019
**ATTORNEYS FOR INTERVENOR**
**STEVE GRAY**

C. Frank Wood