# EXHIBIT "E"

IN THE UNITED STATES DISTRICT COURT
FOR THE SOUTHERN DISTRICT OF TEXAS
BROWNSVILLE DIVISION

| | | |
|---|---|---|
| ZAPOTECA ENERGY INC, Plaintiff | § § § | |
| VS. | § § | Civil Number B-04-048 |
| CHARLES DOUGLAS PHILLIPS, Defendant | § § § | |

### DECLARATION UNDER PENALTY OF PERJURY OF CLIFFORD ARKLEY

1. My name is Clifford Arkley. I am over eighteen years of age and have never been convicted of a felony. I am of sound mind and otherwise capable of making this Declaration. I have personal knowledge of the facts stated herein as I was a contractor to PD Gram & Co. AS, Technical Managers of the rig ENERGY ZAPOTECA.

### The Rig ENERGY ZAPOTECA

2. During October 2003, my company, London Offshore Consultants ("LOC"), was requested by PD Gram & Co. AS (as owners Technical Management for the Rig ENERGY ZAPOTECA) to carry out an inspection of the rig. The inspection and subsequent recommendations were with a view to the issuance of a Certificate of Approval for the movement of the unit from Tuxpan, Mexico to Port Isabel, South Texas. I was allocated as Marine Warranty Surveyor to this project.

3. On 19 October 2003, a dialogue was commenced with Mr. Charles Philips and plans made to visit him at his office in South Padre Island, then to travel on to Tuxpan via Renosa and Poza Rica for rig inspection.

4. On 16 October 2003, I proceeded to South Padre Island for discussions with Charles Philips and during the following week traveled on to Tuxpan where on Tuesday, Wednesday and Thursday I attended and inspected the rig.

5. I traveled back to Houston on Friday 31 October 2003 and issued a preliminary list of recommendations (some 41 items) written with the owner's request in mind that the unit was to be manned during the tow. The LOC stand was that an unmanned dead tow was the preferred option.

6. Essentially the rig was bereft of any SOLAS equipment. Certification was non-existent and all (including essential) machinery had been removed. There were

1

numerous holes and openings compromising the watertight integrity. Unknown and untraceable pipe work had been removed and in places cropped. Some areas of deck had wasted through and there was direct access to the tank spaces below. Some tank access covers were missing and in some locations temporary tank access spaces had been cut into the deck. These did not have approved covers or fitments. There was only temporary crew accommodation on deck and no suitable sanitary facilities, waste disposal or sewage holding tanks. There was no suitable cooking or food storage equipment. Temporary power supply was from a road transportable generator that was not suitable for sea service and had no back up. There was no communications equipment other than one VHF that had limited operation. A major concern was also the Rig's stability. Having been completely altered by the removal of a large amount of machinery and topside structure the accelerations on the legs and their ability to withstand these was in doubt and unproven at this time. The rig was in fact unfit for habitation, uncertificated and unseaworthy. Consequently it was not in condition to navigate or operate as a commercial unit.

7. During the ensuing month of November it became clear that the requirements for a manned tow were not going to be met. The problems of lack of fundamental equipment and certification would be prohibitively expensive and time consuming to overcome. It was recommended again by LOC that an unmanned dead tow be re-considered. A dry tow was also another consideration. It was made clear a Certificate of Approval to move the unit would not be issued for a manned tow.

8. During December 2003 attention and communication was afforded to the stacking site requirements in Port Isabel and on the outstanding requirements for an unmanned tow.

9. During January 2004 I attended a meeting with owners representatives with view to resolving all outstanding requirements for an unmanned, dead, wet tow. Items attended to were stability, jacking equipment, tow assembly, watertight integrity, stacking site and tow vessels.

10. Discussions, reviews and planning took place regularly during February 2004 between myself rig owners and the project manager (Charles Philips)

11. On owners instructions I traveled to Tuxpan on 7 March 2004 to re-inspect the rig and report back on readiness and progress. On Monday 6 March during a discussion with Charles Philips, I was informed that I was not allowed on the rig. On Tuesday 9 March I proceeded to the Rig but was refused access to it by a gangway security person. I discussed the situation with Charles Philips who implied that it would be risky for me to attempt to gain access to the rig as the security guards had instructions not to allow unauthorized persons onboard. Charles Phillips said I was not authorized and my personal safety could not be guaranteed.

2

12. On Wednesday the 10 March, I accompanied various ENERGY ZAPOTECA owners representatives to the temporary company office in Tuxpan. None of the party was allowed access to the 'office'. I then proceeded to the rig with a police escort and what I understood to be a bailiff acting for ENERGY ZAPOTECA owners. None of our party was allowed onboard.

13. On Thursday 11 March, I was requested to stay onsite until access to the rig was gained. This was expected in the next 24 hrs.

14. On Friday 12 March access to the rig was gained and I carried out my inspection. There was some progress from my previous visit although there was still numerous items outstanding to make the vessel ready for sea. I re-wrote my list of recommendations on the basis the rig would be wet towed, dead and unmanned to the stacking site now going to be Sabine, South Texas.

15. On Saturday 13 March I met with the newly appointed Towmaster/Bargemaster Mr. Austin (Rusty) Alexander. We toured the rig and he took over as owners representative on site. An action plan was prepared for further technical inspection (jacking gear, ballast tanks and rig structure) prior to the jacking down, flotation and tow of the rig to Sabine. Outstanding items already documented were to be dealt with. I departed for Houston the following day.

16. I attended the rig again from 18 to 24 March 2004, being instructed to return to Houston as delays were expected due to legal problems. During this period Austin Alexander tested jacking equipment and controls. He also inspected all other rig equipment from a technical and operational standpoint, Communicating with myself on several occasions on his findings and progress readying the rig. The towing vessel 'Martha Eugenia' was also inspected and approved for the towing operation during this time.

17. I returned to Tuxpan on Sunday 4 April. After inspecting the Rig in the company of Austin Alexander it was decided the close out of required items was nearing completion and the tow vessel was ordered for next day.

18. I completed a final "walk through" at 1330 hrs the same day and a CoA was issued at 1400 hrs. This approved a single voyage under tow as a dead unmanned unit from Tuxpan to Sabine with no deviations. At 1430 the main tugboat was connected and the rig became afloat and underway at approximately 1500 hrs. At 1700 all leg chocks were in place. A final check was carried out and all personnel departed the rig at 1745 hrs.

19. The rig arrived at Sabine pilots stations during Sunday 11 April 2004 and berthed on 12 April. It is currently stacked at the arrival location.

3

PURSUANT TO 28 U.S.C. § 1746, I DECLARE (OR CERTIFY, VERIFY, OR STATE), UNDER PENALTY OF PURGERY UNDER THE LAWS OF THE UNITED STATES OF AMERICA THAT THE FOREGOING IS TRUE AND CORRECT.

EXECUTED ON 27 May 2004.

Cliff Arkley

4