# EXHIBIT 1

IN THE UNITED STATES DISTRICT COURT
FOR THE SOUTHERN DISTRICT OF TEXAS
BROWNSVILLE DIVISION

| | | |
|---|---|---|
| ZAPOTECA ENERGY, INC., | § | |
| | § | |
| Petitioner | § | |
| | § | C.A. NO. 04-CV-48 |
| V. | § | |
| | § | |
| CHARLES DOUGLAS PHILLIPS | § | |
| | § | |
| Respondent | § | |

## ZAPOTECA ENERGY, INC.'S REVISED PRELIMINARY
## CALCULATION OF DAMAGES

1.  Zapoteca Energy, Inc. (sometimes referred to as "Zapoteca") has damages in the amount of $3-4,000,000.00 for expenses incurred since delivery of the ENERGY ZAPOTECA to Nabors Drilling International limited was delayed and/or prevented by Charles Phillips in April/May 2003. These expenses are the direct result of the acts of Charles Phillips to deliberately and/or negligently delay and/or thwart the delivery of the rig to Nabors. The various components of Zapoteca's damages include, but are not limited to the following:

   a.  Zapoteca Energy, Inc. has damages of $100,000.00 for settlement of the "rider crew" lawsuit, which was brought by Charles Phillips against Nabors Drilling International Limited. Charles Phillips entered into an agreement with Nabors to provide a "rider crew" for the ENERGY ZAPOTECA wherein Phillips agreed (in violation of express instructions from Zapoteca) that Zapoteca would be responsible for payment of the "riding crew." At the same time, Phillips demanded advance payment from Nabors and after receiving an advance payment of $18,900.00 from Nabors, Phillips then rescinded his offer to provide a riding crew to Nabors.[1] Charles Phillips and other members of the "rider crew" then filed a labor lawsuit against the ENERGY ZAPOTECA and Nabors, which Zapoteca settled for $100,000.00

   b.  Zapoteca Energy, Inc. has damages of approximately $100,000.00 for excess costs and attorney's fees incurred in connection with lawsuits that Charles Phillips falsely advised Zapoteca were without merit. As Zapoteca's legal representative, Charles Phillips directed the defense of various Labor Court and civil lawsuits in Mexico, many of which had some merit because they were the result of Charles Phillips' failure to make payments to workers, vendors and/or suppliers.

---

[1]   See pp. 9-10 and 120 of Exhibit "A," Affirmation of Joseph Manuel Tirado in Support of Nabors Drilling International Limited's Without Notice Application for a Freezing Injunction, Skeleton Argument in Support of Application for Freezing Injunction and Freezing Injunction.

**ZEI 1338**
*PHILLIPS*

c.  Zapoteca Energy, Inc. has damages of approximately $130,000.00 for excess settlement costs and judgments incurred in connection with lawsuits that Charles Phillips falsely advised Zapoteca were without merit.  As Zapoteca's legal representative, Charles Phillips directed the defense of various Labor Court and civil lawsuits in Mexico, many of which had some merit because they were the result of Charles Phillips' failure to make payments to workers, vendors and/or suppliers.

d.  Zapoteca Energy, Inc. has damages of approximately $50,000.00 for the placement of bonds in lawsuits that Charles Phillips falsely advised Zapoteca were without merit.  As Zapoteca's legal representative, Charles Phillips directed the defense of various Labor Court and civil lawsuits in Mexico, many of which had some merit because they were the result of Charles Phillips' failure to make payments to workers, vendors and/or suppliers.

e.  Zapoteca Energy, Inc. has undetermined but substantial damages for rig maintenance paid for but not performed.  Once owner's representatives gained access to the ENERGY ZAPOTECA, it was discovered that no maintenance work had been performed on the rig for a considerable time despite the fact that Charles Phillips had continuously submitted disbursement requests for maintenance funds and Zapoteca had continuously provided Charles Phillips with the requested funds.

f.  Zapoteca Energy, Inc. has damages of approximately $25,000.00 for surveyor's fees related to preparation for a "manned" tow.  Without Zapoteca's authority and directly contrary to Zapoteca's instructions to Charles Phillips to prepare for an "unmanned" tow, Charles Phillips instructed the warranty surveyors for the insurance underwriters that Zapoteca demanded a "manned" tow.  This violation of authority and failure to follow orders by Charles Phillips resulted in unnecessary surveyor fees to essentially start over and prepare for an "unmanned" tow as originally instructed by Zapoteca.

g.  Zapoteca Energy, Inc. has damages of approximately $330,000.00 for wages to unnecessary workers from May 2003 to 9 March 2004.  During this time frame, Charles Phillips reported to Zapoteca that he had 8 retained employees working on the rig when, in fact, he had 20 employees on Zapoteca's payroll.

h.  Zapoteca Energy, Inc. has damages of approximately $215,000.00 for fees and expenses of Per Johansen and Erik Ostbye necessitated by Charles Phillips' lack of cooperation, failure to follow instructions and his actions aimed at obstructing the owner's access to and preventing the movement of the ENERGY ZAPOTECA.

i.  Zapoteca Energy, Inc. has undetermined but substantial damages for unnecessary costs and expenses related to establishing and maintaining an office in Port Isabel, Texas, for Charles Phillips to continue his oversight of ENERGY ZAPOTECA

ZEI 1339
PHILLIPS

project. This cost was totally unnecessary because Zapoteca has learned that no criminal charges were ever brought against Charles Phillips in Mexico as alleged by Charles Phillips.

2.  On February 14, 2005, Zapoteca Energy, Inc. was served with a Freezing Injunction from an English Court for the claims of Nabors Drilling International Limited's arising from the frustrated sale of the ENERGY ZAPOTECA to Nabors due to the acts of Charles Phillips to deliberately and/or negligently delay and/or thwart the delivery of the rig to Nabors. [2] Nabors sought and obtained a Freezing Injunction form the High Court of Justice Queen's Bench Division Commercial Court of England in the amount of $2,500,000.00.[3]

3.  Zapoteca Energy, Inc.'s damages continue to accrue and currently total at least $5,500,000.00, all of which result from acts of fraud and/or conversion by Charles Phillips' and/or his failure to follow instructions from Zapoteca and/or his failure to protect the interests of Zapoteca and/or a breach of his fiduciary duty to Zapoteca.

4.  Zapoteca Energy, Inc. reserves the right to supplement this Revised Preliminary Calculation of Damages as discovery progresses and to the extent that its damages continue to accrue and/or evidence of additional elements of accrued damages is discovered.

---

[2]      See Exhibit "A," Affirmation of Joseph Manuel Tirado in Support of Nabors Drilling International Limited's Without Notice Application for a Freezing Injunction, Skeleton Argument in Support of Application for Freezing Injunction and Freezing Injunction.

[3]      See p. 126 of Exhibit "A," Affirmation of Joseph Manuel Tirado in Support of Nabors Drilling International Limited's Without Notice Application for a Freezing Injunction, Skeleton Argument in Support of Application for Freezing Injunction and Freezing Injunction.

**ZEI 1340**
**PHILLIPS**

project. This cost was totally unnecessary because Zapoteca has learned that no criminal charges were ever brought against Charles Phillips in Mexico as alleged by Charles Phillips.

2.   On February 14, 2005, Zapoteca Energy, Inc. was served with a Freezing Injunction from an English Court for the claims of Nabors Drilling International Limited's arising from the frustrated sale of the ENERGY ZAPOTECA to Nabors due to the acts of Charles Phillips to deliberately and/or negligently delay and/or thwart the delivery of the rig to Nabors. [2] Nabors sought and obtained a Freezing Injunction form the High Court of Justice Queen's Bench Division Commercial Court of England in the amount of $2,500,000.00.[3]

3.   Zapoteca Energy, Inc.'s damages continue to accrue and currently total at least $5,500,000.00, all of which result from acts of fraud and/or conversion by Charles Phillips' and/or his failure to follow instructions from Zapoteca and/or his failure to protect the interests of Zapoteca and/or a breach of his fiduciary duty to Zapoteca.

4.   Zapoteca Energy, Inc. reserves the right to supplement this Revised Preliminary Calculation of Damages as discovery progresses and to the extent that its damages continue to accrue and/or evidence of additional elements of accrued damages is discovered.

---

[2]      See Exhibit "A," Affirmation of Joseph Manuel Tirado in Support of Nabors Drilling International Limited's Without Notice Application for a Freezing Injunction, Skeleton Argument in Support of Application for Freezing Injunction and Freezing Injunction.
[3]      See p. 126 of Exhibit "A," Affirmation of Joseph Manuel Tirado in Support of Nabors Drilling International Limited's Without Notice Application for a Freezing Injunction, Skeleton Argument in Support of Application for Freezing Injunction and Freezing Injunction.

# EXHIBIT A

ZEI 1342
*PHILLIPS*



**Claim Form
(arbitration)**

In the High Court of Justice
Queen's Bench Division
Commercial Court

| | for court use only |
|---|---|
| Claim No. | 2005 Folio No. |
| Issue date | |

In an arbitration claim between

Claimant    **NABORS DRILLING INTERNATIONAL LIMITED**



Defendant(s)    **ZAPOTECA ENERGY, INC**

In the matter of an [intended] arbitration between

Claimant      **ZAPOTECA ENERGY, INC**

Respondent(s)    **NABORS DRILLING INTERNATIONAL LIMITED**

*Set out the names and addresses of persons to be served with the claim form stating their role in the arbitration and whether they are defendants.*

Defendant's
names and
address

**ZAPOTECA ENERGY, INC**

C/o LISCR Trust Company
80 Broad Street
Monrovia, Liberia
Fax No.: +231 227 034 or +231 226 477

| | |
|---|---|
| ☐ | This claim will be heard on: |
| | at      am/pm |
| X | This claim is made without notice. |

The court office at

When corresponding with the court, please address forms or letters to the Court Manager and quote the case number.

**000001**

**ZEI 1343
PHILLIPS**

Remedy claimed and grounds on which claim is made:

A freezing injunction pursuant to Section 44(2)(e) of the Arbitration Act 1996 prohibiting Defendant Zapoteca from in any way disposing of or dealing with or diminishing the value of any of its assets whether they are in or outside England or Wales whether solely or jointly owned up to the value of US$2.5 million. This to include in particular the jack-up offshore oil rig named "ENERGY ZAPOTECA" ("the Vessel") that is currently located at the Sabine Shipyard, Sabine Pass, Jefferson County, Texas, USA.

This remedy is claimed on the basis that (i) the Claimant has a good arguable claim in the pending London arbitration against Zapoteca for damages sustained as a result of Zapoteca's failure to deliver the Vessel by the in accordance with the terms of the MoA between the parties and, in particular, by the extended cancelling date of 31 May 2003; (ii) there is a real risk that, if the freezing injunction is not granted, any award of the London arbitral tribunal in the Claimant's favour would be unenforceable; and (iii) the arbitral tribunal is unable to act because it does not have the power to issue a freezing injunction.

000002

ZEI 1344
PHILLIPS

The Claimant seeks an order for costs against the Defendant, **ZAPOTECA ENERGY, INC.**

Statement of Truth
*(I believe)(The Claimant believes) that the facts stated in these particulars of claim are true.
* I am duly authorised by the claimant to sign this statement

Full name Joseph Manuel Tirado

Name of claimant's solicitor's firm  Baker Botts

signed _____   position or office held Partner
        *(Claimant)(Claimant's solicitor)        (if signing on behalf of firm or company)

*delete as appropriate

Claimant's or claimant's solicitor's address to which documents should be sent if different from overleaf. If you are prepared to accept service by DX, fax or e-mail, please add details.

000003

ZEI 1345
*PHILLIPS*

# IN THE HIGH COURT OF JUSTICE
## QUEEN'S BENCH DIVISION
### COMMERCIAL COURT

B E T W E E N :

    (1)  **NABORS DRILLING INTERNATIONAL LIMITED**

                            **Claimant**

          and

    (2)  **ZAPOTECA ENERGY, INC**

                          **Defendant**

## IN THE MATTER OF THE ARBITRATION ACT 1996
## AND IN THE MATTER OF AN ARBITRATION

B E T W E E N :

    (1)  **ZAPOTECA ENERGY, INC**

                          **Claimant**

          and

    (2)  **NABORS DRILLING INTERNATIONAL LIMITED**

                       **Respondent**

---

**AFFIRMATION OF JOSEPH MANUEL TIRADO**
**IN SUPPORT OF**
**NABORS DRILLING INTERNATIONAL LIMITED's**
**WITHOUT NOTICE APPLICATION**
**FOR A FREEZING INJUNCTION PURSUANT TO**
**SECTION 44(2)(e) OF THE ARBITRATION ACT 1996**

---

000004

ZEI 1346
*PHILLIPS*

I, **JOSEPH MANUEL TIRADO**, of 99, Gresham Street, London EC2V 7BA, **DO SOLEMNLY AND SINCERELY AFFIRM** as follows:

## 1.   INTRODUCTION

1.1   I am a solicitor of the Supreme Court and a partner in the firm of Baker Botts.  I have the responsibility for all the overall care and conduct of this matter on behalf of the Claimant (Respondent in the pending arbitration), Nabors Drilling International Limited ("NDIL").  Save where otherwise appears below, the facts and matters deposed to herein are either within my own knowledge and are true or are based on instructions, documents and information supplied to me in my capacity as aforesaid and are true to the best of my knowledge, information and belief.

## 2.   THE FREEZING INJUNCTION SOUGHT

2.1   I make this affidavit in support of NDIL's application for a freezing injunction in the terms of the proposed order to be produced to the Court against the Respondent (Claimant in the pending arbitration), Zapoteca Energy, Inc ("Zapoteca").   In summary, the relief sought is as follows:

(a)   An order that Zapoteca be prohibited from in any way disposing of or dealing with or diminishing the value of any of its assets whether they are in or outside England or Wales whether solely or jointly owned up to the value of US$2.5 million. This prohibition should include in particular the jack-up offshore oil rig named "Energy Zapoteca" that is currently located at the Sabine Shipyard, Sabine Pass, Jefferson County, Texas, USA.

## 3.   EXHIBITS

3.1   There are now produced and shown to me and exhibited herewith a bundle of correspondence and miscellaneous documents marked "**JMT1**" to which I shall refer in this affidavit.  All references to "Tab" number relate to this Exhibit.

000005

ZEI 1347
*PHILLIPS*

## 4.    THE PARTIES

### *The Defendant, Zapoteca*

4.1    Zapoteca is a Liberian corporation organized and existing pursuant to the Liberian Corporation Act, with its principal place of business located at 80 Broad Street, Monrovia, Liberia. Zapoteca's registered agent for service of process is LISCR Trust Company, part of the Liberian International Shipping & Corporate Registry ("LISCR"), also located at 80 Broad Street, Monrovia, Liberia. According to the LISCR's website, the fax numbers for the LISCR Building are +231 227 034 or +231 226 477.

4.2    At all material times the Vessel was (and continues to be) managed by P.D. Gram & Co. AS ("P.D. Gram"), whose principal place of business is Stranden 1A, Aker Brygge, P.O. Box 1383 Vika, No-0114 Oslo, Norway (Fax: +47 22 01 74 55) on behalf of Zapoteca. The documents and evidence filed in the Texas proceedings described below strongly indicate that Zapoteca and P.D. Gram are closely related entities. For example, the minutes of the first board meeting of Zapoteca show that Peter Gram is a director and the President of Zapoteca (**Tab 1**). A Peter D. Gram is also a principal of P.D. Gram (**Tab 2**).

4.3    Zapoteca is represented in the pending London arbitration proceedings by Lasse Hagen of Nordisk Legal Services ("Nordisk"), Nordisk Skibsrederforening (Northern Shipowners' Defence Club), P.O. Box 3033 Elisenberg, N-0207 Oslo Norway (Fax: +44 22 43 00 35).

4.4    Zapoteca is represented in the Texas proceedings described below by its lead counsel of record, Mr Robert L. Klawetter of Eastham, Watson, Dale & Forney, LLP at The Niels Esperson Building, 808 Travis, 20th Floor, Houston, Texas 77002, USA (Fax: 00 1 713 225 2907).

### *The Claimant, NDIL*

4.5    NDIL is a Bermudan corporation. It is a wholly-owned subsidiary of Nabors Industries Ltd ("Nabors"), the largest land drilling contractor in the world that has been continuously operating in the drilling sector in one form or another since the early 1900s.

000006

ZEI 1348
PHILLIPS

5.    **THE DISPUTE BETWEEN THE PARTIES**

*The MoA to Purchase the "Energy Zapoteca"*

5.1    On or about 18 March 2003 Zapoteca and NDIL entered into a Memorandum of Agreement (the "MoA") for the purchase by NDIL of a jack-up offshore oil rig named Energy Zapoteca (the "Vessel") from Zapoteca for US$8,750,000 (**Tab 3**) that was at that time located in Tuxpan, Mexico.

5.2    Pursuant to clause 5(d) of the MoA, the Vessel was to be delivered no later than 15 April 2003. At some point prior to 15 April 2003, it became clear that Zapoteca would not be able to deliver the Vessel to NDIL in a timely manner. I understand from Mr Wilfredo Rosa, who is Operations Support Manager with Nabors Drilling USA, LP but who was at the material time NDIL's Area Manager for Mexico, and believe, that this delay may have been due to the delay in the equipment required to be installed on the Vessel, which was supplied by NDIL, clearing Customs. The parties agreed to extend delivery to 31 May 2003, and the price for the Vessel was increased to US$8,898,000 pursuant to the First Amendment to Memorandum of Agreement dated 5 May 2003 (**Tab 4**).

5.3    Clause 14 of the MoA provides that:

> *"...Should the Sellers fail to give Notice of Readiness by the date stipulated in Clause 5(d) or fail to be ready to validly complete a legal transfer as aforesaid they shall make due compensation to the Buyers for all their expenses together with interest if their failure is caused by proven negligence and whether or not the Buyers cancel this Agreement."*

Although not stated on the face of the MoA, it is based on the Norwegian Saleform contract with amendments.

5.4    By a letter dated 3 September 2003, NDIL informed Zapoteca that it was exercising its right under clause 14 of the MoA to cancel the MoA because Zapoteca failed to perform its contractual obligation to validly complete a legal transfer of the Vessel by 31 May 2003 (**Tab 5**).

4

ZEI 1349
PHILLIPS

5.5 Because of Zapoteca's failure to validly complete the legal transfer of the Vessel, it is NDIL's case that it has suffered damages in the amount of US$1,667,739.19, plus interest, in engineering cost, construction plans costs, third-party marine services, equipment costs, legal and payroll costs, travel expenses and other such costs relating to its intended purchase of the Vessel. These costs were incurred in reliance on Zapoteca's fulfilment of the Vessel Contract and were direct and foreseeable expenses incurred thereof.

5.6 On 8 October 2003, NDIL wrote to Zapoteca and explained that Zapoteca's negligent and wrongful acts included (without limitation):

(a) preventing NDIL personnel from boarding the Vessel in violation of Clause 15 of the MoA;

(b) falsely claiming that the Master and crew of the Vessel were NDIL employees, and further intimidating NDIL's non-Spanish speaker local representative into executing a Spanish language document to such effect, resulting in wrongful employment claims against NDIL which entangled the Vessel; and

(c) rejecting, without contractual basis, the marine survey that was required under the MoA and completed by Zapoteca's own chosen surveyor.

All of the above resulted in delays that prevented the timely conclusion of the sale of the Vessel by the extended cancelling date of 31 May 2003 (**Tab 6**).

5.7 Based on my review of the evidence and general knowledge of the case, I have formed the view that NDIL has a strong *prima facie* case (and certainly a good arguable case) that Zapoteca's failure to deliver the Vessel by the extended cancelling date of 31 May 2003 was caused by Zapoteca's *"proven negligence"* within the meaning of clause 14 of the MoA. In particular, it is NDIL's case that the Vessel's Master, Charles Douglas Phillips ("Phillips") had deliberately, or alternatively negligently, acted so as to delay and/or thwart the delivery of the Vessel under the MoA. (In addition to being the Vessel's Master, Phillips was also appointed by Zapoteca to be its legal representative/attorney under a Power of Attorney granted 17 April 2001 in Oslo, Norway, **Tab 7**).

5

ZEI 1350
*PHILLIPS*

5.8    Although the underlying facts leading up to the present dispute are quite complex and will have to be investigated in detail before the arbitral tribunal, the broad outline of NDIL's case against Zapoteca in the arbitration will be as follows:

(a)    Delivery of the Vessel by 31 May 2003 was prevented by, *inter alia*: Phillips' non-cooperation and obstructive behaviour preventing the preparation of the Vessel for delivery; the assertion of liens on the Vessel by Phillips and other members of the crew; the commencement and prosecution of an action by Phillips and members of the crew for wages against NDIL; and the assertion of a lien on the Vessel by a shipyard in Tuxpan, Mexico for sums allegedly due to the yard from Zapoteca.

(b)    By clause 5(b) of the MoA, NDIL was responsible for supplying and installing additional equipment necessary to allow the Vessel to be towed to Texas. On Zapoteca's recommendation, NDIL retained the licensed surveying firm of John LeBourhis & Associates, Inc. ("JLA") of Texas to inspect the Vessel and advise on the equipment necessary for the tow. JLA approved the installation of an air compressor necessary for the operation of the Vessel. Despite that approval, Phillips demanded that the air compressor be removed and replaced with "a suitable air compressor" without stating the required specifications. Indeed, on or about 11 May 2003, Phillips unilaterally threw the surveyor from JLA off the Vessel and purported to "discharge" him. This is recorded in Zapoteca/Phillips' fax to NDIL of 11 May 2003 (**Tab 8**).

(c)    In or about mid April 2003, Phillips had agreed with NDIL that he and six other members of the crew would ride with the Vessel from Mexico to Freeport, Texas for a total payment (to be paid in advance) of US$18,900 (**Tab 9**). I understand from Dean Silvers, Senior Director Purchasing at Nabors Corporate Services, Inc who had responsibility for arranging and agreeing the towing contract for the Vessel, that as the sale of the Vessel was to take place in international waters and Phillips and his crew were to move the Vessel to international waters as part of Zapoteca's obligations under the MoA, it was operational safer to permit Phillips and his crew to remain onboard the Vessel and "ride" the Vessel for another 4-5 days to its

6

000009

ZEI 1351
*PHILLIPS*

destination in Texas. It was certainly never intended that Phillips and his crew would become employees of NDIL during this time. Instead, it was understood that Phillips and his crew would be contractors only.

(d)     In late April/early May 2003, even though the Vessel was not ready to leave Mexico, Phillips demanded payment of the US$18,900 in "personnel costs". When NDIL's Colin McKenzie (aka Pee Wee), brought that sum to Tuxpan, Mexico, he was summoned before the Mexican Labour Board ("MLB") and ordered to pay that sum to the crew in front of the MLB. This he did. He was also required to sign a document in Spanish, which he also did.

(e)     On or about 7 May 2003, Phillips and his crew withdrew their offer to ride with the Vessel. The only reason that NDIL had agreed to pay Phillips and his crew US$18,900 was for them riding with the Vessel to Texas.

(f)     Despite having already received a payment of US$18,900 from NDIL and having refused to carry out the service for which that payment was intended (riding with the Vessel to Texas), on or about 9 May 2003, Zapoteca/Phillips presented NDIL with another invoice for US$18,900. Upon being questioned about this, Phillips explained the sum demanded was for his crew and staff preparing the Vessel for delivery under the MoA.

(g)     Based on NDIL's agreement to pay Phillips and the crew US$18,900 to ride with the Vessel to Texas, in or about mid-May 2003, Phillips and the crew commenced proceedings against NDIL for wages and severance. Despite attempts to settle the matter so as to allow the Vessel to be delivered under the MoA, at the hearing before the MLB, Phillips and the crew effectively demanded to be paid some US$260,000 in wages and severance payments. They left the meeting in front of the MLB when NDIL would not agree to such a payment.

(h)     The above sequence of events is described in the internal correspondence from NDIL's Colin McKenzie, Dean Silvers, Sammy Downs and Jesus Llorca attached at (Tab 10) hereto.

7

000010

ZEI 1352
PHILLIPS

(i)    It is my understanding that, in addition, to the above disputes, there were at least two other labour disputes against Zapoteca in which the claimants (who I understand, but do not know for sure, were members of the crew, including Phillips) had asserted liens against the Vessel.

(j)    Celasa, the dockyard where the Vessel had been positioned had also asserted a lien in the sum of US$160,000 for dock charges due from the Vessel.

(k)    Finally, on 25 May 2003, William McDermott (a member of the crew that was to have accompanied the Vessel to Texas), threatened to arrest the Vessel on her arrival in Texas for payment of the enclosed invoice for US$518,060 (**Tab 11**).

5.9    There was also an initial disagreement with Zapoteca regarding the return of NDIL's deposit being held at Nordea Bank ASA, but that issue has been resolved.

### *The Equipment Lease Agreement*

5.10    A second smaller dispute, pertains to the lease agreement for various equipment to be used aboard the Vessel entered into between Zapoteca and NDIL (**Tab 12**). Pursuant to this agreement dated 19 December 2003, equipment worth approximately US$370,000 would be provided to the Vessel for its use so that the Vessel could be transported from Mexico to Texas. Zapoteca has not paid the final instalment due under the Equipment lease Agreement and the sum of US$60,830 plus interest (**Tab 13**) remains due and owing to NDIL.

### *Amount of NDIL's Claim and Estimated Costs*

5.11    The total amount owing to NDIL is US$1,728,569.19 plus interest amounting to US$236,411.40 calculated at the judgment rate of 8% *per annum* and which is continuing to accrue at the daily rate of US$625. In addition, I estimate that the NDIL will incur US$300,000 - US$400,000 in legal expenses during the course of this arbitration.

000011

ZEI 1353
*PHILLIPS*

6.      **ZAPOTECA'S POSSIBLE DEFENCES**

6.1     In its email dated 16 September 2003 P.D. Gram, as agent for Zapoteca, accepted NDIL's Notice of Cancellation dated 3 September 2003 but reserved its rights to challenge the validity of the notice (**Tab 14**). Zapoteca claimed that it was entitled to recover from NDIL a total of US$746,000 (as well as unspecified further amounts) by way of refund of costs or damages for alleged breach of the MoA by NDIL. This figure was calculated as follows:

        a)      US$148,000 representing the increase in the purchase price in the First Amendment to the MoA (US$8,000 per day from 16-30 April 2003 and US$4,000 daily from 1-31 May 2003);

        b)      stand-by costs from 7-21 May 2003 amounting to US$20,000;

        c)      refund of the costs of installing NDIL's equipment and "other services";

        d)      refund of payment to rider crew, US$72,000;

        e)      other stand-by costs totalling US$4,000 daily from 24 May 2003 to 3 September 2003.

6.2     On 26 November 2003, Nordisk wrote to NDIL alleging that NDIL were in breach of the MoA by failing to secure a riding crew, not taking care of its obligations to take delivery and move the Vessel in accordance with the MoA. Accordingly, it was as a result of NDIL's alleged failure to comply with its obligations under the MoA that led to numerous claims being made against the Vessel and causing the delay in delivery (**Tab 15**).

6.3     In addition, in the Texas proceedings described below, Zapoteca has argued that NDIL had "hired" Phillips and the other crew members who were to be part of the riding crew and that it was NDIL's failure to pay Phillips and the crew that lead to their assertion of a lien against the Vessel. This argument will of course have to be fully considered by the arbitral tribunal. However, it is NDIL's position that that argument is without merit in that NDIL had only hired the crew to perform a service which they later refused to perform (and indeed never could have performed as the

9

ZEI 1354
*PHILLIPS*

Vessel never reached international waters) and that Phillips and the other members were at all times employees of Zapoteca and not NDIL.

6.4    I should state that Zapoteca may rely on the Spanish document signed by Collin McKenzie mentioned above and attached at (Tab 16) hereto. That document appears to state that Mr McKenzie appeared on behalf of NDIL as "employers". I am instructed that it will be NDIL's case that the crew were never its employees and Mr McKenzie (a non-Spanish speaker) was intimidated into signing a document in Spanish which he could not read or understand.

## 7.    THE TEXAS PROCEEDINGS

7.1    On 12 March 2004, Zapoteca filed Case No B-04-048 in the United States District Texas Court of the Southern District of Texas, Brownsville Division (the "Texas Court"), an admiralty cause of action pursuant to Rule 9(h) of the Federal Rules of Civil Procedure against Phillips, a US citizen residing in Houston, Texas, seeking a temporary restraining order and preliminary injunction alleging that Phillips was withholding documentation pertaining to Zapoteca and the Vessel (the "Phillips lawsuit"). That same day the Texas Court granted Zapoteca's application for a temporary restraining order.

7.2    On 19 March 2004, after a hearing on Zapoteca's application for a temporary injunction, the Texas Court entered an agreed order ordering, among other things, that Phillips transfer business records to be held by a third party, giving both Phillips and Zapoteca access to the documents.

7.3    Sometime in April 2004, the Vessel was towed from Tuxpan, Mexico to its current location at the Sabine Shipyard, Sabine Pass, Jefferson County, Texas, USA.

7.4    On 20 April 2004, Phillips filed an original counterclaim against Zapoteca alleging wrongful termination. Phillips also sought the arrest and seizure of the Vessel based on a maritime lien for wages and Admiralty Supplemental Rule B of the Federal Rules of Civil Procedure because no property other than the Vessel could be found within Texas to secure any funds that Zapoteca may be obligated to pay Phillips for his claims.

10

ZEI 1355
PHILLIPS

7.5   On 26 April 2004, Phillips filed, together with his first amended counterclaim (in which he only dropped his claim for maritime lien), a motion for the arrest and seizure of the Vessel and the appointment of substitute custodian asking that the Vessel be seized by the United States Marshall and released into the care and custody of a third party to maintain during the pendancy of the Phillips lawsuit.

7.6   On 7 May 2004, the Texas Court ordered Zapoteca not to move or sell the Vessel for 45 days.

7.7   On 6 July 2004 Zapoteca filed an original complaint against Phillips asserting claims for breach of fiduciary duty, breach of contract, and conversion. Zapoteca alleges, in short, that Phillips' conduct, during and after being employed by Zapoteca, caused Zapoteca approximately US$1,160,500 in economic damages.

7.8   On 8 July 2004 the Texas Court ordered that its 7 May 2004 order (requiring Zapoteca not move or sell the Vessel), remain in effect through mediation or until further order of the Texas Court (**Tab 17**).

7.9   On 19 July 2004, Mr Phillips filed a motion requesting joinder of P.D. Gram and its designated representative, Mr Christian Kongsli, to the Phillips' lawsuit as necessary and indispensable parties. Phillips asserted that for times relevant to the Phillips' lawsuit, he was employed by P.D. Gram and was under the supervision of Mr Kongsli (who is also a shareholder in Zapoteca, (**Tab 18**) and thus, acted at their direction.

7.10  On 21 July 2004, NDIL sought to leave to intervene in the Phillips lawsuit. Attached to its motion for leave to intervene, NDIL filed an original complaint and application for writ of attachment of the Vessel. NDIL requested the Texas Court to issue a writ of attachment on the Vessel because the Vessel is Zapoteca's sole asset in the state of Texas that could satisfy the debt Zapoteca owes to NDIL for Zapoteca's breach of Vessel Contract and the Equipment Lease Agreement. NDIL filed its original intervention and complaint because it had reason to believe that there was a substantial risk that Zapoteca would move the Vessel from the state of Texas, leaving NDIL with no asset upon which to satisfy a judgment against Zapoteca.

000011

ZEI 1356
*PHILLIPS*

7.11   Zapoteca filed an opposed motion to transfer venue to the United State District Texas
       Court, Southern District, Houston Division and a motion for rehearing of the Texas
       Court's 8 July 2004 order that ordered Zapoteca not move or sell the Vessel until
       further ordered by the Texas Court. Zapoteca states in this motion for rehearing:

> "... Zapoteca is currently denied the opportunity presented by
> these favorable market conditions due to this Texas Court's
> (now permanent) Order prohibiting Zapoteca from moving or
> selling the rig. Time is clearly of the essence and if the D/V
> ENERGY ZAPOTECA is not released from the Texas Court's
> Order dated July 8, 2004, the opportunity presented by the
> prevailing favorable market conditions will surely be lost."
> (emphasis added)

       **(Tab 19 )**

7.12   In my respectful submission, it is clear from that statement that Zapoteca intends to
       sell the Vessel if allowed to do so, thereby removing Zapoteca's only known asset
       from the reach of its creditors. Further, I am informed by Mr James Lank, Associate
       Counsel at Nabors Corporate Services, Inc, and believe, that Zapoteca has been
       advertising for sale a vessel named "Energy Europa" with substantially similar
       specification to the Vessel **(Tab 20)**. It is NDIL's belief that Zapoteca intends to
       modify the Vessel and sell it under the new name, "Energy Europa", further
       evidencing Zapoteca's intention to sell its only asset.

7.13   On 24 November 2004, NDIL filed an amended complaint in intervention **(Tab 21)**.

7.14   On 14 December 2004, the Texas Court held a hearing with all parties to address the
       motions pending before the Texas Court. At the hearing, however, the Texas Court
       did not rule on the pending motion, but instead, ordered the parties to file
       supplemental briefings. The primary issue before the Texas Court is one of
       jurisdiction; ie, whether Mr Phillips' causes of action are in admiralty. The parties'
       supplemental briefings were filed on 11 February 2005. However, NDIL has now
       withdrawn from the Phillips lawsuit.

7.15   In the meantime, Zapoteca has also filed a motion to modify the Texas Court's order
       of 8 July 2003 from which it is again abundantly clear that Zapoteca intends to sell the
       Vessel. Moreover, that motion shows that Zapoteca intends to sell the Vessel in

**000015**

ZEI 1357
PHILLIPS

exchange for shares of stock in the unnamed "buyer" company (rather than cash) on
or after 15 February 2005 **(Tab 22)**.

7.16    **It is anticipated that the Texas Court will rule on the question of its jurisdiction**
        **and/or Zapoteca's motion to modify as early as today, and potentially, release the**
        **Vessel.**

7.17    I am informed by Tonja de Sloover of Fulbright & Jaworski, NDIL's attorneys in the
        Texas proceedings, that on or about 12 March 12 2004 when Zapoteca sought from
        the Texas Court its temporary restraining order and preliminary injunction against
        Phillips, it represented to the Texas Court that the Vessel would be moved into the
        Texas Court's territorial jurisdiction (believed to be Port Isabelle). However, at the
        hearing before Texas Court held on 14 December 2003, Zapoteca's lead attorney
        informed the Texas Court that Zapoteca had made a "business decision" to move the
        Vessel to the port of Sabine Pass instead, which port is located outside the Texas
        Court's territorial jurisdiction. Ms. De Sloover informs me that Sabine Pass comes
        under the jurisdiction of the Eastern District of Texas, not the Southern District which
        is the Texas Court presently seized with the dispute.

7.18    In my respectful submission there can be no doubt, therefore, that Zapoteca intends to
        put its only known asset out of reach of its creditors as soon as it is able to do so and
        that Zapoteca has demonstrated that it is prepared to mislead the Texas Court in order
        to obtain its injunctive relief against Phillips.

8.      **ARBITRATION AGREEMENT AND APPOINTMENT OF THE ARBITRAL**
        **TRIBUNAL**

8.1     Clause 16 of the MoA provides for the application of English Law and London
        arbitration in the following terms:

> *"This Agreement shall be governed by and construed in*
> *accordance with English Law and any dispute arising out of*
> *this Agreement shall be referred to binding arbitration in*
> *London in accordance with the Arbitration Acts 1950 - 1979 or*
> *any statutory modification or re-enactment thereof for the time*
> *being in force, one arbitrator being appointed by each party.*
> *On the receipt by one party of the nomination in writing of the*
> *other party's arbitrator, that party shall appoint their*
> *arbitrator within fourteen days, failing which the decision of*

13

009016

ZEI 1358
**PHILLIPS**

*the single arbitrator appointed shall apply. If two arbitrators properly appointed shall not agree they shall appoint an umpire whose decision shall be final."*

8.2    On 15 September 2004, counsel for Zapoteca in the Texas proceedings wrote to counsel for NDIL in the Texas proceedings, Fulbright & Jaworski, seeking to invoke the provisions of clause 16 of the MoA and refer the dispute between Zapoteca and NDIL to arbitration in London (**Tab 23**).

8.3    By way of letter dated 10 January 2005 Nordisk confirmed on behalf of Zapoteca its nomination of Mr Baker-Harber as its arbitrator (**Tab 24**). In its letter dated 24 January 2005 Baker Botts confirmed on behalf of NDIL the nomination of Mr Simon Rainey QC of Quadrant Chambers as its arbitrator (**Tab 25**). The arbitral tribunal is duly appointed and the arbitration proceedings have commenced.

## 9.    REASONS FOR SEEKING A FREEZING INJUNCTION

9.1    Should the Texas Court vacate its 8 July 2004 order requiring Zapoteca to not move or sell the Vessel, this will severely impair NDIL's ability to protect its interest in the Vessel without intervention. If the Vessel departs or is sold to a third-party, NDIL will be left without any means to recover its damages for Zapoteca's failure to validly complete a legal transfer of the Vessel pursuant to the Vessel Contract and its failure to pay pursuant to the Equipment Lease Agreement.

9.2    It is clear from Zapoteca's own submissions in the Texas proceedings that it intends to quickly dispose of the Vessel, thereby leaving NDIL with no asset against which to enforce any eventual award of the arbitral tribunal. Even if Zapoteca does not dispose of the Vessel there is a very real risk that Zapoteca may further encumber the Vessel. NDIL would then be unable to attach any Zapoteca asset in execution of any favourable arbitral award.

9.3    Zapoteca is a Liberian corporation. I am informed by Mr James Lank, Associate Counsel at Nabors Corporate Services, Inc that it is NDIL's belief that Zapoteca has no place of business in the United Kingdom. I am further informed by Mr Lank that NDIL also believes that Zapoteca was formed for the sole purpose of facilitating the sale and purchase of the Vessel and that Zapoteca has no assets in the United

14

**000017**

*ZEI 1359*
*PHILLIPS*

Kingdom that can be subject to execution. The sole asset of Zapoteca of which NDIL is aware is the Vessel, currently located at the Sabine Shipyard, Sabine Pass, Jefferson County, Texas, USA.

## 10.   POWER TO GRANT A FREEZING INJUNCTION

10.1   This Honourable Court has the power pursuant to section 44(2)(e) of the Arbitration Act 1996 (the "Act") to grant injunctive relief:

> *"44(1) Unless otherwise agreed by the parties, the court has for the purposes of and in relation to arbitral proceedings the same power of making orders about matters the matters listed below as it has for the purposes of and in relation to legal proceedings.*
>
> *(2)     Those matters are...*
>
> > *(e)     the granting of an interim injunction or the appointment of a receiver."* (emphasis added)

10.2   A freezing injunction may be granted when (1) the party applying for such injunction has a good arguable case on the merits and there is some likelihood that that party will recover judgment against the other party to the proceedings for a certain or approximate item, and (2) the party applying for the injunction has reason to believe that the other party to the dispute has assets to meet the judgment in whole or in part but may well take steps designed to ensure that these are no longer available or traceable when judgement is given against it.[1]

### *Good arguable case*

10.3   There must be a serious issue to be tried on the merits.[2]  The established test is "good arguable case". All that needs to be shown is that the cause of action has substance - this is, in effect, a case which is more than barely capable of serious argument. The Claimant is not required to demonstrate that its chances of success are greater than 50%.[3]

---

[1] Halsbury's Laws of England, (Fourth Edition), Volume 24, para. 868; *Ninemia Maritime Corporation v Trave Schiffarhtsgesellschaft GmbH & Co ("The Niedersachsen")* [1983] 2 Lloyd's Rep. 600.
[2] *American Cyanamid v Ethicon* [1975] AC 396.
[3] *Ninemia Maritime Corporation v Trave Schiffahrtsgesellschaft GmbH & Co ("The Niedersachsen")* [1983] 2 Lloyd's Rep. 600; *Aiglon Ltd v Gau Shan Co Ltd* [1993] 1 Lloyds Rep. 164 QBD.

000018

*ZEI 1360*
*PHILLIPS*

### *Real risk of dissipation of the assets*

10.4    The fundamental purpose of a freezing injunction is to prevent a party to proceedings from taking action designed to frustrate subsequent orders of the Tribunal and/or the Court, and to protect the Respondent from the risk that it would be unable to enforce any final arbitration award.[4]

10.5    The order may be made against a respondent that is based outside England & Wales, in relation to foreign assets:

> "*If for the achievement of this purpose it is necessary to make orders concerning foreign assets, such orders should be made ...*"[5] (emphasis added)

10.6    The party applying for the injunction must show that the danger of dissipation exists. Adverse inference can be drawn from the very fact that the asset is present, that it is moveable and that the other party is abroad.[6]

10.7    Factors to consider in assessing danger include the structure of the company, the size of the company's business, its domicile, the location of other assets (if any) and the circumstances in which the dispute has arisen.[7]

### *No real hardship to the Claimant*

10.8    This Honourable Court must also consider the evidence as a whole and to give some thought to where the balance of convenience lies in deciding whether or not to grant the injunction. It may not be improper to take into account in tipping the balance the relative strength of each party's case.[8]

10.9    It is NDIL's submission that all of the above conditions have been fulfilled and that it has a substantial likelihood of success on the merits of its claim for Zapoteca's breach of the Vessel Contract and the Equipment Lease Agreement. Accordingly, on the basis of the above facts and those set out in the affidavit of David A. Mochizuki, Vice

---

[4] *Derby & Co Ltd v Weldon (Nos 3 and 4)* [1989] 2 WLR 412.
[5] *Derby & Co Ltd v Weldon (Nos 3 and 4)* [1989] 2 WLR 412; Halsbury's Laws of England, (Fourth Edition), Volume 24, para. 866.
[6] *Third Chandris Shipping Corporation v Unimarine SA ("Third Chandris")* [1979] QB 645.
[7] *Ninemia Maritime Corporation v Trave Schiffahrtsgesellschaft GmbH & Co ("The Niedersachsen")* [1983] 2 Lloyd's Rep. 600; *Derby & Co Ltd v Weldon (No 1)* [1990] Ch 48.
[8] *American Cyanamid v Ethicon* [1975] AC 396.

000019

ZEI 1361
*PHILLIPS*

President and Secretary of NDIL in support of NDIL's amended complaint in intervention **(Tab 26)** which remain the case today, I believe that unless a freezing injunction is granted in appropriate terms against Zapoteca that there is a real risk that any judgment obtained by NDIL against Zapoteca would remain unsatisfied.

11.    **LEAVE TO SERVE OUT OF THE JURISDICTION**

11.1    NDIL seeks to serve these proceedings out of the jurisdiction pursuant to Rule 6.20(5)(c) of the Civil Procedure Rules. As noted above, Zapoteca is a foreign, Liberian corporation organized and existing pursuant to the Liberian Corporation Act, with its principal place of business located at 80 Broad Street, Monrovia, Liberia.

11.2    NDIL asks that it be allowed to serve the Court's order and this affidavit on Zapoteca:

(a)    By fax and mail on Zapoteca's registered agent for service of process, LISCR Trust Company, located at 80 Broad Street, Monrovia, Liberia on +231 227 034 or +231 226 477;

(b)    By fax and mail on Zapoteca's representatives in the London arbitration, Lasse Hagen of Nordisk, Nordisk Skibsrederforening, P.O. Box 3033 Elisenberg, N-0207 Oslo Norway (Fax: +44 22 43 00 35);

(c)    By fax (excluding exhibits) on the Vessel's managers, P.D. Gram, whose principal place of business is Stranden 1A, Aker Brygge, P.O. Box 1383 Vika, No-0114 Oslo, Norway (Fax: +47 22 01 74 55) on behalf of Zapoteca; and

(d)    By fax (excluding exhibits) on Zapoteca's lead counsel of record in the Texas Proceedings, Mr Robert L. Klawetter of Eastham, Watson, Dale & Forney, LLP at The Niels Esperson Building, 808 Travis, 20th Floor, Houston, Texas 77002, USA (Fax: 00 1 713 225 2907).

12.    **NDIL'S UNDERTAKING IN DAMAGES**

12.1    NDIL undertakes to compensate Zapoteca for any loss arising out of the grant of the freezing injunction in the event that the Court decides that Zapoteca should be compensated by NDIL for that loss. I have reviewed the draft order which NDIL will

17

000020

**ZEI 1362**
**PHILLIPS**

seek on this application and I have the authority on behalf of NDIL to confirm that NDIL is prepared and able to provide the undertakings referred to therein.

12.2    As noted above NDIL is a wholly-owned subsidiary of Nabors, a corporation publicly traded in the American Stock Exchange ("AMEX") in New York. Its latest Form 10-Q quarterly filing with the U.S. Security and Exchange Commission ("SEC"), shows that it has net assets of US$2.8 billion and made a profit of US$193.6 million during the period 1 January - 30 September 2004. Relevant extracts of the latest Form 10-Q are attached at **Tab 27** hereto.

12.3    The latest audited accounts filed with the SEC (Form 10-K) are for the year ending 31 December 2003. These show that operating revenues and earnings from unconsolidated affiliates for 2003 totalled US$1.9 billion, representing an increase for US$409 million, or 28%, compared to 2002. Net income for 2003 totalled US$192.2 million, representing an increase of 58% compared to 2002. Relevant extracts of the Form 10-K are attached at **Tab 28** hereto.

13.    **RELIEF SOUGHT**

13.1    For the reasons set out above, I respectfully ask this Honourable Court to make an order that Zapoteca be prohibited from in any way disposing of or dealing with or diminishing the value of any of its assets whether they are in or outside England or Wales whether solely or jointly owned up to the value of US$2.5 million. This prohibition should include in particular the Vessel currently located at the Sabine Shipyard, Sabine Pass, Jefferson County, Texas, USA.

**AFFIRMED** at                                      )

this 14th day of February 2005                     )

Before me,

Solicitor

NORTON ROSE
Kempson House
Camomile Street
London  EC3A 7AN

18

000021

ZEI 1363
PHILLIPS

## IN THE HIGH COURT OF JUSTICE
## QUEEN'S BENCH DIVISION
## COMMERCIAL COURT

**B E T W E E N :**

(1)   NABORS DRILLING INTERNATIONAL LIMITED

<u>Claimant</u>

<u>and</u>

(2)   ZAPOTECA ENERGY, INC

<u>Defendant</u>

## IN THE MATTER OF THE ARBITRATION ACT 1996
## AND IN THE MATTER OF AN ARBITRATION

**B E T W E E N :**

(1)   ZAPOTECA ENERGY, INC

<u>Claimant</u>

<u>and</u>

(2)   NABORS DRILLING INTERNATIONAL LIMITED

<u>Respondent</u>

---

### SKELETON ARGUMENT IN SUPPORT OF APPLICATION FOR FREEZING INJUNCTION

---

**I.   INTRODUCTION**

1.   This is an application by Nabors Drilling International Limited ("NDIL"), the Respondents in London arbitration (pending before Mr. Michael Baker Harbour and Simon Rainey QC) for a freezing injunction against the Claimants in that reference, Zapoteca Energy, Inc ("Zapoteca"), pursuant to Section 44(2)(e) of the Arbitration Act 1996.

000118

ZEI 1364
*PHILLIPS*

2.  The requested injunction is in particular directed to the "ENERGY ZAPOTECA", a jack-up offshore oil rig ("the Vessel") presently located at Sabine Pass, Texas, USA.

3.  This application is being made without notice to the Claimants because of the urgency of the matter in that the Texas Court could hand down its ruling at any time and if that ruling results in lifting the arrest/prohibition against the sale of the Vessel, Zapoteca could sell the Vessel before an *inter partes* hearing could be arranged.

## II.  **BACKGROUND**

4.  The detailed background to the present dispute is set out in the Affidavit of Joseph Manuel Tirado in Support of NDIL's Application for Freezing Injunction sworn on 14th February 2005 ("Tirado Affidavit").

5.  In short, in March 2003, NDIL entered into an MoA based on the amended Norwegian Saleform for the purchase of the Vessel from Zapoteca for US$8.75 million, with a cancelling date of 15 April 2003. For various reasons, delivery by that date was not possible, so the parties agreed to extend the cancelling date to 31 May 2003 and increase the price to US$8.898 million.

6.  Zapoteca also failed to deliver by the new cancellation date of 31 May 2003. Negotiations between the parties ensued and NDIL ultimately cancelled the MoA in September 2003.

7.  The Vessel is presently subject arrest/prohibition against sale issued by the US District Court for the Southern District of Texas ("the Texas Court") at the behest of the Vessel's former Master, Charles Douglas Phillips ("Phillips"). Zapoteca has applied to set aside that arrest/prohibition against sale. Final submissions on that issue were submitted to the Texas Court by Zapoteca and Phillips on Friday 11th February 2005. The Texas Court could issue its ruling on Zapoteca's application at any time.

8.  NDIL had previously attempted to intervene in those proceedings so as to assert an independent basis for the arrest. However, its application to intervene was not dealt with, and NDIL has refrained from filing any substantive pleadings or submissions with the Texas Court since the commencement of the arbitral reference in London. Indeed,

000119

ZEI 1365
*PHILLIPS*

NDIL has now formally withdrawn its application to intervene in the Texas proceedings.

9.  Moreover, it appears that the Texas Court may well lack territorial *in rem* jurisdiction over the Vessel in any event.  It appears that the Texas Court had granted Zapoteca a temporary restraining order (i.e. a preliminary injunction) against Phillips based on Zapoteca's assurance to the Court that the Vessel would be moved into the Texas Court's territorial *in rem* jurisdiction.  However, on 14th December 2004, Zapoteca informed the Texas Court that it had taken a *"business decision"* not to move the Vessel into the Texas Court's jurisdiction.

## III.  GOOD ARGUABLE CLAIM

10.  It is NDIL's case in the arbitration that Zapoteca's failure to deliver the Vessel by the cancelling date was caused by Zapoteca's *"proven negligence"* within the meaning of clause 14 of the MoA.

11.  In particular, it is NDIL's case that the Vessel's Master, Charles Douglas Phillips ("Phillips") had deliberately, or alternatively negligently, acted so as to delay and/or thwart the delivery of the Vessel under the MoA.  (In addition to being the Vessel's Master, Phillips was also appointed by Zapoteca to be its legal representative/attorney under a Power of Attorney granted 17 April 2001 in Oslo, Norway.)  It would appear that Phillips did this in order to force Nabors to pay exorbitant sums to him and the rest of the crew (who were going to be rendered unemployed by a successful sale) even though neither he nor the crew were entitled to any payment from NDIL.

12.  The delivery of the Vessel by 31 May 2003 was prevented by, *inter alia*:

(1)  The non-cooperation and obstructive behaviour preventing the preparation of the Vessel for delivery;

(2)  The assertion of liens on the Vessel by Phillips and other members of the crew;

(3)  The commencement and prosecution of an action by Phillips and members of the crew for wages against NDIL; and

000120

**ZEI 1366**
*PHILLIPS*

(4)   The assertion of a lien on the Vessel by a shipyard in Tuxpan, Mexico for sums due to the yard from Zapoteca.

13.   It is NDIL's case that Zapoteca was responsible for the actions of its Master and legal representative/attorney in fact, Phillips and his successful attempt to thwart the completion of the sale.   Furthermore, Zapoteca was responsible for its failure to pay any charges due to the shipyard in Mexico in the vicinity of which the Vessel had been kept for a long time.

14.   It appears from the Texas proceedings that Zapoteca will argue that, since NDIL had agreed to pay Phillips and the crew to sail with the Vessel to Texas (a service that they never performed and in fact repudiated in early May 2003), NDIL somehow became responsible for Phillips' actions.   It is NDIL's case that that argument is unsustainable. NDIL cannot see the legal basis upon which that argument could be advanced.

15. .   Of course, whether NDIL is ultimately successful or not is a matter that the Tribunal will have to determine.   However, it is submitted that NDIL has a strong claim that more than satisfies the requirement for a good arguable case.

## IV.   ASSETS WITHIN AND OUTSIDE THE JURISDICTION

16.   Zapoteca's only known asset is the Vessel, which is in Sabine Pass, Texas, USA.

## V.   RISK OF DISSIPATION OF ASSETS

17.   It is submitted that, for the following reasons, there is a serious risk, if not very strong likelihood, that Zapateca will dissipate its only known asset so as to render any award of the Tribunal unenforceable:

(1)   Zapoteca is a one-ship Liberian company with no known assets save for the Vessel.

(2)   Zapoteca has already stated in clear terms in the Texas proceedings that it wishes to sell the Vessel soon.

(3)   The price for the intended sale is apparently to be paid by way of shares in an unidentified company, and not in cash.

000121

ZEI 1367
*PHILLIPS*

(4)   NDIL's attorney in Texas, Tonja De Sloover, has informed Mr. Tirado that Zapoteca initially assured the Texas Court that it would move the Vessel into the Court's territorial jurisdiction and thereby secured the injunction it wanted against Phillips.  Subsequently, on 14th December 2004, Zapoteca's attorney informed the Texas Court that Zapoteca had made a *"business decision"* not to move the Vessel into the Texas Court's jurisdiction as previously promised.  It is Ms. Sloover's view that this may well deprive the Texas Court of *in rem* jurisdiction over the Vessel.

## VI.   THE PROPOSED FREEZING INJUNCTION

18.   NDIL would like to draw the Court's attention to the following provisions of the proposed freezing injunction presented by them:

(1)   **Return Date (paragraphs 3 & 5):**  NDIL would suggest that the return date be Friday 18th February 2005.

(2)   **Costs (paragraph 12):**  It is proposed that these be reserved to the judge hearing the case on the return date.

(3)   **Undertaking & Security (Schedule B):**  NDIL is willing to provide the usual cross undertaking in damages.  It is also willing to provide security, if deemed necessary, in an amount deemed appropriate by the court.

## VII.   CONCLUSION

19.   For the reasons set out above and in Mr. Tirado's Affidavit, the Court should grant NDIL the requested freezing injunction in the form presented to the Court.

14th February 2005

**CHIRAG KARIA**
Quadrant Chambers

00060122

ZEI 1368
*PHILLIPS*

# TRANSCRIPT OF HEARING
## before Mr. Justice Langley
### held in Court 24 of the Queen's Bench Division, Commercial Court
### on Monday, 14 February 2005 at 11.30 a.m.

**Present:**    **The Honourable Mr. Justice Langley ("JL")**
**Chirag Karia ("CK"), Counsel for Nabors Drilling International, Ltd ("NDIL")**
**Joseph Tirado ("JT"), Partner, Baker Botts, Solicitors for NDIL**
**Chris Miller, ("CM"), Associate, Baker Botts**

---

JL confirmed that he had read the skeleton argument lodged by CK and the affidavit of JT. JL said that he had not as yet read the exhibits to the affidavit.

CK asked JL whether he had any particular questions in relation to the application that was being made.

JL confirmed that he had no particular concerns and proposed looking at the draft order.

In relation to **paragraph 3**, JL confirmed that the return date of 18 February 2005 was sensible.

CK said that as far as NDIL was aware no English lawyers had yet been appointed on behalf of Zapoteca Energy, Inc ("Zapoteca") in relation to the London arbitration, but that Zapoteca was represented by Norwegian lawyers.

In relation to **paragraph 5**, JL confirmed that he was happy with the proposed value of US$2.5 million and for the order to apply worldwide.

In relation to **paragraph 9(1)**, JL commented that he regarded this whole provision as somewhat onerous and that he considered a figure of US$25,000 to be more appropriate.

In relation to **paragraph 10**, JL said that he considered 3 working days in which to respond to be a little tight and proposed to substitute 5 working days instead.

In relation to **paragraph 11(1)**, JL said that he considered the proposed figure of £5,000 to be a little unrealistic and that given that the assumed costs for maintaining the rig in its current location might be substantial, JL proposed increasing the spending limit to £20,000.

In relation to the other provisions of the draft order, JL said that he assumed that they where bog standard unless CK told him otherwise.

CK referred JL to **paragraph 21** and the request to serve multi-parties.

JL queried why it was necessary to serve the "registered agent" and agreed with CK that this was probably an Liberian company registration requirement. JL then wondered whether it would be possible to serve each of the proposed parties for service cumulatively, *i.e.* all at the same time.

CK confirmed that it was NDIL's intention to serve all four parties listed in paragraph 21 at the same time.

000123

ZEI 1369
*PHILLIPS*

CK then referred JL to couple of **Schedule B** of the draft order.

In relation to **paragraph (2)(a)**, JL queried whether Nabors Industries Limited would be prepared to provide a company guarantee.

CK confirmed that he had no instructions to provide such a guarantee. CK proposed instead that it may be possible to word the order in the alternative so that NDIL could either provide a bank guarantee or provide a parent company guarantee.

JL said that if NDIL was prepared to provide a parent guarantee, then this should be in a sum of US$100,000 and be in place by 4 p.m. on Thursday, 17 February 2005.

In relation to the estimated length of hearing for the return date, JL noted that this was extremely difficult to estimate but said that he would have thought that one hour would be appropriate.

CK then asked JL whether he would be available on Friday, 18 February 2005.

JL confirmed that he would not be.

LON01:55247.1

**000124**

**ZEI 1370**
*PHILLIPS*

**IN THE HIGH COURT OF JUSTICE**

**QUEEN'S BENCH DIVISION**

**COMMERCIAL COURT**

**BEFORE THE HONOURABLE MR. JUSTICE LANGLEY**

**BETWEEN:**

### (1) NABORS DRILLING INTERNATIONAL LIMITED

**Claimant**

**and**

### (2) ZAPOTECA ENERGY, INC

**Defendant**

**IN THE MATTER OF THE ARBITRATION ACT 1996**

**AND IN THE MATTER OF AN ARBITRATION**

**B E T W E E N:**

(1)    **ZAPOTECA ENERGY, INC**

**Claimant**

**and**

(2)    **NABORS DRILLING INTERNATIONAL LIMITED**

**Respondent**

*[stamp: SUPREME COURT OF JUDICATURE ADMIRALTY & COMMERCIAL REGISTRY — 14 FEB 2005]*

### PENAL NOTICE

If you, ZAPOTECA ENERGY, INC, disobey this order you may be held to be in contempt of court and may be imprisoned, fined or have your assets seized.

Any other person who knows of this order and does anything which helps or permits the Respondent, ZAPOTECA ENERGY, INC, to breach the terms of this order may also be held to be in contempt of court and may be imprisoned, fined or have their assets seized.

*THIS ORDER*

1.    This is a Freezing Injunction made against ZAPOTECA ENERGY, INC. ("the Respondent") on 14 February 2005 by Mr Justice Langley on the application of Nabors Drilling International Limited ("the Applicant"). The Judge read the Affidavit listed in Schedule A and accepted the undertakings set out in Schedule B at the end of this Order.

LON01:55236.1

**000125**

**ZEI 1371**
*PHILLIPS*

2.  This order was made at a hearing without notice to the Respondent. The Respondent has a right to apply to the court to vary or discharge the order – see paragraph 13 below.

3.  There will be a further hearing in respect of this order on 18th February 2005 ("the return date").

4.  If there is more than one Respondent:

    (a)  unless otherwise stated, references in this order to "the Respondent" means both or all of them; and

    (b)  this order is effective against any Respondent on whom it is served or who is given notice of it.

## FREEZING INJUNCTION

5.  Until the return date or further order of the court, the Respondent must not:

    (1)  remove from England and Wales any of its assets which are in England and Wales up to the value of US$2.5 Million; or

    (2)  in any way dispose of, deal with or diminish the value of any of its assets whether they are in or outside England and Wales up to the same value.

6.  Paragraph 5 applies to all the Respondent's assets whether or not they are in its own name and whether they are solely or jointly owned. For the purpose of this order the Respondent's assets include any asset which it has the power, directly or indirectly, to dispose of or deal with as if it were its own. The Respondent is to be regarded as having such power if a third party holds or controls the asset in accordance with its direct or indirect instructions.

7.  This prohibition includes the following assets in particular:

    (1)  The "ENERGY ZAPOTECA" jack-up offshore oil rig currently believed to be located at the Sabine Shipyard, Sabine Pass, Texas, USA.

8.  (1)  If the total value free of charges or other securities ("unencumbered value") of the Respondent's assets in England and Wales exceeds US$2.5 Million the Respondent may remove any of those assets from England and Wales or may dispose of or deal with them so long as the total unencumbered value of the Respondent's assets still in England and Wales remains above US$2.5 Million.

    (2)  If the total unencumbered value of the Respondent's assets in England and Wales does not exceed US$2.5 Million, the Respondent must not

000126

ZEI 1372
PHILLIPS

remove any of those assets from England and Wales and must not dispose of or deal with any of them. If the Respondent has other assets outside England and Wales, it may dispose of or deal with those assets outside England and Wales so long as the total unencumbered value of all its assets whether in or outside England and Wales remains above **US$2.5 Million.**

## PROVISION OF INFORMATION

9.    (1)   Unless paragraph (2) applies, the Respondent must within **48 hours** of service of this order and to the best of its ability inform the Applicant's solicitors of all its assets worldwide exceeding **US$25,000** in value whether in its own name or not and whether solely or jointly owned, giving the value, location and details of all such assets.

   (2)   If the provision of any of this information is likely to incriminate the Respondent, it may be entitled to refuse to provide it, but is recommended to take legal advice before refusing to provide the information. Wrongful refusal to provide the information is contempt of court and may render the Respondent liable to be imprisoned, fined or have its assets seized.

10.    Within **5 working days** after being served with this order, the Respondent must swear and serve on the Applicant's solicitors an affidavit setting out the above information.

## EXCEPTIONS TO THIS ORDER

11.    (1)   This order does not prohibit the Respondent from spending **£20,000** a week towards its ordinary operating expenses and also a reasonable sum on legal advice and representation. But before spending any money the Respondent must tell the Applicant's legal representatives where the money is to come from.

   (2)   This order does not prohibit the Respondent from dealing with or disposing of any of its assets in the ordinary and proper course of business.

   (3)   The Respondent may agree with the Applicant's legal representatives that the above spending limits should be increased or that this order should be varied in any other respect, but any agreement must be in writing.

   (4)   The order will cease to have effect if the Respondent:

      (a)   provides security by paying the sum of **US$2.5 Million** into court, to be held to the order of the court; or

000127

*ZEI 1373*
*PHILLIPS*

(b)    makes provision for security in that sum by another method agreed with the Applicant's legal representatives.

## COSTS

12.    The costs of this application are to be reserved to the judge hearing the application on the return date.

## VARIATION OR DISCHARGE OF THIS ORDER

13.    Anyone served with or notified of this order may apply to the court at any time to vary or discharge this order (or so much of it as affects that person), but they must first inform the Applicant's solicitors. If any evidence is to be relied upon in support of the application, the substance of it must be communicated in writing to the Applicant's solicitors in advance.

## INTERPRETATION OF THIS ORDER

14.    A Respondent who is an individual who is ordered not to do something must not do it himself or in any other way. It must not do it through others acting on its behalf or on its instructions or with its encouragement.

15.    A Respondent which is not an individual which is ordered not to do something must not do it itself or by its directors, officers, partners, employees or agents or in any other way.

## PARTIES OTHER THAN THE APPLICANT AND RESPONDENT

16.    **Effect of this order**

It is a contempt of court for any person notified of this order knowingly to assist in or permit a breach of this order. Any person doing so may be imprisoned, fined or have their assets seized.

17.    **Set off by banks**

This injunction does not prevent any bank from exercising any right of set off it may have in respect of any facility which it gave to the respondent before it was notified of this order.

18.    **Withdrawals by the Respondent**

No bank need enquire as to the application or proposed application of any money withdrawn by the Respondent if the withdrawal appears to be permitted by this order.

000128

ZEI 1374
*PHILLIPS*

19.    **Persons outside England and Wales**

(1)    Except as provided in paragraph (2) below, the terms of this order do not affect or concern anyone outside the jurisdiction of this court.

(2)    The terms of this order will affect the following persons in a country or state outside the jurisdiction of this court:

(a)    the Respondent or its officer or agent appointed by power of attorney;

(b)    any person who:

(i)    is subject to the jurisdiction of this court;

(ii)    has been given written notice of this order at its residence or place of business within the jurisdiction of this court; and

(iii)    is able to prevent acts or omissions outside the jurisdiction of this court which constitute or assist in a breach of the terms of this order; and

(c)    any other person, only to the extent that this order is declared enforceable by or is enforced by a court in that country or state.

20.    **Assets located outside England and Wales**

Nothing in this order shall, in respect of assets located outside England and Wales, prevent any third party from complying with:

(1)    what it reasonably believes to be its obligations, contractual or otherwise, under the laws and obligations of the country or state in which those assets are situated or under the proper law of any contract between itself and the Respondent; and

(2)    any orders of the courts of that country or state, provided that reasonable notice of any application for such an order is given to the Applicant's solicitors.

000129

LON01:55236.15

ZEI 1375
*PHILLIPS*

## SERVICE OF THIS ORDER

21.  **Service Upon the Respondent**

The Applicant shall serve this order and the documents produced to the Court upon the present application as follows:

(1)  By fax and mail on Zapoteca's registered agent for service of process, LISCR Trust Company, part of the Liberian International Shipping & Corporate Registry, located at 80 Broad Street, Monrovia, Liberia on +231 227 034 or +231 226 477.

(2)  By fax and mail on Zapoteca's representatives in the London arbitration, Lasse Hagen of Nordisk Legal Services, Nordisk Skibsrederforening, P.O. Box 3033 Elisenberg, N-0207 Oslo Norway (+44 22 43 00 35).

(3)  By fax (excluding exhibits to the affidavit) on the Vessel's managers, P.D. Gram, in Oslo, Norway, (+47 22 01 74 55).

(4)  By fax (excluding exhibits to the affidavit) on Zapoteca's lead counsel of record in the Texas proceedings, Mr Robert L. Klawetter of Eastham, Watson, Dale & Forney, LLP at (+1 713 225 2907).

Service as aforesaid shall be deemed good and effective service upon the Respondent.

## COMMUNICATIONS WITH THE COURT

All communications to the court about this order should be sent to Room E201, Royal Courts of Justice, Strand, London WC2A 2LL quoting the case number. The telephone number is +44 (0)20 7947 6826.

The offices are open between 10 a.m. and 4.30 p.m. Monday to Friday.

### SCHEDULE A

### AFFIDAVITS

The Applicant relied on the following affidavits:

| [name] | [number of affidavit] | [date sworn] | [filed on behalf of] |
|---|---|---|---|
| (1) Joseph Manuel Tirado | 1st | 14 February 2005 | Applicant |

LON01:55236.16

000130

ZEI 1376
*PHILLIPS*

## SCHEDULE B

## UNDERTAKINGS GIVEN TO THE COURT BY THE APPLICANT

(1)    If the court later finds that this order has caused loss to the Respondent, and decides that the Respondent should be compensated for that loss, the Applicant will comply with any order the court may make.

(2)    (a)    The Applicant will on or before 4pm Thursday 17th February 2005 cause a written guarantee in the sum of US$100,000 to be issued from a bank with a place of business within England or Wales, in respect of any order the court may make pursuant to paragraph (1) above; and

(b)    immediately upon issue of the guarantee, cause a copy of it to be served on the Respondent.

(3)    The Applicant will serve upon the Respondent, in accordance with paragraph 21 above, together with this order as soon as practicable:

(i)    copies of the affidavits and exhibits containing the evidence relied upon by the Applicant, and any other documents provided to the court on the making of the application;

(ii)    an application notice for continuation of the order.

(4)    Anyone notified of this order will be given a copy of it by the Applicant's legal representatives.

(5)    The Applicant will pay the reasonable costs of anyone other than the Respondent which have been incurred as a result of this order including the costs of finding out whether that person holds any of the Respondent's assets and if the court later finds that this order has caused such person loss, and decides that such person should be compensated for that loss, the Applicant will comply with any order the court may make.

(6)    If this order ceases to have effect (for example, if the Respondent provides security) the Applicant will immediately take all reasonable steps to inform in writing anyone to whom it has given notice of this order, or who it has reasonable grounds for supposing may act upon this order, that it has ceased to have effect.

(7)    The Applicant will not without the permission of the court use any information obtained as a result of this order for the purpose of any civil or criminal proceedings, either in England and Wales or in any other jurisdiction, other than this claim.

LON01:55236.17

**000131**

*ZEI 1377*
*PHILLIPS*

## NAME AND ADDRESS OF APPLICANT'S LEGAL REPRESENTATIVES

The Applicant's legal representatives are:

Baker Botts
Attn: Joseph Manuel Tirado
99, Gresham Street
London EC2V 7BA

Tel:  +44 (0) 20 7726 3636
Fax:  +44 (0) 20 7726 3637
E-mail: joe.tirado@bakerbotts.com

000132

LON01-35236.18

ZEI 1378
*PHILLIPS*