# EXHIBIT D

IN THE UNITED STATES DISTRICT COURT
FOR THE SOUTHERN DISTRICT OF TEXAS
BROWNSVILLE DIVISION

| | | |
|---|---|---|
| ZAPOTECA ENERGY, INC.,<br>Plaintiff/Counter-defendant, | §<br>§<br>§ | |
| v. | §<br>§ | CASE NO. B-04-048 |
| CHARLES DOUGLAS PHILLIPS,<br>Defendant/Counter-claimant. | §<br>§<br>§ | |

## AFFIDAVIT OF CHARLES DOUGLAS PHILLIPS

THE STATE OF TEXAS   §
                        §
COUNTY OF HARRIS   §

BEFORE ME, the undersigned authority, on this day personally appeared CHARLES PHILLIPS, who being by me duly sworn on oath stated and said the following:

1. My name is CHARLES DOUGLAS PHILLIPS, I am over eighteen, am competent to make this affidavit, and have personal knowledge of the facts herein stated.

2. In May 2000, I was hired by SOUTHERN INTERNATIONAL, INC. to act as Project Manager on the Rig ENERGY ZAPOTECA in Tuxpan, Mexico. In June of 2000, I was appointed Master of the Rig ENERGY ZAPOTECA by Christian Kongsli, one of the shareholders (Owners) of ZAPOTECA ENERGY, INC. In December of 2000, I was hired by ZAPOTECA ENERGY, INC. to remain as Master on the Rig ENERGY ZAPOTECA and also serve as the Owners' Representative of the Rig ENERGY ZAPOTECA. In May of 2001, I was given a general Power of Attorney to handle all legal matters for ZAPOTECA ENERGY, INC. in Mexico.

3. The terms of my employment with ZAPOTECA ENERGY, INC. were that I was to receive a salary of twelve thousand and no/100 dollars ($12,000.00) per month, plus a per-diem in Mexico in the amount of $2,000.00 Pesos per week, housing allowance of $15,000.00 Pesos per month, and car allowance of $11,000.00 Pesos per month. Upon my return to the United States in May of 2003, my salary remained the same at twelve thousand and no/100 dollars ($12,000.00) per month, with my per-diem being $75.00 USD per day, housing allowance of $2,250.00 USD per month, and car allowance of $500.00 per week at the time of my termination.



4. Upon being hired by SOUTHERN INTERNATIONAL, INC. in May of 2000 as Project Manager, I traveled to Tuxpan, Mexico, and immediately began work on the Rig ENERGY ZAPOTECA.

5. The Rig ENERGY ZAPOTECA is a Friede & Goldman L-780 Independent Leg Jack-up Barge/Rig.

6. In May of 2000, the Panamanian provisional (navigation) certificate was issued to ZAPOTECA ENERGY, INC. for the Rig ENERGY ZAPOTECA.

7. In the Summer of 2000, the Rig ENERGY ZAPOTECA, although damaged by a "blow-out", was fully capable of being towed or moved.

8. In May of 2000, I was employed by SOUTHERN INTERNATIONAL, INC. to perform work on the Rig ENERGY ZAPOTECA for its use in the marine industry as a jack-up barge/rig.

9. During my employment with SOUTHERN INTERNATIONAL, INC. and ZAPOTECA ENERGY, INC., I physically worked on the Rig ENERGY ZAPOTECA in order to prepare the Rig ENERGY ZAPOTECA for moving and use in the marine industry as a jack-up barge/rig.

10. During my employment with ZAPOTECA ENERGY, INC., and as a direct result of my employment with ZAPOTECA ENERGY, INC., I was charged with a crime in the Country of Mexico and forced to leave Mexico in May of 2003. I must remain outside of the Country of Mexico for a period of not less than three (3) years in order to avoid prosecution for a crime directly resulting from ZAPOTECA ENERGY, INC.'S actions.



11. During my employment with ZAPOTECA ENERGY, INC., I was involved in a labor case in Mexico whereby a writ of attachment was issued against the Rig ENERGY ZAPOTECA in favor of me and my superintendent, for failing to pay us past due and owing wages. The amount of the writ of attachment against the Rig ENERGY ZAPOTECA is $1,115,568.00 USD, of which approximately $500,000.00 USD is directly attributable to wages owed by the Rig ENERGY ZAPOTECA to me.

12. On or about March 10, 2004, I was terminated by ZAPOTECA ENERGY, INC. for failing to perform an illegal act under the laws of the Country of Mexico and move the Rig ENERGY ZAPOTECA from its moored location in the Port of Tuxpan, Mexico, to another location while the Rig ENERGY ZAPOTECA was subject to attachment by the Mexican Labor Court.

13. Upon my termination, I was owed, and remain owed, by ZAPOTECA ENERGY, INC. approximately $20,000.00 in back wages for my services as Master, Owners' Representative and Legal Representative of the Rig ENERGY ZAPOTECA, in addition to $165,000.00 in the form of an agreed severance/bonus payment for the work I performed for ZAPOTECA ENERGY, INC. on the Rig ENERGY ZAPOTECA.

14. The afore described due and owing wages directly result from my services as Master, Owners' Representative and Legal Representative of the Rig ENERGY ZAPOTECA.

15. After my termination, I was named as a defendant in a Mexican Labor Case directly resulting from my role as Master, Owners' Representative and Legal Representative of the Rig ENERGY ZAPOTECA. The costs associated with the defense of this action is in excess of $220,000.00 USD.

16. After my termination, ZAPOTECA ENERGY, INC. maintains no office, agent, officer, shareholder, representative, or property within the United States, other than the Rig ENERGY ZAPOTECA.

17. ZAPOTECA ENERGY, INC. is a foreign corporation incorporated under the laws of Liberia, with its principal place of business and registered agent located at 80 Broad Street, City of Monrovia, County of Montserrado, Republic of Liberia.

18. ZAPOTECA ENERGY, INC.'s only asset is the Rig ENERGY ZAPOTECA.

19. In April of 2004, the Rig ENERGY ZAPOTECA was moved from Tuxpan, Mexico to Sabine Pass, Texas, and as of the making of this affidavit, it remains in Sabine Pass, Texas.

20. In April/May 2003, the Rig ENERGY ZAPOTECA was equipped with two (2) living quarters, portable navigation lights, pumps, tugger, generator, safety equipment, and towing gear.

21. I have seen the Rig ENERGY ZAPOTECA since its arrival in Sabine Pass, Texas and it remains fully capable of being moved or towed to any port of ZAPOTECA ENERGY, INC.'S choosing.

22. I have read the foregoing pleading to which this affidavit is attached, and the contents contained therein are true and correct.



FURTHER AFFIANT SAYETH NOT.

CHARLES DOUGLAS PHILLIPS

THE STATE OF TEXAS          §
                            §
COUNTY OF HARRIS            §

SWORN TO AND SUBSCRIBED TO BEFORE ME by the said CHARLES DOUGLAS PHILLIPS to certify which witness my hand and seal of office on this _17th_ day of _May_, 2004.

> SUNNY ROBINSON
> MY COMMISSION EXPIRES
> September 17, 2006

Notary Public, State of Texas

My Commission Expires:

# EXHIBIT E

IN THE UNITED STATES DISTRICT COURT
FOR THE SOUTHERN DISTRICT OF TEXAS
BROWNSVILLE DIVISION

ZAPOTECA ENERGY, INC.                §
                                     §
VS.                                  §          CIVIL NO. B-04-048
                                     §          In Admiralty/Rule 9(h)
CHARLES DOUGLAS PHILLIPS, et al.     §

## AFFIDAVIT OF CHARLES D. PHILLIPS

STATE OF TEXAS          §
                        §
COUNTY OF HARRIS        §

Before me, the undersigned officer, on this day personally appeared Charles D. Phillips who, after first being duly sworn, deposes and says on oath as follows:

1.      My name is Charles D. Phillips. I am over the age of 21 years. I have never been convicted of a felony or a crime of moral turpitude, and I am not otherwise disqualified from making this affidavit. Except where otherwise stated, I have personal knowledge of every fact to which I testify in this affidavit, and every fact to which I testify in this affidavit is true and correct to my personal knowledge.

2.      I am 61 years old and a U.S. Citizen. My home address is 14227 Misty Meadow Lane, Houston, Texas 77079.

3.      I am a licensed Master. I received my first Master's license from the United States Coast Guard on December 14, 1984. That license covers "any gross tons and oceans." My Master's license number is 560648 and issued by the U.S. Coast Guard in New Orleans, Louisiana. In addition, I also hold a United States Coast Guard license as an Able-bodied Seaman/Lifeboatman. I also hold certificates from Noble Denton & Associates as a Marine

Move Supervisor for Mobile Offshore Drilling Units and am a Certified Rig Mover from Global Marine.

4.      In 1980, I was the Master of the DAN PRINCE, a jack-up drilling rig registered and flagged in Liberia. While under tow from Dutch Harbour, Alaska, to Abijahn, West Africa, the vessel sank due to severe weather with no loss of life. At the end of the investigation and hearings, I received a commendation from the U.S. Coast Guard Admiral and the hearing board for my actions and performance as Master for my efforts to save the Vessel and in maintaining the safety of the crew.

5.      I have never had any negative action or proceedings taken against of my Coast Guard licenses. None of these licenses has ever been suspended or revoked.

6.      In regard to the Rig, ENERGY ZAPOTECA, sometimes called the NABORS 660 (hereinafter "the Vessel"), I originally was an employee of Southern International, Inc. ("Southern") and was hired by Southern in May of 2000 to become project manager having to do with refurbishing the Vessel. At that time I also became the Master of the Vessel. My employer initially was Southern, but I was assigned to the Vessel and working under the supervision of the Vessel's managers, P.D. Gram & Co. ("Gram"). My understanding is that the Vessel's title owner is Zapoteca Energy, Inc. ("Zapoteca"), which to my knowledge was created strictly to acquire title in the Vessel. However all Rig operations, supervision, management, repair, etc., were seen to by the Vessel's managers, Gram, since Zapoteca has no actual employees or officers. If it does, I never met them. I was appointed Master of the ENERGY ZAPOTECA in the Summer of 2000 by Mr. Christian Kongsli. In December 2000, I was under the supervision of Gram. My instructions came from the Vessel's

managers, Gram. I was told that Mr. Kongsli, to whom I reported, was authorized by Gram as my supervisor. That was also true in late 2003 and even through mid-March of 2004.

In the Spring of 2003, I went to work for Nabors Drilling as Master of the ENERGY ZAPOTECA/NABORS 660. I continued to work for Gram and Zapoteca as the owners' representative and legal representative. That was after Nabors had entered into a Memorandum of Agreement to purchase the Vessel. However, in August of 2003, I left Nabors' employ and returned to the employment of Gram as the Master of the ENERGY ZAPOTECA. Throughout 2003 I was the Master of the Vessel and was either an employee of Nabors or Gram, depending on the time frame. (During the Nabors time period, Nabors paid me a portion of my Master's wages, but not the balance. That issue later was settled.) Throughout my period as a Gram employee, I submitted my payroll and other items to Gram and received my paycheck and reimbursement of various expenses from Gram as Master. I also continued to report to Gram, through my supervisor and contact, Mr. Kongsli. Again, to my knowledge, Zapoteca had no actual employees. Rather, the Vessel again was managed by Zapoteca's managers, Gram, just as had occurred earlier.

7.      During the period of March 3-11, 2004, Mr. Kongsli, my supervisor at Gram, came to Port Isabelle, Texas, to meet with me and discuss progress of the Vessel's improvements, my bonus, meetings with the crew members, and final preparations of the Vessel for her intended ocean tow from Tuxpan, Mexico, to what I was told would be Port Isabelle, Texas. Mr. Kongsli did not indicate to me that he was unhappy with my performance, nor did he request that I provide any documents, files, or other papers to him. However, in a sudden shock to me, on March 10, 2004, I received a fax letter from Zapoteca's attorney, Ed Nelson, with whom I had dealt on numerous occasions over the

preceding five months or so and with whom I had exchanged correspondence well over a hundred times. While Mr. Nelson was Zapoteca's counsel, he gave me advice as the Vessel's Master and as the local representative of Zapoteca, upon which I routinely relied. He frequently told me that he had received instructions from Gram or Zapoteca and was passing those instructions to me. He also gave me a good deal of legal advice on how to handle the various claims against or concerning Zapoteca in Mexico. Several of the claims were against Zapoteca and against me personally. On several occasions he assured me that my own claims as a merchant mariner, seaman and the Vessel's Master, were protected under controlling law, so I did not need to worry when Zapoteca did not pay me promptly, postponed payment of my bonus, etc. On March 10, 2004, the same day I had been meeting with Mr. Kongsli, I got a letter from Mr. Nelson indicating that my employment was terminated. I was shocked that I was being terminated for refusing to move the Vessel without permission of the Port Captain and the Labor President.

8.    I later learned that Zapoteca, in a meeting in Oslo, Norway, on February 18, 2004, revoked my Power of Attorney without any justification. I did not learn of this February 18, 2004 meeting or revocation until I was served on March 15, 2004, with the Application for TRO filed by Zapoteca on March 12, 2004.

9.    Although I had been told that the Vessel would be towed to Port Isabelle, Texas, I later learned that in fact Zapoteca had no intent to do so, and in fact had been planning with Nabors, who was intending to buy the Rig, that the Rig was to be taken to Freeport, Texas, or points further east. I believe that I was being misinformed intentionally of the intended destination of the Vessel, in Gram's or Zapoteca's desire to keep me from becoming more alarmed about not being paid and trying to take steps to protect my claims,

including seeking an embargo from the appropriate Mexican court. After I was fired on March 10, 2004, I did seek an embargo order from the appropriate Mexican labor court. That Embargo Order was issued on April 7, 2004. However, Zapoteca and Gram were successful in having the Vessel leave Tuxpan before the court officials could attach the Vessel, thus thwarting the intent of the Mexican judicial officials in trying to hold the Vessel within the Mexican court's jurisdiction. If she had not departed as quickly as she did, the Vessel would have been attached under Mexican law, which I understand is similar to an arrest in Admiralty under United States law.

      10.    One of the civil disputes Zapoteca had in Mexico was based on alleged charges owed to Protexa/Celesa. As the local representative of Zapoteca and the Vessel, I was questioned by a Mexican court representative. I had a Mexican attorney representing me, who was hired by Zapoteca and paid by Zapoteca. He advised me on how to answer various questions. Protexa/Celesa later asserted that one of my answers was incorrect and on that basis were able to get criminal charges issued against me in Mexico. Zapoteca agreed shortly after the civil claims were asserted by Protexa, and again after the criminal charges were asserted, that it would protect me from both the civil and criminal charges and take all steps necessary to be sure those claims and charges against me personally were completely dropped, both by Protexa/Celesa and by the appropriate judicial authorities. In late May 2003, my wife and I had to flee Mexico due to fear that an arrest warrant was forthcoming. Zapoteca confirmed that to me and indicated that they would be sure in resolving the civil claim with Protexa that all the criminal charges against me would be dropped and withdrawn. In June 2003, an agreement was drawn up between Zapoteca and Protexa whereby Protexa was obligated "to obtain the total and final discharge of the charges against me." In late

June, 2003, the agreement was changed without informing me. Christian Kongsli and Henirk Aadnesen with Nodisk Legal Services changed the agreement from "total and final discharge" to "everything within Protexa's power to obtain the total discharge of the criminal charges against me. I learned on August 2, 2003, in a meeting with Mr. P. D. Gram and Mr. Christian Kongsli in Houston, Texas, that the agreement with Protexa had been changed and that the criminal charges were not dropped.    Shortly after that meeting, I learned that an arrest warrant had been issued in early July, 2003, by the criminal court in Tuxpan, Mexico. Since then, I have not been able to return to Mexico and, based on the advices from Zapoteca's Mexican counsel to me, I will not be able to return to Mexico, even to visit, for a period of at least 4-5 years, and possibly later. I have been advised by Zapoteca's counsel that it will take at least that long before the criminal charges against me cannot be pursued.

11.    Around the period of time that I dealt with the Vessel, she had various insurance coverages in effect, which would be typical of commercial vessels in navigation. For example, she had collision hull coverage (the vessel equivalent of property damage), collision liability (if she ran into or was run into by another vessel), protection and indemnity coverage (which is somewhat similar to comprehensive general liability coverage as might apply on a homeowners' policy), employee and wage protection coverage, and even navigation and tower's liability coverage. These coverages were renewed or put into effect in conjunction with the anticipated and ultimately successful towage of the Vessel from Mexico to Texas. Those coverages were in effect in the Summer of 2000, and were renewed or extended, including specifically tower's liability coverages, in 2003 and 2004, after Zapoteca and Nabors had contracted for the sale and delivery of the Vessel to Nabors in international or Texas waters.

12.     As reflected in the counter-claim filed in this case, I have various claims against Zapoteca, the Vessel and Gram, (collectively "Vessel Interests") which include:

(a)     The Vessel Interest's failure to pay me my back wages and employment benefits prior to and through the date of my termination of employment, March 10, 2004;

(b)     The Vessel Interest's wrongful termination of my employment and retaliatory discharge of me, based on my failure to have the Vessel moved within the port of Tuxpan, Mexico, which had I done so would have been in violation of local orders and would have made me subject to immediate arrest and imprisonment;

(c)     The Vessel Interest's contractual obligation to pay me my $165,000 bonus, which was agreed to be paid in the Spring of 2003 and later in the Summer of 2003, but which I indicated that I would defer until the Spring of 2004;

(d)     The Vessel Interest's debt to me of my portion of the Embargo Order issued by the Mexican court on April 7, 2004, of which my portion is approximately $800,000 to $900,000;

(e)     My entitlement to hold harmless, defense and indemnity obligations having to do with Mexican labor cases in which I personally am named and may have some liability by virtue of being Zapoteca's local representative in Mexico; and

(f)     Zapoteca's liability to me for failing to get the criminal charges totally dismissed and withdrawn, thereby damaging my reputation and prohibiting my return to Mexico, where I otherwise could gain employment for a period of some 5-6 years or more.

13.     I have a substantial likelihood of success on the merits of my claims against Zapoteca and the Vessel because, in part, I was the Vessel's Captain and had not been paid

my wages and benefits, either prior to or after Zapoteca's attorney, Mr. Ed Nelson, fired me on March 10, 2004. Zapoteca owes me back wages, fringe benefits, reimbursement of housing, car allowance, phone allowance, repatriation (including moving expenses to the United States) and the bonus I had agreed to for exceptional work I had done on the refurbishment of the Vessel, and work done to ready the Vessel to be brought to the United States (and specifically Texas) in the Fall of 2003 and the Spring of 2004. I have a substantial likelihood of recovery on the other claims (b, d, e & f above) as well.

14.     Accordingly, I have asserted my counterclaim in this court against Zapoteca and seek damages in excess of $2,000,000.00, plus interest, costs and attorney's fees. I should be permitted to attach property of Zapoteca to secure these amounts and claims.

15.     Zapoteca, the defendant as to my claims, is a Liberian corporation with no place of business in the State of Texas. Further, upon information and belief, Zapoteca has no assets anywhere in the state of Texas, with the sole exception being the Vessel, located at the Sabine Shipyard, Sabine Pass, Jefferson County, Texas. Accordingly, upon successful prosecution of this suit, I will have a post-judgment lien against the Vessel. I already have one or more pre-judgment liens, based on my seaman's wage claim, abrupt discharge on March 10, 2004, and the Mexican "Embargo Order."

16.     Upon information and belief, the Vessel is a risk for departure. If the Vessel departs, I will be left without means to recover my damages from Zapoteca. I fear that Zapoteca will remove the Vessel from the jurisdiction of this Court.

17.     Zapoteca is justly indebted to me. A writ of attachment in my favor is not sought for the purpose of injuring or harassing, and I will probably lose the debt unless an attachment is issued.

18.     I will suffer immediate and irreparable injury if the Court does not grant a Rule B or C attachment or if a temporary restraining order or preliminary injunction is not issued because I will be left without means to recover my damages from Zapoteca. The harm to me outweighs the harm to Zapoteca if the temporary restraining order and preliminary injunction are not granted, as this is the sole asset of Zapoteca's in which I can satisfy a potential judgment lien and Zapoteca is not currently conducting business with the Vessel, as she presently is docked or "stacked" at the Sabine Shipyard, Sabine Pass, Jefferson County, Texas.

19.     Granting a temporary restraining order and preliminary injunction is in the public interest in that it secures a judgment lien in my favor, since I live and work in Texas, am a Texas resident and U.S. citizen and Zapoteca is an overseas company. Further, it will prohibit Zapoteca, a foreign corporation, from avoiding its liabilities and debts to me by further encumbering its only asset in Texas upon which I can satisfy a judgment.

20.     If the pre-judgment relief I seek is not granted, I have no other adequate remedy at law.   Should my request for TRO, preliminary injunction and Rule B & C attachment or arrest be denied, I will be without remedy to prevent Zapoteca from disposing of or further encumbering the Vessel. I will be left without means to recover my damages for Zapoteca's wrongful termination/retaliatory discharge, failure to pay to me my earned seaman's wages, and failure to protect me from civil and criminal proceedings in Mexico or from personal liabilities for Zapoteca's and the Rig's debts and liabilities, etc.)

21.     If so ordered, I will obtain a bond or other such surety or bond payable to Zapoteca Energy, Inc., in the above-referenced action in the amount and under the terms fixed by the Court's order and on the further condition that I will prosecute this suit to effect

and pay the extent of the penal amount of the bond or surety all damages and costs that may be adjudged against me for wrongfully suing out such writ of attachment.

22.    If so ordered, I also will obtain a bond or other such surety on the amount payable to Zapoteca Energy, Inc., in the above-referenced action in the amount and under the terms fixed by the Court's order for the payment of such costs and damages as may be incurred or suffered by any party who is found to have been wrongfully enjoined or restrained by a temporary restraining order, preliminary injunction, and permanent injunction.

23.    Regarding the Christian Kongsli affidavit of March 11, 2004, attached as Exhibit "A" to the TRO filed on March 12, 2004; I state as follows:

(a)    Christian Kongsli would have had full knowledge that the Vessel was not coming to Port Isabel, Texas, when he signed his affidavit on March 11, 2004;

(b)    On March 3, 2004, I provided the ballast program and tanks, and towing procedures to Mr. Kongsli. The next day (March 4, 2004) he forwarded them to Erik Ostybe, Per Johansen, and Meritus in Tuxpan, Mexico and Gram in Norway;

(c)    On Page 2, paragraph 4, Chrisian Kongsli should have been aware when he signed his affidavit that the attachments (embargoes) from the Labor Court had not been lifted and that the Vessel could not legally be moved from her location in Mexico. Zapoteca, Zapoteca's counsel in Mexico and its counsel in Houston were also aware that the Labor Court attachments on the Vessel prohibited any movement of the Vessel from her then- present location.

(d)    In late June, 2003, I was not terminated or reprimanded for not moving the Vessel to APITUX dock, as instructed by Gram; I also was not terminated or

reprimanded for not allowing onboard Christian Kongsli, Henrik Aadnesen (with Nordisk Legal), our agent with Meritus, or the Port Inspector. At that time, the Vessel had two attachments (embargoes) in effect by the Labor Court and could not be moved from her then-present location. The Labor Court President assigned the crew as watchman for the Labor Court onboard the Vessel. Christian Kongsli instructed the agent for Meritus to cancel the inspection by the port inspector after learning that the Vessel could not be moved until all attachments had been lifted. On July 10, 2003, I received an e-mail from Gram, (Mr. Kim Steimler), stating: "Charlie, let there be no doubt in your mind that we recognize that you have protected our interest and done it well."

  24. Regarding the Erik Ostybe affidavit filed on May 28, 2004 in the Supplemental Response to Defendant's Motion for Arrest and Seizure of Vessel, I state as follows:

  (a) Erik Ostybe should have been fully aware based on the Memorandum of Agreement between Zapoteca and Nabors, entered in March 2003, that the Vessel was approved for a tow from Tuxpan, Mexico to Freeport, Texas in April/May 2003. He also should have been fully aware that the tow from Tuxpan, Mexico to Freeport, Texas was approved by their insurance company and survey company for a "manned tow." He also should have been fully aware that the entire purchase price of the Vessel was transferred to Zapoteca's bank account in Norway and England.

  (b) Erik Ostybe also should have been aware that the Vessel was made ready for a manned tow for Nabors in April, May or June of 2003 and August of 2003.

  (c) Even after Nabors cancelled the MOA in early September 2003, Zapoteca continued to make plans to take the Vessel to Freeport, Texas for Nabors.

25.    Regarding Cliff Arkley's affidavit, attached to Zapoteca's Supplemental Response filed on May 28, 2004; I state as follows:

(a)    There are various letters, faxes and e-mails from the Vessel's hull insurers' surveyors, London Offshore Consultants (including Cliff Arkley and his supervisor, Kevin Highfield) discussing conditions to be met before the proposed manned tow, beginning in December of 2003. Starting then and running through February and even March of 2004, London Offshore Consultants (including Mr. Arkley) were proceeding with steps for the manned tow. Christian Kongsli, acting on behalf of Gram as Vessel managers and Zapoteca Energy, Inc. as the Vessel's owners, and on behalf of the Vessel ENERGY ZAPOTECA (herein sometimes collectively "Vessel Interests") in early February 2004 indicated that Gram or Zapoteca would provide the life rafts which would be required for the "riding crew." Similar correspondence confirmed that the Vessel would be towed, (i.e., a "wet tow" movement). Mr. Kongsli on behalf of Gram or Zapoteca was making arrangements for Visas for the Mexican citizens who would be on the riding crew. However, to the best of my knowledge as of the date of my termination of employment on March 10, 2004, neither Zapoteca nor Gram had made arrangements to get the life rafts aboard the Vessel, which was a pre-condition to the Vessel being able to be towed with a riding crew aboard. Consequently, she could only be towed in an unmanned status until that life saving gear was placed aboard. It was never placed aboard, so the Vessel ultimately was towed, unmanned.

(b)    In addition, Zapoteca was well aware that Nabors had rented an accommodation quarters, which had been placed aboard the rig, in anticipation of the manned tow from Tuxpan, Mexico to Texas in April or May of 2003. This in fact was the

same accommodation quarters that Zapoteca rented from Nabors under an agreement entered into in December of 2003. Neither Nabors nor Zapoteca would consider that accommodation quarters to be "unfit for habitation," as suggested by Mr. Arkley.

(c)     In addition, the Vessel Interests, including their insurer, were communicating among themselves that they were very concerned that London Offshore Consultants were "very much to blame" in the "delay in moving this rig." These statements and related documents make clear that delays associated with having the Vessel ready for a manned tow were not caused by me, but were caused by Gram or Zapoteca in not getting life rafts aboard promptly or by Vessel Interests' surveyors in delaying and making unnecessarily complex the arrangements for the towage of the rig.

FURTHER AFFIANT SAYETH NOT:

_____
Charles D. Phillips

SWORN TO AND SUBSCRIBED BEFORE ME on this _10th_ day of August, 2004.

_____
Notary Public in and for the State of Texas

Shari Carnahan
_____
Printed Name of Notary

My Commission Expires: _2-14-05_

SHARI L. CARNAHAN
NOTARY PUBLIC
State of Texas
Comm. Exp. 02-14-2005

# EXHIBIT F

IN THE UNITED STATES DISTRICT COURT
FOR THE SOUTHERN DISTRICT OF TEXAS
BROWNSVILLE DIVISION

ZAPOTECA ENERGY INC.

VS

CHARLES DOUGLAS PHILLIPS, et al.

CIVIL NO. B-04-048
In Admiralty/Rule 9 (h)

### AFFIDAVIT OF CHARLES D. PHILLIPS

STATE OF TEXAS

COUNTY OF HARRIS

Before me, the undersigned officer, on this day personally appeared Charles D. Phillips who after first being duly sworn, deposes and says on oath as follows:

1.    My name is Charles D. Phillips. I am over the age of 21 years. I have never been convicted of a felony or a crime of moral turpitude, and I am not otherwise disqualified from making this affidavit. Except where otherwise stated, I have personal knowledge of every fact to which I testify in this affidavit, and every fact to which I testify in this affidavit is true and correct to my personal knowledge.

2.    I am 62 years old and a U.S. Citizen. My home address is 14227 Misty Meadow Lane, Houston, Texas 77079.

3.    I have approximately 29 years experience working on Jackup Rigs. Over that time, I have served in the capacity of Master, Barge Engineer, Insurance Surveyor, Certified Rig Mover, Inspector, Jackman, Electrician, and Owners Representative.

4.    I was based in Tuxpan, Mexico, for Southern International, Inc./Zapotec Energy, Inc., from May 29, 2000, until May 28, 2003. On May 28, 2003, my wife and I had to leave

Mexico because false criminal charges were filed against me by Javier Gerardo Gonzalez Pastrana, an officer of Construcciones Y Equipos Latinoamericanos  S A. De C.V. (Celasa). From June 2003, to March 10, 2004, I was, first, based in McAllen, Texas, and later relocated to South Padre Island, Texas.

5.    Throughout the period from May 29, 2000, to January  12, 2004, I never met Erik Ostybe, nor did I exchange any correspondence to or from Erik Ostybe, nor did I ever speak with Erik Ostybe, nor, to my knowledge, was Erik Ostybe copied on any correspondence between me and the Owners of the "ENERGY ZAPOTECA," including its Managers,  P. D. Gram & Co., and Christian Kongsli, in whatever capacity he had.

6.    I met Erik Ostybe for the first time on January 13, 2004, at the offices of Mesa Drilling, in Houston, Texas. (These are the same offices that my supervisor, Christian Kongsli, refers to as the Blystad offices in Houston, Texas). On January 13 and 14, 2004, I attended meetings at the Mesa Drilling office in Houston, Texas, with Christian Kongsli, Arturo Bazaldua Erik Ostybe, Ed Nelson, and Per Johansen.

7.    As I understand it, Erik Ostybe has filed a total of three (3) affidavits in this case during the period from February 2004, to December 2004, dated February 27, 2004, May 3, 2004, and December 13, 2004. Ostybe stated in each of these affidavits:  " I have personal knowledge of the facts stated herein, as I am representative of Zapoteca Energy Inc."; in another affidavit, Ostybe continues with "and to the best of my knowledge these facts are true and correct."

These three Ostybe affidavits are misleading and filled with misstatements of facts. Erik Ostybe was not even connected with Zapoteca Energy Inc. from May 2000 until sometime in January 2004.  Ostybe never visited me in South Texas, the office of Energy Zapoteca in

Tuxpan, Mexico, or the Rig "ENERGY ZAPOTECA," itself, in Tuxpan, Mexico, at any time during the period from May 29, 2000, to March 10, 2004.

8.    If Erik Ostybe had personal knowledge of the facts, as he alleges, he would have known (a) that only the drilling package, drilling substructure, and cantilever, all of which were positioned 65 feet aft of the stern of the "Zapoteca," were destroyed in the "fire" he described; (b) that the Rig "Zapoteca" was <u>not</u> destroyed, or even seriously damaged, by the fire; (c) that after the fire, PMM/Protexa removed the accommodation unit from the Rig, placed it onboard one of their barges and then rented it to Pemex; (d) PMM/Protexa also removed the offshore Link-Belt cranes, and then rented and placed them onboard a McDermott barge; (e) PMM/Protexa also removed the helideck and placed it onboard one of their barges, and (f) that none of the Rig's accommodation platform, cranes, helideck, or other equipment were damaged by the fire he complains of, which occurred in 1989.

9.    If Erik Ostybe had personal knowledge of the facts, as he alleges, he would have known that Zapoteca Energy Inc., had been negotiating in the Spring of 2002, to the Summer of 2003, with Protexa for the return of one Link-Belt crane and the helideck, since both the crane and the helideck had considerable value, as they had not been damaged by any fire. However, Zapoteca chose to give up the crane and the helideck, as part of the agreement to get the "export document" back from Protexa/Celasa.

10.    If Erik Ostybe had personal knowledge, he would have known that Bureau Veritas, the classification society in effect for the Rig, inspected the 3 jacking units with 36 gear/motors, and found no damage whatsoever was caused by a fire. The aft 2 jacking units, which were in the area located closest to the fire, were 75 feet away, so they sustained no

damage. The various inspection reports from Bureau Veritas were submitted to Zapoteca and still should be in the Zapoteca files.

11.    If Erik Ostybe had personal knowledge he would have known that on September 15, 1999, Perforaciones Maritimas Mexicanas, S.A. De C.V. ("PMM"), the previous Owners of the "ENERGY ZAPOTECA," were granted a temporary mooring permit for the "Zapoteca" from the Mexican Secretary of Communication and Transportation under the Laws of Navigation of Mexico, for the period of April 26, 1999, until June 1, 2000.

12.    If Erik Ostybe had personal knowledge, as he claims, he would have known that on March 2, 2000, Perforaciones Maritimas Mexicanas S.A. De C.V., the previous Owners of the Rig "ENERGY ZAPOTECA," reinstated the "Zapoteca" into Navigation.

13.    If Erik Ostybe had personal knowledge, as he claims, he would have known that on March 7, 2000, Christian Kongsli signed a Memorandum of Agreement with PMM to purchase the "Zapoteca" with an existing Panamanian flag and Navigation Certificate. This Memorandum of Agreement is a "Norwegian Shipbrokers Association's Memorandum of Agreement for Sale and Purchase of Ships, code name Saleform 1987." In number 5 of the agreement, it states: "Should the vessel become a total or constructive total loss before the delivery, the deposit shall immediately be released to Buyers and the contract thereafter considered null and void."

14.    These documents make clear that Zapoteca did not purchase a vessel that was a total or constructive total loss, as Zapoteca is now trying to assert. (See transcript of hearing of December 14, 2004, page 13, line 23, where Zapoteca's counsel states: "the rig was declared a total loss."). When Christian Kongsli signed the MOA to purchase the "Zapoteca" on March 7, 2000, it was no longer a total constructive loss.

15.   If Erik Ostybe had personal knowledge, he would have known that on May 7, 2000, Zapoteca Energy Inc. accepted "Delivery" of the Rig "ENERGY ZAPOTECA," as a non-self propelled self elevating jackup platform," formerly named "Zapoteca," from PMM, with a current Panamanian flag and Navigation Certificate.

16.   If Erik Ostybe had personal knowledge, he would have known that Zapoteca maintained a valid Panamanian Flag and Navigation Certificate for the Rig "ENERGY ZAPOTECA" from May 2000 to May 2004.

17.   If Erik Ostybe had personal knowledge, he would have known that in July 2000, Christian Kongsli, one of the Owners of the Rig ENERGY ZAPOTECA, assigned Charles Phillips as the Captain (Master) of the vessel Rig ENERGY ZAPOTECA.

18.   If Erik Ostybe had personal knowledge, he would have known that LeBourhis Marine Surveyors approved the Rig ENERGY ZAPOTECA/NABORS 660 for a manned tow from Tuxpan, Mexico, to Texas, in May, June, July, and August 2003.   He would have knowledge that the letter dated May 12, 2003, from LeBourhis to Christian Kongsli (with a copy to Dean Silvers with Nabors Industries), stated:

> Mr. Christian Kongsli:  This is confirmation of our second telephone conversation of this morning.   All the equipment onboard this jackup unit "ENERGY ZAPOTECA" were found to be properly installed and the unit is ready for the proposed relocation move in the Tuxpan Pantepec River, from present location at the Celasa Dock to alongside the APITUX Dock and subsequently for the towage onward to Freeport or Corpus Christi, Texas.   Our warranty surveyor, Captain Dennis Padron, will issue the corresponding warranty certificate of approval prior

to departure from present location and again for the ocean towage, and will attend onboard as it is common industry practice."

19.    If Erik Ostybe had personal knowledge, he would have known that Kim Steimler with P.D. Gram & Co. as manager for Zapoteca, signed an Equipment Lease Agreement with Nabors Drilling International on December 19, 2003, to deliver the Rig Energy Zapoteca to Freeport, Texas, not to Port Isabelle, Texas.

20.    In about September/October 2003, Zapoteca changed insurance companies for the Rig Energy Zapoteca. Blystad Shipping's insurance underwriters would now cover the Rig Energy Zapoteca on a month-by-month basis. In March 2004, the insurance policy shows a blank for the towing destination for the Rig Energy Zapoteca. This is highly irregular; in my 29 years experience, I cannot recall seeing a certificate of insurance issued with the destination left blank.

21.    As of March 6, 2004, no preparations or notification had been given to the U.S. Coast Guard, Port Director of Port Isabelle, local pilots, or Dix Shipping, (the agents for P.D. Gram & Co.) of the expected arrival of the rig ENERGY ZAPOTECA into Port Isabelle, Texas. Nevertheless, Kevin Highfield of LOC stated that the tug GULF DUKE was preparing to tow the Rig to Port Isabelle, and was expected to arrive in Tuxpan on Wednesday, March 10, 2004, the same day I was fired.

22.    On March 3, 2004, Christian Kongsli arrived in Brownsville, Texas, from Oslo Norway. On March 9 and 10, 2004, Christian Kongsli was meeting with the crew members' supervisors of the Rig ENERGY ZAPOTECA at his hotel in South Padre Island, Texas. Christian Kongsli, requested this meeting at the date and location. This is extremely unusual, especially since the key personnel for the Rig ENERGY ZAPOTECA were in Port Isabelle,

attending this meeting as requested by Mr. Kongsli, at the same time the Tug GULF DUKE was to be arriving in Tuxpan, Mexico.

23.    On March 10, 2004, the ocean going Tug GULF DUKE was scheduled to arrive in Tuxpan, Mexico. Even then, no preparations or notification had been given to the U.S. Coast Guard, Port Director of Port Isabel, local pilots, or Dix Shipping, the agents for P.D. Gram & Co., of the expected arrival of the Rig ENERGY ZAPOTECA into Port Isabelle.

24.    On March 10, 2004, I received a termination letter from Zapoteca's U.S. counsel, Ed Nelson.

25.    On the morning of March 11, 2004, Christian Kongsli checked out of his hotel in South Padre Island and took a taxi to the offices of Dix Shipping in Brownsville, Texas. Kongsli told the ship's agent, Cecilio Avila of Dix Shipping in Brownsville, that Charles Phillips "had no more power." Kongsli then left the Dix Shipping office and proceeded by taxi to the airport in Brownsville, for a flight to Houston, Texas.

26.    During the time period of March 3, 2004, when Christian Kongsli arrived in South Padre Island to March 10, 1994, Christian Kongsli never met with the Port Director of Port Isabelle, U.S. Coast Guard, local pilots, or the agents at Dix Shipping regarding the Rig ENERGY ZAPOTECA. No applications for the COFR certificate or inspections were filled out for the U.S. Coast Guard while Kongsli was in South Padre Island. Kongsli never wanted to see or visit the stacking location in Port Isabelle, where the Rig ENERGY ZAPOTECA allegedly was to be placed. Christian Kongsli is one of the owners of the ENERGY ZAPOTECA and has full power of attorney to act on Zapoteca's behalf.

27.    On March 11, 2004, Christian Kongsli signed an affidavit stating: "The Rig ENERGY ZAPOTECA is presently located in Tuxpan, Mexico and Zapoteca is presently engaged in daily business and in operations for the sailing of the Rig ENERGY ZAPOTECA from Tuxpan, Mexico to Port Isabelle, Texas." Kongsli left Port Isabelle with the Tug GULF DUKE waiting in Tuxpan, without making any preparations or notification to anyone in Port Isabelle of the expected arrival of the Rig Energy Zapoteca.

28.    On March 12, 2004, Zapoteca filed a TRO in the Federal Court in Brownsville, Texas, also stating in its motion that the Rig ENERGY ZAPOTECA was sailing from Tuxpan, Mexico, to Port Isabelle, Texas.

29.    No instructions were given by Kim Steimler of P.D. Gram & Co., either to Dix Shipping to Christian Kongsli, or to me, to start any preparations or notifications, or to prepare documentation necessary so that the Rig ENERGY ZAPOTECA could enter U.S. waters and Port Isabelle, Texas.

30.    On May 27, 2004, Cliff Arkley, who is reflected now as a contractor for P.D. Gram & Co. (rather than his prior position, as a contractor for LOC, the surveyors for the insurance underwriters) signed an affidavit stating: "On Friday March 12, 2004, . . . I re-wrote my list of recommendations on the basis the rig would be wet towed, dead and unmanned, to the stacking site now going to be Sabine, South Texas."

31.    In response to my attorney's request to Zapoteca for production of documents, Zapoteca's counsel produced, on February 4, 2005, a letter from Erik Ostybe, dated March 12, 2004, to Gulf Coast Marine, confirming that the Rig was bound for Sabine Pass, Texas.

32.    On December 19, 2003, Kim Steimler with P.D. Gram & Co. AS, signed a lease agreement with Nabors Drilling International to deliver the Rig ENERGY ZAPOTECA to

Freeport, Texas, not Port Isabelle, Texas. (I was not aware of this agreement until July 2004). At no time did Kim Streimler with P.D. Gram & Co. or Christian Kongsli inform me that Zapoteca or P.D. Gram & Co., had signed an agreement with Nabors to deliver the Rig ENERGY ZAPOTECA to Freeport, Texas. Zapoteca and P.D. Gram & Co. made a business decision on December 19, 2003, when they signed an agreement with Nabors to deliver the Rig ENERGY ZAPOTECA to Freeport, Texas, instead of Port Isabelle, Texas. This agreement states in part:

> Preliminary provisions: (c)
>
> "The parties agree to meet in Houston, Texas at a mutually agreed date after arrival of the Rig in International waters for nonbinding discussions regarding Nabors Drilling International Limited possible purchase of the Rig."
>
> Lease Provisions: (6)
>
> "Return of Equipment: if the Purchase Option is not exercised, the Equipment will be delivered to Nabors Drilling International Limited at Port Freeport, Texas, USA. Zapoteca will notify NDIL upon the Rig's departure from Tuxpan and give at least three days' notice prior to arrival in Freeport." (emphasis added).

This agreement between Zapoteca and Nabors makes clear that Zapoteca never intended to take the Rig ENERGY ZAPOTECA to Port Isabelle, Texas, as they were leading everyone to believe.

33.    When Zapoteca filed its motion for a TRO on March 12, 2004, its own documents established that it knew that the Rig ENERGY ZAPOTECA was not sailing from Tuxpan, Mexico, to Port Isabelle, Texas.

34.    In the Court hearing on March 18, 2004, Zapoteca failed to inform the Court that the Rig ENERGY ZAPOTECA would be sailing to Sabine Pass, Texas, instead of Port Isabelle, Texas, as Zapoteca had stated in their motion for TRO filed on March 12, 2004. Zapoteca made no mention in the TRO filed on March 12, 2004, or in the Court hearing on March 18, 2004, that

the Tug GULF DUKE was already in Tuxpan, Mexico, waiting to tow the Rig ENERGY ZAPOTECA to Sabine Pass, Texas.

35.    In a letter from Zapoteca's counsel, Ed Nelson, to Christian Kongsli dated November 26, 2003, Ed Nelson states: "In developing the 'Plan' we were mindful of the possibility and risk someone will file yet another action against and attach the Rig EZ. The 'Plan' is designed to deceive anyone who might file an action and attach the Rig EZ into believing the Rig EZ would not be leaving Mexico until late January."

36.    Zapoteca and Erik Ostybe filed a motion and affidavit on December 13, 2004. The motion by Zapoteca and the affidavit by Erik Ostybe reflect the following:

Zapoteca and Erik Ostybe state:

"Zapoteca Energy, Inc.'s first notice and/or information whatsoever concerning the ENERGY EUROPA was received on or about November 22, 2004, upon its receipt of Charles Phillips' Response to Zapoteca's Motion for Rehearing filed herein." "Zapoteca Energy, Inc. has never been contacted by, nor had discussions with Intership Limited regarding marketing of the rig ENERGY ZAPOTECA under its actual name or an assumed name."

37.    In Zapoteca's counsel's own inventory list dated October 15, 2004, the ENERGY EUROPA file is listed on page 12, box 11, folder 7. Zapoteca, Christian Kongsli, and P.D. Gram & Co., were well aware of Intership and the ENERGY EUROPA throughout the period from 2002 to 2004, and its own document list confirms it.

38.    Zapoteca's relationship with Intership dates back to the Spring of 2002.

(a)    There is an e-mail dated March 7, 2002, from Charles Phillips to Christian Kongsli:

"We will contact Pemex to see if Intership is marketing the Energy Europa!!!!"

(b)    There also is an e-mail dated March 19, 2002, from Charles Phillips to Christian Kongsli: "We must be careful with the Intership group. We do not know today if Intership is speaking with Unocal and/or Pemex. You remember Intership from last time. they were bidding their barges to Pemex while talking with you on the Energy Zapoteca."

"We should not discuss anything with (Intership) until they remove the rig from their website."

(c)    There also is an e-mail dated March 19, 2002, from David Kent with Rigzone to Frank de Groot with Unocal:

"On a separate note, I would like to clarify a technical question you raised earlier in our discussions. You ask me if the /Energy Zapoteca and Energy Europa were one in the same, and I confidently responded that they were not the same rig. In fact, as it turns out, the Energy Europa does not exist at all, she is a design concept only, an independent leg accommodation jackup based on the Energy Zapoteca hull and marketed by Intership Ltd., as the Energy Europa. To avoid any confusion, please note there is only one newly classed F&G L-780 jackup, the Energy Zapoteca. The rig owner has no current commitment to any buyer or charter, Intership is marketing the Energy Zapoteca without owner authority and with respect to Unocal, Rigzone is the exclusive broker. The owner asked me to clarify these points because Intership contacted them today advising that they have a customer interested in inspecting the Energy Zapoteca on March 26th/27th." (emphasis added).

(d)    There also is an e-mail dated March 19, 2002, from Charles Phillips to Christian Kongsli:

"I sent you a copy of an e-mail from David Kent. This does not look good when a company is marketing a rig that they do not have. Unocal is wondering what is going on. Intership must remove the Energy Zapoteca from their website. We do not want to be connected to Inter-ship at all. This is guilt by association."

(e)    There also is an e-mail dated March 28, 2002, from Charles Phillips to Christian Kongsli:

"They (Unocal) liked the rig. They will meet with Inter-ship next week. What is the connection with Inter-ship."

39.    I have reviewed the TRO and related documents filed by Zapoteca. I attended the hearing on March 18, 2004, and May 7, 2004, before the Honorable Andrew J. Hanen. Zapoteca failed to inform the Court in Brownsville, Texas, when it filed its TRO on March 12, 2004, and again on March 18 and May 7, 2004, during the Court hearings, that it had entered into a an agreement with Nabors on December 19, 2003, to deliver the Rig ENERGY ZAPOTECA to Freeport, Texas or that the Rig was bound for, and in fact had arrived in, Sabine Pass, Texas, on

April 12, 2004.

FURTHER AFFIANT SAYETH NOT.

Charles D. Phillips

SWORN TO AND SUBSCRIBED BEFORE ME on this 25th day of February, 2005.

Notary Public in and for the State of Texas

Shari Carnahan
Printed Name of Notary

My Commission Expires: 2-14-09

SHARI L. CARNAHAN
NOTARY PUBLIC
State of Texas
Comm. Exp. 02-14-2005